**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARCELORMITTAL NORTH AMERICA HOLDINGS LLC,<br><br>       Plaintiff,<br><br>  v.<br><br>ESSAR GLOBAL FUND LIMITED,<br><br>       Defendant,<br><br>  and<br><br>MESABI METALLICS COMPANY LLC f/k/a ESSAR STEEL MINNESOTA LLC,<br><br>      Garnishee. | Civil Action No.  21-cv-6975<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      Judgment Debtor Essar Steel Limited ("Essar Steel") owes Plaintiff over $1.4 billion on a final, non-appealable federal judgment issued by the U.S. District Court for the District of Minnesota on April 2, 2018 (the "Judgment").   The Judgment remains wholly unsatisfied over three years after it was entered.   That Judgment recognized and affirmed an international arbitral award issued on December 19, 2017 by a three-member arbitral tribunal constituted under the auspices of the International Chamber of Commerce (the "ICC"). ArcelorMittal USA, LLC subsequently assigned the Judgment to its then-parent company, Plaintiff ArcelorMittal North America Holdings LLC (hereinafter "ArcelorMittal" or "Plaintiff").   Plaintiff registered the Judgment in the Southern District of New York pursuant to 28 U.S.C. § 1963 on June 16, 2021.  This action seeks to unwind fraudulent transfers that have thwarted ArcelorMittal's ability to enforce the Judgment and to enforce the Judgment against Essar Steel's alter ego and parent corporation, Defendant Essar Global Fund Limited ("Essar Global"), which has assets sited within this District.

2.      According to Essar Steel's 2013, 2014, and 2015 audited financial statements, Essar Global owed a receivable of $1.48 billion to Essar Steel.  The receivable, which constituted nearly 60 percent of Essar Steel's total assets, was stated to be payable on demand and to bear no interest.  In 2016, shortly after ArcelorMittal USA, LLC ("ArcelorMittal USA") commenced its ICC arbitration against Essar Steel to recover damages under a supply agreement governed by New York law (the "ICC Arbitration"), Essar Global and Essar Steel attempted to make the nearly $1.5 billion receivable "disappear" by restating Essar Steel's 2014 and 2015 audited financial statements to remove the Essar Global receivable that had been previously recorded on Essar Steel's books and records.  Their attempt to eliminate the Essar Global receivable was made in

1

order to make Essar Steel judgment proof so that ArcelorMittal USA could not recover any amounts awarded to it in the recently commenced arbitration.  The purported elimination of almost 60 percent of Essar Steel's assets was intended to, and, not surprisingly, did, leave Essar Steel insolvent and unable to pay its debts on an ongoing basis.  The 2016 conveyance is fraudulent pursuant to Sections 273, 273-a, and 276 of New York's Debtor & Creditor Law ("DCL"). Plaintiff respectfully requests that this Court disregard the fraudulent conveyance pursuant to DCL § 278 and enter judgment in favor of Plaintiff against Essar Global for the full amount of the fraudulently conveyed $1.48 billion payable-on-demand receivable owed to Judgment Debtor Essar Steel.

3.     Plaintiff also respectfully requests that the Court determine that Essar Global is Essar Steel's alter ego and is independently liable for the Judgment against Essar Steel.  Essar Global is an entity that has made no secret of, and indeed has openly admitted in multiple forums and contexts, its blatant disregard of the purportedly separate corporate forms of its subsidiaries. As alleged below, Essar Global has played fast and loose with its vast web of subsidiaries (collectively, with Essar Global, the "Essar Group"), shifting funds as suits its purpose—which, in this case, was to ensure its dominated subsidiary, Essar Steel, avoided ever paying any judgment owed to Plaintiff.  Essar Global's purposeful actions have enabled Essar Steel, for these last three years, to drain itself of assets (for the benefit of Essar Global) so as to thwart enforcement of the Judgment based upon an arbitral award for breach of a contract negotiated in New York and governed by New York law.

4.     In addition, in light of Essar Global's status as the alter ego of Judgment Debtor Essar Steel, Plaintiff respectfully requests that this Court order Essar Global and Garnishee Mesabi Metallics Company LLC f/k/a Essar Steel Minnesota LLC ("Mesabi Metallics" or "Garnishee")

to turn over to Plaintiff all of Essar Global's interest in the notes owed by Garnishee to Essar Global—such debt being sited in this District because the Garnishee chose New York law to govern its obligations and irrevocably submitted to the personal jurisdiction of the federal and state courts located in Manhattan—and such other property of Essar Global as may be identified. As found on Essar's website in a press release dated January 7, 2019, Essar Global announced that "Essar Global has purchased US$260 million face value notes issued by Mesabi Metallics Inc."

5.      Plaintiff ArcelorMittal is the successor in interest to ArcelorMittal USA.  Two of Essar Global's subsidiaries, Essar Steel and Essar Steel Minnesota ("Essar Steel Minnesota"), contracted with ArcelorMittal USA to supply a substantial quantity of iron ore pellets, a raw material necessary for ArcelorMittal USA's production of steel.  The agreement was negotiated through Essar Group's offices in New York and was governed by New York law.  Both Essar Steel and Essar Steel Minnesota listed 277 Park Avenue in New York as the address for notices under the agreement and the agreement was signed by an Essar Group employee located at Essar Americas, Inc. ("Essar Americas") in New York.  During negotiations and thereafter, Essar Global provided written assurances to ArcelorMittal USA—assurances that were forwarded through the same Essar Group employee in New York who negotiated the contract—that Essar Global would stand behind its subsidiaries and provide adequate funding to perform under the supply agreement for iron ore pellets.

6.      Although the parties amended their pellet sale agreement to allow the Essar Group counterparties additional time to perform, Essar Steel Minnesota ultimately failed to construct the plant that was to produce the iron ore pellets.  Contrary to its representations, Essar Global failed

to provide the necessary funding and Essar Steel Minnesota was forced to file bankruptcy in Delaware with over $1 billion in liabilities.

7.      As part of its plan to exit bankruptcy, Essar Steel Minnesota changed its name to Mesabi Metallics and issued $300 million in Fixed Rate Junior Secured Notes (the "Notes") that ultimately ended up in the hands of Essar Global.  The agreements governing the Notes included a New York choice of law clause, and Mesabi Metallics consented to New York courts' jurisdiction as part of the Pledge and Security Interest Agreement it signed at the same time it issued the Notes. As Essar Global is an alter ego of Essar Steel, Plaintiff respectfully requests that this Court order Garnishee Mesabi Metallics to pay all principal and interest on the Notes to Plaintiff, Essar Steel's Judgment creditor, pursuant to New York CPLR 5225 and 5227, which apply to the Judgment through application of Federal Rule of Civil Procedure 69.

8.      Essar Steel's breach of the pellet sale agreement and its amendments led to significant losses and cost of cover for ArcelorMittal USA.  Essar Steel was jointly and severally liable with Essar Steel Minnesota for ArcelorMittal USA's losses, and on August 9, 2016, ArcelorMittal USA commenced an arbitration against Essar Steel pursuant to the pellet sale agreement, as amended.  Essar Steel lost the arbitration and the Tribunal rendered an award that ordered Essar Steel to pay ArcelorMittal USA $1,379,457,503 (including pre-Award interest), plus $1,533,853 as costs of the arbitration.  The U.S. District Court in Minnesota confirmed that award on April 2, 2018.  Essar Steel has not made any payment on the Judgment.  Essar Steel's failure to pay is due to the steps of its parent, Essar Global, to render Essar Steel judgement proof.  In 2016, shortly after ArcelorMittal USA initiated the ICC Arbitration against Essar Steel, Essar Global extinguished Essar Steel's most valuable asset, the $1.48 billion receivable, in a transaction bearing multiple badges of fraud.  By extinguishing this asset, which had been carried on Essar

Steel's audited annual financial statements for years, Essar Global transferred to itself $1.48 billion from Essar Steel.

9.      The conveyance of the $1.48 billion payable-on-demand receivable was fraudulent under DCL §§ 273, 273-a, and 276.  The conveyance runs afoul of DCL § 273 because it was made without fair consideration—indeed, it was made for no consideration at all—and Essar Steel's financial statements conclusively show that Essar Steel was rendered insolvent by the conveyance. The conveyance also runs afoul of DCL § 273-a because it was made while Essar Steel was a defendant in an action for money damages against it—the ICC Arbitration—and Essar Steel has not satisfied the resulting Judgment.   And finally, the conveyance is fraudulent pursuant to DCL § 276 because it was made with the actual intent to defraud ArcelorMittal USA.   The transaction bears many of the badges of fraud probative of such intent, including: the absence of consideration; the fact that the transaction rendered Essar Steel insolvent; the timing of the 2016 transfer (just after ArcelorMittal USA filed its Request for Arbitration of a claim Essar Global knew was meritorious); the fact that the transfer was made for the benefit of an insider (Essar Steel's ultimate parent, Essar Global); and the secretive manner in which the transfer was made (via back-office accounting legerdemain, requiring restating the prior years' audited financial statements).

10.      In sum, ArcelorMittal is entitled to disregard the fraudulent conveyance, to obtain a judgment against Essar Global for the full amount of the $1.48 billion payable-on-demand receivable, to enforce such judgment against Essar Global's assets in New York, and to obtain a turnover order against Mesabi Metallics directing payment of the amount due on the Notes acquired by Essar Global to ArcelorMittal in the ordinary course.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over Counts I, II, and III of this action pursuant to its inherent enforcement jurisdiction. *Epperson v. Entertainment Express, Inc.*, 242 F.3d 100 (2d Cir. 2001).

12.     This Court has subject matter jurisdiction over Counts IV, V, and VI of this action, which are so related to Counts I, II, and III that they form part of the same case or controversy, pursuant to 28 U.S.C. § 1367.

13.     Personal jurisdiction in this District is proper over Essar Global pursuant to New York CPLR 302(a)(1).  Essar Global and its alter ego Essar Steel transacted business within New York, and a sufficient nexus exists between the business transacted and the claims asserted. Garnishee Mesabi Metallics consented to personal jurisdiction in New York.  N.Y. Gen. Oblig. L. § 5-1402.

