# Exhibit 2

STATE OF MINNESOTA

COUNTY OF ITASCA

IN DISTRICT COURT

NINTH JUDICIAL DISTRICT

---

ArcelorMittal USA LLC,

        Plaintiff,

v.

Essar Steel Ltd.,
Essar Global Fund, Ltd.,
Essar Steel Asia Holdings, Ltd.,
Essar Steel Middle East Fze,
and Prashant Ruia,

        Defendants.

File No. 31-CV-18-625

**ORDER**

---

The above-entitled matter came on for motion hearing before the Honorable Lois J. Lang, Judge of District Court, at the Itasca County Courthouse, in the City of Grand Rapids, County of Itasca, State of Minnesota, on June 4, 2018.

At the June 4, 2018 motion hearing, (1) Karl Procaccini and Clifford Greene, of Greene Espel PLLP, 222 South Ninth Street, Suite 2200, Minneapolis, Minnesota 55402; and (2) Christopher Tompkins and Vincent Lazar, of Jenner & Block LLP, 353 North Clark Street, Chicago, Illinois 60654, appeared on behalf of Plaintiff ArcelorMittal USA LLC [hereinafter 'Plaintiff']. David Marshall and Leah Janus, of Fredrikson & Byron, P.A., 200 South Sixth Street, Suite 4000, Minneapolis, Minnesota 55402-1425, appeared on behalf of Defendants Essar Global Fund, Ltd. [hereinafter 'Essar Global'], and Essar Steel Asia Holdings, Ltd. [hereinafter 'Essar Asia']. Keven Hickey, of Bassford Remele, P.A., 100 South Fifth Street, Suite 1500,

Minneapolis, Minnesota  55402-1254, appeared on behalf of Defendant Essar Steel, Ltd. [hereinafter 'Essar Steel.'][1]

In January 2014, Plaintiff, Essar Steel, and Essar Steel Minnesota LLC [hereinafter 'Essar Minnesota'][2] entered into an Amended and Restated Pellet Sale Agreement (hereinafter the 'Amended Pellet Sale Agreement'), in which Essar Minnesota and Essar Steel agreed to complete the construction of an open-pit mining project in northern Minnesota (the "Nashwauk Project"), and to supply a large quantity of iron ore to Plaintiff.  On May 26, 2016, Plaintiff notified Essar Steel and Essar Minnesota that it was terminating the Pellet Sale Agreement based on those entities' failure to make timely deliveries of the promised iron ore.  In July 2016, Essar Minnesota filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware.

In August 2016, Plaintiff initiated an arbitration proceeding before the International Chamber of Commerce ("ICC"), alleging breach of the Amended Pellet Sale Agreement by Essar Steel.  On December 19, 2017, the ICC tribunal issued a final award against Essar Steel, in favor of Plaintiff, in the amount of $1,380,991,356.04 (the "ICC Final Award.").  Plaintiff filed a petition to confirm the ICC Final Award in the United States District Court for the District of Minnesota; on April 2, 2018, the U.S. District Court entered a judgment recognizing the Final Award in favor of Plaintiff, against Essar Steel.  To date, Essar Steel has not paid Plaintiff any portion of the approximately 1.4 billion dollar ICC Final Award.

---

[1] Personal service has not yet been effected on Defendant Essar Steel Middle East Fze or Defendant Prashant Ruia; neither appeared at the June 4, 2018 hearing.

[2] Essar Minnesota is not a party to the instant proceedings.

Plaintiff commenced this action in the District Court for the State of Minnesota, County of Itasca, by Summons and Complaint filed March 2, 2018. Plaintiff seeks to hold the other named Essar entities, as well as the CEO of Essar Global, liable for Essar Steel's outstanding liability to Plaintiff. Count One of the Complaint alleges that Essar Steel made actual fraudulent transfers to Essar Global, Essar Asia, and Essar Middle East, in violation of Minn. Stat. §§ 513.44(a)(1) and 513.47.[3] Count Two alleges that Essar Steel made constructive fraudulent transfers to Essar Global, Essar Asia, and Essar Middle East, in violation of Minn. Stat. §§ 513.44(a)(2) and 513.47. Count Three alleges that the CEO of Essar Global, Prashant Ruia, knowingly aided and abetted the alleged fraudulent transfers of Essar Steel's property. Count Four alleges that Prashant Ruia conspired with Essar Steel, Essar Global, Essar Asia, and Essar Middle East in the alleged fraudulent transfers of Essar Steel's property. Count Five alleges that, under the theories or remedies of piercing the corporate veil, alter ego, and/or mere instrumentality, the corporate structure of Essar Steel should be disregarded, and Essar Global should be held liable for Essar Steel's liability for breach of the Amended Pellet Sale Agreement, pursuant to the ICC's Final Award. Count Six alleges that Essar Steel was acting as the agent of Essar Global with respect to the Amended Pellet Sale Agreement, and that—as a result of such agency relationship—Essar Global is liable for damages suffered by Plaintiff as a result of Essar Steel's breach of the Amended Pellet Sale Agreement.

By Notice of Motion and Motion to Dismiss, filed April 5, 2018, and Amended Notice of Motion and Motion to Dismiss, filed April 16, 2018, Essar Global seeks dismissal of Plaintiff's

---

[3] Minn. Stat. § 513.41 et seq., referred to as the "Minnesota Uniform Fraudulent Transfer Act" (MUFTA), sets forth provisions of the Uniform Fraudulent Transfer Act, which Minnesota adopted in 1987. *See Citizens State Bank Norwood Young Am. v. Brown*, 849 N.W.2d 55, 60 (Minn. 2014), as corrected (July 24, 2014).

3

complaint based on (1) lack of personal jurisdiction; (2) *forum non conveniens*; and/or (3) failure to state a claim upon which relief can be granted.

By Notice of Motion and Motion to Dismiss, filed April 16, 2018, Essar Steel seeks dismissal of Plaintiff's complaint based on (1) lack of personal jurisdiction; (2) *forum non conveniens*; and/or (3) failure to state a claim upon which relief can be granted. In the alternative, Essar Steel seeks an order compelling arbitration.

By Notice of Motion and Motion to Dismiss, filed April 16, 2018, Essar Asia seeks dismissal of Plaintiff's complaint based on (1) lack of personal jurisdiction; (2) *forum non conveniens*; and/or (3) failure to state a claim upon which relief can be granted.

Plaintiff opposes the motions to dismiss of Essar Steel, Essar Global, and Essar Asia, in their entirety.

By Notice of Motion and Motion filed May 17, 2018, Plaintiff requests leave to conduct jurisdictional discovery.  Essar Steel, Essar Global, and Essar Asia oppose Plaintiff's request for jurisdictional discovery.

By Notice of Motion and Motion filed May 21, 2018, Essar Global and Essar Asia move to stay discovery; Essar Steel joins in Essar Global and Essar Asia's motion to stay discovery. Plaintiff opposes the motion to stay discovery.  Plaintiff argues that general discovery should proceed, but—even if the Court stays general discovery—jurisdictional discovery should proceed.

The matter is deemed submitted June 4, 2018.

Based on the arguments of counsel, exhibits filed, and all of the files, records and proceedings herein, the Court makes the following:

**ORDER**

1.     The Court lacks specific personal jurisdiction over Essar Steel, Essar Global, and Essar Asia with respect to Plaintiff's fraudulent transfer claims.  The motions of Essar Steel, Essar Global, and Essar Asia to dismiss Counts I and II of the Complaint, for lack of personal jurisdiction, are **GRANTED.[4]**

       A.     Specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017) (quotations omitted).

       B.     Plaintiff's fraudulent transfer claims involve the transfers of assets, located abroad, between foreign entities.  Any alleged link between: (1) the alleged fraudulent transfers between Essar Steel, Essar Asia, and Essar Global, and (2) Essar Steel's liability to Plaintiff arising from its breach of the Amended Pellet Sale Agreement and the ICC Final Award, is too tenuous to support the exercise of specific personal jurisdiction.

2.     Assuming the Court has jurisdiction over Plaintiff's alter ego, piercing the corporate veil, and agency liability claims, the Court declines to exercise jurisdiction over those claims based on the doctrine of *forum non* conveniens. The motions of Essar Steel, Essar Global, and Essar Asia to dismiss Counts V and VI of the Complaint, pursuant to the doctrine of *forum non conveniens*, are **GRANTED.**

       A.     "The doctrine of *forum non conveniens* allows a district court with jurisdiction over the subject matter and the parties discretion to decline jurisdiction over a cause of action when another forum would be more convenient for the parties, the witnesses, and the court." *Paulownia Plantations de Panama Corp. v. Rajamannan*, 793 N.W.2d 128, 133 (Minn. 2009). A *forum non conveniens* analysis involves two steps: first, the district court must establish whether an "available and adequate" alternative forum exists. *Id.* at 133 (citations omitted).  If so, the second step in the *forum non conveniens* analysis "requires the court to weigh the private and public interest factors of both forums." *Id.* at 137.

       B.     Plaintiff has an available and adequate alternative forum for its claim, the Courts of Mauritius.  The public and private interest factors strongly weigh against the Court's exercise of jurisdiction over Essar Steel, Essar Global, and Essar Asia.  Of particular significance, the crux of Plaintiff's claims involve alleged fraudulent transfers, and disregard of corporate formalities, which implicate the corporate decision-making of foreign personnel of foreign Defendants, in a series of foreign transactions.  Most of the evidence in the

---

[4] If Counts I and II of the Complaint, alleging actual and constructive fraudulent transfers, were not dismissed for lack of specific personal jurisdiction, the Court would dismiss those claims pursuant to the doctrine of *forum non conveniens*.

matter is located outside Minnesota. Furthermore, this action involves a dispute between global steel conglomerates, over the alleged transfer of international corporate assets and the disregard of corporate formalities between international parents and subsidiaries. None of the parties, including Plaintiff, is a Minnesota resident. Despite Plaintiff's attempts to tie these claims to the underlying failure of the Nashwauk Project, Minnesota's interest in hearing this dispute is weak.

3.    The Court has dismissed Counts One, Two, Five, and Six of the Complaint (all of the pending claims against Essar Steel, Essar Global, and Essar Asia) based on either lack of specific personal jurisdiction, *forum non conveniens*, or both. The Court's dismissal of these claims renders moot Plaintiff's motion for jurisdictional discovery,[5] Defendants' motions to stay discovery, and Essar Steel's alternative request for arbitration.

4.    The following claims remain against the following Defendants, who have not yet been personally served:

- Count One against <u>Essar Middle East</u>, alleging that Essar Steel made actual fraudulent transfers to Essar Middle East, in violation of Minn. Stat. §§ 513.44(a)(1) and 513.47.

- Count Two against <u>Essar Middle East</u>, alleging that Essar Steel made constructive fraudulent transfers to Essar Middle East, in violation of Minn. Stat. §§ 513.44(a)(2) and 513.47.

- Count Three against <u>Prashant Ruia</u>, alleging that that the CEO of Essar Global, Prashant Ruia, knowingly aided and abetted the alleged fraudulent transfers of Essar Steel's property.

- Count Four against <u>Prashant Ruia</u>, alleging that Prashant Ruia conspired with Essar Steel, Essar Global, Essar Asia, and Essar Middle East in the alleged fraudulent transfers of Essar Steel's property.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

The attached memorandum is incorporated herein and expressly made a part of this Order

DATE: June 27, 2018                                 BY THE COURT:

_____
                                                          Lois J. Lang
                                                          Judge of District Court

---

[5] As discussed in the accompanying Memorandum, the evidence Plaintiff seeks through additional jurisdictional discovery would not alter the Court's decision to decline jurisdiction on grounds of *forum non conveniens*.

**MEMORANDUM**

## I.      Procedural Background

In January 2014, Plaintiff ArcelorMittal USA LLC [hereinafter 'Plaintiff'], Essar Steel Minnesota LLC [hereinafter 'Essar Minnesota'],[6] and Defendant Essar Steel, Ltd. [hereinafter 'Essar Steel'] entered into an Amended and Restated Pellet Sale Agreement [hereinafter the 'Amended Pellet Sale Agreement'), in which Essar Minnesota and Essar Steel agreed to complete the construction of an open-pit mining project in northern Minnesota (the 'Nashwauk Project'), and to supply a large quantity of iron ore to Plaintiff.  On May 26, 2016, Plaintiff notified Essar Steel and Essar Minnesota that it was terminating the Amended Pellet Sale Agreement based on those entities' failure to make timely deliveries of the promised iron ore.  In July 2016, Essar Minnesota filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware.

In August 2016, Plaintiff initiated an arbitration proceeding before the International Chamber of Commerce (ICC), alleging breach of the Amended Pellet Sale Agreement by Essar Steel.  On December 19, 2017, the ICC tribunal issued a final award against Essar Steel, in favor of Plaintiff, in the amount of $1,380,991,356.04 (the "ICC Final Award.").  Plaintiff filed a petition to confirm the ICC Final Award in the United States District Court for the District of Minnesota; on April 2, 2018, the U.S. District Court entered a judgment recognizing the Final Award in favor of Plaintiff, and against Essar Steel.  To date, Essar Steel has not paid any portion of the approximately 1.4 billion dollar ICC Final Award to Plaintiff.

Plaintiff commenced this action in the District Court for the State of Minnesota, County of Itasca, by Summons and Complaint filed March 2, 2018, against Essar Steel, Essar Global

---

[6] Essar Minnesota is not a party to the instant proceedings.

