# Exhibit 4

LB3HArcO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ARCELORMITTAL NORTH AMERICA
HOLDINGS LLC,

                 Plaintiff,

          v.                          21 Civ. 6975 (KPF)

ESSAR GLOBAL FUND LIMITED, et
al.,

                 Defendants.
                                      Oral Argument
------------------------------x
                                      New York, N.Y.
                                      November 3, 2021
                                      4:05 p.m.

Before:

                 HON. KATHERINE POLK FAILLA,

                                      District Judge


                       APPEARANCES

GIBSON, DUNN & CRUTCHER, LLP
     Attorneys for Plaintiff
BY:  ROBERT L. WEIGEL
     JASON WILLIAM MYATT

QUINN EMANUEL URQUHART & SULLIVAN LLP
     Attorneys for Defendants
BY:  ROLLO CLYDE BAKER IV
     TODD BEATTIE

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

LB3HArcO

(The Court and all parties present remotely)

THE DEPUTY CLERK:  Your Honor, this the matter of ArcelorMittal North American Holdings LLC v. Essar Global Fund Limited, et al.  Counsel, please state your name, beginning with plaintiff.

MR. WEIGEL:  Yes.  Thank you.  Robert Weigel and Jason Myatt from Gibson, Dunn for the plaintiff, ArcelorMittal North American Holdings LLC.

THE COURT:  Thank you, and good afternoon.  This is Judge Failla.

And representing the defendants this afternoon?

MR. BAKER:  Good afternoon, your Honor.  This is Rollo Baker from Quinn Emanuel on behalf of defendants Essar Global Fund Limited and Mesabi Metallics, and I'm joined by Quinn Emanuel associate Todd Beattie.  And with the Court's permission, I intend to address issues corresponding forum non conveniens and comity, and Mr. Beattie will address issues concerning personal jurisdiction and 12(b)(6) issues.

THE COURT:  Yes, certainly.

Mr. Weigel, is there a division of labor between you and Mr. Myatt?

MR. WEIGEL:  No, your Honor.  I'm going to be handling it.

THE COURT:  That's fine.  Thank you.

All right.  Good afternoon to all of you, and thank

LB3HArcO

you very much for participating in this conference.  It remains an unfortunate truth that we are having conferences of this type by phone and not in person, but given the current state of the pandemic, it does make the most sense.

I want the parties to be aware that I have reviewed the complaint in this case, which is of some length compared to other complaints that I have, as well as pre-motion letters that I have received from the defense and from plaintiff.  And sometimes I begin by asking the parties questions, and what I think I'm going to do here is, if I may, to orient the parties as to things that I am interested in.

Just by way of background, after reading all of the submissions in this case, I was sort of -- was reminded of what I think is a parable about the blind men and the elephant and one's perspective determining -- or perhaps one's shortsightedness determining how one interprets something. Because I do understand and, of course they are very well presented, the arguments in plaintiff's complaint and in its responsive letter about why this case is in New York and should be in New York, but equally well presented are the defendants' arguments about the pendency of these other cases and what they mean for me.

So one thing I would like to understand from the parties, and hopefully you have the same perspectives on this, is what is the status of any foreign proceeding that actually

LB3HArcO

might have an impact on my case?  There was a UK proceeding that was called to my attention, and I was given a rather lengthy decision to read in that regard.  There was a Mauritian proceeding that I was to take a look at, and I looked at those materials as well.  But I would like to get a better sense of where those cases are and how they impact, if at all, my case.

MR. WEIGEL:  Certainly, your Honor -- I'm sorry.

THE COURT:  No, no, that's fine.

Then also in the context of pre-motion conferences, I am sometimes advised by the nonmoving party that they wish to amend their pleadings.  I did not get the sense here that this was a case in which amendment would cure the issues raised by the defense, but if they are or if there are contemplated amendments, I'll hear about those.

So, Mr. Weigel, let me please begin with you, sir. Thank you.

MR. WEIGEL:  Sure.  Well, your Honor, this case arises out of a contract that was entered into by Essar Global, or Essar Steel, and my client, or my client's predecessor.  It is a New York law contract.  It had an arbitration clause in it. That arbitration clause was utilized.  It was New York law but covered -- had a Minnesota seat.  There was an arbitration. Essar Steel participated for a bit and then dropped out, and tribunal entered an award against them of approximately $1.4 billion.  That was reduced to a judgment, confirmed by the

LB3HArcO

district court in Minnesota, and then brought to the Southern District.

Under the New York Convention, which governs arbitrable awards, and I think your Honor is probably familiar with this, it contemplates multiple jurisdictions could be used to enforce the award. The *Karaha Bodas* case in the Fifth Circuit and there's a confusing similarly named case in the Second Circuit, both of which make that point that there's nothing wrong with having multiple proceedings to enforce an arbitrable award around the globe. In fact, that's what the treaty says, and that's what people typically do.

There is an action that we commenced in England, in London, to go after assets that are present in England. There's a very large oil refinery that's maintained by the Essar Group in -- I think it's in the north of England, and so our predecessor counsel commenced an action in England to try to "get at that asset." That case is going to a pre-motion -- it's not a pre-motion conference. It's a pretrial conference, as far as I can tell. It's sort of a comparable event in New York or U.S. litigation. And that case, you know, we'll get set down for a trial at some point in time, probably late in 2022 or '23. It is related, but it is a conspiracy claim. It asserts that these parties, collection of parties, including the principals of Essar Global engaged in a conspiracy to defraud our clients.

LB3HArcO

There is also --

THE COURT:  Sir, let me stop you there.  Sir, let me stop you there.  Thank you.

Perhaps I wasn't clear, because to a degree you've been repeating things I already know from the documents that I read, but perhaps you're just calling things to my attention. I'm aware of a lot of what you've told me, and yes, I am aware of the New York Convention.  Thank you.

But with respect to the UK High Court judgment, does that document have any, any, precedential impact on any of the issues that you are raising in my case?

MR. WEIGEL:  If you're referring to the decision on the worldwide freezing order, I would maintain that it doesn't. It was an interlocutory decision.  That court has allowed the case to go forward with an amended pleading, and I don't think it has -- you know, it was in the nature of a preliminary injunction, and --

THE COURT:  OK.