14.     Specifically, Essar Global and Essar Steel entered into multiple contracts central to the parties' dispute and this action that were governed by New York law, including:

   a)  The Amended and Restated Pellet Sale and Purchase Agreement, by and among Essar Steel, Essar Steel Minnesota, and ArcelorMittal USA, dated as of January 10, 2014 (hereinafter, the "Amended Pellet Sale Agreement").  As described at ¶¶ 44–49, *infra*, this agreement extended the time for the Essar counterparties to comply with their obligations to construct a mine and pellet plant in Minnesota to supply ArcelorMittal USA with pellets needed for its production of steel, and this is the agreement that the Essar counterparties, including Essar Steel, breached.  The ICC arbitral tribunal found Essar Steel was liable for breach of the Amended Pellet Sale Agreement—a liability which Essar Steel and its parent

Essar Global have assiduously attempted to avoid through the fraudulent transfer at issue in this action.  The contract underlying the dispute that gave rise to the ICC Award and Judgment is governed "in all respects" by New York law;

b)  The Guarantee Agreement dated December 29, 2010, governed by New York law, entered into by Essar Global Limited (as Defendant Essar Global was formerly known) and Essar Steel Minnesota in favor of ICICI Bank Limited, Singapore Branch, as facility agent on behalf of ICICI Bank Limited, New York Branch, wherein Essar Global guaranteed debt for Essar Steel Minnesota in order to secure financing for the Minnesota pellet plant project that was to supply the iron ore pellets that Essar Steel was contractually obliged to sell to ArcelorMittal USA LLC under the Amended Pellet Sale Agreement;

c)  The Guaranty, dated September 30, 2014 and governed by New York law, given by Defendant Essar Global in favor of U.S. Bank National Association guaranteeing additional debt for Essar Steel Minnesota to secure additional funding for the same Minnesota pellet plant project;

d)  The Equity Contribution Agreement, dated September 30, 2014 and governed by New York law, between Essar Global, Essar Steel Minnesota, and U.S. Bank National Association, in which Essar Global agreed to provide any shortfall in funding of the Minnesota pellet plant project;

e)  The General Indemnity Agreement, dated September 28, 2015 and governed by New York law, between Essar Steel Minnesota, Essar Global, Essar Steel, and Indemnitors (including OneBeacon Insurance Company and Atlantic Specialty Insurance Company) relating to bonds to fund the Minnesota pellet plant; and

f)   The Fixed Rate Junior Secured Notes Indenture and corresponding Pledge and Security Agreement, which Mesabi Metallics agreed to when it issued $300 million in debt, $260 million of which Essar Global purchased in 2019. The Pledge and Security Agreement also required Mesabi Metallics and its guarantors to submit to the jurisdiction of New York courts "in any legal action or proceeding" relating to the Pledge and Security Agreement.

15.   Despite the New York law governed guarantee agreements executed by Essar Global to enable Essar Steel and Essar Steel Minnesota to meet their obligations under the New York law governed Amended Pellet Sale Agreement and the representations made by Essar Global through its agent in New York to ArcelorMittal USA that Essar Global would stand behind Essar Steel Minnesota, Essar Global and Essar Steel secretly funneled $1.48 billion from Essar Steel to Essar Global to avoid the liability imposed under the New York law contract.

16.   The contracts listed above were not only governed by New York law, but also specified agents for service of process and notice in New York. For example:

a)   Notices to Essar Resources and Essar Steel Minnesota under the original pellet sale agreement ("Pellet Sale Agreement") were to be delivered to Essar Steel Minnesota at 277 Park Avenue, 35th Floor, New York, NY 10172, with attention to Madhu Vuppuluri, the President and Chief Executive Officer of Essar Steel Minnesota, who maintained his office at all relevant times at 277 Park Avenue;

b)   Notices to Essar Steel and Essar Steel Minnesota under the Amended Pellet Sale Agreement were to be delivered to Essar Steel Minnesota at 277 Park Avenue, 35th Floor, New York, NY 10172, again to the attention to Madhu Vuppuluri;

c)  Under the 2010 Guarantee Agreement between Essar Global and ICICI Bank Limited, Essar Global designated Essar Americas, with its office at 277 Park Avenue, 35th Floor, New York, NY 10172, as its agent to accept service and all legal process, summons, notices and documents, and specified that Mr. Vuppuluri, at that same address, was to receive all notices under the agreement;

d)  Under the 2014 Guarantee Agreement between Essar Global and U.S. Bank National Association, Essar Americas was again designated as Essar Global's agent and the address for Notices to Essar Global was provided as care of Essar Americas at 277 Park Avenue; and

e)  Under the 2014 Equity Contribution Agreement between Essar Global and U.S. Bank National Association, Essar Americas was again designated as Essar Global's agent and the address for Notices to Essar Global was provided as care of Essar Americas at 277 Park Avenue.

17.  Furthermore, the key contracts giving rise to this action were negotiated in New York and signed in New York:

a)  The Pellet Sale Agreement and the Amended Pellet Sale Agreement were negotiated in New York, by Mr. Vuppuluri, in his role as CEO and President of Essar Steel Minnesota;

b)  Mr. Vuppuluri, based in New York, signed the following relevant contracts on behalf of Essar Steel Minnesota:

   a.  The Pellet Sale Agreement, which he also signed on behalf of Essar Resources;

   b.  The Amended Pellet Sale Agreement;

   c.  The First Amendment to the Amended Pellet Sale Agreement;

    d.   The Second Amendment to the Amended Pellet Sale Agreement;

    e.   The Third Amendment to the Amended Pellet Sale Agreement;

    f.   The December 29, 2010 Guarantee of Essar Global in favor of ICICI Bank Limited;

    g.   The December 29, 2010 Guarantee of Essar Steel in favor of ICICI Bank Limited; and

    h.   The September 28, 2015 Indemnity Agreement between Essar Steel Minnesota, Essar Global, Essar Steel, and Indemnitors (including OneBeacon Insurance Company and Atlantic Specialty Insurance Company).

18.    When it appeared that Essar Steel and Essar Steel Minnesota would not be able to satisfy their obligations under the Amended Pellet Sale Agreement, then-President and CEO of Essar Steel Minnesota, Mr. Vuppuluri, forwarded assurances to ArcelorMittal USA LLC from Essar Global through New York to ArcelorMittal USA.  Despite Essar Global's representations, it did not support its subsidiaries and ensure funding to complete the Minnesota pellet plant project. Instead, Essar Global funneled funds out of Essar Steel in an attempt to render it judgment proof, giving rise to the present action.

19.    Essar Global, Essar Steel, or Mesabi Metallics also consented to jurisdiction in New York for disputes arising out of or relating to at least the following agreements:

    a)   The December 29, 2010 Guarantee of Essar Global in favor of ICICI Bank Limited;

    b)   The December 29, 2010 Guarantee of Essar Steel in favor of ICICI Bank Limited;

    c)   The 2014 Guarantee Agreement between Essar Global and U.S. Bank National Association;

d)  The 2014 Equity Contribution Agreement between Essar Global and U.S. Bank National Association; and

e)  The Pledge and Security Agreement signed by Mesabi Metallics in connection with the Notes.

Thus, litigation relating to those, and other, agreements surrounding the funding for the Minnesota pellet plant project has taken place in New York. *See Barclays Bank v. EGFL*, No. 157086/2016 (N.Y. Sup. Ct. July 6, 2016); *ICICI Bank Ltd. v. EGFL*, No. 16-cv-07836 (S.D.N.Y. Oct. 6, 2016); *EGFL v. Midtown Acquisitions*, No. 654750/2017 (N.Y. Sup. Ct. Jul. 12, 2017); *Midtown Acquisitions v. EGFL*, No. 159401/2016 (N.Y. Sup. Ct. Nov. 7, 2016); *Atlantic Specialty Insurance v. ESML et al.*, No. 652199/2016 (N.Y. Sup. Ct. Apr. 25, 2015); *Bank of India, New York v. Essar Steel Holdings Limited,* No. 655315/2016 (N.Y. Sup. Ct. Oct. 6, 2016) (granting plaintiff's motion for summary judgment and entering judgment against Essar Steel).

20.    Other litigation to which Essar Global has been party to in New York includes *Travis Coal Restructured Holdings LLC v. EGFL*, 14 Civ. 1908 (S.D.N.Y. Mar. 19, 2014) and *Ramasamy v. Essar Global Ltd.*, 11 Civ. 3912 (S.D.N.Y. June 8, 2011).

21.    Mr. Vuppuluri, a key player in the Essar Group organization, has maintained his offices in New York throughout the relevant time periods.  During the ICC Arbitration, Essar Steel named Mr. Vuppuluri as one of its representatives.  At the time of the ICC Arbitration, Mr. Vuppuluri was the President and CEO of another Essar Group entity, Essar Capital Limited, but remained at Essar Americas' 277 Park Avenue office in New York City (the same address listed for notices to Essar Steel and Essar Steel Minnesota under the Amended Pellet Sale Agreement).  Essar Capital Limited is the investment manager for Essar Global and acts as its agent.  Essar Capital monitors and manages the entire portfolio of investments owned by EGFL.

22.     In sum, Essar Global and Essar Steel repeatedly transacted business in New York and purposefully availed themselves of the benefits of New York's laws and its legal system. Each contract referenced above, each instance of appointing an agent in New York, each instance of Mr. Vuppuluri's involvement in negotiating, signing, and assuring ArcelorMittal USA of Essar Global's financial support for its subsidiaries' performance under the Amended Pellet Sale Agreement was a purposeful act by Essar Global and/or Essar Steel to avail themselves of this forum.

23.     The transaction of business in New York by Essar Group entities has unmistakable links to this dispute and action. This action is brought to collect the Judgment resulting from Essar Steel's breach of a New York law contract. The Amended Pellet Sale Agreement was an essential piece to the successful completion of the Minnesota pellet plant that the Essar Group was funding through its multiple guaranties. Having a long-term buyer for the iron ore pellets to be produced by the pellet plant was crucial to convincing lenders that Essar Steel Minnesota would generate the revenue necessary for the repayment of the hundreds of millions in New York law governed debt that Essar Global had guaranteed in New York in order to build the pellet plant. Essar Steel's obligations under the Amended Pellet Sale Agreement, and Essar Global's deliberate attempt to make it impossible to enforce those obligations, are directly related to the business both Essar Global and Essar Steel transacted in New York, namely the financing of the construction of the pellet plant and the sale of its products.

24.     The revenue to be generated by the Pellet Sale Agreement, negotiated in New York and governed by New York law, was a key piece of the financing for the construction of the pellet plant. That financing was transacted by Essar Global and Essar Steel in New York and governed by New York law. Essar Global and Essar Steel both wanted ArcelorMittal USA to commit to

12

buying the iron ore pellets and each encouraged ArcelorMittal USA to enter into the agreement through actions taken by their agent in New York.  In short, ArcelorMittal's claims to recover on its Judgment based on the damages ArcelorMittal USA suffered by reason of Essar Steel's failure to construct the Minnesota pellet plant and the resulting breach of the Amended Pellet Sale Agreement are directly related to the business transacted by Essar Global and Essar Steel in New York.

25.     The assurances forwarded by Essar Global through New York are evidence of Essar Global and Essar Steel's fraudulent intent—despite assuring ArcelorMittal USA that Essar Global would provide financial support to the Minnesota pellet plant enterprise, Essar Global did the opposite, and stripped Essar Steel of assets, by extinguishing Essar Steel's $1.48 billion receivable.

26.     The alter ego claim also relates to Essar Global's transaction of business in New York, as Essar Global's abuse of Essar Steel's corporate form is illustrated by, and includes, its guarantees and promises to prop up its subsidiaries (made in or through New York).  Instead Essar Global did the opposite, siphoning off Essar Steel's funds when a significant risk of liability appeared on the horizon.