Fund, Ltd. [hereinafter 'Essar Global'], Essar Steel Asia Holdings, Ltd. [hereinafter 'Essar Asia'], Essar Steel Middle East Fze [hereinafter 'Essar Middle East'], and Prashant Ruia, CEO of Essar Global.  Plaintiff seeks to hold the other named Essar entities, as well as the CEO of Essar Global, liable for Essar Steel's outstanding liability to Plaintiff.

Count One of the Complaint alleges that Essar Steel made actual fraudulent transfers to Essar Global, Essar Asia, and Essar Middle East, in violation of Minn. Stat. §§ 513.44(a)(1) and 513.47.[7] Count Two alleges that Essar Steel made constructive fraudulent transfers to Essar Global, Essar Asia, and Essar Middle East, in violation of Minn. Stat. §§ 513.44(a)(2) and 513.47.  Count Three alleges that the CEO of Essar Global, Prashant Ruia, knowingly aided and abetted the alleged fraudulent transfers of Essar Steel's property.  Count Four alleges that Prashant Ruia conspired with Essar Steel, Essar Global, Essar Asia, and Essar Middle East in the alleged fraudulent transfers of Essar Steel's property.  Count Five alleges that, under the theories or remedies of piercing the corporate veil, alter ego, and/or mere instrumentality, the corporate structure of Essar Steel should be disregarded, and Essar Global should be held liable for Essar Steel's liability for breach of the Amended Pellet Sale Agreement, pursuant to the ICC's Final Award.  Count Six alleges that Essar Steel was acting as the agent of Essar Global with respect to the Amended Pellet Sale Agreement, and that—as a result of such agency relationship—Essar Global is liable for damages suffered by Plaintiff as a result of Essar Steel's breach of the Amended Pellet Sale Agreement.

By Notice of Motion and Motion to Dismiss, filed April 5, 2018, and Amended Notice of Motion and Motion to Dismiss, filed April 16, 2018, Essar Global seeks dismissal of Plaintiff's

---

[7] Minn. Stat. § 513.41 et seq., referred to as the "Minnesota Uniform Transfer Act" (MUFTA), sets forth provisions of the Uniform Fraudulent Transfer Act, which Minnesota adopted in 1987.  *See Citizens State Bank Norwood Young Am. v. Brown*, 849 N.W.2d 55, 60 (Minn. 2014), as corrected (July 24, 2014).

complaint based on (1) lack of personal jurisdiction; (2) *forum non conveniens*; and/or (3) failure to state a claim upon which relief can be granted.

By Notice of Motion and Motion to Dismiss, filed April 16, 2018, Essar Steel seeks dismissal of Plaintiff's complaint based on (1) lack of personal jurisdiction; (2) *forum non conveniens*; and/or (3) failure to state a claim upon which relief can be granted. In the alternative, Essar Steel seeks an order compelling arbitration.

By Notice of Motion and Motion to Dismiss, filed April 16, 2018, Essar Asia seeks dismissal of Plaintiff's complaint based on (1) lack of personal jurisdiction; (2) *forum non conveniens*; and/or (3) failure to state a claim upon which relief can be granted.

Plaintiff opposes the motions to dismiss of Essar Steel, Essar Global, and Essar Asia, in their entirety.

By Notice of Motion and Motion filed May 17, 2018, Plaintiff requests leave to conduct jurisdictional discovery. Essar Steel, Essar Global, and Essar Asia oppose Plaintiff's request for jurisdictional discovery.

By Notice of Motion and Motion filed May 21, 2018, Essar Global and Essar Asia move to stay discovery; Essar Steel joins in Essar Global and Essar Asia's motion to stay discovery. Plaintiff opposes the motion to stay discovery. Plaintiff argues that general discovery should proceed, but—even if the Court stays general discovery—jurisdictional discovery should proceed.

Personal service has not yet been effected on Defendant Essar Middle East or Defendant Prashant Ruia. Neither Essar Middle East nor Prashant Ruia appeared at the June 4, 2018 hearing before the undersigned, nor have they participated in any capacity in these proceedings.

Any reference to the "Essar Defendants" in this Memorandum refers to Essar Steel, Essar Global, and Essar Asia. For purposes of the Order, the "Essar Defendants" should not be construed to include Essar Middle East or Prashant Ruia, who have not been personally served.

## II.    Factual Background[8]

### A.    The Parties

Plaintiff ArcelorMittal USA is "a limited liability company organized under the laws of Delaware, with its headquarters at 1 South Dearborn, 19th Floor, and Chicago, Illinois, 60603." [Compl. ¶ 6.] Plaintiff is "one of the largest steelmakers in North America. It employs approximately 20,000 people through its operations in 13 states, including mining operations in Virginia and Minnesota." [*Id.*] Plaintiff is "a subsidiary of ArcelorMittal, S.A., a *societe anonyme* incorporated under Luxembourg law. ArcelorMittal S.A. wholly owns [Plaintiff] indirectly through a series of Delaware limited liability companies and an S.a.r.l. (Ispat Inland S.a.r.l.) organized in Luxembourg. ArcelorMittal S.A. is the world's largest steel and mining company." [*Id.* at ¶ 7.]

The Complaint alleges that Essar Steel is organized under the laws of Mauritius. Essar Steel is a wholly-owned subsidiary of Essar Global." [Compl. ¶ 8.]

Essar Global "is organized under the laws of the Cayman Islands with offices in Asia, Africa, Europe, and the Americas. Essar Global is an investment fund overseeing a worldwide conglomerate of companies." [*Id.* at ¶ 9.] Essar Global is "owned or controlled by Shashi Ruia,

---

[8] Defendants challenge whether this Court has personal jurisdiction to hear the instant claims, as discussed further below. "Once jurisdiction has been challenged by the defendant, the burden is on the plaintiff to prove that sufficient contacts exist with the forum state. At the pretrial stage, however, the plaintiff's allegations and supporting evidence are to be taken as true." *Juelich v. Yamazaki Mazak Optonics Corp.*, 682 N.W.2d 565, 569–70 (Minn. 2004) (internal citations omitted). The allegations in Plaintiff's complaint are accepted as true for the purposes of determining whether the Court has personal jurisdiction over Defendants.

The following statement of facts is for purposes of this order only and has no bearing on any subsequent factual or legal determinations in this matter.

10

Ravi Ruia, Prashant Ruia, Anshuman Ruia, and Rewant Ruia (collectively, the "Ruia Family")." [*Id.*]  On Plaintiff's "information and belief, Defendant Prashant Ruia is a resident of Mumbai, India.  Prashant Ruia is the CEO of Essar Global and has at various times served as a director of Essar Steel, Essar India, and other Essar Group entities."  [*Id.* at ¶ 12.]

Essar Global is an investment fund overseeing a worldwide conglomerate of businesses in Asia, Africa, Europe, and the Americas. [Compl. ¶ 9.]  Essar Global is the ultimate parent of dozens of subsidiaries conducting business under the "Essar" name (collectively, the 'Essar Group'). [*Id*.]  The Ruia Family manages Essar Global through its "investment manager," Essar Capital.[9] [*See* Declaration of Plaintiff's Attorney Christopher Tompkins, filed May 25, 2018, at Ex. 4, p. 1.]

Essar Asia "is organized under the laws of Mauritius.  Essar Asia is a wholly-owned indirect subsidiary of Essar Global.  Essar Asia currently is the majority shareholder in Essar Steel India Ltd.[10] ("Essar India"), which operates Essar's steel-making business in India and is currently the subject of an Indian insolvency proceeding."  [Compl. ¶ 10.]  Essar Steel and Essar Asia have the same registered office address in Mauritius. [Tompkins Decl., Exs. 1–2.]

Essar Middle East "is organized under the laws of the United Arab Emirates and is based in Dubai.  Essar Middle East is a wholly-owned subsidiary of Essar India.  Essar Steel Middle East currently is the owner of Essar Steel UAE Limited[11] ("Essar UAE"), which is organized under the laws of the United Arab Emirates and is based in Dubai." [Compl. ¶ 11.]

---

[9] Essar Capital is not a party to this action.

[10] Essar India is not a party to this action.

[11] Essar UAE is not a party to this action.

### B. The "Nashwauk Project"

#### 1. Essar Steel's Acquisition of Essar Steel Minnesota

"Essar Steel purchased Minnesota Steel Industries LLC in October 2007 and changed the company's name to [Essar Minnesota]." [Compl. ¶ 22.]  This acquisition was ostensibly made to facilitate the completion of the "Nashwauk Project," a "large open pit iron ore mine on the western edge of the Mesabi iron range in Minnesota which was to include a pelletizing plant." *Id.* Essar Minnesota is not a party to these proceedings.

#### 2. Early Stages of the "Nashwauk Project"

The Essar Group claimed that its acquisition of Essar Minnesota, and planned Nashwauk Project, "established a solid beachhead in the Americas." [Tompkins Decl., filed May 25, 2018, at Ex. 3, p. 8.]  Members of the Ruia Family visited Minnesota in connection with the Nashwauk Project. [See *id*., Ex. 21 at p. 2.]

##### a. Negotiation of Minnesota Subsidies

"Essar Group entities sought multi-million dollar subsidies for the Nashwauk Project from the State of Minnesota and local governments.  The proposed subsidies were negotiated by Essar Global, Essar Steel, and Essar Minnesota with the State of Minnesota and Itasca County." [Compl. ¶ 23.]  Defendant Prashant Ruia and other members of the Essar Group visited Minnesota as part of these negotiations. [See Tompkins Decl., Ex. 16 at p. 1.]

Essar Steel made various representations regarding its assets when negotiating subsidies for the Nashwauk Project. "In a June 2008 letter to the Itasca County Board of Commissioners, Essar Steel (then known as Essar Steel Holdings Ltd.) represented that Essar Steel had an estimated net worth of $5 billion, generated minimum cash of $2 billion each year, and had an enterprise value of $22 billion." [Compl. ¶ 50.]

In September 2008, "Essar Global entered into agreements with Itasca County and the State of Minnesota whereby Essar Global secured business subsidies totaling approximately $65 million for the development of infrastructure, road, and rail improvements necessary for the Nashwauk Project." [Compl. ¶ 24.]  Essar Global further "agreed that it would be responsible for repayment for some or all of the $65 million subsidy in the event that the Nashwauk project did not create a certain number of jobs." [*Id.*]

In one of its business subsidy agreements with Itasca County, Essar Global acknowledged that the Nashwauk Project would "produce and provide both an economic and non-economic benefit to Essar Global." [Tompkins Decl., Ex. 9, Complaint and Exhibits filed in Minnesota File No. 31-CV-17-959, *County of Itasca v. Essar Global Fund Limited*, Exhibit A - Reimbursement Agreement at p. 4.]

Both Essar Global and Essar Minnesota were parties to these business subsidy agreements. The same person—Essar Minnesota's CEO, Madhu Vuppuluri—signed these agreements on behalf of both Essar Minnesota and Essar Global. [*See*, *e.g., id*. at pp. 8–9.] In so doing, Mr. Vuppuluri agreed that both of these entities would litigate any disputes arising out of the business subsidy agreements in Minnesota. [*See, e.g., id*. at 7.]

### b.  Third-Party Funding for the Nashwauk Project

Along with public subsidies, the Nashwauk Project required third-party funding.  Essar Group entities "commenced the development and construction of the [Nashwauk Project], and purported to secure hundreds of millions of dollars of debt and equity financing for the construction of the project." [Compl. ¶ 25.]  "Essar Global, Essar Steel, Essar Asia, and other Essar Group entities provided guaranties on behalf of Essar Minnesota.  Essar Global also made promises of direct cash contributions to the Nashwauk Project, and to fund any deficiency that

may exist between the total cost of the project and available financing. The total amount of debt financing for which one or more of the Defendants provided guaranties exceeds $1 billion." [*Id.*]

To obtain funding from ICICI Bank for the Nashwauk Project, the Essar Defendants guaranteed hundreds of millions of dollars of debt incurred by Essar Minnesota. [*See generally* Tompkins Decl., Exs. 10–13, Documents related to federal action captioned *ICICI Bank Limited v. Essar Global Fund Limited, et al.* (S.D.N.Y. No 16-CV-7836 (GHW).]  In the agreements with ICICI Bank to guarantee Essar Minnesota's debts, Essar Global, Essar Steel, and Essar Asia each represented that they would "derive substantial direct and indirect benefit" from the extension of credit to Essar Minnesota for the Nashwauk Project. [Tompkins Decl., Exs. 11–13 at p. 1.] Essar Global made similar representations when it guaranteed additional debt for Essar Minnesota from U.S. Bank National Association. [Tompkins Decl., Ex. 14, Copy of September 30, 2014 Guaranty provided by Essar Global in favor of U.S. Bank National Association, filed as an exhibit in the New York state action captioned *Barclays Bank PLC v. Essar Global Fund Limited* (Index No. 57086/2016) at p. 1.]

### 3.  The "Pellet Sale Agreement"

In 2011, Essar Global approached ArcelorMittal S.A., Plaintiff's parent corporation, to explore its interest in obtaining iron ore pellets from the Nashwauk Project. [Declaration of John Brett, President and CEO of Plaintiff ArcelorMittal USA LLC ("Brett Decl.") ¶ 7.] Representatives of the Essar Group continued discussions with ArcelorMittal, S.A. and Plaintiff regarding a potential supply agreement throughout 2011 and 2012.  [*Id*. ¶¶ 7–12.]  Plaintiff's negotiations with Essar Group personnel regarding iron ore pellets took place in Minnesota and New York. [*Id*.]