MR. WEIGEL:  -- has no binding nature on this Court.

The Mauritian action was, in our view, a sham action. It was brought by Essar Global, the parent company, against its own subsidiary, Essar Steel, using the same law firm that was actually representing Essar Steel in opposing the entry of a judgment based upon the arbitrable award in Mauritius.  So Essar Steel's lawyer representing Essar Global is suing Essar

LB3HArcO

Steel in that action, claiming that the receivable that was owed by Essar Steel to Essar Global that was extinguished, that is the crux of our case, has been extinguished.  Nothing's happened in that case.  We went and pulled the docket yesterday, and that case has not progressed at all.  We think that's a collusive lawsuit.

But in all circumstances, the New York Convention allows us to come to New York and go after U.S. assets.  And the idea that there would be a -- if, in fact, one were to wait and get a judgment in England and then come to the U.S., we would then have to domesticate that judgment, and that's a whole other fight, and New York Convention does require that.

THE COURT:  Sir, to be clear -- sir, to be clear, my concern is your UK case appears to have been brought in 2019.  So it is, of course, somewhat dispiriting to hear that the trial in the case will not be for another year or so.  But having elected to bring that case some two years ago, why -- are you not worried that having two cases simultaneously in two different courts will result in inconsistent findings?  I wasn't the one who brought the UK case.  You were.  So I am trying to find out why you should nonetheless bring a second case where you run the risk of inconsistent findings.

MR. WEIGEL:  OK.  Because the simple answer is, your Honor, we're trying to collect a judgment, and there are assets in the U.S., and we want to go after those assets.  And the

LB3HArcO

*Karaha Bodas* case in the Fifth Circuit makes it plain that there is always -- this is what the New York Convention contemplates, and there's always the potential that one country's courts could not honor an arbitrable award and another country's courts could.  And that's not a basis for not enforcing, according to the treaty, an arbitrable award in a particular state.

Here, we have a New York judgment.  We are successor counsel, I will say that.  We looked at this, and we say we have a federal judgment in the United States; that the United States is where we should be in forcing this.  We have found out that they have assets in the United States; namely, there is a -- the pellet plant that is the underlying engine for this whole dispute happened in -- was in Minnesota.  There was an attempt to bring this action in Minnesota.  Essar Global came in and challenged jurisdiction, said they weren't subject to jurisdiction in Minnesota.  We came in and we took a deep dive, and we believe that we can establish through a variety of acts that Essar Global took in New York that they are subject to personal jurisdiction in New York.

So we believe that we can establish personal jurisdiction and that we can go after these assets.  In particular, there are notes that this -- successor company, Mesabi Metallics, entered into with a -- that are governed by New York law where Mesabi Metallics agreed to subject itself to

LB3HArcO

New York jurisdiction.  So if we could get the judgment against Essar Global here, then we could go after those assets, which are located in Minnesota.  And, well, the notes are in the New York.  The plant itself is in Minnesota, but this is a New York-centered activity.  Essar Global came to New York. They signed numerous loan agreements and guarantees subject to New York law.  They've litigated in New York before.  So we came to the conclusion we could establish personal jurisdiction over Essar Global in New York, contrary to the result that happened in Minnesota.  So that's largely why we're here, your Honor.

THE COURT:  What else would you like me to know, sir?

MR. WEIGEL:  Well, I think that -- again, I think the comity analysis, although I don't know if you want to go into this at this point, your Honor, but comity also would allow us to proceed in New York.  This court's obligation to take jurisdiction is a strong one, and there's no indication that -- because of the nature of the New York Convention, there's no indication that any other court would in any way be offended if this court were to try to enforce a New York judgment against assets in the United States.

THE COURT:  So let's pause right there.

I would have to say that, as I look at the issues raised in your adversary's letter, I am more interested in the forum non conveniens than I am in comity, but I think, to your

LB3HArcO

point that you've just been making, you've suggested to me that I should care very much about the New York -- forum selection clause in New York, consent to jurisdiction, and that works, as far as it goes, with respect to some of the entities, but I'm not sure -- I mean, Essar Global may have assets in New York, but I'm not sure this is the place to be deciding the alter ego issue. So let me try and say that a little bit better than I just did.

There are questions about the enforcement of your judgment and the seizing of assets, and I certainly understand how those would be -- how the New York Convention would apply and how the New York context would matter. But when we're talking about the alter ego issue, I'm not really sure that any of the activities that you are talking about that suggest alter ego status or, separately, any of the conduct that you are suggesting indicates a fraudulent conveyance is implicating New York, and that's what concerns me. But I'll let you speak to that issue.

MR. WEIGEL: Sure. It's very simple, your Honor. We are trying to enforce our rights under a New York contract that was negotiated in New York and governed by New York law. What happened, plain and simple, was that less than two months after an arbitration was commenced to recover damages for breach of that contract by Essar Steel, Essar Global, the parent of Essar Steel, basically stripped the company of all of its assets and

LB3HArcO

left it an empty shell, making it impossible for us to enforce our rights under this New York law contract.  And if it was that easy to avoid a contract governed by New York law that all you had to do was transfer your assets to an offshore entity and the courts in the United States are now powerless to go after that, that would really render the judicial power of the United States less than whole.

And you cannot get away from your obligations under New York law simply by transferring your assets to a related party.  There is certainly case law that says that just receipt of a fraudulent conveyance from -- from New York, or from the United States, subjects you to jurisdiction in the United States.  And there's no question here that Essar Global knew the financial condition of its subsidiary.  It purposely, at least our allegations are that it purposely, stripped it of assets, assets that had been on its books since 2013.  But two months after we commence our arbitration, suddenly they strip those assets out and say that they don't actually owe the money that was on the -- that was on their balance sheet.

I'm sorry, your Honor.  Another call came in.  I thought I was going to get cut off here.  Sorry.  Can you still hear me?

THE COURT:  That's OK.  Yes, sir.  Yes, I do.