27.     Essar Global's routine siphoning off of funds from its subsidiaries made it impossible for Essar Steel to comply with a New York law contract, the Amended Pellet Sale Agreement.  And Essar Global and Essar Steel's actions at issue in this case—the fraudulent conveyance of a $1.48 billion receivable—were done with the intent of preventing the enforcement of a New York contract and the resulting Judgment.  Accordingly, personal jurisdiction is proper here.

28.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or omissions giving rise to the claim occurred" in the Southern District of New York.

## THE PARTIES

29.     Plaintiff ArcelorMittal is a limited liability corporation organized under the laws of Delaware with a principal place of business in Chicago, Illinois.  ArcelorMittal USA, Plaintiff's predecessor in interest, owned several steel mills in North America.

30.     ArcelorMittal is now the judgment creditor and owner of the debt at issue in this action, after the original judgment creditor, ArcelorMittal USA, assigned its Judgment in the amount of $1,412,880,771.33 (inclusive of the December 19, 2017 ICC Award, which awarded ArcelorMittal USA  $1,379,457,503.00 on the merits of its claim and $1,533,853.04 in arbitration costs, and pre-judgment interest amounting to $31,889,415.29) to ArcelorMittal.  A notice of assignment of the Judgment was filed in the District of Minnesota on June 11, 2021.  The Judgment was registered with ArcelorMittal as assignee of ArcelorMittal USA, LLC in the Southern District of New York on June 16, 2021.

31.     Defendant Essar Global is organized under the laws of the Cayman Islands and is a multinational corporation and the ultimate parent of dozens of subsidiaries, including its wholly-owned subsidiary and alter ego Essar Steel and all other Essar Group entities referred to in this Complaint.  Essar Global operates in an array of industries, including steel and mining, and is owned and controlled by the Ruia Family.

32.     Garnishee Mesabi Metallics is organized under the laws of Minnesota.  Essar Steel Minnesota changed its name to Mesabi Metallics in bankruptcy proceedings in December 2016.  Essar Steel Minnesota signed the original Pellet Sale Agreement with ArcelorMittal USA

governing the parties' rights and obligations with respect to the steel pellet plant that was to be built.  As part of the bankruptcy plan, Mesabi Metallics issued the Notes and submitted to personal jurisdiction in New York in connection with the Notes.  Essar Global acquired the New York law governed Notes, which are located in this District and constitute property of the Judgment Debtor, Essar Steel.

## OTHER RELEVANT ENTITIES

33.     Judgment Debtor Essar Steel is organized under the laws of Mauritius and is a wholly-owned subsidiary and alter ego of Defendant Essar Global.  Essar Steel was placed into voluntary administration by its directors in Mauritius and is currently under administration under the laws of Mauritius.  Essar Global and Essar Steel initiated the administration proceedings with the intent to dispose of AMUSA's claim through the liquidation of Essar Steel.

34.     Essar Resources is an indirect subsidiary of Essar Global.  Essar Resources signed the original Pellet Sale Agreement with ArcelorMittal USA governing the parties' rights and obligations with respect to the steel pellet plant that was to be built.  Essar Resources was later removed from the agreement and substituted with Essar Steel, as discussed at ¶ 45, *infra*.

35.     Essar Americas and Essar Capital Americas, Inc. are subsidiaries of Essar Global based in New York City.  The President and CEO of Essar Steel Minnesota, Madhu Vuppuluri, was based out of Essar Americas' office in New York City during all relevant times, and Essar Steel Minnesota listed its office as 277 Park Avenue in the Amended Pellet Sale Agreement.

36.     Essar Steel Mauritius Limited ("Essar Steel Mauritius") is a direct subsidiary of Essar Global.  As described further below, Essar Steel Mauritius participated in the 2012 and 2013 transactions resulting in the $1.48 billion receivable.

37.     Essar Steel Asia Holdings Limited ("Essar Asia") is an indirect subsidiary of Essar Global.  Prior to September 17, 2012, it was known as Essar Resources Mauritius Limited. As described further below, Essar Asia participated in the 2012 and 2013 transactions resulting in the $1.48 billion receivable.

38.     As discussed further below, Essar Global so dominated and controlled all subsidiaries within the Essar Group that actions of employees in all entities within the Essar Group, including the subsidiaries named above, should be imputed to Essar Global.

## FACTUAL ALLEGATIONS

I.     **Essar Steel Breached Its Agreement with ArcelorMittal USA, Leading to Over a Billion Dollars in Damages**

   A.     *The Pellet Sale Agreement*

39.     On December 17, 2012, ArcelorMittal USA entered into the Pellet Sale Agreement with Essar Steel Minnesota and Essar Resources for the purchase of a large quantity of iron ore pellets over a 10-year period from an iron ore mine and pelletizing plant being developed by Essar Steel Minnesota in Nashwauk, Minnesota.

40.     The Pellet Sale Agreement was negotiated by employees of Essar Steel's subsidiary, Essar Steel Minnesota, in New York City.  Indeed, Madhu Vuppuluri, the President and Chief Executive Officer of a party to the Pellet Sale Agreement, Essar Steel Minnesota, was based out of Essar Americas' offices in New York City.  Notices to Essar Steel Minnesota under the agreement were to be directed to Mr. Vuppuluri's attention at 277 Park Avenue, 35th Floor, New York, New York 10172 (the address of Essar Americas).  Mr. Vuppuluri also signed the Pellet Sale Agreement on behalf of both Essar Resources and Essar Steel Minnesota.  The parties selected New York law to govern the agreement in all respects.

41.     In order to obtain funding for the significant cost of the development of the mine and pelletizing plant, Essar Global and Essar Steel provided multiple guarantees to lenders.  Those guarantees were also governed by New York law.  For example, ICICI Bank Limited, acting through its New York branch, extended loans in the amount of nearly $530 million to Essar Steel Minnesota under a December 29, 2010 Credit Agreement as subsequently amended.  The same day, Essar Global executed a Guarantee Agreement in favor of ICICI Bank Limited to guarantee the loan.  That Guarantee Agreement is governed by New York law, and therein Essar Global submitted to the jurisdiction of federal and state courts in New York City.  The Guarantee Agreement further provides that Essar Global designated Essar Americas, located in New York City, as its agent to receive service.  When ICICI Bank Limited ultimately brought suit against Essar Global for failure to pay either principal or interest owed, that suit proceeded in this District. *See ICICI Bank Ltd. v. Essar Global Fund Ltd. et al.*, 1:16-cv-7836-GHW (SDNY).

42.     On December 29, 2010, Essar Steel Holdings Limited (now known as Essar Steel) also entered into a Guarantee Agreement governed by New York law wherein Essar Steel guaranteed debt for Essar Steel Minnesota in order to secure financing for the Minnesota pellet plan project.

43.     The Pellet Sale Agreement provided a strict timeline for the Essar counterparties' performance.  It provided that the commencement of the production of the iron ore pellets and delivery of the pellets to ArcelorMittal USA was expected to occur in 2013, but could occur no later than July 1, 2014.

### B.     The Amended Pellet Sale Agreement

44.     When it became clear that the Essar counterparties were not going to meet their obligations on time, the parties agreed to amend the Pellet Sale Agreement.  ArcelorMittal USA agreed to push back the deadlines for commencement of production and delivery of the iron ore

pellets for a full year, to July 1, 2015, allowing the Essar counterparties additional time to perform their key obligation under the contract.

45.     The Amended Pellet Sale Agreement was executed on January 10, 2014.  The Amended Pellet Sale Agreement extended the deadline for the delivery of the iron ore pellets, provided ArcelorMittal compensation for this delay, and emphasized that "[t]ime is of the essence" for the delivery of the iron ore pellets.  The Amended Pellet Sale Agreement also substituted Essar Steel for Essar Resources.  Essar Resources was originally a party because Essar Global had represented that it would become the parent company of Essar Steel Minnesota.  However, Essar Steel remained the parent company of Essar Steel Minnesota in 2014, so the substitution of parties was agreed at that time.  Essar Steel Minnesota and Essar Steel were jointly and severally liable under the Amended Pellet Sale Agreement.

46.     Like the 2010 Pellet Sale Agreement, Essar Steel and Essar Steel Minnesota negotiated the 2014 Amended Pellet Sale Agreement and its financing from Essar's offices in New York.  The renegotiation of the agreement was again done in part through Essar Group employees in New York.  Again, Essar Steel and Essar Steel Minnesota agreed that notices to both entities would be sent to Mr. Vuppuluri's attention at 277 Park Avenue, and that the agreement would be governed by New York law.  Mr. Vuppuluri, based in New York City, again signed the agreement as President and CEO of Essar Steel Minnesota.  The Amended Pellet Sale Agreement subsequently was amended three times, each making discrete amendments, but making no change to the choice of New York law or to the provisions calling for notice to Essar Steel and Essar Minnesota to be made in New York, and each time being signed by New York-based Mr. Vuppuluri on behalf of Essar Steel Minnesota.

47.     Essar Global then entered into additional guarantees to support funding for the project contemplated under the Amended Pellet Sale Agreement.  For example, on September 30, 2014, Essar Global executed a guaranty agreement in favor of U.S. Bank National Association guaranteeing additional debt for Essar Steel Minnesota.  Again, Essar Global elected for that guaranty to be governed by, and construed and interpreted in accordance with, New York law. Again, Essar Global agreed to submit to jurisdiction in the federal and state courts in New York City, and irrevocably designated Essar Americas, located in New York City, to receive service. Essar Global also agreed to receive notices under the guaranty agreement at Essar Americas.

48.     Concurrently on September 30, 2014, Essar Global executed an Equity Contribution Agreement with Essar Steel Minnesota and U.S. Bank National Association, providing a written and binding commitment to provide any shortfall in funding of the Minnesota pellet plan project.  Yet again, that agreement was governed by New York law, Essar Global was to receive notices and service through Essar Americas in New York City, and Essar Global consented to jurisdiction in New York.

49.     When it became clear that Essar Steel and Essar Steel Minnesota would again miss the delivery deadline, the Amended Pellet Sale Agreement was amended yet again, on April 25, 2014 and August 11, 2014.  On June 18, 2015, ArcelorMittal USA agreed to yet another year-long extension of the delivery deadline, which was now set at July 1, 2016.  All three subsequent amendments continued to be governed by New York law, continued to provide for notices to be sent to 277 Park Avenue, and were executed on behalf of Essar Steel Minnesota by Mr. Vuppuluri, based in New York City.

50.     In December 2015, in an effort to persuade ArcelorMittal USA to agree to yet another extension of the delivery deadline, Mr. Vuppuluri forwarded assurances from Essar Global

through New York to ArcelorMittal USA, confirming that Essar Global was the ultimate shareholder of Essar Steel Minnesota, had made substantial contributions of equity to Essar Steel Minnesota, had guaranteed debts of Essar Steel Minnesota, and had undertaken the obligation to fund any shortfall between the total cost of the project and available financing. In January 2016, Mr. Vuppuluri forwarded additional assurances from Essar Global, confirming that Essar Global would provide any shortfall in project funding and forwarding a copy of Essar Global's agreement with U.S. Bank National Association confirming as much.