On December 17, 2012, Essar Minnesota and Essar Resources, Inc. (hereinafter 'Essar Resources'), entered into a Pellet Sale and Purchase Agreement (hereinafter the 'Pellet Sale Agreement') with Plaintiff.[12]  [Compl. ¶ 32.]  Pursuant to this agreement, Essar Minnesota and Essar Resources were required to supply a large quantity of iron ore pellets from the Nashwauk Project to Plaintiff for a ten-year period beginning no later than July 1, 2014. [Declaration of Eric C. Knorr, Plaintiff's employee who held the titles of Division Manager of Raw Steel Supply from 2013-2015, and Vice President of Procurement and Supply Chain from 2015-2017 ("Knorr Decl."), at Ex. 27 – Pellet Sale and Purchase Agreement at §§ 2, 18.]

### 4.  The "Amended Pellet Sale Agreement"

"By late 2013, it was clear that Essar Minnesota could not meet the July 1, 2014 deadline for production and delivery established in the 2012 [Pellet Sale] Agreement." [Compl. ¶ 34.]  On January 10, 2014, Plaintiff "accommodated Essar Minnesota by executing the Amended and Restated Pellet Sale and Purchase Agreement" (hereinafter the 'Amended Pellet Sale Agreement'), "in which [Plaintiff] agreed to extend the date for commencement of production and delivery from July 1, 2014, to July 1, 2015." [*Id.*]  Plaintiff's negotiations with Essar Group personnel regarding the Amended Pellet Sale Agreement took place in Minnesota and New York.  [Brett Decl. ¶¶ 11–12.]  The Amended Pellet Sale Agreement was signed on behalf of Essar Steel by Sushil Baid.[13]

The Amended Pellet Sale Agreement "substituted Essar Steel (Essar Minnesota's parent company) as a party in place of Essar Resources." [Compl. ¶ 36.]  "The substitution of Essar Steel for Essar Resources was necessary because during negotiations, [Plaintiff] learned that

---

[12] Neither Essar Minnesota nor Essar Resources is a party to the instant action.

[13] As discussed below, Mr. Baid served as a signatory for Essar Global in later correspondence to Plaintiff.

Essar Resources was in fact not the parent company of Essar Minnesota as had been previously represented to [Plaintiff.]" [*Id.*]

Essar Steel agreed that disputes arising under the Amended Pellet Sale Agreement were to be arbitrated under the Rules of Arbitration of the International Chamber of Commerce (ICC), by a panel of arbitrators confirmed by the ICC International Court of Arbitration (ICC Court), sitting in Minneapolis, Minnesota.  [Knorr Decl., Ex. 28 – Amended Pellet Sale Agreement at § 12(a)–(c).]  Essar Steel also agreed to submit to the jurisdiction of Minnesota courts for the enforcement of any arbitration award. [*Id*. at § 12(h).]  Specifically, the January 10, 2014 Amended Pellet Sale Agreement between Plaintiff, and Essar Steel and Essar Minnesota, provided as follows:

12.    ARBITRATION

(a)    The parties agree that all disputes, claims, questions or disagreements (*"Controversies"*) arising under, out of, relating to, or in connection with this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce ("ICC Rules"). For purposes of this Article 12, Essar Resources, Inc. [sic][14] and Essar Steel Minnesota LLC shall be considered to be one party.

(b)    The Arbitral Panel shall consist of three independent and impartial arbitrators, who shall be subject to confirmation by the ICC International Court of Arbitration ("ICC Court").

***

(c)    The arbitration shall be in the English language, and the site of the arbitration shall be in Minneapolis, Minnesota.  All testimonial hearings shall be heard in Minneapolis unless both parties agree otherwise.

---

[14] The Amended Pellet Sale Agreement "substituted Essar Steel (Essar Minnesota's parent company) as a party in place of Essar Resources." [Compl. ¶ 36.]  The Arbitration provision of the Amended Pellet Sale Agreement appears to have retained the language of the original, December 17, 2012 Pellet Sale Agreement, naming Essar Resources, rather than Essar Steel.  This is the only substantive provision of the Amended Pellet Sale Agreement to name Essar Resources, rather than Essar Steel.

None of the Essar entities have argued that Essar Steel is not bound by the language of the Arbitration Section of the Amended Pellet Sale Agreement by virtue of this error. Accordingly, the Court concludes that the reference to Essar Resources in the Arbitration Section of the Amended Pellet Sale Agreement was a scrivener's error, and that Essar Steel—as a signatory to the Amended Pellet Sale Agreement—intended to be bound by the Arbitration provisions.

16

       ***

(h)     The parties agree that the award may be enforced in any court of competent jurisdiction, including without limitations the federal and state courts in Minnesota and Illinois, and the parties agree to submit to the jurisdiction of the Minnesota and Illinois federal and state courts. The arbitration, including any enforcement proceedings or motion to vacate, shall be subject to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* which shall preempt any state arbitration law.

[Knorr Decl., Ex. 28 – Amended Pellet Sale Agreement at § 12(a)–(h).]

"By June 2015, it had become clear that Essar Minnesota and Essar Steel again would not meet their obligations to commence production and delivery by the deadline specified in the [Amended] Pellet Sale Agreement." [Compl. ¶ 37.] Plaintiff "again accommodated the Essar Group entities by executing another amendment to the [Amended] Pellet Sale Agreement that, among other things, further extended the date for commencement of production and delivery to July 1, 2016." [*Id.*]

In October 2015, a representative of Essar Capital, Joseph Seifert, visited Eric Knorr, who was then serving as Plaintiff's Vice President of Procurement and Supply Chain, and represented that Essar Global remained committed to completing the Nashwauk Project. [Knorr Decl. ¶ 12.]

In December 2015, "in connection with efforts to convince [Plaintiff] to agree to a further extension of the deadline for commencement of production and delivery [of iron ore pellets from the Nashwauk Project], Essar Global provided a letter to [Plaintiff] indicating that it was the ultimate shareholder of Essar Minnesota, had made substantial contributions of equity to Essar Minnesota, had guaranteed the debts of Essar Minnesota, and had undertaken the obligation to fund any shortfall between the total cost of the Nashwauk Project and available financing." [Compl. ¶ 38; *see also* Knorr Decl., Ex. 29 – December 17, 2016 Letter to Eric Knorr from

Sushil Baid, on behalf of Essar Global.]  This letter was signed on behalf of Essar Global by Mr. Baid, the same person who had previously signed the Amended Pellet Sale Agreement on behalf of Essar Steel.  [*Id.*, Ex 29.] .

### C.  Termination of the Nashwauk Project and Breach of the Amended Pellet Sale Agreement

In December 2015, Essar Minnesota promised the State of Minnesota that it would make good on its obligations incurred to facilitate the Nashwauk Project. [Compl. ¶ 30.]  However, after Essar Minnesota missed the deadlines for those payments, Governor Mark Dayton announced that the State would terminate Essar Minnesota's mineral leases unless Essar Minnesota paid its obligations to the State, Itasca County, and its vendors by July 1, 2016.  [*Id.*]

By May 2016, "it had become clear [to Plaintiff] that Essar Minnesota and Essar Steel could not and would not perform" under the terms of the Amended Pellet Sale Agreement. [Compl. ¶ 40.]  "Accordingly, on May 27, 2016, [Plaintiff] notified Essar Minnesota and Essar Steel that it was terminating the [Amended] Pellet Sale Agreement." [*Id.*]

"On July 8, 2016, Governor Dayton announced that the State of Minnesota was terminating Essar Minnesota's mineral leases. [Compl. ¶ 31.]  In response, "Essar Minnesota filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code in the United State District Bankruptcy Court for the District of Delaware." [*Id.*]

### D.  International Chamber of Commerce (ICC) Arbitration

As a result of the breach of the Amended Pellet Sale Agreement, "and pursuant to section 12 of the [Amended] Pellet Sale Agreement, Plaintiff filed a Request for Arbitration against Essar Steel in the International Court of Arbitration of the International Commerce Commission (the "ICC Court") in August 2016." [*See* Plaintiff's Memorandum of Law in Opposition to the Essar Defendants' Motions to Dismiss, filed May 25, 2018, at p. 12 (citing Tompkins Decl., Ex.

17 – ICC Tribunal Final [Arbitration] Award, Case No. 22187/RD/MK, ArcelorMittal USA LLC

v. Essar Steel Ltd., at ¶ 12.]  Plaintiff describes the ICC Arbitration Proceedings as follows:

> Later in 2016, Essar Steel filed an Answer and Counterclaim in response to ArcelorMittal USA's Request for Arbitration.[15]
>
> Essar Steel participated in the arbitration through August 2017. It exchanged document requests with [Plaintiff], attended the pre-hearing conference, made written submissions concerning document production disputes, and produced a number of documents.[16] It initially was represented by the international law firm of Milbank, Tweed, Hadley & McCloy LLP, which was later replaced by the law firm of Pepper Hamilton LLP.[17] After Pepper Hamilton withdrew from the representation, Andrew Wright, Senior Legal Counsel at Essar Capital, undertook representation of Essar Steel in the arbitration.[18]
>
> Late in the summer of 2017, Mr. Wright informed the ICC Arbitral Tribunal that Essar Steel would "not be filing any further written submissions" or attending the arbitration hearing.[19]  But "for the avoidance of any doubt," Mr. Wright made clear that these decisions did "not mean that Essar Steel [was] 'not defending' the claim or not standing by its counterclaim."[20] Mr. Wright emphasized that Essar Steel was relying "on the Tribunal to have due regard to the material that it [had] already submitted and to ensure that, if it maintained its claim, [ArcelorMittal USA] is required to prove its case to the necessary standard."[21]
>
> …At a three-day October 2017 hearing in Minneapolis, [Plaintiff] presented live testimony of three experts and three fact witnesses who were examined by the Tribunal.[22]

On December 19, 2017, the ICC tribunal issued a final award against Essar Steel, in favor

of Plaintiff, in the amount of $1,380,991,356.04 (the 'ICC Final Award').  On April 2, 2018, the

United States District Court for the District of Minnesota entered a judgment recognizing the

ICC Final Award.  [Plaintiff's Memorandum of Law in Opposition to the Essar Defendants'

---

[15] Citing Tompkins Decl., Ex.17 at ¶¶ 13–16.
[16] Citing *id.*, at ¶¶ 34–43.
[17] Citing Tompkins Decl.., Exs. 23–24.
[18] Citing *id.,* Ex 18.
[19] Citing *id*, Ex. 17 at ¶ 50.
[20] Citing *id.*
[21] Citing *id.*
[22] Citing Tompkins Decl., Ex. 17 at ¶ 54.

Motions to Dismiss, filed May 25, 2018, at p. 13.] At the June 4, 2018 hearing before the undersigned, the parties disagreed as to whether the ICC Final Award constituted a "default judgment" against Essar Steel, and further disputed the consequences of the Award's status (or lack thereof) as a default judgment.[23]

At the time the ICC Final Award was issued, Essar Steel already had been adjudicated liable for $588 million in connection with the loans from ICICI Bank in a federal action in the Southern District of New York, *ICICI Bank Limited v. Essar Global Fund Limited, et al.* (S.D.N.Y. No 16-CV-7836(GHW). [*See* Tompkins Decl., Ex. 26.]

### E. The Instant Action

To date, "Essar Steel has not complied with the ICC Final Award or paid any portion of the damages awarded to [Plaintiff.]" [Compl. ¶ 3.] Plaintiff commenced this action by Summons and Complaint filed March 2, 2018, against Essar Steel, Essar Global, Essar Asia, Essar Middle East, and Prashant Ruia, CEO of Essar Global. Plaintiff seeks to hold the other named Essar entities, as well as the CEO of Essar Global, liable for Essar Steel's outstanding liability to Plaintiff.

### 1. Characterization of Claims

Plaintiff advances three basic theories of liability against the Essar defendants in these proceedings: (1) Plaintiff seeks to void a series of allegedly fraudulent transfers between Essar Steel and the other Essar defendants; (2) Plaintiff argues that—under the theories or remedies of piercing the corporate veil, alter ego, and/or mere instrumentality—the corporate structure of Essar Steel should be disregarded, and Essar Global should be held responsible for Essar Steel's liability to Plaintiff; and (3) Plaintiff alleges that Essar Steel was acting as the agent of Essar

---

[23] As further discussed below, the Court ultimately concludes that such argument has little practical significance.

Global with respect to the Amended Pellet Sale Agreement, and that—as a result of such agency relationship—Essar Global is liable for damages suffered by Plaintiff as a result of Essar Steel's breach of the Agreement.  Plaintiff characterizes these claims as actions to "enforce" the ICC Final Award, so as to trigger Section 12(a)-(h) of the Amended Pellet Agreement between Plaintiff, Essar Steel, and Essar Minnesota—in which Essar Steel agreed that "all disputes, claims, questions or disagreements … arising under, out of, relating to, or in connection with this [Amended Pellet Sale] Agreement" would be subject to ICC arbitration, and that any such ICC arbitration award "may be *enforced* in any court of competent jurisdiction, including without limitations the federal and state courts in Minnesota and Illinois, and the parties agree to submit to the jurisdiction of the Minnesota and Illinois federal and state courts." [*See* Knorr Decl., Ex. 28 – Amended Pellet Sale Agreement at § 12(a)–(h) (emphasis added).]