But, sir, Essar Steel, as I understand it, is a Cayman Islands company.  So, I mean, when we're talking about

LB3HArcO

fraudulent conveyance, I'd feel a little better if some part of the conveyance is taking place in the U.S., even better, in New York. But I thought that Essar Minnesota went bankrupt, and I'm left with Essar Steel in the Cayman Islands.

I understand what you're saying, sir, which is that it's a bad thing when folks transfer away assets in order to avoid paying a judgment. I get that. But I guess I am saying, where the conduct that you are challenging seems to take place away from New York, and indeed away from the United States, I understand you to be saying that it is still your view that I should be handling that here, even though what I might be deciding is the impact of conduct and actions taken under other countries' laws. Is that correct?

MR. WEIGEL: I think that is correct, but if I could elaborate a little bit, your Honor?

THE COURT: Please.

MR. WEIGEL: This act was done to avoid an outcome in the United States. Essar Steel is -- Essar Steel is the Mauritius company, and Essar Global is the Cayman company. And Essar Steel and Essar Global both came to New York and negotiated financing for this pellet plant up in Minnesota. Our contract with them was essential to the financing that Essar Global guaranteed in New York; namely, we were the parties that were going to buy the pellets and provide the revenue that would then be able to service the debt that Essar

LB3HArcO

Global was taking on.

So this is not a situation where this is a transaction that took place wholly in some other country, and we are asking this Court to insert itself into something that happened in Brazil. This whole transaction was U.S. centric. It was borrowings under New York law to build and develop a pellet plant in Minnesota, and all of the contracts are governed by New York law. Essar Steel, which came to New York to transact business here, did, in fact, transfer its assets when it became clear that it was going to be held liable for violating the contract that it negotiated inside New York.

I would maintain that this is not a situation where there was some physical act that took place elsewhere. We're talking about a receivable that was on Essar Steel's books that then gets extinguished through the machinations of restating financial statements going back several years. So there was no physical transfer of a truck or gold, or something like that, someplace outside the country. This was an act done with the intent to defeat, effectively defeat, U.S. process, a U.S. lawsuit. The parties agreed to arbitrate. We went through the whole arbitration process. We then went to get it domesticated in New York -- or in Minnesota and then into New York. And this is a New York judgment, and it's entitled to be enforced. If a party could avoid a New York judgment by the simple expedience of -- even a foreign party, which -- there's no

dispute that Essar Steel was liable -- was subject to jurisdiction here, and there's really very little dispute that Essar Global is subject to jurisdiction here.  Essar Global sent us a note through their New York office saying, you know, we'll stand behind Essar Minnesota, and then they went and they simply stripped the company of all its assets.

So I guess what I'm saying, your Honor, is this was an attempt to defeat a lawsuit that -- or an arbitration and then a judgment in the United States.  That was the whole purpose of doing this.  So to say that this has no connection to the United States or that this was based on -- I think ignores the reality that there are fraudulent conveyance laws that are designed to protect creditors, and Essar Global has litigated quite a few cases in New York, has brought cases in New York.

And if we're looking at the fraudulent -- at the forum non standard, the Second Circuit has said in the *Iragorri* case and even the *Guidi* case, if there's a legitimate reason for bringing the case in a particular forum -- and there is here because we have a New York judgment, we have jurisdiction over Essar Global here -- that our choice of forum is entitled to a great deal of deference, and they would be obliged to establish that the convenience is -- you know, that it's oppressive and vexatious to the defendant out of all proportion to our convenience.  There's no real assertion and no way they can assert that this was done for forum shopping.  This is done to

LB3HArcO

collect U.S. assets pursuant to a New York judgment, and we're allowed to do exactly what we're doing under the New York Convention, which is a U.S. treaty.  And there's a strong public policy in seeing that U.S. judgments are enforced. There is a strong public policy in favor of arbitration, which has just been defeated here because we ended up getting an empty award at this point against Essar Steel, which they have not honored at all.

So we do not think that there is any basis to send this case elsewhere.  We think that maintaining an action here to get U.S. assets and in England to get English assets is perfectly consistent with the treaty, and it's exactly what we should be doing here.

THE COURT:  Sir, just so that I can tie up a few loose ends, you're not suggesting, I don't think, that the UK forum is an inadequate forum for the action that's being brought there or that the forum in Mauritius is an improper forum for the actions being brought there.  I appreciate, as to the latter, you're suggesting it's a sham proceeding.  But you're not questioning, or are you, one's able, the ability of one of the parties involved in this dispute, to bring an action in either of those jurisdictions?

MR. WEIGEL:  I am not saying that they are -- I'm certainly not saying the English courts, nor am I saying the Mauritian courts are, per se, inadequate forums.  What I am

LB3HArcO

saying is that they are not a forum that can deliver the remedy that we need here, which is to go after the U.S. assets. That --

THE COURT:  I understand.  I'll let you continue, sir.

MR. WEIGEL:  In other words, we're entitled to get satisfaction of that judgment.  And as a judge in another case said, every day that our judgment isn't satisfied is indeed something of an affront to the U.S. judicial system.  The reason they want it to go to England or they want it to go to Mauritius is transparent, and I think the Second Circuit notes this, too, that the court needs to be aware of this, that the so-called convenience of the defendant is often excuse just for delay, and that is clearly what they're looking for here.  They have managed to avoid paying this award so far for quite a period of time, and they wish to continue to avoid doing so.

And we would maintain that New York law would apply here because this was done with an intent to defraud a creditor based upon a contract under New York law, and that if New York law was unable to address this situation, it would make New York law -- the value of having a contract governed by New York law quite a bit less, because anytime you signed up with a foreign plaintiff, they could just strip the company out of its assets and force you to go to Mauritius to litigate, which is not what the parties bargained for.

THE COURT:  Mr. Weigel, please understand the concern

LB3HArcO

they I have is not with the validity of the judgment that you have or the propriety of its domestication in New York.  The issue is your allegations here are that Essar Global engaged in accounting shenanigans and/or fraudulent conveyances, and I guess I was kind of hoping that some court somewhere might have agreed with you.  But, in fact, what we have is a proceeding in the UK that's still sort of deciding that issue, or that hasn't decided that issue finally but doesn't necessarily agree with all the factual arguments that you're making to me, and then the Mauritius case that we've been talking about.