### C. Essar Steel's Anticipatory Breach

51.     By May 2016, it became clear that Essar Steel and Essar Steel Minnesota would once again miss the delivery deadline. Therefore, on May 27, 2016, ArcelorMittal USA gave notice of its termination of the Agreement, via a letter to Mr. Vuppuluri in New York City.

52.     In July 2016, Essar Steel Minnesota filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware.

## II.     The Award and the Judgment

### A.     The ICC Arbitration

53.     On August 9, 2016, ArcelorMittal USA commenced an ICC arbitration against Essar Steel seeking damages for Essar Steel's breach of the Amended Pellet Sale Agreement (the "ICC Arbitration").

54.     ArcelorMittal USA argued that Essar Steel Minnesota committed anticipatory repudiation of, and breached, the Amended Pellet Sale Agreement, and that Essar Steel was liable for those breaches. ArcelorMittal USA sought the cost of its cover.

55.     Essar Steel named as one of its representatives in the arbitration Mr. Vuppuluri, who, by the time of the ICC Arbitration, was the President and CEO of another Essar Group entity,

Essar Capital Limited, but whose office remained at Essar Americas' 277 Park Avenue office in New York City.

56.     Essar Steel failed to submit payment to the ICC for the costs of the arbitration, and ceased participating in the arbitration, informing the three-member arbitral tribunal, which was composed of experienced American practitioners Jean Kalicki, Edward Kehoe, whom Essar Steel had selected, and James Carter (together the "Tribunal"), that it was "not presently in a position to assist the Tribunal any further."  Under the ICC Rules, the Tribunal ensured Essar Steel had a reasonable opportunity to participate in the arbitration, despite its default in its payment obligations and refusal to participate.  The Tribunal held a two-day evidentiary hearing on October 10 and 11, 2017, but Essar Steel chose not to participate.

57.     On December 19, 2017, the Tribunal issued a 46-page award in ArcelorMittal USA's favor.  The Tribunal concluded that Essar Steel Minnesota anticipatorily repudiated the Amended Pellet Sale Agreement and that Essar Steel was jointly and severally liable for the consequences of that anticipatory breach.  The Tribunal awarded ArcelorMittal USA damages in the amount of $1,379,457,503 (including pre-Award interest), plus $1,533,853 as costs of the arbitration and post-judgment interest compounding at a rate of 8.6 percent.

### B.     The Judgment

58.     On April 2, 2018, the Judgment recognizing the ICC Arbitration Award was entered in the District of Minnesota in favor of ArcelorMittal USA in the amount of $1,380,991,356.04.  *See* Case No. 0:18-cv-00083-DWF-LIB, D.I. 37.  Additionally, pre-judgment interest was awarded from December 19, 2017 through March 30, 2018 in the amount of $31,889,415.29.  *See id.*

59.     On June 11, 2021, ArcelorMittal USA filed in the District of Minnesota a notice of assignment of the Judgment to Plaintiff ArcelorMittal North America Holdings LLC.

60.     On June 16, 2021, Plaintiff, as assignee of ArcelorMittal USA, registered the Judgment in this District.

61.     To date, Essar Steel has not complied with the ICC Final Award, despite its obligation, by agreeing to ICC arbitration, to "undertake to carry out any award without delay" and "waive[] [its] right to any form of recourse insofar as such waiver can validly be made" [Art. 34(6) 2012 ICC Rules].  Neither Essar Steel, nor any other Essar Group entity, has paid any portion of the amount due to ArcelorMittal.

## III.    Mesabi Metallics

62.     While in bankruptcy, Essar Steel Minnesota changed its name to Mesabi Metallics.

63.     On June 8, 2017, Mesabi Metallics filed a Third Amended Chapter 11 Plan of Reorganization for Mesabi Metallics Company LLC (f/k/a Essar Steel Minnesota LLC) and ESML Holdings Inc (the "Plan").   The bankruptcy court subsequently confirmed the Plan with a Confirmation Order on June 13, 2017.

64.     As part of the Plan, Mesabi Metallics issued $300 million in Fixed Rate Junior Secured Notes.  The Notes and corresponding Indenture Agreement and Pledge and Security Agreement are all governed by New York law.  In the Pledge and Security Agreement, Mesabi Metallics and its guarantors agreed to submit themselves and their property to the jurisdiction of "any state or federal court sitting in the Borough of Manhattan in the City of New York" "in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof."   Under New York General Obligations Law Section 5-1402, that submission to jurisdiction is enforceable as the transaction exceeds $1 million.

65.     Mesabi Metallics' Operating Agreement prohibited transfer of rights or interest in Mesabi Metallics "to any Essar Related Person."   The definition of Essar Related Person encompassed "Essar Steel India Limited and each of its direct and indirect subsidiaries, divisions,

joint ventures, parent companies, equity holders, associate companies and affiliates," including Essar Global and other Essar entities.

66.     The Operating Agreement also included a warranty provided by each of the members of Mesabi Metallics that they were "not, and will not be while it is a Member, an Essar Related Person; and . . . did not, and will not, obtain any funds from an Essar Related Person for purposes of the investments contemplated by this Agreement."

67.     In June 2018, the Operating Agreement was restated to delete all restrictions on transfers to Essar Related Persons and on Essar Related ownership of Mesabi Metallics.

68.     On September 12, 2018, Mercuria Energy purchased a majority stake in Mesabi Metallics, with Essar Global as its minority partner.

69.     Essar Global subsequently purchased $260 million in Mesabi Metallics debt.

## IV.     The Fraudulent Conveyance of $1.5 Billion

### A.     The 2012 Share Purchase Agreement

70.     In 2012, Essar Global began a series of transactions that led to the creation of the $1.48 billion receivable.

71.     In 2012, Essar Steel owned 1,910,255,183 shares of Essar Steel India Limited ("Essar India") (approximately equivalent to a 73 percent stake in Essar India).

72.     On June 29, 2012, Essar Steel sold its entire stake in Essar India to Essar Resources Mauritius Limited (later known as Essar Steel Asia Holdings Limited) for an unsecured, non-interest bearing promissory note in the amount of $1,388,530,158 (the "$1.3 Billion Promissory Note").

73.     The $1.3 Billion Promissory Note reflected the then-fair value of the shares of Essar Steel India.  The fairness of the valuation was confirmed by a contemporaneous opinion dated June 29, 2012 by Ernst & Young entitled, "Valuation of Essar Steel India Limited" for "Essar Steel

Limited (Mauritius)."  That report concluded that the equity value of Essar India was 107,698 million rupees, or approximately 1.88 billion USD.  Under this valuation, Essar Steel's 72.72 percent stake in Essar India was worth approximately $1.3 billion.

74.     On March 23, 2013, Essar Steel transferred the $1.3 Billion Promissory Note to its parent company, Essar Global, pursuant to an assignment agreement.

75.     The $1.3 Billion Promissory Note was then reassigned to multiple Essar Group entities in quick succession.  First, Essar Global assigned the $1.3 Billion Promissory Note to its direct subsidiary Essar Steel Mauritius in exchange for the latter's issuance of 1,388,530,158 shares of $1 each in favor of Essar Global.  Essar Steel Mauritius then assigned the $1.3 Billion Promissory Note to the same entity that purchased the shares of Essar Steel India—Essar Steel Asia Holdings Limited ("Essar Asia").  This effectively extinguished the original note.

76.     After this convoluted transaction concluded, Essar Steel was left with the $1.3 billion receivable from Essar Global and no shares of Essar India.  On March 31, 2013, that receivable was recorded as a current asset on Essar Steel's balance sheet in its audited financials, and valued at $1,388,530,158 (the "$1.3 Billion Receivable")—the same value as both the $1.3 Billion Promissory Note transferred to Essar Global and the Essar India shares transferred to Essar Asia.  That receivable made up approximately 94 percent of Essar Steel's current assets, and approximately 54 percent of its total assets, including current and non-current assets.

77.     The fact that Essar Steel engaged in this transaction, transferring shares of Essar India to Essar Global in exchange for an unsecured, non-interest-bearing receivable, makes clear that Essar Steel was a fully dominated and controlled puppet of Essar Global.

78.     The inclusion of the $1.3 Billion Receivable in Essar Steel's Financial Statements for the year ending March 31, 2013 (the "March 31, 2013 Financial Statements") was neither an

accident nor a mistake. The value of the receivable from Essar Global was confirmed by Essar Steel's management and Board of Directors in the March 31, 2013 Financial Statements, where the June 2012 transfers were first recorded in full. An analysis of the fair value of the $1.3 Billion Receivable was performed and the fair value of the $1.3 Billion Receivable is specifically listed as $1.3 billion. The March 31, 2013 Financial Statements state that "[t]he carrying value of all financial assets and liabilities closely approximate their fair value" and "[f]air values of available-for-sale investment, other receivables, other payables, and other current liabilities approximate their carrying values." The $1.3 Billion Receivable from Essar Global to Essar Steel was recorded under "other receivables" on Essar Steel's March 31, 2013 Financial Statements. The terms of that $1.3 Billion Receivable were specified in Essar Steel's March 31, 2013 Financial Statements as "unsecured, non-interest bearing and repayable on demand."

79.     Essar Steel's March 31, 2013 Financial Statements were audited by independent auditors, Deloitte. Deloitte performed an audit "to obtain reasonable assurance whether the separate financial statements are free from material misstatement." Deloitte opined that the March 31, 2013 Financial Statements gave a "true and fair view of the financial position of Essar Steel Limited on a stand-alone basis as at 31 March 2013, and of its financial performance and cash flows for the year then ended in accordance with International Financial Reporting Standards…."

80.     The Essar Steel Board of Directors signed and approved the March 31, 2013 Financial Statements on September 27, 2013.

81.     The June 2012/March 2013 transaction is depicted in the diagram below:



82.     At the end of the June 2012/March 2013 transactions, Essar Steel had exchanged shares of Essar India worth $1.3 billion for a receivable from its parent company in the same amount—$1.3 billion.  The shares of Essar India formerly owned by Essar Steel ended up being owned indirectly by the confusingly similar Essar Steel Mauritius.

### B.     The 2013 Share Purchase Agreement

83.     In March 2013, after having just disposed of all of its shares of Essar India in 2012, Essar Steel inexplicitly purchased an additional 118,678,842 shares of Essar India for $99,914,135. After acquiring these new Essar India shares, Essar Steel transferred them, yet again, to Essar Asia.