Defendants argue that Plaintiff's requests to void allegedly fraudulent transactions, pierce the corporate veil and/or declare Essar Steel a "mere instrumentality" of Essar Global, or hold Essar Global liable based on alleged agency relationship with Essar Steel go beyond mere enforcement of the ICC Final Award. As a result, Defendants argue that any consent by Essar Steel to Minnesota Courts' jurisdiction to "enforce" ICC arbitration awards under the Amended Pellet Sale Agreement does not govern Plaintiff's current claims.

This characterization of claims is crucial to the Court's determination of whether it has personal jurisdiction over Defendants, as further discussed below.

### 2.  Plaintiff's Allegations and Evidence in Support of its Current Claims[24]

#### a.  Essar Group Informational Materials

Plaintiff alleges that the Essar Group's informational and advertising materials demonstrate the "close interconnection between Essar Steel, Essar Global, Essar Asia, and Essar Middle East, including their symbiotic relationships and consolidation of corporate image and operations."  [*See* Compl. At ¶ 19.]

In a copy of an Organizational Brochure[25] titled the "Essar Group Profile," attached as Exhibit 3 to the May 25, 2018 Declaration of Plaintiff's Attorney Tompkins, the Essar Group promotes itself as a family business built and run by the Ruia Family. [*See* Tompkins Decl., Ex. 3 at p. 2.]  The Brochure advertises the Essar Group's "lean and dynamic team of employees" who provide "world-class services and products" through its various businesses. [*Id.*]  The Brochure further states that "[a]ll our [Essar Group's] businesses are highly integrated across the value chain." [Tompkins Decl., Ex. 3 at p. 3.]

The Essar Group's "Corporate Profile" section of its website, accessed June 30, 2017, at www.essar.com, identifies Essar Capital as Essar Global's investment manager.  [*See* Tompkins Decl., Ex. 4, at p. 1.]  Essar Capital claims to be a "global investor, controlling a number of world class assets diversified across the core sectors of Energy, Metals & Mining, Infrastructure (comprising ports and [Engineering, Procurement, and Construction] businesses) and Services (primarily comprising shipping and [Business Process Outsourcing] businesses." [*Id.*]  Essar's website identifies Essar Steel as one of the key assets "controll[ed]" by Essar Global.  [*Id.* at 1–2.]

---

[24] The allegations in Plaintiff's complaint and Plaintiff's supporting evidence are accepted as true for the purposes of determining whether the Court has personal jurisdiction over Defendants.  *See Juelich v. Yamazaki Mazak Optonics Corp.*, 682 N.W.2d 565, 569–70 (Minn. 2004) (internal citations omitted).

[25] The copy of the Brochure appears to be undated.

The "Essar Group Profile" Brochure further states that Essar Steel Holdings, Ltd. is "the holding company that drives Essar Steel's expansion plans." [Tompkins Decl., Ex. 3 at p.f 6.] Essar Steel has its own website (www.essarsteel.com) that, as of February 28, 2014, stated that "Essar Steel is a global integrated producer with an annual capacity of 14 million tonnes with a strong presence in intensive steel consuming markets of Asia and North America." [Tompkins Decl., Ex. 25 at p. 1.]

### b.  Representations by Essar Minnesota in a 2014 Note Offering

Plaintiff further notes that Essar Minnesota—in an effort to secure additional funding for the Nashwauk Project in 2014—stated in the offering materials that Essar Minnesota was "controlled by Essar Steel and [Essar Global] and, accordingly, Essar Steel and [Essar Global] [had] the ability to influence [its] policies and operations." [Tompkins Decl., Ex. 15 – May 7, 2014 Offering circular from Essar Minnesota for 11.500% Secured Senior Notes, due 2020, at p. 40.]

### c.  Essar Steel Financial Statements (2009)

Plaintiff filed a copy of Essar Steel's audited financial statements for the year ending March 31, 2009.[26] Essar Steel's financial statements state that it is managed by Essar Global and has the "complete support" of Essar Global for all its operations:

> [Essar Steel's] objectives while managing capital are to safeguard its ability to continue as a going concern and to provide returns for its shareholders. [Essar Steel] is a debt geared Company and the equity is attributable to the parents of [Essar Steel].

> The capital management process is determined and managed at the holding company [Essar Global] level. [Essar Steel] is also assured complete support from [Essar Global] in relation to its operations.

---

[26] Those financial statements were filed in the federal action in the District of Minnesota captioned *Great Lakes Transmission Limited Partnership v. Essar Steel Minnesota, LLC, et al.* (D. Minn. 09-CV-03037 SRN/LIB). [*See* Tompkins Decl. at ¶ 8.]

[Tompkins Decl., Ex. 6 at p. 29.]  Plaintiff alleges that this information included in Essar Steel's March 31, 2009 financial statement tends to establish Essar Global's "domination and control" over its subsidiaries, including Essar Steel.  [*See* Plaintiff's Memorandum of Law in Opposition to the Essar Defendants' Motions to Dismiss, at p. 4.]

### d.  Information from Separate Court Proceedings involving the Essar Group

Plaintiff further alleges that Essar Global's domination and control of its subsidiaries has been recognized in other court proceedings.

For example, in an opinion issued last year in the matter of *Ernst & Young v. Essar Global Fund Ltd. et al.,* 2017 ONSC 1366, the Ontario Superior Court of Justice found that the evidence before it was "overwhelming in substantiating that Essar Global and Essar Capital were calling the shots" for their subsidiary companies.[27]  [Tompkins Decl., Ex. 5 at p. 18; *see also* Plaintiff's Memorandum of Law in Opposition to the Essar Defendants' Motions to Dismiss, at p. 4.]

Furthermore, Essar Minnesota filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code in the United States District Bankruptcy Court for the District of Delaware.  Plaintiff has furnished the Court with a copy of the Complaint and Substantive and Non-Substantive Objections to Claim Nos. 179-186 by Essar Minnesota in that bankruptcy action, captioned *In re Essar Steel Minnesota* (D. Del. 16-11626 (BLS) [Tompkins Decl. ¶ 7, Ex. 7.]  Essar Minnesota's bankruptcy Complaint alleges causes of action for "breach of contract,

---

[27] The *Ernst & Young v. Essar Global Fund Ltd. et al.,* proceedings before the Ontario Superior Court of Justice involved a series of transactions involving Essar Steel Algoma, Inc.; Essar Tech Algoma, Inc.; Algoma Holdings, B.V.; Essar Steel Algoma (Alberta) ULC; and Essar Steel Algoma, Inc. USA.  Essar Global is the ultimate parent company of those entities.  [*See generally* Tompkins Decl. Ex. 5.]  None of those entities are parties to the instant action.

Therefore, any conclusions drawn by the Ontario Superior Court of Justice about Essar Global's control of its subsidiaries in the *Ernst & Young* proceedings did not involve any of the subsidiaries named in the instant action.

fraudulent transfer, breach of fiduciary duties and aiding and abetting breach of fiduciary duties, tortious interference with contract, promissory estoppel, claims disallowance, equitable subordination, declaratory relief alter ego, and alter ego" against other Essar entities. [*Id.*, Ex. 7 at p. 2.]

Specifically, Essar Minnesota's bankruptcy Complaint alleges that:

- "Essar Global and its affiliates, including in particular Essar Projects Limited (Dubai) ("Essar Projects"), orchestrated and directed every material aspect of [Essar Minnesota's] business." [Tompkins Decl., Ex. 7 at pp. 2–3.]

- Essar Global engaged in a "course of conduct in which [Essar Minnesota] was treated as if it existed solely for the benefit of the Essar Global enterprise, without regard for [Essar Minnesota's] interests or its creditors." [*Id.* at p. 3.]

- Essar Global siphoned "hundreds of millions of dollars" from Essar Minnesota, and that this conduct was "part of a larger effort to shore up [Essar Global's finances] that treated [Essar Minnesota] as part of a single enterprise for the benefit of Essar Global without regard to [Essar Minnesota's] financial condition." [Tompkins Decl., Ex. 7 at p. 4.] "As part of that effort Essar Projects itself transferred approximately $800 million to Essar Global, including hundreds of millions paid by [Essar Minnesota] … under the contract to build the never-completed [Nashwauk] Project." [*Id.*]

- "Essar Global and certain persons in control of the Essar Global enterprise" exercised "pervasive domination and control" over Essar Minnesota and other Essar entities. [*Id.* at p. 6].

- "On information and belief," Prashant Ruia is the "de facto Group Chief Executive Officer and Managing Director of Essar Global, all of the defendants, and indeed, the entire Essar Global Enterprise." [*Id.* at p. 42.]

[Tompkins Decl., Ex. 7; *see also* Plaintiff's Memorandum of Law in Opposition to the Essar Defendants' Motions to Dismiss, at pp. 4-5.] Notably, these allegations are part of a bankruptcy *complaint*; accordingly, they are allegations that have not been substantiated through a court ruling.

25

### e.  Alleged Fraudulent Transfers by Essar Steel to other Essar Entities

Plaintiff alleges that "over the course of the Nashwauk Project, Essar Group entities, at the direction of Essar Global and members of the Ruia Family, reneged on their financing commitments and siphoned funds from the project through intra-company transactions, leaving it strapped for cash and eventually bringing construction to a halt."  [Compl. ¶ 26.]

#### 1)  Essar Asia 2012 Transfer

Plaintiff alleges that Essar Steel's directors, including Prashant Ruia, began to strip Essar Steel of its assets in 2012. "On or about June 30, 2012, Essar Steel transferred approximately 1.9 billion shares in Essar India to Essar Asia" (hereinafter the 'Essar Asia 2012 Transfer'). [Compl. ¶ 52.]  "The Essar Asia 2012 Transfer left Essar Steel with only a small remaining stake in Essar India." [*Id.*]  On Plaintiff's "information and belief, the Essar Asia 2012 Transfer was directed by Prashant Ruia and Essar Global."  On information and belief, Plaintiff alleges that "Essar Steel received little or no consideration for the Essar Asia 2012 transfer."[28]

#### 2)  Essar Asia 2013 Transfer

On August 26, 2013, Essar Steel transferred approximately 118,000,000 shares in Essar India to Essar Asia (hereinafter the 'Essar Asia 2013 Transfer'). [*See* Tompkins Decl., Ex. 20 at p. 19.]  "The Essar Asia 2013 Transfer left Essar Steel with only minimal holdings in Essar India."[29] [Compl. ¶ 54.]  On Plaintiff's information and belief, "the Essar Asia 2013 Transfer was directed by Prashant Ruia and Essar Global." [*Id.*]

---

[28] Notably, Essar Steel was not a party to the December 7, 2012 Pellet Sale Agreement between Plaintiff, and Essar Minnesota and Essar Resources.  Rather, Essar Steel entered into the January 10, 2014 Amended Pellet Sale Agreement with Plaintiff.  Thus, at the time of the alleged Essar Asia 2012 transfer, Essar Steel was not in a contractual relationship with Plaintiff.

[29] At the time of the alleged Essar Asia 2013 transfer, Essar Steel was not in a contractual relationship with Plaintiff.

Plaintiff acknowledges that, "[o]n paper, Essar Asia paid Essar Steel for the shares it received in the Essar Asia 2013 Transfer by issuing a promissory note to Essar Steel for approximately USD $100,000,000." [Compl. ¶ 55.] "However,… that promissory note was itself first assigned to Essar Global for what appears to be no consideration." [*Id.*; *see also* Tompkins Decl., Ex. 20 at pp. 19–20.]

### 3) Essar UAE Transfer (2015)

"Prior to 2015, Essar Steel owned 100% of Essar [United Arab Emirates] UAE. However, sometime in 2015 Essar Steel transferred its shares in Essar UAE to another Essar affiliate, Essar Middle East, which now owns 100% of Essar UAE (the 'Essar UAE Transfer')." [Compl. ¶ 57.] On Plaintiff's information and belief, "the Essar UAE Transfer was directed by Prashant Ruia and Essar Global," and "Essar Steel did not receive consideration for the Essar UAE Transfer." [*Id.* ¶¶ 57-58.]

### 3. The Essar Defendants' Evidence regarding Corporate Form, and Activities in Minnesota

The Essar Defendants argue that their activities in Minnesota are insufficient to subject them to the Court's jurisdiction, and dispute Plaintiff's arguments that the Essar Defendants disregarded corporate formalities.

Essar Steel submitted a Declaration of Tarunkumar Harshadkumar Shah, an authorized signatory of Essar Steel, filed May 7, 2018. In his Declaration, Mr. Shah states, in part: (1) Essar Steel is a Mauritius corporation with principal place of business in Port Louis, Mauritius; (2) Essar Steel has never been registered to do business in Minnesota; (3) Essar Steel does not maintain, and has never maintained, an office in Minnesota; (4) Essar Steel has never had officers, directors, agents, representatives, or employees reside in Minnesota: (5) Essar Steel has never owned or leased real property located in Minnesota; (6) Essar Steel has never directly

27

owned any assets located in Minnesota; (7) Essar Steel has never maintained any bank accounts in Minnesota; (8) no one in Minnesota is authorized to accept service of a summons or complaint on behalf of Essar Steel; (9) Essar Steel has no agents in the United States authorized to accept service of process on its behalf; (10) Essar Steel operates independently of Essar Global and the other Essar Subsidiaries; (11) Essar Steel, Essar Global and the other Essar Subsidiaries are each separate incorporated and licensed entities operated by their separate distinct board of directors; (12) Essar Steel observes regular corporate procedure, including holding regular meetings of officers and directors; maintaining separate financial accounts; and maintaining separate books and records; (13) Essar Steel has officers and directors who manage Essar Steel as a separate legal entity; (14) Essar Steel operates on a day-to-day basis as a legal entity separate from Essar Global and the other Essar Subsidiaries; and (15) Essar Steel has never done business in Minnesota, or entered into contracts with Minnesota businesses or entities, other than the January 2014 Amended Pellet Sale Agreement.  [May 7, 2018 Decl. of Shah, ¶¶ 1-30.]