So I do understand everything that you're saying, and I'm just trying to reconcile that with what I would have to do and what law I might have to apply in order to agree or disagree with you about the alter ego issue and about the fraudulent conveyance issue.

MR. WEIGEL:  I think your Honor may have just flipped it slightly, but in an important way.

THE COURT:  Excuse me.  OK.

MR. WEIGEL:  The entity that engaged in the accounting shenanigans is Essar Steel.

THE COURT:  Excuse me.  Yes.

MR. WEIGEL:  Essar Steel is the entity, is the transferor here.  Essar Global accepted the transfer, but Essar Steel, the defendant in the lawsuit, the judgment debtor at this point, is the one that made the transfer, and it is its

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LB3HArcO

conduct that is really at issue here.

Essar Global -- receipt of a fraudulent conveyance subjects you to have to give the money back. But we don't have to prove that Essar Global had a bad intent. We have to prove that it was Essar Steel, the entity that signed our contract, governed -- agreed to be governed by New York law, it is the entity that gave away its assets and made the fraudulent conveyance. It's the transferor. And under New York law and pretty much any law, because I don't think that the plaintiff -- the defendants have really said, you know, anybody's fraudulent conveyance law is particularly different. I mean, any legal system that allows you to borrow money says you can't give money to your brother-in-law before you have to pay it back and walk away. I once looked at this, and it goes back to the Justinian Code. But it's everywhere, the concept that if you borrow money, you can't give away your assets before you pay your creditors, and that's exactly what they did.

But they agreed to be subject to New York law. So that's why we say New York law applies, because Essar Steel, the entity that signed the contract, took actions to get rid of its assets, admittedly at the direction, that we believe, of Essar Global who controls it and is its alter ego. But it is Essar Steel, the entity that signed the contract, whose conduct is at issue here. To allow the defendant in a lawsuit to say I

LB3HArcO

can transfer my assets, and if I transfer them to a Cayman company, then you got to go to the Caymans, then if I transfer it to a Chinese company, you've got to go to China, that's not the way this system works.  We can find that they are fraudulent transferor and that Essar Global is the recipient of that transfer.  But you could be an innocent transferee and still have to give the money back.  I could give all my money to my brother-in-law before my mortgage comes due, and even if my brother-in-law just thinks I'm a great guy, you could still get the money back.

So this idea that we have to go chase them around -- chase the money around the globe is not how it's supposed to work.  They owe this money to us, and they gave it away to Essar Global, we maintain with Essar Global's knowledge.  But it is a New York issue.  It is a New York contract, and it is a New York transfer that defeated the arbitration that they agreed to submit to.

THE COURT:  Sir, why don't you speak to the issue of personal jurisdiction.

MR. WEIGEL:  Sure.

THE COURT:  Sir, as I'm understanding from my deputy, your colleague dropped off the line.  Shall we wait to see if he or she returns?  Is it Mr. Myatt who dropped off the line?

MR. WEIGEL:  No.  Thank you very much.  The reason Mr. Myatt isn't speaking is that we had another court in

LB3HArcO

Delaware schedule a hearing at 4:30.

THE COURT:  I see.  Mr. Myatt, I take no offense at his departure.

OK.  Go ahead, please continue, sir.

MR. WEIGEL:  Sure.  So we are alleging here that Essar Global transacted business in New York, and I don't know how that can really be disputed.  They signed numerous New York law guarantees.  They appointed -- in those contracts they appointed Essar Americas, which has an office on Park Avenue, as their agent for service.  They affirmatively brought an action in New York against Midtown something or other.  But they have availed themselves, purposely availed themselves, of the benefits of New York law to borrow money to fund this project in Minnesota.  So I don't think there's any real doubt that we meet the transacting business test which can be met, as your Honor knows, by a single act in New York, and here we have multiple acts where they took advantage of New York law.

The next step of that, as the Court of Appeals said in the *Licci* case, is that there must be some articulable nexus between their transacting business in New York and the claim that is asserted.  The Court of Appeals made it plain in *Licci*, which involved a clearing account in New York, but the law is the same, that causation is not required, and that it's a relatively permissive standard whether there is the articulable nexus.  And in *Licci*, the Court said that the standard is

LB3HArcO

basically that the cause of action not be completely untethered or un- -- I think the word they used was "unmoored" to the transacting of business.

But the Court of Appeals also made it clear that not every element of a cause of action has to be connected to New York. It could be a single element. And here, we have them taking an asset that would otherwise have been available to us to enforce our judgment, and they received it. It all comes out of the same transaction. It's all interrelated. In other words, Essar Global is the parent, Essar Global was the one developing this pellet plant, and Essar Global guaranteed debts. It agreed with one other -- one of the creditors that it would fund any shortfalls. That agreement -- both of these agreements -- all of these agreements were under New York law. So they transacted business here. Our claim, which arises out of the same transaction, the same project, is not untethered to what they did here. We were an essential piece of them getting the funding to be able to do the deal. In other words, in this sort of project equity sort of case, they need somebody to buy the stuff that comes out of the plant so that -- you know, so that there's a revenue stream, so that the lenders can look at that and say, OK. We have ArcelorMittal, which is a big steel company, and they are providing the revenue that will satisfy the debt. And what happened, instead of Essar Global honoring its obligations to fund and to fulfill any shortfall, is that

LB3HArcO

they stripped the company of assets and tried to prevent us and others from collecting.

So we don't think this one is even close on personal jurisdiction.  There's no question that they transacted business in New York.  And the relationship between our claim, which is that they received from Essar Steel assets with the intent and for the purposes of stripping Essar Steel so that we could not collect on this New York contract, ties into the acts that Essar Global did in the U.S., and therefore that they're subject to personal jurisdiction.

THE COURT:  All right.  Then I believe I understand you to be opposing the request of your adversary for bifurcation.  Let me turn to Mr. Baker, in the first instance, to begin to get his responses to the questions I've been asking in my discussions with Mr. Weigel.

Mr. Baker, you may begin where you'd like to.