84.     On August 26, 2013, Essar Asia and Essar Steel entered into a share purchase agreement, whereby Essar Steel transferred its 118,678,842 equity shares of Essar India to

Essar Asia in consideration for a second non-interest-bearing promissory note, this time for $99,450,000 (the "$99 Million Promissory Note"). The $99 Million Promissory Note then followed the exact same trajectory as before: Essar Steel assigned the $99 Million Promissory Note to Essar Global, receiving in exchange a receivable of $99,450,000 (the "$99 Million Receivable"). Essar Global then assigned the $99 Million Promissory Note to Essar Steel Mauritius in exchange for its shares, Essar Steel Mauritius assigned $99 Million Promissory Note in favor of Essar Asia in exchange for its shares. In other words, the transactions of 2012 were repeated exactly, on a smaller scale. The effect was to transfer $99 million in cash out of Essar Steel and leave it with an additional non-interest-bearing receivable from Essar Global in that amount.

85. As with the first transfer of shares of Essar India to Essar Global in exchange for an unsecured, non-interest-bearing receivable, this transaction makes clear that Essar Steel was a fully dominated and controlled puppet of Essar Global.

86. The $1.3 Billion Receivable and $99 Billion Receivable were not included by accident in Essar Steel's Financial Statements for the year ending March 31, 2014 (the "March 31, 2014 Financial Statements"). The $1.3 Billion and $99 Million Receivables from Essar Global are recorded in multiple places in the March 31, 2014 Financial Statements. They appear on the Balance Sheet as a current asset under "Other receivables," in Note 6 ("Investment in Subsidiary Companies"), Note 10 ("Other Receivables"), and Note 21 ("Related Party Transactions").

87. Essar Steel's balance sheet as of March 31, 2014 showed total current assets of $1,628,338,983, of which the $1,487,980,158 receivable (the "$1.48 Billion Receivable") from Essar Global was approximately 91 percent. Essar Steel's balance sheet showed current and non-current assets totaling $2,624,475,520, of which the $1.48 Billion Receivable from Essar Global was approximately 57 percent.

88.     The $1.3 Billion and $99 Million Receivables were confirmed to reflect their fair values by the Essar Steel Board of Directors in the March 31, 2014 Financial Statements.  In Note 19, Essar Steel again indicated that it had performed a fair value analysis and represented that the carrying value of assets, including "other receivables," approximated their fair value.  And again, Essar Steel specifically identified the fair value of the combined receivables—this time listing the fair value of the combined receivables as $1.48 billion.  Again, Essar Steel specified that receivables from related parties, which included the $1.3 Billion and $99 Million Receivables from Essar Global, were "unsecured, non-interest bearing and repayable on demand."

89.     Again, the March 31, 2014 Financial Statements were audited by an independent auditor—this time, by Nexia Baker & Arenson ("Nexia Baker").  Nexia Baker performed its audit using the same International Financial Reporting Standards as Deloitte had the year prior. Nexia Baker also confirmed that the financial statements gave a "true and fair view of the financial position of the Company as of 31 March 2014, and of its financial performance and its cash flows for the year then ended…"  No adjustments were made to the March 31, 2013 Financial Statements, which were presented side by side with the 2014 results, as is customary.

90.     The March 31, 2014 Financial Statements were signed and approved by Essar Steel's Board of Directors and Nexia Baker on September 29, 2014.

91.     Essar Steel's Financial Statement for the year ending March 31, 2015 (the "March 31, 2015 Financial Statements"), also audited and approved by Nexia Baker, again showed the $1.48 Billion Receivable from Essar Global, and again represented that this receivable was recorded at its fair value.  The March 31, 2015 Financial Statements also repeated the 2014 numbers, without any alteration to the presentation of the $1.48 Billion Receivable.

### C.    The 2016 Elimination of Fair Consideration Received for the Shares

92.    On August 9, 2016, ArcelorMittal USA filed its Request for Arbitration against Essar Steel, seeking monetary damages which Essar Steel knew or should have known would exceed $1 billion.

93.    On September 29, 2016, the Essar Steel Board of Directors approved the company's Financial Statements for the year ending March 31, 2016 (the "March 31, 2016 Financial Statements").

94.    On those statements, approved less than two months after ArcelorMittal USA filed its ICC Arbitration against Essar Steel, putting Essar Steel on notice of potential liability of over $1 billion, the $1.48 Billion Receivable from Essar Global was eliminated by an accounting fraud undertaken by Essar Global.

95.    With the elimination of the $1.48 Billion Receivable, Essar Steel was rendered insolvent and left with unreasonably small capital.

96.    Essar Global eliminated the $1.48 Billion Receivable with actual intent to hinder, delay, and defraud ArcelorMittal USA (and now ArcelorMittal) in the collection of any award or judgment resulting from the ICC Arbitration.

97.    Until September 29, 2016, the $1.48 Billion Receivable had been recorded on Essar Steel's financial statements (audited by two different accounting firms, Deloitte and Nexia Baker) as a current asset and confirmed to be carried at its fair value. *See supra* ¶¶ 78–91.

98.    The qualities of the $1.48 Billion Receivable had been repeatedly described in Essar Steel's financial statements as "unsecured, non-interest bearing and receivable on demand." *See supra* ¶¶ 78, 88.

99.    In other words, the $1.48 Billion Receivable was not included in Essar Steel's financial statements by accident or mistake.  It was recorded repeatedly and deliberately in

Essar Steel's financial statements (*see supra* ¶¶ 78–91), and was quantified, analyzed for fair value, and its terms were described (as unsecured, non-interest bearing, and receivable on demand) on those same financial statements (*see supra* ¶¶ 78, 88).  The 2013, 2014, and 2015 financial statements (reflecting the $1.38 Billion Receivable in 2013 and the $1.48 Billion Receivable in 2014 and 2015) were signed and approved by the Essar Steel Board of Directors and audited by two accounting firms, Deloitte and Nexia Baker.

100.    Yet, in an attempt to justify its purported elimination of the $1.48 Billion Receivable from its current assets, which purported to give Essar Global a release from its $1.48 billion obligation, Essar Steel claimed that each of its Board of Directors, Deloitte, and Nexia Baker had repeatedly erred in their accounting treatment of this asset.

101.    Essar Steel deceptively claimed that the elimination of the $1.48 Billion Receivable simply corrected an accounting error.  Essar Steel claimed the $1.48 Billion Receivable was "an advance against [Essar Global's] future buyback" of shares of Essar Steel worth $1.48 billion.  Essar Steel then restated its March 31, 2014 and March 31, 2015 Financial Statements to remove the $1.48 Billion from "other receivables" and "current assets," and record it instead as an "advance against future buyback" under "Capital and reserves."

102.    The purported reason for this restatement was described in Note 26 ("Prior Year Adjustment") of Essar Steel's March 31, 2016 Financial Statements:

> In 2013, the Company disposed of 2,028,934,025 equity shares held in Essar Steel India Limited (ESIL) to Essar Asia Holdings Limited (ESAHL) and as consideration, the latter issued promissory notes for the amount of USD1,487,980,158.  Subsequently, under a future buyback arrangement, the promissory notes were assigned to Essar Global Fund Limited (EGFL), the sole shareholder of the Company, as ***an advance against future buyback*** of 1,487,980,158 equity shares at USD 1 each.  This amount should have been classified under equity.  Accordingly, the financial statement for the years ended 31 March 2014 and 2015 have been restated to reflect the correct accounting

treatment.  ***The Company will have to satisfy the solvency test to finalise the share buyback.*** (emphases added).

103.    The proposed "share buyback," referenced in Note 26 and used in an attempt to justify Essar Global's fraud, is a meaningless coinage designed to mask the fraudulent transfer. The proposed transaction, even if it had been completed—it never was—would have in no way altered Essar Global's 100 percent equity ownership of Essar Steel.  Had Essar Steel received $1.48 billion worth of its own shares from its parent corporation Essar Global—through a transaction that left Essar Steel insolvent—Essar Global would *still* own 100 percent of issued shares of Essar Steel.  The "share buyback" would confer no benefit to Essar Steel, which still would be 100 percent owned by Essar Global.  In any event, no "share buyback" ever occurred. *See infra* ¶¶ 121–125.

104.    Thus a "future buyback" has little meaning when involves a parent corporation that owns 100 percent of the stock of a subsidiary already—the 2016 elimination of the $1.48 Billion Receivable was nothing more than a fraudulent accounting maneuver papered over with meaningless jargon.

105.    Note 26 of the March 31, 2016 Financial Statements was false and deceptive, intended by Essar Global to mask its fraudulent transfer of $1.48 billion out of Essar Steel and into itself.  The prior financial statements recognized that Essar Steel was owed $1.48 billion by Essar Global in relation to a transaction where Essar Steel had transferred $1.48 billion of stock in Essar India to another Essar Group company.  The 2016 elimination of the $1.48 Billion Receivable was a fraudulent transfer, pure and simple.

106.    Note 26 was also intentionally misleading.  As discussed further below, at the time this statement was approved by the Essar Steel Board of Directors, Essar Global and Essar Steel knew that Essar Steel would never satisfy the solvency test under Mauritian law and would *not* be

able to effectuate any share buyback.  *See infra* ¶¶ 121–125.  Notably, the elimination of the $1.48 Billion Receivable (in addition to being a fraudulent transfer) also violated Mauritian law, as it supposedly was a $1.48 billion prepayment by Essar Steel to Essar Global for a purported "stock buyback" at a time when Essar Steel could not have lawfully repurchased its shares under the Mauritius Companies Act.

107.    Essar Steel's March 31, 2016 Financial Statements were audited by Nexia Baker, the same firm that audited and approved the March 31, 2014 and March 31, 2015 Financial Statements where the $1.48 Billion Receivable was recorded as a current asset and confirmed to be recorded at fair value.  In 2014 and 2015, Nexia Baker represented that "the audit evidence [Nexia Baker] obtained [was] sufficient and appropriate to provide a basis for [its] audit opinion" and in each year Nexia Baker stated that, in its opinion, "the financial statements give a true and fair view of the financial position of the company."  The character of the $1.48 Billion Receivable did not change in 2016.

### D.    The "Future Buyback" Held Out as Purported Justification Was Impossible and Never Occurred

108.    The fraudulent conveyance described above left Essar Steel with negative equity and, unsurprisingly, led to the financial ruin of Essar Steel.

109.    As of March 31, 2016, after giving effect to the conveyance, Essar Steel had negative equity of $618,382,212.

110.    As of March 31, 2016, after giving effect to the conveyance, Essar Steel had a mere $1.08 million in current assets and $8.4 million in total assets.  Essar Steel's liabilities far exceeded its assets: it recorded $610 million in non-current liabilities and over $16 million in current liabilities.  Moreover, those reported liabilities did not take into account the potential for a judgment in excess of $1 billion in ArcelorMittal USA's then-pending ICC Arbitration.

111.    Essar Steel acknowledged its financial distress in its March 31, 2016 Financial Statements.  In the March 31, 2016 Financial Statements, Essar Steel stated that it had "incurred a loss" of over $1.6 billion, "and at that date the Company's total liabilities exceeded its total assets by USD618,382,212…The directors believe that continued financial support from the shareholder will be forthcoming over the next twelve months and therefore the financial statements have been prepared on the going concern basis."  In other words, without the promise of financial support from Essar Global, Essar Steel would not have qualified as a "going concern."  Of course, the size of the $1.6 billion loss was due to the fraudulent elimination for no consideration of the $1.48 Billion Receivable owed by Essar Global.