Essar Global submitted a Declaration of Ritish Doorbiz, Company Secretary of Essar Global, filed May 7, 2018.  In his Declaration, Mr. Doorbiz states, in part: (1) Essar Global is a Cayman Islands corporation, with its principal place of business in the Cayman Islands; (2) Essar Global is not a party to the Amended Pellet Sale Agreement; (3) the asset transfers referenced in Plaintiff's Complaint were made from and to Non-US entities; (4) the transfers took place outside of the United States; (5) Essar Global has never been registered to do business in Minnesota; (6)  Essar Global does not maintain, and has never maintained, an office in Minnesota; (7) Essar Global has never had officers, directors, agents, representatives, or employees reside in Minnesota; (8) except for in one set of unconnected proceedings where a representative of Essar Global gave testimony before a Court in Minnesota, Essar Global has

never sent agents or representatives to visit Minnesota; (9) Essar Global has never owned or leased real property located in Minnesota; (10) Essar Global has never directly owned any assets located in Minnesota; (11) Essar Global has never maintained any bank accounts in Minnesota; (12) Essar Global has never had any direct investments in Minnesota; (13) no one in Minnesota is authorized to accept service of a summons or complaint on behalf of Essar Global; (14) Essar Global operates independently of the Essar Subsidiaries; (15) Essar Global does not prepare consolidated financial reporting statements with the Essar Subsidiaries; (16) Essar Global, Essar Steel and the other Essar Subsidiaries are each separate incorporated and licensed entities which are operated by their respective boards of directors; and (17) under the guidance of its board, Essar Global observes regular corporate procedures, including holding regular meetings of officers and directors; maintaining separate financial accounts; and maintaining separate books and records.  [May 8, 2018 Decl. of Doorbiz, ¶¶ 1-32.]

Furthermore, Mr. Doorbiz states that: in 2008, Essar Global entered into two agreements with Itasca County, Minnesota, in which Essar Global agreed to reimburse Itasca County for a state-funded grant in the event that Essar Minnesota did not complete construction of the Nashwauk Project within a specified period or did not meet certain job- and wage-related goals with respect to the Nashwauk Project.  Essar Global also guaranteed various financing obligations of Essar Minnesota relating to the Nashwauk Project. The guaranties were not governed by Minnesota law.  [*Id.* at ¶ 25.]  Doorbiz states that Essar Global has never conducted business related to Minnesota, or entered into contracts with Minnesota residents or entities, except for the foregoing reimbursement and guaranty agreements related to the Nashwauk project.  [*Id.* at ¶¶ 13-15.]

29

Essar Asia submitted a Declaration of Uday Kumar Gujadhur, a director of Essar Asia, filed May 7, 2018.  In his Declaration, Mr. Gujadhur states, in part: (1) Essar Asia is a Mauritius corporation with principal place of business in Port Louis, Mauritius; (2) Essar Asia is not a party to the Amended Pellet Sale Agreement; (3) none of the asset transfers referenced in Plaintiff's complaint took place in the United States; (4) the transfers referenced in Plaintiff's Complaint were made from and to non-U.S. entities; (5) the transferred assets were never located in the United States; (6) Essar Asia has never been registered to do business in Minnesota; (7) Essar Asia does not maintain, and has never maintained, an office in Minnesota; (8) Essar Asia has never had officers, directors, agents, representatives, or employees located in Minnesota; (9) Essar Asia has never conducted business related to Minnesota; (10) Essar Asia has never entered into contracts with Minnesota residents or entities, or contracts to be performed in Minnesota; (11) Essar Asia has never sent agents or representatives to visit Minnesota; (12) Essar Asia had limited telephone calls to Minnesota residents or entities through one of its employees during the years 2014 to 2016, and that limited interaction had no relation with the Amended Pellet Supply Agreement; (13) Essar Asia has never owned or leased real property located in Minnesota; (14) Essar Asia has never owned any assets located in Minnesota; (15) Essar Asia has never maintained any bank accounts in Minnesota; (16) No one in Minnesota is authorized to accept service of a summons or complaint on behalf of Essar Asia; (17) Essar Asia has no agents in the United States authorized to accept service on its behalf; (18) Essar Asia operates independently of Essar Global and the other Essar Subsidiaries; (19) Essar Asia is neither controlled by nor controls Essar Global and the other Essar Subsidiaries; (20) Essar Asia observes regular corporate procedures, including holding regular meetings of officers and directors; maintaining separate financial accounts; and maintaining separate books and records; and (21) Essar Asia's

officers and directors manage Essar Asia as a separate legal entity from Essar Global and the other Essar Subsidiaries. [May 7, 2018 Dec. of Gujadhur, ¶¶ 1-35.]

### III.    Analysis of the Parties' Motions

#### A.    Defendants' Motions to Dismiss for Lack of Personal Jurisdiction

Essar Steel, Essar Asia, and Essar Global move for dismissal of Plaintiff's Complaint, arguing that the Court lacks personal jurisdiction over the Essar Defendants.  Plaintiff opposes Defendants' motions.

#### 1.    General Legal Standard

"Once jurisdiction has been challenged by the defendant, the burden is on the plaintiff to prove that sufficient contacts exist with the forum state. At the pretrial stage, however, the plaintiff's allegations and supporting evidence are to be taken as true." *Juelich v. Yamazaki Mazak Optonics Corp.*, 682 N.W.2d 565, 569–70 (Minn. 2004) (internal citations omitted). Where, as here, "a motion to dismiss is supported by affidavits, the nonmoving party cannot rely on general statements in [its] pleading." *Hoff v. Kempton*, 317 N.W.2d 361, 363 n. 2 (Minn. 1982).  In determining whether personal jurisdiction exists, the Court is not limited to considering only the pleadings, but can inquire into jurisdictional facts by examining affidavits or other evidence. *Stevens v. Redwing*, 146 F.3d 538, 543 (8th Cir. 1998).  When reviewing a motion to dismiss for lack of personal jurisdiction, the court determines "whether, taking all the factual allegations in the complaint and supporting affidavits as true, the plaintiff has made a prima facie showing of personal jurisdiction."  *Rilley v. MoneyMutual, LLC*, 884 N.W.2d 321, 326 (Minn. 2016), cert. denied, 137 S. Ct. 1331, 197 L. Ed. 2d 518 (2017) (internal citations omitted).

To establish personal jurisdiction over a foreign defendant, personal jurisdiction must be authorized by the Minnesota long-arm statute and must comport with constitutional due-process requirements. *See* Minn. Stat. § 543.19; *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980); *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945). "Minnesota's long-arm statute and the federal Due Process Clause are co-extensive, meaning that if the federal constitution's due process requirements are met, the long-arm statute's requirements are also satisfied. Minnesota courts therefore may… apply federal law to ascertain whether personal jurisdiction exists." *JL Schwieters Const., Inc. v. Goldridge Const., Inc.*, 788 N.W.2d 529, 534 (Minn. Ct. App. 2010) (citations omitted); *see also Domtar, Inc. v. Niagara Fire Ins. Co.,* 533 N.W.2d 25, 30 (Minn. 1995). "[I]n doubtful cases, doubts should be resolved in favor of retention of jurisdiction." *Hardrives, Inc. v. City of LaCrosse, Wisconsin*, 240 N.W.2d 814, 818 (1976).

Personal jurisdiction may be exercised in one of two forms—general or specific. Regardless of the type of personal jurisdiction at issue, due process requires that a court exercise personal jurisdiction over a non-resident defendant only where that defendant has sufficient minimum contacts with the forum state "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co,* 326 U.S. at 316 (quotation omitted).

### 2. The Court lacks general personal jurisdiction over the Essar Defendants.

A court may exercise general personal jurisdiction over a party only when the party maintains "continuous and systematic" contacts with the forum such that it becomes subject to the jurisdiction of that state's courts for any purpose. *Marshall v. Inn on Madeline Island*, 610 N.W.2d 670, 674 (Minn. Ct. App. 2000) (quoting *Helicopteros Nacionales de Colombia, S.A. v.*

*Hall*, 466 U.S. 408, 414 nn.8–9 (1984)). In other words, general jurisdiction arises when a defendant is "fairly regarded as at home" in the jurisdiction. *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014). "A corporation is regarded at home in its place of incorporation or in its principal place of business." *Id.*

The Complaint alleges that Essar Steel is organized under the laws of Mauritius; that Essar Global is organized under the laws of the Cayman Islands with offices in Asia, Africa, Europe, and the Americas; that Essar Asia is organized under the laws of Mauritius; and that Essar Middle East is organized under the laws of the United Arab Emirates and is based in Dubai. None of the Essar entities are incorporated in or have their principal places of business in Minnesota. Plaintiff concedes that the Court lacks general personal jurisdiction over the Essar Defendants.

### 3. Specific Personal Jurisdiction

"Specific personal jurisdiction exists when the defendant's contacts with the forum state are limited, yet connected with the plaintiff's claim such that the claim arises out of or relates to the defendant's contacts with the forum. *Domtar*, 533 N.W.2d at 30–31 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474; *Helicopteros Nacionales*, 466 U.S. at 414.)) A single contact with the forum can be sufficient to confer specific personal jurisdiction "if the cause of action arises out of that contact." *Id.* (*citing McGee v. International Life Ins. Co.*, 355 U.S. 220, 223 (1957)). "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014).

Minnesota courts use a five-factor test to determine whether a non-resident defendant, has sufficient minimum contacts with the state to support the exercise of specific personal jurisdiction:

(1) the quantity of contacts between the nonresident defendant and the forum state;

(2) the nature and quality of the contacts;

(3) the source and connection of the cause of action with the contacts;

(4) the state's interest in providing a forum; and

(5) the convenience of the parties.

*Juelich*, 682 N.W.2d at 570. "The first three factors determine whether minimum contacts exist and the last two factors determine whether the exercise of jurisdiction is reasonable according to traditional notions of fair play and substantial justice." *Id*.

### 1) The Court lacks specific jurisdiction over the Essar Defendants with respect to Plaintiff's fraudulent transfer claims.

#### a) Quantity, Nature, and Quality of Defendants' Minnesota Contacts

Accepting Plaintiff's evidence, and the allegations in its Complaint, as true for purposes of determining whether the Court has specific personal jurisdiction over the Essar Defendants, the quantity, nature, and quality of the Defendants' contacts with Minnesota are as follows:

Essar Steel had ongoing contacts with Minnesota, at a minimum, from January 10, 2014, when Essar Steel became a party to the Amended Pellet Sale Agreement, through May 27, 2016, when Plaintiff notified Essar Minnesota and Essar Steel that it was terminating the Amended Pellet Sale Agreement.  Furthermore, in Section 12(a)-(h) of the Amended Pellet Agreement, Essar Steel agreed that "all disputes, claims, questions or disagreements … arising under, out of, relating to, or in connection with this [Amended Pellet Sale] Agreement" would be subject to

34

ICC arbitration, and that any such ICC arbitration award "may be enforced in any court of competent jurisdiction, including without limitations the federal and state courts in Minnesota and Illinois, and the parties agree to submit to the jurisdiction of the Minnesota and Illinois federal and state courts." [*See* Knorr Decl., Ex. 28 – Amended Pellet Sale Agreement at § 12(a)–(h).]  A valid forum-selection clause is sufficient to confer personal jurisdiction over a defendant. *Dominium Austin Partners, L.L.C. v. Emerson*, 248 F.3d 720, 726–27 (8th Cir. 2001).[30]

Essar Global's contacts with Minnesota, as summarized by Plaintiff, involve "caus[ing] Essar Steel to purchase Minnesota Steel" [which it renamed Essar Minnesota]; "negotiate[ing] substantial subsidies from Minnesota government officials in connection with the Nashwauk Project;" acknowledging that the Nashwauk Project would generate "both an economic and non-economic benefit to Essar Global;"[31] and "guarantee[ing] loans provided to Essar Minnesota for the Nashwauk project."  [Plaintiff's Memorandum of Law in Opposition to the Essar Defendants' Motions to Dismiss, at pp. 17-18.]  Plaintiff further alleges that "Essar Global's numerous contacts with Minnesota, which, like Essar Steel's contacts, all relate to the Nashwauk Project's failure and this resulting enforcement action" permit the court to exercise specific personal jurisdiction over Essar Global.  [*Id.* at p. 18.]

Plaintiff alleges that Essar Asia has sufficient Minnesota contacts to permit the exercise of specific personal jurisdiction based on its close, synergistic relationship with Essar Steel and Essar Global; Essar Asia's direct acknowledgment that it would "derive substantial direct and indirect benefit" from the provision of funding to Essar Minnesota to facilitate the Nashwauk

---

[30] As further discussed below, however, the scope of Essar Steel's consent to Minnesota courts' jurisdiction extends only to those disputes involving the *enforcement* of an ICC arbitration award.

[31] *See* Tompkins Decl., Ex. 9, Reimbursement Agreement at p. 4.

Project, and the subsequent guarantee of such funding;[32] and Essar Asia's status—along with Essar Minnesota, Essar Steel, and Essar Global—as part of the highly integrated Essar Group. [Plaintiff's Memorandum of Law in Opposition to the Essar Defendants' Motions to Dismiss, at pp. 18-19.]