MR. BAKER:  OK.  I'm going to start with the New York Convention.  And thank you, your Honor, for giving me an opportunity to respond.

There's a lot of discussion about the New York Convention.  Unless I missed something, we're not here in a situation where the plaintiff is seeking to enforce an arbitration award under the New York Convention.  Even if we were, New York courts and the Second Circuit have held that the doctrine of forum non conveniens applies with full force with

LB3HArcO

respect to arbitration judgment enforcement actions both under the New York Convention and with respect to domestic arbitration awards.  And two cases that --

THE COURT:  Mr. Baker, can we just pause here for a second, and can I just be honest with you, sir, because I figure that's a good way to begin our relationship together. One of my few cases finding forum non conveniens resulted in a reversal from the Second Circuit.  So I've got to tell you I am once bitten and twice shy when it comes to forum non conveniens.  So I do want you to give me some confidence that I'm not going to be in the same problem I was with the circuit that I was last time.  So go from there, sir.

MR. BAKER:  Sure, your Honor.  Well, I think maybe given that comment, I think a case that I would point your Honor to is from the Second Circuit.  It's a 2002 case.  *In Re Arbitration Between Monagesque De Reassurances*, 311 3d. 488, and that's Second Circuit 2002.  And, your Honor, that case is a case in which the Second Circuit confirmed it was appropriate to dismiss an arbitration enforcement action on forum non conveniens grounds because the plaintiff in that case, much like the plaintiff in the case here, sought to enforce an arbitration award against a nonsignatory under an alter ego that.  And the court concluded that on forum non conveniens grounds, the case should be dismissed in favor of a foreign forum because the question of alter ego would need to be

LB3HArcO

resolved under foreign law.  All the relevant evidence and witnesses and issues occurred abroad, and foreign law would apply.  And that, your Honor, is exactly what we have here.

Now, your Honor asked the question, at the beginning of the session, whether there were foreign proceedings that could have an impact on this action, and the answer to that question is absolutely yes.  And if we focus first, your Honor, on the UK proceeding that the plaintiff's predecessor commenced nearly two years ago in November 2019, the whole centerpiece of that dispute is that the restructuring transactions and the restatement constituted an unlawful dissipation of assets.  In that proceeding, the precise core issues that the plaintiff seeks to litigate here are going to be resolved.  And as your Honor has access to it, I believe it's Exhibit A to defendants' letter, Justice Henshaw's decision, which denied the plaintiff's request for a worldwide freezing order, I think is quite useful and interesting and perhaps explains why the plaintiff is now, under new counsel, trying to switch strategies and come to a different forum.  But as your Honor will know, that is a detailed 81-page opinion, and the court there had the benefit of documentary evidence and witness statements and concluded in that detailed opinion that there were serious doubts as to the colorability, the logic, the plausibility of plaintiff's theory that the restructuring that was authorized March 2012 that the plaintiff complains about,

both in the UK proceeding and in this proceeding, was improper or that that 2016 restatement could be characterized as a dissipation of assets.

Again, I understand that we're bound by a motion to dismiss -- at this procedural phase, we may be bound in large part by the pleadings in the complaint, but from a forum non conveniens perspective, I think it's important to understand how devastating that decision was for plaintiff and why this is the textbook case for forum shopping. We're not here because is simply seeking to enforce an arbitration award against a signatory to an arbitration agreement. We're here because the plaintiff is trying to litigate, in a perhaps more favorable forum -- they're seeking a jury, for example, your Honor -- the precise issue of whether the restructuring and restatement could be a fraudulent transfer and whether Essar Global dominates, controls, is an alter ego of Essar Steel, but --

THE COURT:  Sir, please pause right there.

MR. BAKER:  Sure.

THE COURT:  According to Mr. Weigel, the reason why there are two proceedings is because in the UK proceeding, they can get the assets in the UK, and in the proceeding before me, they can get the assets in the U.S.  So I appreciate what you're saying, which is that all of this is animated by Justice Henshaw's decision of last March.  I think it was -- yes, it was March of 2020, but I understand from your adversaries that

LB3HArcO

they believe that this is the only -- that bringing the case here is the only way to get the assets here.

Can you disagree with that?

MR. BAKER:  I do disagree.  Well, first off, your Honor, I don't discredit what -- you know, that may be opposing counsel's sincere belief, but I think, again, your Honor mentioned that you're cognizant of the Second Circuit's view, particularly with respect to forum non conveniens issues, and I think there's a case that is pretty useful in answering that question.  I will not be able to pronounce the first name of the case.  I believe it's *Figueiredo Ferraz v. Republic of Peru*, 665 F.3d 384 at 390 (2d Cir. 2011), and the court explains, in dismissing a case on forum non conveniens grounds, which was an arbitration enforcement action, that:  "It is no doubt true that only a United States court may attach a defendant's particular assets located here, but that circumstance cannot render a foreign forum inadequate.  If it could, every suit having the ultimate objective of executing upon assets located in this country could never be dismissed because of forum non conveniens."  That's at page 390.

The court went on to explain that was not the law and cited examples where courts within the Second Circuit dismissed despite a plaintiff claiming that the assets were located in the United States, and, therefore, they had no choice but to bring the action here.  The plaintiff's action speaks louder

LB3HArcO

than their words here.  They pursued the litigation in the UK nearly two years ago seeking to litigate the question of whether the restructuring and restatement could somehow be considered improper or a fraudulent transfer, an improper dissipation of assets, in that proceeding have admitted that Mauritius law governs the question, and nonetheless are now trying to re-litigate the same set of issues here.

Now, the plaintiff is free to get a judgment in the UK finding that the restructuring and the restatement were fraudulent transfers, although I think we have at least an initial indication that they're going to have some difficulty doing so because when the court actually looked at the evidence and the timeline, at least based on the decision denying the worldwide freezing order, the timeline isn't even close to sustaining plaintiff's theory, which effectively is that the defendants had a crystal ball back in 2012 when they authorized the restructuring that nearly a half decade later there would be an arbitration and that there would be a judgment award, and somehow set into motion way back in 2012 a series of events to render Essar Steel judgment proof.  Frankly, it doesn't really add up.  But, in any event, your Honor, what they are free to do is to get a ruling from the UK court concerning the propriety of the restructuring and restatement and then seek to enforce it over here.