112.    In short, due to the fraudulent elimination of $1.48 billion in assets, Essar Steel was in dire financial straits, and was considered a going concern only due to assurances that Essar Global would continue to prop up its puppet entity, Essar Steel.

113.    Under Section 69 of the Mauritius Companies Act, a company cannot acquire its own shares unless, among other conditions, "the company shall immediately after the acquisition satisfy the solvency test."  Section 6 of that same Act defines the "solvency test" as satisfied if the following conditions are met: "(a) the company is able to pay its debts as they become due in the normal course of business; and (b) the value of the company's assets is greater than the sum of: (i) the value of its liabilities; and (ii) the company's stated capital."

114.    Essar Steel could not come close to satisfying either prong of this test.  It could not pay its debts.  Indeed, its liabilities far exceeded its assets, and it was considered a going concern only due to an expectation of unspecified future support from Essar Global.  And Essar Steel's assets did not exceed the value of its liabilities plus its stated capital.  For example, in 2016,

Essar Steel's assets ($8,458,195) paled in comparison to its liabilities ($626,840,407) plus its stated capital ($2,778,754,447).

115.    Thus, the purported "future [stock] buyback" could not be achieved because, as the Board of Directors well knew when it approved the March 31, 2016 Financial Statements, Essar Steel could not satisfy the solvency test.  Under the restated financials of 2014 and 2015, Essar Steel would not have been able to satisfy the solvency test in those years either.

116.    Additionally, Essar Global has asserted that its lenders had liens on Essar Global's assets, including its shares of Essar Steel.  Essar Global knew that its lenders' permission was required before Essar Global and Essar Steel could sell the lenders' collateral.  That permission was never obtained.

### E.    The 2016 Conveyance Bears Multiple Badges of Fraud

117.    The 2016 conveyance bears many indicators of Essar Global's and Essar Steel's fraudulent intent.

118.    The 2016 conveyance occurred while ArcelorMittal's ICC Arbitration against Essar Steel was pending.  Indeed, it occurred less than two months after the ICC Arbitration was initiated.  The timing of Essar Steel's sudden extinguishment of its $1.48 billion asset—a receivable owed to it by its parent Essar Global, at a moment when Essar Steel was facing potential liability of that same amount, shows that Essar Global and Essar Steel intended to move Essar Steel's most valuable asset out of ArcelorMittal USA's reach.  Essar Steel and Essar Global acted with full knowledge of ArcelorMittal USA's claims and Essar Steel's inability to pay ArcelorMittal USA's claims once the $1.48 Billion Receivable was eliminated.

119.    Essar Steel received no consideration for the elimination of the $1.48 Billion Receivable.

120.   The 2016 conveyance occurred between related parties.   The 2016 fraudulent conveyance was made by subsidiary Essar Steel in favor of its parent company (and thus, an insider) Essar Global.

121.   The $1.48 Billion Receivable represented a high percentage of Essar Steel's assets and its elimination rendered Essar Steel insolvent.   After the 2016 restatement, Essar Steel had liability of $626,840,407 and assets of only $8,458,195.   The conveyance left Essar Steel unable to pay its bills.   As of March 31, 2014, the $1.48 Billion Receivable from Essar Global constituted approximately 57 percent of Essar Steel's total assets.

122.   The 2016 conveyance was done in a manner designed to conceal it.   The elimination of the $1.48 Billion Receivable was agreed to suddenly, in secret, via an accounting manipulation, and not in the usual course of business.   After the Board of Directors and independent auditors from two separate accounting firms had repeatedly confirmed the existence, fair value, and correct accounting treatment for the $1.48 Billion Receivable, that receivable was suddenly extinguished in a footnote to Essar Steel's March 31, 2016 Financial Statements.   Those March 31, 2016 Financial Statements reflect the unusual step of restating accounts after three years had passed. Notably, the March 31, 2013 Financial Statements, which were audited by Deloitte and not Nexia Baker, were never restated, and to this day continue to reflect the $1.3 billion of the $1.48 Billion Receivable that was then owed by Essar Global and payable on demand.

123.   The March 31, 2016 Financial Statements reflecting the fraudulent transfer contain obvious obfuscations.   For example, the March 31, 2016 Financial Statements state that Essar Steel "will have to satisfy the solvency test to finalise the share buyback."   But, when the March 31, 2016 Financial Statement was approved by the Essar Steel Board of Directors and audited by

Nexia Baker, it was a known fact that Essar Steel could not, under any circumstances, satisfy the solvency test.

124.    The same auditor that audited the 2014 and 2015 financial statements that approved the $1.48 billion as a current asset of Essar Steel, and confirmed the asset was listed at its fair value, unjustifiably changed positions in 2016.  In 2014 and 2015, Nexia Baker had all relevant information and access to all facts, and properly characterized the $1.48 Billion Receivable as an asset.  Then, although it identified no new information or facts in its 2016 "Independent Auditors' Report" attached to the March 31, 2016 Financial Statements, Nexia Baker unjustifiably approved the Essar Steel Board of Director's sudden and unfounded elimination of the receivable and the pretextual justification offered for the change—that the $1.48 billion allegedly "should have been classified under equity."

125.    The proposed "future [stock] buyback" offered as a pretextual justification for the elimination of the $1.48 Billion Receivable, made no commercial sense (as Essar Global would own 100 percent of Essar Steel's shares regardless), and eliminated the value of the very shares being repurchased.  In any event, the purported "future [stock] buyback" was impossible to consummate under the Mauritius Companies Act's solvency test, as Essar Global and Essar Steel well knew.

126.    The badges of fraud present in this case and cataloged above prove fraudulent intent of Essar Global and its wholly owned subsidiary in conveying away Essar Steel's largest asset immediately after the arbitration was commenced against it.

## V.    Essar Global and Essar Steel Are Alter Egos

127.    Essar Global and Essar Steel are alter egos.  Essar Global operates as a single unified organization, disregarding the separate corporate form of its subsidiaries, and its treatment of Essar Steel is no exception.

A.   *Essar Global Dominated and Controlled Essar Steel*

128.   This is a textbook case of a dominant shareholder disregarding the corporate form of, and siphoning assets from, its subsidiary.   Essar Global's total domination and control of Essar Steel are illustrated by Essar Steel's lack of corporate formalities, the overlap between Essar Global and Essar Steel's leadership, Essar Steel's lack of independent business discretion, Essar Steel's severe undercapitalization, and Essar Global's failure to deal with Essar Steel at arms' length, among other facts described in ¶¶ 143-151, *infra.*

129.   *Failure to maintain corporate formalities.*   Essar Steel and Essar Global failed to maintain the formalities of separate corporate existence.   On information and belief, Essar Steel did not observe regular corporate formalities such as holding regular meetings of officers, directors, or members, paying dividends, maintaining separate financial accounts, or maintaining separate books and records.   Likewise, on information and belief, the Board of Directors of Essar Global did not regularly meet or issue resolutions and kept inaccurate or incomplete corporate records.

130.   *Overlap in leadership and representation.*   Essar Steel and Essar Global have significant overlap in ownership, officers, directors, and personnel.   Essar Global CEO Prashant Ruia was a director of Essar Steel from March 17, 2010, to July 29, 2016.   Ravikant Ruia, Uday Kumar Gujadhur, Firdhose Coovadia, and Sushil Baid have served on the boards of both Essar Steel and Essar Global.

131.   Essar Steel and Essar Global have designated the same individuals and agents to sign key documents, accept service of process, and provide both entities with legal representation. For example, proofs of claim against Essar Steel Minnesota's bankruptcy estate in its bankruptcy proceedings were signed by Sushil Baid on behalf of both Essar Global and Essar Steel. Essar Global and Essar Steel also both designated the same agent—Essar Americas—for service

of process in guarantee agreements related to the Minnesota project at issue in the Pellet Sale Agreement and Amended Pellet Sale Agreement.

132.    In addition, Essar Global directed Essar Steel's representation during the ICC Arbitration and in subsequent enforcement proceedings.  Essar Steel was represented in the arbitration by Madhu Vuppuluri (former Senior Vice President of Essar Global and then-President and CEO of Essar Steel Minnesota) and Andrew Wright, who worked for Essar Capital Services, made presentations to Essar Global's board on legal issues, and formed a legal team to, in his own words, "[s]upport Essar Capital Limited and [Essar Global] … on matters which affected the Essar portfolio on a wider basis (such as debt financings); and … [w]here requested by Essar Capital Limited, supplement and support a portfolio company that may be undertaking a sizeable transaction, financing or litigation."

133.    ***Lack of independent business discretion.***  Essar Steel has no independent business discretion.  Essar Global made important decisions about the contract terms, budgets, and resources of Essar Steel without regard to the purported separate existence of Essar Steel. Essar Steel's financial statements for the year ending March 31, 2009 (at which time Essar Steel was known as Essar Steel Holdings Ltd.) state that Essar Steel's "capital management process is determined and managed at the holding company [Essar Global] level."  For example, Essar Global forced Essar Steel to sell its shares in Essar Steel India, worth $1.3 billion, ultimately in exchange for an unsecured non-interest-bearing receivable from Essar Global.  Essar Global then forced Essar Steel to spend $99 million in cash to purchase additional shares in Essar Steel India and then exchanged those shares for an additional $99 million receivable from Essar Global that was, again, unsecured and non-interest bearing.  Both transactions were not conducted on arm's length terms—they were dictated by Essar Global.

134.    ***Undercapitalization.***    Due to Essar Global's domination and control over Essar Steel as its alter ego, Essar Steel is severely undercapitalized.    After Essar Global directed Essar Steel to sell its shares of Essar India in 2012 and 2013, upon information and belief, Essar Steel could not have met Mauritius's solvency test at any point after March 2012.    As of March 31, 2014, the $1.48 Billion Receivable from Essar Global constituted approximately 57 percent of Essar Steel's total assets.    *See supra* ¶ 87.    Therefore, when Essar Global eliminated the $1.48 Billion Receivable, Essar Steel faced financial disaster.    *See supra* ¶ 121.    In 2018 and 2019, Essar Steel's current assets were less than $2 million.    Essar Steel claimed that it remained solvent, preparing the March 31, 2016 Financial Statements on a going concern basis, solely due to Essar Global's promise of future financial support.

135.    ***Free exchange of assets and funds, and failure to deal at arm's length.***    The 2016 fraudulent conveyance and the 2012 and 2013 transfers that preceded it are illustrative of the way Essar Global moved assets between entities freely, including itself and Essar Steel, and as it suited its then-current purpose.    The 2012 and 2013 transfers were circular (moving promissory notes through Essar Group entities until they arrived back at the Essar group entity that issued them) and repetitive (the same transaction from 2012 was repeated again, inexplicably, in 2013 on a smaller scale).    Then, in the face of impending liability from Essar Steel's anticipated failure to perform under the Amended Pellet Sale Agreement, Essar Global directed Essar Steel to fraudulently eliminate its key asset in 2016, resulting in a $1.48 billion loss for Essar Steel and a $1.48 billion gain for Essar Global, for no consideration.    These transactions left Essar Steel with substantial debt, no meaningful assets, and unable to satisfy its obligations to legitimate creditors, specifically ArcelorMittal.