### b) Connection of the Cause of Action with Defendants' Contacts

Assuming, for the sake of argument, that the foregoing factors would support the Court's exercise of specific personal jurisdiction over the Essar Defendants, the third factor in Minnesota courts' specific personal jurisdiction analysis—namely the "source and connection of the cause of action with these contacts"—weighs strongly against the exercise of specific personal jurisdiction over the Essar Defendants, with respect to Plaintiff's fraudulent transaction claims.

"In order for a state court to exercise specific jurisdiction, the *suit* must arise out of or relate to the defendant's contacts with the *forum*… For this reason, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*,137 S. Ct. 1773, 1780 (2017) (quotations omitted) (emphasis in original).

Plaintiff's fraudulent transfer claims involve the transfers of assets, located abroad, between foreign entities.  Furthermore, Plaintiff challenges three transfers, namely: (1) the Essar Asia 2012 Transfer, in which Essar Steel transferred approximately 1.9 billion shares in Essar India to Essar Asia, and for which Essar Steel allegedly received little or no consideration; (2) the Essar Asia 2013 Transfer, in which Essar Steel transferred approximately 118,000,000 shares in Essar India to Essar Asia for little or no consideration; and (3) the Essar UAE Transfer (2015),

---

[32] *See* Tompkins Decl., Ex. 12 at p. 1.

36

in which Essar Steel transferred its shares in Essar UAE to another Essar affiliate, Essar Middle East without consideration.

Essar Steel was not a party to the Amended Pellet Sale Agreement with Plaintiff until January 10, 2014; therefore, two of the three Essar Steel asset transfers challenged by Plaintiff—the Essar Asia 2012 Transfer and the Essar Asia 2013 Transfer—occurred *before* Essar Steel had a contractual relationship with Plaintiff.

Moreover, the Essar Asia 2012 and Essar Asia 2013 Transfers involved the transfers of shares of Essar India.  As Plaintiff's Complaint acknowledges, Essar India "is currently the subject of an Indian insolvency proceeding."  [Compl. ¶ 10.]  Plaintiff alleges that the Essar Asia 2012 and Essar Asia 2013 Transfers were made for the purpose of voiding Essar Steel's liability related to the Nashwauk Project.  However, the Essar Asia 2012 and 2013 Transfers involved Essar India, which—like Essar Minnesota—is the subject of insolvency proceedings; therefore, the Essar Asia 2012 and 2013 Transfers also affected the financial viability of other Essar Group entities that are not parties to the instant action.

Plaintiff has not submitted any evidence tending to link the alleged fraudulent transfers between Essar Steel (a Mauritius company) and Essar Global (a Cayman Islands company), or between Essar Steel and Essar Asia (a Mauritius company) to Minnesota.  Any alleged link between the alleged fraudulent transfers between the Essar Defendants, and Essar Steel's liability to Plaintiff arising from its breach of the Amended Pellet Sale Agreement and the ICC Final Award, is too tenuous to support the exercise of specific personal jurisdiction.  *See, e.g., Zayed v. Peregrine Fin. Grp., Inc.,* Civ. No. 12-269 MJD/FLN, 2012 WL 2373423, at *2 (D. Minn. June 22, 2012)[33] (holding that forum-selection clause in contract does not give rise to jurisdiction

---

[33] Unpublished decisions are not precedential but may have persuasive value. *See Dynamic Air, Inc. v. Bloch*, 502 N.W.2d 796, 800 (Minn. Ct. App. 1993).

where asserted claims do not arise out of the contract); *Marshall v. Inn on Madeline Island*, 610

N.W.2d 670 (Minn. Ct. App. 2000) (holding that entering into contract in forum state can bring

party under court's specific personal jurisdiction "but only where the dispute involves the

contract").  There is no nexus between Plaintiff's fraudulent transaction claims and the State of

Minnesota that would support the exercise of specific personal jurisdiction over the Essar

Defendants.[34]

> c)  **Minnesota's interest in providing a forum, and the convenience of the parties**.

The final two factors in Minnesota's five-factor test to determine whether specific

personal jurisdiction may be exercised over a non-resident defendant "determine whether the

exercise of jurisdiction is reasonable according to traditional notions of fair play and substantial

justice." *Juelich*, 682 N.W.2d at 570.

---

[34] Plaintiff cites *Oakridge Holdings Inc. v. Brukman*, 528 N.W.2d 274, 276-77 (Minn. Ct. App. 1995), *review denied* (Minn. May 16, 1995) as an example in which a Minnesota Court affirmed the exercise of personal jurisdiction where the claims "related to, but did not arise out of, [the] defendants'' Minnesota contacts."  [See Plaintiff's Memorandum of Law in Opposition to the Essar Defendants' Motions to Dismiss, filed May 25, 2018, at p. 20.] *Oakridge Holdings* is inapposite.

There, the plaintiff (a Minnesota corporation), sued non-resident defendants, who were former directors and officers of the plaintiff-corporation, for (1) fraudulent misrepresentation, (2) ultra vires acts, (3) breach of fiduciary duty, and (4) gross negligence.  The defendants' contacts with Minnesota involved telephone and facsimile communications with the plaintiff-company's Minnesota-based counsel and auditor.  As the Court of Appeals wrote:

> Unlike the usual case, in which a resident sues a foreign corporation, here a Minnesota corporation is suing its own nonresident corporate directors. *We believe that the determinative factor is that appellants voluntarily became officers and directors of a Minnesota corporation*. Accordingly, they cannot argue that they could not reasonably anticipate defending an action in Minnesota by their Minnesota corporation asserting acts harmful to the corporation.

*Oakridge Holdings, Inc*., 528 N.W.2d at 277 (emphasis added).  Here, in contrast, Plaintiff and the Essar Defendants are all non-residents of Minnesota, and the alleged fraudulent transactions did not occur in Minnesota, did not involve Minnesota assets, and related tangentially—if at all—to a Minnesota contract.

As the Federal District Court for the District of Minnesota noted in *McGill v. Conwed Corp.*, No. CV 17-01047 (SRN/HB), 2017 WL 4534827, at *10 (D. Minn. Oct. 10, 2017):

> With no party to this case being a Minnesota citizen, it is unlikely that Minnesota would have a clear interest in providing a forum for this action. And with respect to the convenience of the parties, the same considerations ring true. No party here is a Minnesota citizen, and there is no evidence in the record that any witnesses reside here.

The *McGill* Court ultimately concluded that it lacked specific personal jurisdiction over the defendant. The same concerns are present in this case.

Plaintiff argues that "Minnesota has an interest in providing a forum for companies like ArcelorMittal USA who conduct substantial business in this state" and that the convenience of the parties supports the exercise of jurisdiction over the Essar Defendants because they "faced no inconvenience in negotiating and receiving significant public subsidies in Minnesota," and they "faced no inconvenience in negotiating contracts in Minnesota." [*See* Plaintiff's Memorandum of Law in Opposition to the Essar Defendants' Motions to Dismiss at pp. 22-23.] Plaintiff's arguments are not persuasive.

While Minnesota may have *some* interest in providing a forum for companies who transact substantial business in its borders, such as Plaintiff, that interest is lessened when the substance of Plaintiff's claims—in this case for allegedly fraudulent transactions between foreign entities, involving foreign assets—bears no nexus to Minnesota. And Plaintiff's arguments that the parties would not be inconvenienced in litigating Plaintiff's claims in Minnesota because the Essar Defendants took advantage of past subsidies and business opportunities in Minnesota practically concedes the issue; the convenience of the parties factor in the personal jurisdiction analysis relates to the process of litigating *current* claims in a court of law, not past behaviors. The final two factors in Minnesota's five-factor test to determine whether specific personal

39

jurisdiction may be exercised over a non-resident defendant do not support the exercise of specific personal jurisdiction over Essar Steel, Essar Global, or Essar Asia.

For all of the reasons discussed above, the Court concludes that it lacks specific jurisdiction over Essar Steel, Essar Global, and Essar Asia with respect to Plaintiff's fraudulent transfer claims.[35]

> **2)    The Court declines to address whether it has specific personal jurisdiction over the Essar Defendants with respect to Plaintiff's alter ego, piercing the corporate veil, and agency theories of liability.**

Plaintiff argues that the Court has either direct, specific personal jurisdiction over the Essar Defendants related to Plaintiff's alter ego, piercing the corporate veil, and agency theories of liability, or vicarious personal jurisdiction over the Essar Defendants related to those claims. In the alternative, Plaintiff argues that it is entitled to jurisdictional discovery for the purposes of developing the factual record to support these claims.

In Section 12(a)-(h) of the January 2014 Amended Pellet Agreement between Plaintiff, Essar Steel, and Essar Minnesota, Essar Steel agreed that "all disputes, claims, questions or

---

[35] Plaintiff additionally argues that "[p]ost arbitration lawsuits seeking to recover awarded funds—including veil piercing and fraudulent transfer claims—are actions to "enforce" arbitration awards." [*See* Plaintiff's Memorandum of Law in Opposition to the Essar Defendants' Motions to Dismiss at p. 36.]  Plaintiff cites three cases, *In re Flores*, No. 07-52684-LMC, 2008 WL 2008617 at *4 (Bankr. W.D. Tex. May 6, 2008), *Giron v. Dodds*, 35 A.3d 433 (D.C. 2012), and *Juskiewicz v. Fed. Ins. Co.,* No.C 97 2111 SBA, 1998 WL 276263 at *4 (N.D. Cal. June 18, 1998) in support of this argument.

The Court agrees that alter ego or veil piercing claims may be construed as actions to "enforce" arbitration awards; there, the theory of recovery is that the party subject to the arbitration award and its alter ego corporations are, in essence, the same entity.  Under an alter ego or veil piercing claim, the plaintiff is arguing that the involved entities are a single corporate actor.  Accordingly, the entity against which veil piercing or alter ego liability is sought is, in effect, substituted for the party subject to the arbitration award, and stands in that party's shoes.

However, the cases cited by Plaintiff do not stand for, or even address, the proposition that a fraudulent transfer claim may be construed as an action to enforce an arbitration award.  Accordingly, the Court finds that Plaintiff's fraudulent transfer claims are not merely a method to "enforce" the ICC Final Award.  By extension, Essar Steel's consent to the jurisdiction of Minnesota State Courts to "enforce" any ICC arbitration award, in Section 12 of the Amended Pellet Sale Agreement, does not cover the instant fraudulent transfer claims.

disagreements … arising under, out of, relating to, or in connection with this [Amended Pellet Sale] Agreement" would be subject to ICC arbitration, and that any such ICC arbitration award "may be *enforced* in any court of competent jurisdiction, including without limitations the federal and state courts in Minnesota and Illinois, and the parties agree to submit to the jurisdiction of the Minnesota and Illinois federal and state courts." [*See* Knorr Decl., Ex. 28 – Amended Pellet Sale Agreement at § 12(a)–(h).]

Plaintiff cites *Giron v. Dodds*, 35 A.3d 433, 438–39 (D.C. 2012) for the proposition that a claim to pierce the corporate veil following an arbitration award does not involve a new substantive claim, but rather involves "efforts to collect the arbitration award rendered in [the prevailing party's] favor." The *Giron* case further cited numerous federal cases "in which the courts have asserted jurisdiction over actions to collect an arbitration award through piercing the corporate veil." *See id.* Plaintiff's argument that veil piercing and alter ego claims following an arbitration award are methods to "enforce" the award has some merit.

Because (1) Essar Steel consented to the jurisdiction of Minnesota state courts in any action to enforce an ICC arbitration award, and (2) Plaintiff's alter ego, piercing the corporate veil, and agency theories of liability seek to disregard corporate distinctions between the Essar Defendants and effectively treat the Essar Defendants as a single corporate entity, it follows that the Court could, potentially, exercise specific jurisdiction over Essar Global and Essar Asia related to those claims. Essar Global and Essar Steel would be treated as a single corporate entity; therefore, Essar Global would stand in Essar Steel's shoes with respect to the ICC Final Award and the liability it imposed.

Plaintiff argues, in part, that it has made out a prima facie case for the Court's exercise of specific personal jurisdiction over Essar Steel, Essar Global, and Essar Asia (on Plaintiff's alter

41

ego, veil piercing, and agency liability claims), based on: (1) the close, synergistic relationship of the Essar entities; (2)  the consolidation of corporate image and operations of the Essar Defendants through their informational and advertising materials; (3) the fact that the same individuals have signed documents on behalf of different Essar entities; (4) evidence in proceedings before other courts tending to establish that Essar Global exercised domination and control over Essar subsidiaries; (5) Essar Global's negotiation of subsidies for the Nashwauk Project, benefitting Essar Steel and Essar Minnesota; and (6) acknowledgement by Essar Steel, Essar Global, and Essar Asia that they would "derive substantial direct and indirect benefit" from the extension of credit to Essar Minnesota for the Nashwauk Project. [*See* Tompkins Decl., Exs. 11–13 at p. 1.]

Determining whether Plaintiff has made out a prima facie case for the Court's exercise of specific personal jurisdiction over the Essar Defendants on the veil piercing, alter ego, and agency liability claims would be a belabored, fact-intensive inquiry.  Any jurisdictional discovery on the matter is likely to be expensive, and voluminous.

Furthermore, as discussed below, under the "internal affairs doctrine," the law of a company's jurisdiction of incorporation is used to determine issues relating to the internal affairs of the company, and courts have applied the internal affairs doctrine as their choice of law for piercing the corporate veil and alter ego liability claims.  To determine whether the Court has specific personal jurisdiction over Plaintiff's veil piercing, alter ego, and agency liability claims, it is not clear whether the Court would apply substantive Minnesota law governing those claims, or the laws of the Essar Defendants' jurisdictions of incorporation.  No party appears to have taken a position on this issue.