Likewise, there is the Mauritius proceeding.  I refer

LB3HArcO

to it as the Mauritius adversary proceeding.  Opposing counsel have said they believe it's a -- I can't remember the precise terminology, but called into question the legitimacy of that proceeding.

THE COURT:  I heard the words "sham" and "collusive," sir.  I'll let you pick whichever one you like better.

MR. BAKER:  I don't like either of them, to be honest, your Honor.

THE COURT:  OK.

MR. BAKER:  But, in any event, I think that case has not progressed very far.  One point that was not mentioned by opposing counsel is that following Essar Steel being placed into administration in -- apologies -- March 2019, an administrator was appointed, and AM U.S.A., which is, I believe, the predecessor to plaintiff, then swiftly thereafter attempted to appoint its own administrator, which then created a deadlock.  And the question of the deadlock is currently before the Mauritius Supreme Court to conclude which administrator -- or how those administrators are supposed to proceed with the administration of ESL, or Essar Steel.  And my understanding is that in part explains why the adversary proceeding, in which AM U.S.A. is a party, has not proceeded. But that proceeding as well is going to adjudicate the question of whether the restructuring was proper under Mauritius law and whether EGFL has any debt obligation to Essar Steel.

So I think I've answered a number of your Honor's questions.

THE COURT:  Yes.  Why don't we -- sir, why don't we move to comity, because you were speaking to me, in the context of forum non conveniens, about access to evidence and access to materials and how that might be easier in the UK than in New York.  I do understand that argument, although I will say more recent decisions in this age are suggesting that a lot of this stuff can be done electronically, so I'm not sure they have the same force as earlier decisions.

But to the extent that you are asking me to allow the UK courts to make the decision and then have plaintiff bring that -- or do something with the UK court decision, if, indeed, it were to obtain a decision in its favor, that sounds to me more in comity than in forum non conveniens.  So do you want to speak to your comity argument, sir?

MR. BAKER:  I would be happy to do so, your Honor.

So first off, with respect to comity, I think the plaintiff confuses the concepts.  There are two distinct concepts for comity.  One is prescriptive comity, and one is adjudicative comity.  We're not seeking or asking the Court to exercise prescriptive comity.  We are asking the Court to exercise adjudicative comity.

THE COURT:  OK.

MR. BAKER:  The key case upon which the plaintiff

LB3HArcO

relies there is *JW Oil Field Equipment*, and that case is inapposite for a number of reasons, including because that case, unlike our case, dealt with prescriptive comity, and the court was addressing the question of whether it could enforce a judgment that would require the German bank to violate foreign law.  That, of course, is not what we have here.  We're not asserting that if the Court proceeds here, it will violate foreign law.  We are saying that the principles in the adjudicative comity and the extraordinary circumstances that are required to be found in order to exercise it are present here.

Your Honor, I think this case is quite similar to *Thornton Tomasetti*, to *Ole Media Management*, and to *Kingstown Capital*, three cases we cite in our letter.  And in each of those cases, the court either dismissed, in the case of *Kingstown*, or stayed, in the case, I believe, of *Thornton*, and certainly in *Ole Media*, a second-filed proceeding in New York based on the principles of adjudicative comity.  And that test, of course, was announced by the Second Circuit in *Royal and Sun Alliance Insurance*.  That's 466 F.3d 88 (2006).  There are five factors that the court considers:

Similarity of parties and issues, there's really no dispute there, certainly with respect to the UK proceeding.

Interest of judicial economy, I don't understand how there could be a real dispute there.

Orders in which the actions were filed, there's no dispute that the plaintiff filed what we believe to be a sort of copycat cookie-cutter litigation in London two years before -- nearly two years before it filed the lawsuit here. There's no dispute that the UK court is an adequate forum.

And in terms of fairness and prejudice, also weigh heavily in favor of a finding that adjudicative comity is appropriate here.  The plaintiff suffers no prejudice by having to move forward with the proceeding which it commenced nearly two years ago.  Of course, the plaintiff appears not to want to do so given the worldwide freezing decision, and the defendant would be prejudiced by having to litigate two actions at the same time.

And EGFL has no presence here.  None of the witnesses, none of the documents, none of the third parties involved in the restructuring or the restatement are located in New York. Many of the parties are outside of the Court's subpoena power. I realize that, in the context of the three-page letter, we did not identify specific names and documents.  We're going to do so in the briefing, subject to your Honor's permission to proceed, and I'm happy to identify some folks now.

But in terms of fairness and prejudice, we think the factor is squarely in my client's favor.  And just as in *Thornton and Tomasetti*, which is a Southern District of New York case from 2015, "simultaneous litigation over identical

LB3HArcO

issues would result in a waste of judicial resources," and that's exactly what would happen here.

There can be real -- no real dispute that foreign law, Cayman Islands or Mauritius, governs the propriety of the restructuring and the accounting correction in the 2016 financial statements. And so at a minimum, at a minimum, we think adjudicative comity would favor a stay and a resolution of foreign proceedings given the factors I just discussed.

THE COURT:  Sir, thank you very much.

MR. WEIGEL:  Your Honor.

THE COURT:  Yes, I'm sorry.  This is who speaking, please?  Is this Mr. Weigel?

MR. WEIGEL:  Yes, your Honor.

THE COURT:  OK.  Mr. Weigel, I did want to hear from Mr. Beattie on personal jurisdiction issues, but is this something that can't wait?

MR. WEIGEL:  No, no, no, however your Honor wants to handle it is fine.

THE COURT:  Thank you.

Mr. Baker, I was going to turn to your colleague to speak about personal jurisdiction issues.  Is it you or he who will be addressing the point of bifurcation?

MR. BAKER:  That would be me, and I'm happy to address it now, if that's OK.

THE COURT:  Go ahead, please, sir.

LB3HArcO

MR. BAKER:  I'll be very quick.  We think this is the textbook case for bifurcation given the threshold forum non conveniens and comity issues, and that it would be efficient to proceed in that manner before we have to get into the, I think, trickier, more complex issues presented by the personal jurisdiction issues and the 12(b)(6) issues that we intend to raise.