136.   Essar Steel and Essar Global openly admitted Essar Global's control of significant assets on Essar Steel's balance sheet.  For example, Essar Steel's audited financial statements reflect a category of receivables known as "receivables from related parties," in which the $1.48 Billion Receivable was recorded in 2014 and 2015.  Essar Steel's financial statements note that receivables from related parties "are unsecured, non-interest bearing and receivable on demand" (hardly arm's length transactions), and that related parties are "individuals and companies where the individual or company has the ability directly or indirectly to control the other party or exercise significant influence over the other party in making operating and financial decisions or vice-versa."  Accordingly, Essar Steel has admitted in its audited financial statements, approved by its Board of Directors, that Essar Global controlled or had significant influence over Essar Steel's financial decisions.

137.   Essar Global has not dealt with Essar Steel at arm's length, as is evident from the fact that Essar Global forced Essar Steel first to accept the unsecured non-interest bearing $1.48 Billion Receivable and then purported to eliminate that same $1.48 Billion Receivable when it became clear that the $1.48 Billion Receivable would need to be called upon to pay Essar Steel's liabilities.  Additionally, Essar Global and Essar Steel used the same Essar Group entity, Essar Capital Services, to provide support services relating to financing and M&A activity from April 2010 to April 2013, during the time of the 2012 transfer of shares of Essar India and assignment of the $1.3 Billion Promissory Note to Essar Global.

138.   ***Financial dependency.***  Just as Essar Global could, at will, eliminate Essar Steel's most valuable asset, transferring $1.48 billion of value from Essar Steel to Essar Global, so too could Essar Global elect to prop up its puppet entity Essar Steel.  And Essar Steel depended on Essar Global to do so.

139.    Essar Steel depended on Essar Global to guarantee the debts upon which Essar Steel relied.  Essar Global guaranteed debts relating to the Minnesota mine and pellet plant (though ultimately did not pay those debts resulting in litigation, *see supra* ¶¶ 41–50).  For example, Essar Global entered into guarantees with ICICI Bank and U.S. Bank National Association to guarantee debt for Essar Steel's wholly owned subsidiary, Essar Steel Minnesota.  And in 2015, Essar Global confirmed to ArcelorMittal USA that it had made a written and binding commitment to fund any shortfall in funds required for the Minnesota project, telling ArcelorMittal USA that the project "was ultimately backed by the financial and technical resources of the Essar Group."

140.    Essar Steel's financial dependency on Essar Global is confirmed in Essar Steel's audited financial statements.  In its March 31, 2016 Financial Statements, Essar Steel admitted that its statements were prepared on a going concern basis despite astronomical losses because Essar Steel "believe[d] that continued financial support from the shareholder [Essar Global] will be forthcoming...."

141.    Moreover, at least one affiant with personal knowledge of Essar Group's operation, the general partner of one of Essar Global's creditors, has affirmed under oath that Essar Global's "primary function is to allocate capital (*i.e.*, cash) among and between its many, many subsidiaries."  Thus, "[w]here a debtor is distressed financially, inter-affiliate transfers threaten to take value away from creditors and place them elsewhere more beneficial to equity holders (*i.e.*, fraudulent or preferential transfers)."

142.    ***Representations to the public.***  Essar Global considered Essar Steel to be its instrument, and its public-facing statements reflect this position.  Essar Steel does not have an independent website.  Instead, information concerning Essar Steel's operations and activities is on

www.essar.com.[1]  Other than a short description of Essar Capital Limited, the Essar.com website does not delineate between the various companies as separate entities, and the copyright information at the bottom indicates only that it is the copyright of "Essar."  Upon information and belief, Essar Global did not distinguish between Essar Steel and other Essar Group entities in its corporate literature, referring to Essar Steel as interchangeable with other Essar Group entities working in the steel industry.  For example, the Essar Group's website stated that Essar Steel had operations in Algoma, Canada, and in Minnesota, USA, when in reality, those operations were under the ownership of other Essar Group entities: Essar Steel Algoma Inc. and Essar Steel Minnesota respectively.

B.    **Essar Global's Pattern and Practice of Domination and Control Over Essar Group Subsidiaries**

143.    Essar Global's disregard of Essar Steel's purportedly separate corporate form is not a unique event.  Instead, it is part of Essar Global's pattern and practice of controlling and dominating the subsidiaries within the Essar Group.

144.    Essar Global has made no secret of its disregard of the corporate forms of its subsidiaries.  Essar Global has openly admitted that this is the way it practices its business.  Essar Global's counsel submitted a witness statement in pending litigation alleging conspiracy claims against Essar Global that is pending before the High Court of Justice of England and Wales, Commercial Court, admitting that there is a "[c]ontinuous flow of monies between related entities", and inter-company loans are an "integral" and "essential" part of Essar Global's business, none of which "make[s] any difference" to Essar Global's value as a whole.

---

[1]  There was also a separate website, www.essarsteel.com, which had a copyright for "Essar Steel," but rather than describe Essar Steel's activities, it described the various steel activities conducted by any of the Essar Group entities, including, for example, Essar Power, Essar Oil, and Essar Communications.

145.    One of the techniques used by Essar Global to dominate and control its subsidiaries was to cause them to execute agreements for the sole benefit of Essar Global.  Indeed, a single Essar Group employee would sign such agreements on behalf of every Essar Group signatory, including Essar Steel and Essar Global, reflecting their status as alter egos.

146.    Not surprisingly, Essar Global has faced multiple legal actions alleging that it is the alter ego of several subsidiaries in the Essar Group.

147.    For example, in an insolvency proceeding in the Ontario Superior Court of Justice, an independent monitor found that Essar Global exercised "*de facto* control" over its subsidiary Essar Algoma.  *See Ernst & Young v. Essar Global Fund Ltd. et al*, 2017 ONSC 1366 (March 6, 2017).  In a decision issued by its then-chief justice, the Ontario Superior Court of Justice found "overwhelming" evidence "substantiating that [Essar Global] and Essar Capital were calling the shots" for their subsidiary companies on certain large transactions.  Indeed, the Ontario Superior Court of Justice determined that Essar Global executives were making strategic decisions over the protests of their subsidiaries' independent directors, and to the detriment of those subsidiaries.  The court further found that Essar Global had acted in bad faith in using its control over its subsidiaries for its own benefit.

148.    Similarly, the District Court of Minnesota permitted alter ego claims against Essar Global, Essar Steel, and other Essar Group entities to proceed.  *Great Lakes v. ESML et al.*, Case No. 0:09-cv-03037-SRN-LIB (D. Minn. Mar. 19, 2013), ECF No. 559.  The plaintiff had alleged: "(1) [Essar Steel Minnesota] was insufficiently capitalized for purposes of the corporate undertaking of building the Nashwauk Facility [pellet plant in Minnesota]; (2) [Essar Steel Minnesota] was insolvent and lacked revenue when it acquired [Minnesota Steel Industries]; (3) [Essar Steel Minnesota] and [Essar Steel and Essar Global] have overlapping officers and

directors and do not observe regular corporate formalities; and (4) [Essar Steel Minnesota] is a mere shell or facade of [Essar Steel and Essar Global]." *Id.* at 26.  The court found that plaintiff had adequately alleged a claim for piercing the corporate veil and that evidence supported that claim.  The case ultimately settled before the Court adjudicated the alter ego claims on the merits.

149.    Other alter ego allegations against Essar Global include those made by Essar Steel Minnesota's bankruptcy estate in an adversary proceeding in bankruptcy court, alleging "a course of conduct in which [Essar Steel Minnesota] was treated as if it existed solely for the benefit of the Essar Global enterprise, without regard for [Essar Steel Minnesota]'s interests or its creditors." Third Amended Complaint ¶ 2, *Scher v. EGFL*, Adv. Proc. No. 17-50001 (BLS) (Bankr. D. Del. July 3, 2019), ECF No. 118.  The bankruptcy complaint alleges Essar Global "created, dissolved, and reorganized" its subsidiaries as its controlling persons saw fit, including one entity that "was created for the sole purpose of taking over [certain] contractual obligations of Essar Constructions and Essar Projects." *Id.* ¶ 134.  Essar Global hired senior executives for Essar Steel Minnesota without knowledge or consent of Essar Steel Minnesota's board. *Id.* ¶ 142.  Employees remained on Essar Steel Minnesota's payroll even though they were working on other projects. *Id.*  And regarding "loans" and "payments" between Essar Global and its subsidiaries (and among its subsidiaries), there was "little business justification . . . beyond the cash needs of the entity receiving them," and "it was often the case that the same officers and directors/governors represented the corporate entity transferring and receiving the funds." *Id.* ¶ 136.  There is a pending settlement motion in the bankruptcy action, and the alter ego issues have not been adjudicated.

150.    Similarly, in proceedings brought by Barclays Bank and Midtown Acquisitions, among other judgment creditors, against Essar Global relating to non-payment of Essar Steel

Minnesota's guaranteed debts, the general partner of one of Essar Global's creditors, Midtown Acquisitions, explained that he had reason to believe Essar Group engaged in fraudulent transfers among its subsidiaries to avoid paying sums lawfully owed. As the affiant explained, Essar Global left a trail of bankrupt subsidiaries in its wake, including Essar Steel Minnesota (after defaulting on more than $1 billion of debt), Essar Steel Algoma Inc. (after also defaulting on more than $1 billion of debt), and Trinity Coal Corp. (placed into involuntary bankruptcy by its creditors with over $100 million in claims). The affiant also explained that he had observed Essar Global's intercompany transactions skyrocket since March 2012, which corresponds with when the Pellet Sale Agreement was executed.

151.    On March 26, 2019, as a result of Essar Global's domination of Essar Steel for its own purposes and disregard for Essar Steel's interests, Essar Steel's directors placed Essar Steel into administration proceedings in Mauritius. Unlike bankruptcy proceedings in the United States, administration proceedings in Mauritius do not result in a stay of other actions or require the Mauritian Court's permission to commence and prosecute other lawsuits that are not before the Mauritius Bankruptcy/Commercial Division of the Supreme Court, or indeed outside of Mauritius. *See Jafajul v. Maubank Ltd.*, 2018 SCJ 384 at 10 (Sup. Ct. Mauritius, Nov. 21, 2018). At the same time, Essar Global—again in disregard of the purportedly separate corporate existence and interests of Essar Steel—attempted to extinguish its debt to Essar Steel. On May 6, 2018, Essar Global commenced separate proceedings in Mauritius against its own alter ego, Essar Steel, seeking a declaration that Essar Global was not indebted to Essar Steel. The actions commenced by Essar Global in Mauritius are further collusive litigation and evidence that Essar Global treats Essar Steel as its alter ego.