Ultimately, the Court need not make the determination of whether specific personal jurisdiction may be exercised over the Essar Defendants on Plaintiff's alter ego, veil piercing, and agency claims, or whether jurisdictional discovery is necessary, because the Court declines to exercise jurisdiction over those claims based on the doctrine of *forum non conveniens*. The Court is firmly convinced that this action does not belong in Minnesota, and that any additional facts Plaintiff seeks to uncover through jurisdictional discovery will not alter the Court's analysis under the doctrine of *forum non conveniens*—which involves different factors than the Court's analysis of specific personal jurisdiction. The Court therefore declines to address whether it has specific personal jurisdiction over Essar Steel, Essar Global, and Essar Asia with respect to Plaintiff's alter ego, piercing the corporate veil, and agency theories of liability.

### B. Defendants are entitled to dismissal of Plaintiffs' claims[36] based on the doctrine of *forum non conveniens*.

#### 1. Legal Standard

"When the exercise of personal jurisdiction imposes a hardship that does not rise to the level of a due process violation, dismissal on the basis of *forum non conveniens* may be an appropriate remedy." *Rykoff-Sexton, Inc. v. American Appraisal Associates, Inc.*, 469 N.W.2d 88, 91 (Minn. 1991). "The doctrine of *forum non conveniens* allows a district court with jurisdiction over the subject matter and the parties discretion to decline jurisdiction over a cause of action when another forum would be more convenient for the parties, the witnesses, and the court." *Paulownia Plantations de Panama Corp. v. Rajamannan*, 793 N.W.2d 128, 133 (Minn. 2009); *see also Hague v. Allstate Ins. Co.*, 289 N.W.2d 43, 45 (Minn. 1978), *judgment aff'd*, 449

---

[36] The Court concludes that it lacks specific personal jurisdiction over Plaintiff's fraudulent transfer claims, as discussed above. Even if the Court had personal jurisdiction over the fraudulent transfer claims, it would decline to exercise that jurisdiction based on the doctrine of *forum non conveniens*.

U.S. 302 (1981). A *forum non conveniens* determination "is committed to the sound discretion of the trial court, to which substantial deference is given." *Paulownia Plantations*, 793 N.W.2d at 133 (citations omitted).

A *forum non conveniens* analysis involves two steps: first, the district court must establish whether an "available and adequate" alternative forum exists. *Id.* at 133 (citations omitted). If so, the second step in the *forum non conveniens* analysis "requires the court to weigh the private and public interest factors of both forums." *Paulownia Plantations*, 793 N.W.2d at 137.[37]

### 2. An available and adequate alternate forum exists for Plaintiff's claims.

An alternative forum is "available," for purposes of determining whether an action should be dismissed on *forum non conveniens* grounds, when the foreign court has jurisdiction over the case and the parties. *Paulownia Plantations*, 793 N.W.2d at 134. An alternative forum is adequate where "the party has an effective remedy in the alternative forum." *Id.* "[T]he possibility that the substantive law of the alternative forum is less favorable is not a relevant consideration in *forum non conveniens* analysis … Differences in the substantive law will enter into the court's analysis only if there is absolutely no effective remedy in the alternative forum." *Bergquist v. Medtronic, Inc.*, 379 N.W.2d 508, 512 (Minn. 1986) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 250-54 (1981)).

Plaintiff concedes that Mauritius, under the laws of which Essar Steel and Essar Asia are organized, provides an adequate and available alternative forum. Plaintiff states: "[Plaintiff]

---

[37] Plaintiff argues that "there is no requirement [under Minnesota law] that a court consider any public interest factors" in its *forum non conveniens* analysis. [*See* Plaintiff's Memorandum of Law in Opposition to the Essar Defendants' Motions to Dismiss, at p. 33.] Plaintiff cites *Rykoff-Sexton, Inc. v. American Appraisal Associates, Inc.*, 469 N.W.2d 88, 91 (Minn. 1991) in support of its position. Plaintiff's argument is flatly contradicted by the more recent *Paulownia Plantations* opinion, issued by the Minnesota Supreme Court in 2009, which "*requires* the court to weigh the private and public interest factors of both forums" in the second step of the *forum non conveniens* analysis. *Paulownia Plantations*, 793 N.W.2d at 137 (emphasis added).

ArcelorMittal USA is not contesting the Essar Defendants' threshold argument that an alternative forum such as Mauritius exists in this case, and that the laws of Mauritius may afford ArcelorMittal USA some remedy for its fraudulent-transfer and veil piercing claims." [Plaintiff's Memorandum of Law in Opposition to the Essar Defendants' Motions to Dismiss, at p. 30, n. 38.]  The May 7, 2018 Declaration of Mauritian Lawyer Iqbal Rajahbalee, SC, filed in support of Essar Asia and Essar Steel's motions to dismiss, detailing the provisions of Mauritian law governing Plaintiff's claims, further supports the existence of an adequate alternate forum. Therefore, an available and adequate alternate forum exists for Plaintiff's claims against Essar Steel, Essar Global, and Essar Asia; the first step of the *forum non conveniens* analysis is satisfied.

### 3.    The private interest factors support dismissal of Plaintiffs' claims based on the doctrine of *non conveniens.*

The Court must consider the following private interest factors in the second step of its *forum non conveniens* analysis:  "(1) the relative ease of access to sources of proof; (2) availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; (3) [the] possibility of [a] view of [the] premises, if [such] view would be appropriate to the action; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive." *Paulownia Plantations*, 793 N.W.2d at 137.

The main sources of proof relevant to Plaintiff's alter ego, veil piercing, and agency claims relate to the inter-relationships between Essar Steel, Essar Global, and Essar Asia, and the transactions and business relationships between those entities.[38]  According to the Declarations of Shah, Doorbiz, and Gujadhur, Essar Steel, Essar Global, and Essar Asia do not have, nor have

---

[38] Although the Court has concluded that it lacks personal jurisdiction over Plaintiff's fraudulent transfer claims, the sources of proof related to those claims also involve foreign transactions between foreign entities.

45

they ever had, officers, directors, agents, representatives, or employees reside in Minnesota.  The

crux of Plaintiff's claims involves alleged fraudulent transfers, and disregard of corporate

formalities, which implicate the corporate decision-making of foreign personnel of foreign

entities, in a series of foreign transactions.  The relative ease of access to sources of proof is low

in Minnesota, and this factor weighs against the Court's exercise of jurisdiction over the Essar

Defendants.

> In assessing this factor, courts merely consider whether some evidence is located or is likely to be located in the State of Minnesota. *See C.H. Robinson Worldwide, Inc. v. FLS Transp., Inc.*, 772 N.W.2d 528, 539 (Minn. Ct. App. 2009) (affirming refusal to dismiss for *forum non conveniens* because "it is reasonable to presume that much of the evidence in this case would come from Minnesota"); *Edmondson v. BNSF Ry. Co.*, No. 27-cv-14-19663, 2015 WL 10528453, at *5 (Minn. Dist. Ct. May 12, 2015) (denying motion to dismiss on *forum non conveniens* grounds where some evidence was located out of state, but "significant evidence" was located in Minnesota). Here, at least some of the evidence in this case—including contracts entered into by Essar Steel and Essar Global with the State of Minnesota, and other evidence related to ArcelorMittal USA's claims—is in Minnesota. Indeed, significant evidence may come from employees of Essar Minnesota, n/k/a Mesabi Metallics Company, LLC, a Minnesota corporate entity. Moreover, if the Court grants ArcelorMittal USA's Motion for Jurisdictional Discovery, it is likely that such discovery will uncover additional evidence located in Minnesota. This factor weighs in favor of preserving ArcelorMittal USA's choice of forum.

Plaintiff contends that there is sufficient evidence located in Minnesota to support the

Court's exercise of jurisdiction:

[Plaintiff's Memorandum of Law in Opposition to the Essar Defendants' Motions to Dismiss, at

pp. 31-32.]  Plaintiff's arguments are internally inconsistent and unpersuasive.  The cases

Plaintiff cites stand for the proposition that it is proper for the court to exercise jurisdiction when

"much of" the evidence or "significant" evidence is likely to be found in Minnesota.  The

exercise of jurisdiction is not proper where only "some" evidence is likely to be found in

Minnesota, as Plaintiff suggests.

The second private interest factor—the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses—also weighs against the Court's exercise of jurisdiction over the Essar Defendants. The Court does not have subpoena power over all potential fact witnesses, although that fact alone is not dispositive. *See, e.g., Rykoff-Sexton, Inc.* 469 N.W.2d at 91 (holding that the defendant has the burden of demonstrating that foreign witnesses would be "unable to attend suit" in Minnesota). The Court also concludes that the potential witnesses with the most relevant testimony regarding the Essar Defendants' corporate relationships, practices, and patterns of financial transactions are employees of those entities, all of whom are located in foreign jurisdictions. This factor weights against the Court's exercise of jurisdiction over the Essar Defendants.

Factor three in the private interest analysis, the possibility of viewing the premises, is not at issue in this case.

The final private interest factor—which encompasses all other practical problems that make trial of a case easy, expeditious, and inexpensive—also strongly weighs against the Court's exercise of jurisdiction over the Essar Defendants. This action involves no Minnesota parties. Essar Steel is organized under the laws of Mauritius with its principal place of business in Mauritius; Essar Global is organized under the laws of the Cayman Islands with offices in Asia, Africa, Europe, and the Americas; and Essar Asia is organized under the laws of Mauritius with its principal place of business in Mauritius. Although Plaintiff engages in substantial business within the state of Minnesota, Plaintiff is incorporated under the laws of Delaware, with its principal place of business in Chicago, Illinois. Plaintiff's ultimate parent corporation is incorporated under Luxembourg law.

47

The expense of haling all of these foreign parties into Minnesota court is beyond dispute. Furthermore, two of the Defendants in this action—Essar Middle East and Prashant Ruia—must be served through diplomatic channels; personal service on these Defendants has not yet been effected. Based on the early stages of this case, the Court fully expects that trying this case in Minnesota would involve significant delays and impose ongoing logistical burdens. The private interest factors strongly weigh against the exercise of jurisdiction over the Essar Defendants.

### 4. The public interest factors support dismissal of Plaintiffs' claims based on the doctrine of *non conveniens.*

The final step in the Court's *forum non conveniens* analysis is to weigh the following public interest factors: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized controversies decided at home; (3) the interest in having the trial of a diversity case in a forum that is familiar with the law that must govern the action; (4) the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty." *Paulownia Plantations* 793 N.W.2d at 137 (citation omitted). Additionally, the Minnesota Supreme Court has recognized taxpayer considerations as a part of the public-interest analysis. *See, e.g., Bergquist v. Medtronic, Inc.,* 379 N.W.2d 508, 512 (Minn. 1986) (questioning "[w]hy should the United States taxpayers, or taxpayers of Minnesota in the present case, be presumed to pay for the costs of trial for a plaintiff who is a citizen of a foreign nation?").

This action involves a dispute between global steel conglomerates, over the alleged transfer of international corporate assets and disregard of corporate formalities between foreign parents and subsidiaries. Despite Plaintiff's attempts to tie these claims to the underlying failure of the Nashwauk Project, the connection of Plaintiff's claims to the forum of Minnesota is weak.

48

Accordingly, the "local interest" in having this matter heard at home is also weak, because the essence of Plaintiff's claims are not localized to Minnesota.

Plaintiff claims Minnesota has a strong interest in this case, because Minnesota has an interest in resolving controversies involving parties conducting business in its borders. Plaintiff's argument is not persuasive. Even if Plaintiff were to prevail in any claims heard by a Minnesota jury, the ultimate benefit would flow to Plaintiff—a Delaware company, with its principal place of business in Illinois, which is a wholly-owned subsidiary of its Luxembourg-based parent. The parties' ties to Minnesota, including Plaintiff's, are too weak to warrant the exercise of jurisdiction over the Essar Defendants.

There is also substantial unfairness in burdening Minnesota jurors with jury duty in this complex litigation, with multiple foreign parties, which would necessitate a long jury trial and draw resources away from conflicts that are truly local in nature.

Finally, the public interest factors recognize the interest in having the trial of a diversity case in a forum that is familiar with the law that must govern the action, and the preference to avoid unnecessary problems in conflict of laws, or in the application of foreign law.

As Essar Global persuasively argues, Plaintiff's claims seeking to hold Essar Global liable for Essar Steel's liability to Plaintiff, based on the theories of alter ego liability, piercing the corporate veil, or agency liability, implicate the internal affairs doctrine:

> Under the internal affairs doctrine … the law of a company's jurisdiction of incorporation is used to determine issues relating to the internal affairs of the company. *See First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983); see also Restatement (Second) of Conflict of Laws §§ 302, 307. This is because "[a]pplication of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation." *First Nat. City Bank*, 462 U.S. at 621. Courts have "applied the internal affairs doctrine as their choice of law for piercing the corporate veil" and alter ego liability claims. *Matson Logistics, LLC*

49

*v. Smiens*, No. Civ. 12- 400 ADM/JJK, 2012 WL 2005607, at *6 (D. Minn. June 5, 2012) (gathering cases).