THE COURT:  OK.  So that is how you're proposing to divide it.  As you see it, the first stage is forum non conveniens and comity and then, assuming the case survives that, personal jurisdiction and then regular 12(b)(6) issues?

MR. BAKER:  Yes, your Honor.

THE COURT:  Thank you.

Mr. Beattie, I'll hear from you now, and I thank you for your patience.

MR. BEATTIE:  Thank you, your Honor.

I'd like to focus on the second prong of Section 302(a)(1) of the long-arm statute, and that's the requirement that each cause of action has to arise from the transaction of business in New York.  And if you recall back to the New York contacts that Mr. Weigel discussed, they're all contacts pertaining to the underlying breach of contract claim. We heard about the pellet agreement and the forum selection clause there and the governing law clauses, various guarantee agreements, etc., etc.  That's all pertaining to the underlying

LB3HArcO

contract claim, which at this point is water under the bridge. The contacts that matter and that are relevant are the contacts pertaining to the alleged fraudulent transfer.

Your Honor may recall there's a diagram on page 26 of the complaint which diagrams the alleged transfer where Essar Steel divested itself of its Essar India shares, and the promissory notes were transferred to various entities, none of that has any connection whatsoever to New York. None of these entities is a New York entity with a New York principal place of business. None of these transfers was pursuant to a contract or agreement with a New York forum selection clause or a New York governing law clause. There's just absolutely no alleged New York connection to any of that.

So we think that's clearly insufficient under the case law. We cited in our letter the *Thackurdeen* case, and the court there was very clear that it's not enough to have a New York contract that is a link in the chain leading up to where we are today. It's just not sufficient. Each cause of action has to be -- has to give -- at least one element of each cause of action has to be connected to the New York contact. And in recent days, your Honor, I was able to locate a case which, we would submit, is on all fours with this case here, and I'll give you the citation for that. It's the *Imax Corporation v. Essel Group* case, and that's 154 A.D.3d 464. And it's a First Department case from 2017. And there, like

LB3HArcO

here, there was an ICC arbitration involving a breach of contract claim, a judgment was rendered, and there was an allegation that the party against whom the judgment was rendered had been effectively made insolvent by a demerger. And so the plaintiff in the underlying arbitration, which was the Imax Corporation, filed an action in New York. It was a turnover action under CPLR 5225(b) against the Indian conglomerate that allegedly owned and controlled the company that was involved in the underlying arbitration.

The basis for personal jurisdiction in the case was a different provision of the long-arm statute. It was 302(a)(3). But the reasoning of the court was the same. What the court said there was the contacts that were relevant to the analysis, to the specific jurisdiction analysis, were the events that were involved in the alleged demerger which occurred in India. That the facts about the contract dispute -- and the contract there was negotiated in New York -- didn't matter. It was of no moment. And we think the same result should follow here.

Then very briefly, turning to Mesabi, the basis for personal jurisdiction over Mesabi is the fact that the pledge and security agreement that was executed in connection with the Mesabi notes includes a New York forum selection clause. But the principle here is simple that plaintiff is not a signatory to that pledge and security agreement. The parties to that agreement are Mesabi, various guarantors, the collateral agent,

and then the lenders are identified as third-party beneficiaries. So because the plaintiff here isn't a party to that contract and isn't closely related to any party, they don't have standing to enforce the forum selection clause in that agreement, and so that can't be the basis for personal jurisdiction over Mesabi.

THE COURT: Mr. Beattie, I don't want to put you at odds with your colleague, Mr. Baker, but Mr. Baker tells me that bifurcation is appropriate, if not necessary, in part because of the complexities of the personal jurisdiction analysis. As you're describing it to me, sir, it sounds as though you think that the personal jurisdiction analysis isn't that difficult, but I'll hear from you as to your views.

MR. BEATTIE: So I would say that the analysis is fairly straightforward. I did not discuss the first prong of the long-arm statute, which is the question of whether Essar Global transacted business in New York. We would submit that that is a closer question, your Honor. The contacts that Mr. Weigel addressed earlier, those are the types of contacts that might be sufficient to show the transaction of business. We think it would be a close call because Essar Global doesn't -- isn't registered to do business in New York. It doesn't maintain an office or facilities in New York, etc., etc. So that would be a closer call.

But on prong two, I would submit it is fairly

LB3HArcO

straightforward.  I don't know comparatively if I would say it's more or less simpler than the forum nons issue, but I would say I think it is fairly straightforward, your Honor.

THE COURT:  OK.  I appreciate the candor, and you and Mr. Baker can have that debate offline.

Mr. Weigel, I'll hear from you in reply.

MR. WEIGEL:  Thank you, your Honor.

A couple of points:  First off, Justice Henshaw's decision is of no -- was on an interlocutory decision and has no binding effect in the UK or in the U.S.

THE COURT:  Mr. Weigel, just please pause for a minute, sir.

I'm not even disagreeing with that, and I did understand that.  When and if this case comes to trial in late 2022 or early 2023, is it a jury trial, sir, or is it a bench trial before Justice Henshaw?

MR. WEIGEL:  Your Honor is testing my knowledge of English procedure, but it is definitely not in front of Justice Henshaw.

THE COURT:  I see.

MR. WEIGEL:  There is no judge assigned to this case. I have a dim recollection of something I heard in law school that you don't get a jury in civil cases in England, but I'm not sure of that, and I really wouldn't purport to understand that.

LB3HArcO

MR. BAKER:  That is my understanding as well, that a jury trial wouldn't be available.  Sorry to speak up.

THE COURT:  That's Mr. Baker.  OK.  Thank you.

But, Mr. Baker, do you agree as well that whoever gets to hear this trial is not going to be Justice Henshaw?

MR. BAKER:  I honestly don't know the answer to that question, your Honor, but I will by the time we submit briefing.

THE COURT:  Well, that's very helpful.  OK.

All right.  Mr. Weigel, please continue.