## CLAIMS FOR RELIEF

### FIRST COUNT

### (Against Essar Global for Rescission and Turnover of Fraudulent
### Conveyances in Violation of New York Debtor and Creditor Law § 273)

152.    Plaintiff incorporates herein by reference paragraphs 1 through 151, *supra*, as if fully set forth herein.

153.    Under New York law, transactions are voidable if the transferor is or will be thereby rendered insolvent, and the transfer is made without fair consideration.

154.    The transferor is "insolvent" when the present fair salable value of its assets is less than the amount that will be required to pay its probable liability on its existing debts as they become absolute and matured.  When a transfer is made for no consideration, the transferor is presumed insolvent.

155.    Fair consideration requires good faith and the payment of a fair equivalent value for the property interest conveyed.  Transfers to corporate insiders are presumed to be in bad faith.

156.    On September 29, 2016, Essar Steel conveyed $1,487,980,158 to Essar Global by extinguishing the $1.48 Billion Receivable for no consideration.

157.    Essar Steel was rendered insolvent as a result of this conveyance.

158.    Essar Steel received no consideration from Essar Global in return for the transfer of the $1.48 Billion Receivable.  As a matter of law, Essar Steel was rendered presumptively insolvent by the transfer of the $1.48 Billion Receivable.

159.    In fact, the transfer of the $1.48 Billion Receivable did render Essar Steel insolvent. After the conveyance, Essar Steel's assets were far less than its current liabilities.  As of March 31, 2016, Essar Steel had just $1,087,639 in current assets and $8,458,195 in current and

non-current assets combined.  As of that same date, Essar Steel had $16,440,171 in current liabilities and $626,840,407 in current and non-current liabilities combined.

160.   Essar Steel admitted in its March 31, 2016 Financial Statements that it had "incurred a loss" of over $1.6 billion, "and at that date the Company's total liabilities exceeded its total assets by USD618,382,212…."  Indeed, Essar Steel was considered a going concern only due to an expectation of unspecified future support from Essar Global—support Essar Global has failed to provide.

161.   Furthermore, Essar Steel's liabilities in its March 31, 2016 Financial Statements did not take into account its liability for its breach of the Amended Pellet Sale Agreement.

162.   The transfer of the $1.48 Billion Receivable was made without fair consideration because it was not made in good faith or for reasonably equivalent value.

163.   The $1.48 Billion Receivable was not conveyed or received in good faith; rather, it was an accounting manipulation designed to render Essar Steel judgment-proof.  Indeed, it was effectuated shortly after Essar Steel was named as Respondent in an ICC Arbitration that ultimately lead to a $1.38 billion award against Essar Steel.  Essar Steel has yet to satisfy the Judgment resulting from the ICC Award against it.

164.   Furthermore, the $1.48 Billion Receivable was transferred to an insider— Essar Global, Essar Steel's parent corporation—and thus, the transfer is presumed to be in bad faith.

165.   Finally, Essar Steel obtained no consideration whatsoever in exchange for the conveyance of the $1.48 Billion Receivable.  Thus, there was no payment of a fair equivalent value for the property interest conveyed—there was no payment at all.

166.    Accordingly, the conveyance of the $1.48 Billion Receivable was fraudulent under DCL § 273.

## SECOND COUNT

### (Against Essar Global for Rescission and Turnover of Fraudulent Conveyances in Violation of New York Debtor and Creditor Law § 273-a)

167.    Plaintiff incorporates herein by reference paragraphs 1 through 151, *supra*, as if fully set forth herein.

168.    Under New York law, a conveyance made without fair consideration when the transferor is a defendant in an action for money damages is fraudulent if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

169.    As described above, *supra* ¶¶ 93–94, on September 29, 2016, Essar Steel conveyed $1,487,980,158 to Essar Global by extinguishing the $1.48 Billion Receivable.

170.    As described above, *supra* ¶¶ 92–107, that conveyance was made without fair consideration.

171.    At the time the conveyance was made, Essar Steel was a defendant in an action for money damages.  Essar Steel was the Respondent in the ICC Arbitration that ArcelorMittal USA brought, seeking significant monetary damages.

172.    On December 19, 2017, ArcelorMittal USA obtained an Award for $1,379,457,503 (including pre-Award interest), plus $1,533,853 as costs of the arbitration and post-judgment interest compounding at a rate of 8.6 percent.

173.    ArcelorMittal subsequently obtained a Judgment against Essar Steel in the District of Minnesota in the amount of $1,380,991,356.04, with prejudgment interest in the additional amount of $31,889,415.29.  *See* Case No. 0:18-cv-00083-DWF-LIB, D.I. 37.

174.    Neither Essar Steel nor Essar Global, nor any other Essar Group entity, has satisfied ArcelorMittal's Judgment.

175.    Accordingly, the conveyance of the $1.48 Billion Receivable was fraudulent under DCL § 273-a.

## THIRD COUNT

### (Against Essar Global for Rescission and Turnover of Fraudulent Conveyances in Violation of New York Debtor and Creditor Law § 276)

176.    Plaintiff incorporates herein by reference paragraphs 1 through 151, *supra*, as if fully set forth herein.

177.    Under New York law, every conveyance made and every obligation incurred with actual intent to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

178.    As described above, *see* ¶¶ 93–94 *supra*¸ on September 29, 2016, Essar Steel conveyed $1,487,980,158 to Essar Global by extinguishing the $1.48 Billion Receivable from its March 31, 2016 Financial Statements, audited by Nexia Baker.

179.    Essar Global transferred the $1.48 Billion Receivable with the intent to hinder, delay, and defraud ArcelorMittal.

180.    The transfer bears multiple badges of fraud demonstrating Essar Global and Essar Steel's fraudulent intent, including, but not limited to, the following:

a.    The 2016 conveyance occurred less than two months after ArcelorMittal USA's ICC Arbitration was initiated against Essar Steel;

b.    The 2016 conveyance occurred between related parties, and the conveyance was made to an insider (Essar Steel's parent company, Essar Global);

c.    The $1.48 Billion Receivable represented a high percentage of Essar Steel's assets;

d.  The 2016 conveyance was done in a sudden and secretive manner, via an accounting manipulation, and not in the usual course of business;

e.  The March 31, 2016 Financial Statements reflecting the fraudulent transfer contain obvious obfuscations, including the pretextual justification of a "future [share] buyback," which made no commercial sense (as Essar Global would own 100 percent of Essar Steel's shares regardless), and in any event was impossible to consummate under the Mauritius Companies Act solvency test, as Essar Global and Essar Steel well knew;

f.  Essar Steel received no consideration for the elimination of the $1.48 Billion Receivable; and

g.  The extinguishing of the $1.48 billion left Essar Steel insolvent and unable to pay its debts.

181.  Accordingly, the conveyance of the $1.48 Billion Receivable was fraudulent under DCL § 276.

## FOURTH COUNT

### (Against Essar Global as Alter Ego of Essar Steel)

182.  Plaintiff incorporates herein by reference paragraphs 1 through 151, *supra*, as if fully set forth herein.

183.  Essar Global exercised complete domination and control over Essar Steel such that Essar Steel was a mere instrumentality of Essar Global.

184.  Essar Global used its complete control and domination of Essar Steel to commit fraud and wrongdoing, including manipulating and abusing Essar Steel's corporate structure and divesting Essar Steel of its most significant assets, in an attempt to evade obligations to ArcelorMittal and Plaintiff's Judgment.

185.    By taking these actions to attempt to render Essar Steel judgment proof and avoid liability for Essar Steel's obligations pursuant to Plaintiff's Judgment, Essar Global has imposed an injustice on Plaintiff.

186.    Accordingly, Essar Global is liable for the full amount of the Judgment plus post-judgment interest.

## FIFTH COUNT

### (Against Essar Global for Turnover Pursuant to CPLR 5225)

187.    Plaintiff incorporates herein by reference paragraphs 1 through 151, *supra*, as if fully set forth herein.

188.    Section 5225(a) of the CPLR states, in relevant part, "where it is shown that the judgment debtor is in possession or custody of money or other personal property in which [the judgment creditor] has an interest, the court shall order that the judgment debtor pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment."

189.    Pursuant to Rule 69(a) of the Federal Rules of Civil Procedure and CPLR 5225, Plaintiff respectfully requests that the Court enforce Plaintiff's Judgment against Essar Steel by issuing an order conveying, assigning, and directing the payment to Plaintiff of all rights, title, and interest of Essar Steel's alter ego Essar Global in the New York law governed Notes and any other assets that remain in Essar Global's possession, in an amount to satisfy the Judgment.

## SIXTH COUNT

### (Against Garnishee Mesabi Metallics for Turnover Pursuant to CPLR 5227)

190.   Plaintiff incorporates herein by reference paragraphs 1 through 151, *supra*, as if fully set forth herein.

191.   Section 5227 of the CPLR states, in relevant part, that a court may require "any person who it is shown is or will become indebted to the judgment debtor . . . to pay to the judgment creditor the debt upon maturity, or so much of it as is sufficient to satisfy the judgment, and to execute and deliver any document necessary to effect payment," or "direct that a judgment be entered against such person in favor of the judgment creditor."

192.   Pursuant to Rule 69(a) of the Federal Rules of Civil Procedure and CPLR 5227, Plaintiff respectfully requests that the Court enforce Plaintiff's Judgment against Essar Steel (and Essar Global as Essar Steel's alter ego) by issuing an order requiring Mesabi Metallics to pay over to Plaintiff any and all amounts due on the Notes.

### PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

1.   Enter judgment disregarding the fraudulent conveyance and direct Essar Global to pay the sum of Plaintiff's Judgment plus post-judgment interest to Plaintiff;

2.   Enter judgment against Essar Global, as alter ego of Essar Steel, in the amount of Plaintiff's Judgment, including pre- and post-judgment interest;

3.   Enter an order conveying, assigning, and directing the payment to Plaintiff of all rights, title, and interest of Essar Steel's alter ego Essar Global in any assets that remain in Essar Global's possession, in an amount to satisfy Plaintiff's Judgment;

4.      Enter a turnover order against Mesabi Metallics and in favor of Plaintiff in the amounts owed on the Notes;

5.      Enter an order requiring Essar Global to pay Plaintiff's punitive damages;

6.      Enter an order enjoining Essar Global from taking any action to transfer, dispose of, encumber, or otherwise reduce any of its assets;

7.      Order payment of Plaintiff's attorneys' fees and expenses; and

8.      Award Plaintiff other and further relief the Court deems just and proper.

Dated:  August 18, 2021

Respectfully submitted,

Robert L. Weigel
Robert F. Serio
Jason W. Myatt
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
Telephone:  (212) 351-4000
Facsimile:  (212) 351-4035
rweigel@gibsondunn.com
rserio@gibsondunn.com
jmyatt@gibsondunn.com

*Attorneys for Plaintiff*