[Memorandum in Support of Essar Global's Motion to Dismiss, at p. 19.]  Accordingly, Plaintiff's claims for alter ego liability, piercing the corporate veil, and agency liability would be determined under the substantive law of the Cayman Islands, Essar Global's jurisdiction of incorporation, pursuant to the internal affairs doctrine.  It would burden both the Court and the jurors to learn and apply foreign substantive law to this dispute between non-resident parties. The public interest factors strongly weigh in favor of declining jurisdiction over the Essar Defendants.

In opposing Defendants' motions to dismiss on grounds of *foreign non conveniens,* Plaintiff argues generally that:

> This Court is a proper venue for this dispute. A plaintiff's choice of forum should rarely be disturbed unless it is to "vex" or "harass" the defendant." *Hague v. Allstate Ins. Co.*, 289 N.W.2d 43, 46 (Minn. 1978). This is true even when the plaintiff is not a Minnesota resident. *O'Neill v. St. Jude Med., Inc.*, No. C8-04-1261, 2005 WL 1114469, at *2 (Minn. Dist. Ct. Apr. 28, 2005).

[Plaintiff's Memorandum of Law in Opposition to the Essar Defendants' Motions to Dismiss, at p. 28.]  While it is true that a Plaintiff's choice of forum is generally accorded deference, Plaintiff fails to acknowledge that, when weighing the public and private interest factors in determining whether to dismiss an action on ground of *forum non conveniens*, the court gives deference to plaintiff's choice of forum; however, *"the traditional presumption that the plaintiff's choice of forum should not be disturbed will not be given full effect when the plaintiff is foreign."* *Bergquist* 379 N.W.2d at 512–513 (internal quotation omitted) (emphasis added). Plaintiff, a Delaware company with its principal place of business in Illinois, is a wholly-owned subsidiary of its Luxembourg-based parent.  Plaintiff is foreign, and therefore its choice of forum is entitled to less deference.

50

Plaintiff's arguments that this action belongs in Minnesota are unpersuasive.  Because Plaintiff has an adequate alternative forum for its claims, and because the public and private interest factors strongly weigh against the exercise of jurisdiction over the Essar Defendants, the Court grants the motions of Essar Steel, Essar Global, and Essar Asia for dismissal, based on the doctrine of *forum non conveniens.*

### C.  Defendants' Motions to Dismiss for Failure to State a Claim

Although the Court has dismissed Counts One, Two, Five, and Six of the Complaint (all of the pending claims against Essar Steel, Essar Global, and Essar Asia) based on either lack of specific personal jurisdiction, *forum non conveniens*, or both, the Court will briefly address the Essar Defendants' alternate arguments for dismissal based on failure to state a claim upon which relief can be granted, pursuant to Minnesota Rule of Civil Procedure 12.02.

> **1.  Defendants Essar Global and Essar Asia are not entitled to dismissal of Plaintiff's claims for piercing the corporate veil, alter ego liability, or agency liability based on the argument that the ICC Final Award was obtained by default against Essar Steel.**

Essar Global and Essar Asia cite a federal district court decision, *North Atlantic Distribution, Inc. v. Teamsters Local Union No. 430*, 497 F.Supp.2d 315 (D.R.I. 2007), for the proposition that an arbitration award obtained by default may not be enforced against a related entity (such as through a veil piercing or alter ego theory), because such enforcement of a default judgment would violate due process.  Essar Global and Essar Asia's arguments are not persuasive, because they selectively quote from the *North Atlantic Distribution, Inc.* opinion.

Rather, in *North Atlantic Distribution, Inc.* the court, relying on Section 59 of the Restatement (Second) of Judgments, held that notice and a fair opportunity to defend the action resulting in the judgment must be present in order to hold an alter ego liable for the judgment rendered in an earlier litigation. *Id.* at 323. Central to the court's holding that enforcement of a

51

default judgment against a non-party related entity would violate due process was the fact that the alleged alter ego did not have either notice or an opportunity to litigate the underlying judgment on the merits. *See id*. at 325.

Here, by contrast, Essar Steel participated in the early stages of the ICC arbitration proceeding. It exchanged document requests with [Plaintiff], attended the pre-hearing conference, made written submissions concerning document production disputes, and produced a number of documents. It initially was represented by the international law firm of Milbank, Tweed, Hadley & McCloy LLP, which was later replaced by the law firm of Pepper Hamilton LLP. After Pepper Hamilton withdrew from the representation, Andrew Wright, Senior Legal Counsel at Essar Capital, undertook representation of Essar Steel in the arbitration.  The Ruia Family manages Essar Global through its "investment manager," Essar Capital.[39] [*See* Declaration of Plaintiff's Attorney Christopher Tompkins, filed May 25, 2018, at Ex. 4, p. 1.] Due to the close relationship between Essar Global and Essar Capital, the Court imputes Essar Capital's knowledge of and participation in the ICC arbitration proceedings against Essar Steel, to Essar Global.

Late in the summer of 2017, Mr. Wright—senior legal counsel for Essar Capital, acting on behalf of Essar Steel—informed the ICC Arbitral Tribunal that Essar Steel would not be filing any further written submissions or attending the arbitration hearing, but he also made clear that these decisions did not mean that Essar Steel was not defending the claim or not standing by its counterclaim.  Here, the facts are sufficient to establish that the Essar entities had both actual notice of the Arbitration hearing and an opportunity to participate. Accordingly, the *North Atlantic Distribution, Inc.* opinion is inapposite, and the Essar Defendants are not entitled

---

[39] Essar Capital is not a party to this action.

to dismissal of Plaintiff's claims for piercing the corporate veil, alter ego liability, or agency liability based on the fact the ICC Final Award was obtained by "default" against Essar Steel.

### 2. The Essar Defendants are entitled to dismissal of Counts One and Two of the Complaint, alleging fraudulent transfers in violation of the Minnesota Uniform Fraudulent Transfer Act, based on the doctrine of extraterritoriality.

Plaintiff alleges that Essar Steel made actual fraudulent transfers to Essar Global and Essar Asia, in violation of Minn. Stat. §§ 513.44(a)(1) and 513.47, and constructive fraudulent transfers to Essar Global, and Essar Asia, in violation of Minn. Stat. §§ 513.44(a)(2) and 513.47. Minn. Stat. § 513.41 *et seq.*, referred to as the "Minnesota Uniform Fraudulent Transfer Act" (MUFTA), sets forth provisions of the Uniform Fraudulent Transfer Act (UFTA), which Minnesota adopted in 1987. *See Citizens State Bank Norwood Young Am. v. Brown*, 849 N.W.2d 55, 60 (Minn. 2014), as corrected (July 24, 2014). Thus, Plaintiff argues that a series of asset transfers—the Essar Asia 2012 Transfer, the Essar Asia 2013 Transfer, and the UAE (2015) Transfer—made between foreign entities, involving foreign assets, violate provisions of Minnesota substantive law.

Pursuant to the doctrine known as the "rule against extraterritoriality," however, the MUFTA cannot be applied outside the territory of Minnesota. See *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013) ("When a statute gives no clear indication of an extraterritorial application, it has none."); *Longaker v. Boston Sci. Corp.*, 872 F. Supp. 2d 816, 819 (D. Minn. 2012), *aff'd*, 715 F.3d 658 (8th Cir. 2013) ("A general presumption exists against the extra-territorial application of a state's statutes.").

Courts applying the Uniform Fraudulent Transfer Act (UFTA), as adopted by at least two other jurisdictions (Illinois and Colorado), have concluded that the statutes' provisions may not be applied extraterritorially. *See Armada (Singapore) Pte Ltd. v. Amcol Int'l Corp.*, 244 F. Supp.

53

3d 750, 758 (N.D. Ill. 2017), *aff'd*, No. 17–2324, 2018 WL 1464556 (7th Cir. Mar. 26, 2018) (dismissing claims under the Illinois Uniform Fraudulent Transfer Act when the transfers were made between foreign entities abroad, and noting that "[i]t follows that [plaintiff's fraudulent transfer] claims require extraterritorial application of the [state] statute. Since the statute does not apply extraterritorially, [plaintiff's] claims must be dismissed."); *see also UET RR, LLC v. Comis*, No. 14-CV-01237-RPM, 2017 WL 1856508, at *7 (D. Colo. May 9, 2017) ("The [Colorado Uniform Fraudulent Transfer Act] claim also fails. Under Colorado law, a statute is presumed not to have extraterritorial effect. The transfers that the plaintiff says violated [the Act] occurred in Michigan, Arkansas, and Canada.").  The Court is convinced that the same reasoning—concluding that the UFTA may not be applied extraterritorially—applies with equal force to the Minnesota Uniform Fraudulent Transfer Act, Minn. Stat. § 513.41 *et seq*., which codifies provisions of UFTA, as adopted by Minnesota in 1987.

Plaintiff argues that a 1903 Minnesota Supreme Court case, *In re St. Paul & K.C. Grain Co.*, 94 N.W. 218 (Minn. 1903) specifically excluded Minnesota's fraudulent transfer laws from the general presumption against extraterritorial effect.  Plaintiff's reading of the *K.C. Grain Co.* opinion is not persuasive, and ignores the clear language of that case stating:

> [W]e are unable to concur in the contention of respondents that all the receipts are valid as to all the grain, wherever actually situated at the time they were issued, by force of the statutes of this state. It is an elementary rule that statutory law has no extraterritorial effect. Statutes of a state have no effect ex proprio vigore beyond its own limits, and, even if a legislature should intend its laws to apply to persons and property in other states, its enactments in that direction would be wholly inoperative and void. It is beyond the power of a state to impose its laws upon another state, or to provide that contracts entered into in accordance with its laws shall be valid and enforceable in a foreign jurisdiction … We are unable to concur in the ingenious argument of counsel for respondents in this respect, and apply the general rule which limits the operation of statutory law to the state of its enactment.

*Id.* 94 N.W. at 225.

The Court has already concluded that it lacks specific personal jurisdiction over the Essar Defendants relating to Counts One and Two of the Complaint, alleging fraudulent transfers in violation of the Minnesota Uniform Fraudulent Transfer Act, but—even if the Court had jurisdiction over such claims, it would decline to exercise such jurisdiction based on the doctrine of *forum non conveniens*. A third basis to dismiss Counts One and Two of the Complaint, (alleging fraudulent transfers in violation of Minnesota statute by foreign Defendants, involving foreign assets), is that those claims are not cognizable based on the doctrine of extraterritoriality.

**3. Essar Global, although entitled to dismissal of Count Six (alleging an agency relationship between Essar Global and Essar Steel) based on *forum non conveniens*, would not be entitled to dismissal of Count Six for failure to state a claim.**

Essar Global argues that Plaintiff's agency claim against it should be dismissed for failure to state a claim, because Plaintiff has made an insufficient showing of essential elements of an agency claim, including lack of "consent" by Essar Global to Essar Steel's acting on its behalf, and lack of "authoritative control" by Essar Global over Essar Steel's work. [*See* Memorandum in Support of Essar Global's Motion to Dismiss, at pp. 22-23.] However, as Plaintiff correctly argues, Minnesota courts have long held that "the existence of an agency relationship is a question of fact." *Vacura v. Haar's Equip*., Inc., 364 N.W.2d 387, 391 (Minn. 1985) (reversing the trial court's grant of summary judgment on the plaintiff's agency claim)(*citing White v. Boucher*, 322 N.W.2d 560, 566 (Minn.1982); PMH Properties v. Nichols, 263 N.W.2d 799, 802 (Minn.1978)). Were it not for the Court's decision to decline jurisdiction over Essar Steel on Plaintiff's agency claims based on the doctrine of *forum non conveniens*, Plaintiff would have been entitled to additional discovery to develop facts to support its agency claim. Dismissal of Plaintiff's agency claims for failure to state a claim, pursuant to Minnesota Rule of Civil Procedure 12.02(e), is inappropriate at this stage of the proceedings.

## IV.    Conclusion

The Court lacks specific jurisdiction over the Essar Defendants with respect to Plaintiff's fraudulent transfer claims.  The motions of Essar Steel, Essar Global, and Essar Asia to dismiss Counts I and II of the Complaint, for lack of personal jurisdiction, are GRANTED.[40]  Plaintiff's fraudulent transfer claims involve the transfers of assets, located abroad, between foreign entities.  Any alleged link between the alleged fraudulent transfers between the Essar Defendants, and Essar Steel's liability to Plaintiff arising from its breach of the Amended Pellet Sale Agreement and the ICC Final Award, is too tenuous to support the exercise of specific personal jurisdiction.

Assuming the Court has jurisdiction over Plaintiff's alter ego, piercing the corporate veil, and agency liability claims, the Court declines to exercise jurisdiction over those claims based on the doctrine of *forum non* conveniens. The motions of Essar Steel, Essar Global, and Essar Asia to dismiss Counts V and VI of the Complaint, pursuant to the doctrine of *forum non conveniens*, are GRANTED.  Plaintiff has an available and adequate alternative forum for its claim, and the public and private interest factors strongly weigh against the Court's exercise of jurisdiction over the Essar Defendants

The Court has dismissed Counts One, Two, Five, and Six of the Complaint (all of the pending claims against Essar Steel, Essar Global, and Essar Asia) based on either lack of specific personal jurisdiction, *forum non conveniens*, or both.  The Court's dismissal of these claims renders moot Plaintiff's motion for jurisdictional discovery, Defendants' motions to stay discovery, and Essar Steel's alternative request for arbitration.

L. J. L.

---

[40] If Counts I and II of the Complaint, alleging actual and constructive fraudulent transfers, were not dismissed for lack of specific personal jurisdiction, the Court would dismiss those claims pursuant to the doctrine of *forum non conveniens*.