MR. WEIGEL:  Sure.  And the forum non conveniens section, your Honor, I think it is important to realize that what the Second Circuit said in the -- I guess it was the Guido -- *Guidi* case versus Inter-Continental, and then the second decision, the *Iragorri* case, that there should be attention paid to the plaintiff's choice of forum, particularly when the plaintiff is a domestic U.S. company.  And I guess at this point in time, because of federal statute, that forum non only applies in the question of foreign -- sending something to a foreign court.

I would like to remind the Court that we actually commenced this action first in Minnesota and were told -- Essar Global came in, and we did that back in 2018.  So this is not a question we were forum shopping.  We got bounced out of Minnesota because Essar Global took the position that they were

LB3HArcO

not subject to personal jurisdiction in Minnesota, and, indeed, we didn't have any other contacts between Essar Global in Minnesota that we have between Essar Global in New York.

So I would argue that there is no basis for disturbing my client's choice of forum for this dispute. We're a Delaware corporation suing in the U.S. We're suing in New York because we can get jurisdiction over the defendant in New York, which is why we did that.

And with regard to the Justice Henshaw decision, they keep talking about a 2012 conspiracy, which is how they like to characterize this and is how they characterized it in front of Justice Henshaw, but that's not what we're suing for, and it points out the difference between our case and what prior counsel was trying to do in London. We are taking the position that there was in 2016 a transfer, an extinguishment of a receivable that had been on the company's books, Essar Steel's books, audited in 2013, 2014, and 2015, and that was extinguished in 2016, two months after the arbitration was commenced.

So we're not concerned about what happened in 2012. We're not asserting that this dates back to 2012. We're saying that this is a very simple fraudulent conveyance. They had an asset on their books, Essar Steel did, of $1.4 million. We commenced our arbitration, and suddenly they made that asset disappear, Essar Steel did, through accounting machinations,

LB3HArcO

and that's a different case than the case that's going forward in the UK.

On the comity point, I would just point out that there is vital interest in the United States, both in seeing that -- promoting arbitration, but in also seeing that U.S. judgments are enforced, and that's what we're trying to do here. The UK court does not have any particular interest in seeing the U.S. judgment enforced. This is a policy of the United States.

And in terms of Essar Global's footprint in New York, I would just like to note -- and, again, three pages of briefing, my adversary went to the extent of taking letterhead off of their brief so he could get an extra line, so we're operating on less than complete facts here -- but Essar Capital is the managing entity of Essar Steel -- Essar Global Fund Limited. And the president of Essar Capital, Mr. Vuppuluri, is actually, at least for a good part of the time, I don't know if he's still there today, but he is -- sent out letters indicating that he is the president of Essar Capital, which is the group that manages all of Essar Global, and he's based on Park Avenue. So they do have a contact here. There really isn't any doubt that they are subject to -- that they transacted business here.

And I would just, again on personal jurisdiction, point out the *Licci* case which makes it very plain that there has to be a relationship between the acts in the United States

LB3HArcO

and the cause of action, but it does not have to be a causal relationship, and that is the permissive standard.  So we suggest -- we would argue that when your Honor gets a chance to see all the facts, that we're going to be able to establish that, in fact, Essar Global has voluntarily come into this jurisdiction, purposely availed itself of the benefits of doing business in New York, and then when it didn't -- when their deal didn't turn out the way they hoped, they tried to take all their marbles and go home.

I guess, on the bifurcation issue, obviously, that's at the Court's pleasure.  We think that there is an enormous amount of overlap between the various issues and that we could just end up briefing the case multiple times for the Court and that it's not terribly efficient, but however the Court wants to do it, we certainly will comply.

THE COURT:  I do appreciate that. OK.  Thank you.

Let me do this, please:  I'm going to take this whole matter under advisement and think about how best to structure the briefing in this case.  I really don't have the ability to prevent Mr. Baker and his client from filing a motion to dismiss.  I just want to be sure I appropriately limit it.  So you should see an order from me in the next day or so specifying what it is we should be briefing.

I will likely grant the parties a limited extension of pages, but to the point raised most recently by Mr. Weigel, I

LB3HArcO

do not appreciate formatting shenanigans of the type that I saw in Mr. Baker's letter.  There is barely -- I mean, I am capable of reading, but you really did make it hard by removing basically any and all spaces between lines.  And I also did -- it was not lost on me your creative use of footnotes with small type font.  So when and if we get to the point of briefing these motions, I am going to expect the parties to actually respect margins and font sizes and to not put everything into footnotes, because if I notice that it's done again, I do have the ability and I have, in fact, rejected briefing.  But for now, the defendants' obligation to respond is stayed pending my order.

I imagine, Mr. Weigel, given the amount of money at issue, that the parties have discussed and realize that at this time it is fruitless to discuss settlement of this case. Mr. Weigel, am I correct?

MR. WEIGEL:  I think that the parties are commercial entities and that they have discussed settlement.  No settlement has been reached.  I expect the parties will continue to discuss settlement.  But everybody is commercial, and we understand that that makes sense.  But no settlement has been reached at this point in time, and I don't know when or if one is going to be reached.

THE COURT:  All right.  Mr. Weigel, let me be more pointed.  You see no reason for me to defer setting a schedule

LB3HArcO

for motion practice in this case so that the parties could pursue settlement, is that correct?

MR. WEIGEL:  I think that would be absolutely counterproductive to any possibility of resolving the case.

THE COURT:  I see.  OK.  Thank you.

All right.  Mr. Baker, you agree, sir, I need to decide these motions before you can talk about settlement?

MR. BAKER:  I don't know if that's the case, but I don't see a downside to proceeding with motion practice now.

And I also want to say I apologize, your Honor, and the margin issue will never happen again.

THE COURT:  OK.  I'm hoping as much, because I will remember.

All right.  Thank you all very much for your time this afternoon, and I appreciate hearing from you.  And someday I'll hear from Mr. Myatt when he's not dealing with other judge's time.  You'll see an order from me in the near term, and in some weird intellectually curious way, I'm looking forward to the parties' briefing.

Thank you very much.  We are adjourned.

MR. WEIGEL:  Thank you, your Honor.

MR. BAKER:  Thank you, your Honor.

(Adjourned)