# Exhibit 1

*Re-Amended Particulars of Claim by Order of Mr Justice Calver dated 24 March 2021*

Claim no. CL-2019-000674

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**COMMERCIAL COURT (QBD)**

**B E T W E E N:**

~~ARCELORMITTAL USA LLC~~

~~(a company incorporated under the laws of the State of Delaware)~~

**ARCELORMITTAL NORTH AMERICA HOLDINGS LLC**

**(a company incorporated under the laws of the State of Delaware)**

Claimant

and

**(1) MR RAVI RUIA**

**(2) MR PRASHANT RUIA**

**(3) MR SUSHIL BAID**

**(4) MR ANDREW WRIGHT**

~~(5) MR JOSEPH SEIFERT~~

**(6) MR UDAY KUMAR GUJADHUR**

**(7) MR NIGEL BELL**

**(8) ESSAR GLOBAL FUND LIMITED**

**(a company incorporated under the laws of the Cayman Islands)**

**(9) ESSAR CAPITAL LIMITED**

**(a company incorporated under the laws of the Cayman Islands)**

**(10) ESSAR CAPITAL SERVICES (UK) LIMITED**

Defendants

---

**RE-AMENDED PARTICULARS OF CLAIM**

---

A.    SUMMARY

1.    These Amended Particulars of Claim are were served pursuant to the Order of the Honourable Mr Justice Butcher dated 7 December 2020 in substitution for the Particulars of Claim dated 18 November 2019.  These Re-Amended Particulars of Claim reflect the assignment of the claims particularised herein to ArcelorMittal North America Holdings LLC ("**AMNAH**").  All references to dollars are to US dollars.

2.    The Claimant ("**AMUSA**") AMNAH is a significant creditor of Essar Steel Limited ("**ESL**"), a wholly owned subsidiary of the Eighth Defendant ("**EGFL**"), in the sum of $1,507,573,709.82 plus interest. This claim is for damages for unlawful means conspiracy to avoid those liabilities, which have arisen out of the breach of a 10 year iron ore supply contract entered into in 2012 between AMUSA and companies called Essar Steel Minnesota LLC ("**ESML**"), Essar Resources Inc ("**Essar Resources**") and ESL, which are part of an international conglomerate known as the Essar Group, of which the corporate Defendants are all members and with which the individual Defendants are all connected.

3.    On 17 December 2012, AMUSA and ESML entered into an agreement pursuant to which AMUSA was to purchase iron ore from an iron ore mine and processing facility in Minnesota, known as the Nashwauk Project (the "**Pellet Sale Agreement**").  On 10 January 2014, ESML's parent, ESL, became a party to the Pellet Sale Agreement and became jointly and severally liable for the performance of ESML's obligations thereunder (the **"Amended Pellet Sale Agreement"**).

4.    A dispute arose in relation to ESML's failure to deliver iron ore pellets under the Amended Pellet Sale Agreement and on 27 May 2016 AMUSA served notice to terminate on grounds of material breach. AMUSA commenced arbitral proceedings against ESL on 9 August 2016 (the "**ICC Arbitration**") (ESML having filed for relief under Chapter 11 of the US Bankruptcy Code a month after the Amended Pellet Sale Agreement was terminated).  On 19 December 2017, AMUSA obtained an Award in its favour in the ICC Arbitration (the "**ICC Award**").  On 14 January 2019, AMUSA entered judgment against ESL in England in terms of the ICC Award in the sum of $1,507,573,709.82 plus interest.  No part of the ICC Award or the judgment sum was paid.  On 26 March 2019, the day after the English court made a worldwide freezing order against it, ESL was placed into administration in Mauritius.

5. As set out below, the Defendants and each of them have conspired to injure AMUSA by unlawful means. On a date or dates unknown in the period between approximately 29 September 2015 and 29 September 2016, the Defendants and/or any two or more of them agreed or combined together with a common intention to injure or cause loss to AMUSA by putting ESL in a position in which it lacked the financial resources to pay any substantial liability under the Amended Pellet Sale Agreement and/or ICC Award. In this period, the Defendants would have known that there was a real likelihood of a substantial liability being incurred to AMUSA given the unsuccessful nature of the Nashwauk Project.

6. The Defendants acted in furtherance of the conspiracy by: (1) causing or procuring ESL not to call in a sum of approximately $1.5 billion owed to it by its parent company, EGFL (arising under promissory notes which upon assignment by ESL to EGFL in 2013 gave rise to a sum receivable from EGFL representing the face value of the notes assigned (i.e. $1.5 billion)); (2) causing or permitting ESL to waive such sum ("**the Waiver**"); and (3) causing or permitting ESL to dissipate a total of $200 million arising out of the sale of Essar Steel UAE Ltd ("**Essar Steel UAE**"), such sums being transferred to EGFL and a related company, Peak Trading Overseas Limited ("**Peak Trading**"), for no consideration or at an undervalue ("**the UAE Disbursements**"). Such actions entailed a breach of fiduciary duty by ESL's directors and/or a breach by ESL of the Mauritius Companies Act 2001 ("**the Mauritius Companies Act**").

7. As a result of the conspiracy, ESL had insufficient assets with which to meet any substantial liabilities under the Amended Pellet Sale Agreement and/or ICC Award. ESL has been placed into administration. It is uncertain whether the unsecured creditors will receive any dividend. AMUSA has therefore suffered loss and damage, being the loss of a chance of recovering the ICC Award in full, together with the costs of investigating and mitigating the wrongs complained of.

7A. Pursuant to an 'Assignment of Claims and Related Rights' between AMUSA and AMNAH dated 8 December 2020, AMUSA assigned to AMNAH inter alia all of its rights, title and interest in and to the claims and causes of action alleged in these proceedings. Written notice of such assignment was given to the Defendants on 4 February 2021.

7B.  Further, pursuant to a Board Resolution of AMUSA dated 8 December 2020, AMUSA distributed to AMNAH by way of dividend in kind inter alia all of its rights, title and interest in and to the claims and causes of action against ESL arising out of the ICC Award.  Such dividend constituted an assignment, being the transfer from AMUSA to AMNAH of the whole of an existing right or interest in intangible property.  Written notice of such assignment was given to ESL on 4 February 2021.

B.    **PARTIES AND OTHER RELEVANT PERSONS**

8.  AMUSA was incorporated in 2002 under the laws of Delaware and is was formerly part of the ArcelorMittal Group, the world's leading steel and mining business.

8A.  AMNAH was incorporated on 20 June 2016 under the laws of Delaware.  On 26 July 2016, AMNAH became the 100% shareholder of ArcelorMittal USA Holdings II LLC (which in turn was the 100% shareholder of AMUSA).  On 7 December 2020, ArcelorMittal USA Holdings II LLC merged with AMUSA and accordingly AMNAH became AMUSA's 100% shareholder.  On 9 December 2020, the shares held by AMNAH in AMUSA were transferred to Cleveland-Cliffs Inc. (a North American producer of flat-rolled steel).

9.  The Essar Group.  The Defendants are companies in or individuals associated with the Essar Group.  The Essar Group is an investment group, investing in various industries including metals & mining. The Essar Group is comprised of companies incorporated in jurisdictions around the world including England, Mauritius and the Cayman Islands.

10.  The Ruia family are the founders and ultimate beneficial owners, through offshore trusts, of the Essar Group.  The First Defendant ("**Ravi**") founded the group with his brother, Shashi, who is the father of the Second Defendant (**"Prashant"**).

11.  Ravi was one of the founders of the Essar Group, remains one of the ultimate beneficial owners of the Essar Group, and continues to "*exercise significant influence over [EGFL]*".  Ravi was a director of EGFL from 5 April 2010 to 26 March 2012.

12.  Prashant is, and was at all material times, a key individual at the Essar Group and one of its ultimate beneficial owners and controlling minds.  In an Information Memorandum for EGFL dated November 2014, Prashant is described as *"fundamental to [Essar's] strategy, continued growth and diversification"*.  Prashant is or was at material times a director or equivalent officer at relevant Essar Group companies, including:

12.1    ESL (from 17 March 2010 to 29 July 2016); and

12.2    The Ninth Defendant ("**Essar Capital**") (from 25 June 2013 to present).

13.    <u>The Third Defendant ("**Mr Baid**")</u> is described in an EGFL Information Memorandum dated November 2014 as having *"managed all aspects of the [Essar] Group's holding companies in Mauritius."* Mr Baid is or was at material times a director or equivalent officer at relevant Essar Group companies, including:

13.1    ESL (from 4 April 2017 to present);

13.2    The Tenth Defendant ("**Essar Capital Services**") (from 24 November 2015 to present);

13.3    EGFL (from 3 to 31 December 2018); and

13.4    Essar Capital (from 25 July 2014 to present).

14.    <u>The Fourth Defendant ("**Mr Wright**")</u> was at material times Senior Legal Counsel at Essar Capital Services (from September 2011 to March 2016). The legal team of which he formed part worked primarily to *"[s]upport Essar Capital Limited and [EGFL] … on matters which affected the Essar portfolio on a wider basis (such as debt financings); and … [w]here requested by Essar Capital Limited, supplement and support a portfolio company that may be undertaking a sizeable transaction, financing or litigation."* Mr Wright made presentations to the board of directors of EGFL on legal matters and represented ESL in the ICC Arbitration; in doing so he acted on the instruction of Mr Baid.

15.    <u>The Sixth Defendant ("**Mr Gujadhur**")</u> was at material times a director of ESL from 3 November 1992 to 1 April 2017; at EGFL from 3 July 2009 to 23 March 2013; and at Essar Capital from 22 March 2013.

16.    <u>The Seventh Defendant ("**Mr Bell**")</u> was a non-executive director of EGFL at material times, from 21 October 2009 to 17 November 2017. In that capacity, it is understood that Mr Bell reviewed all major transactions that EGFL entered into.

17.    <u>EGFL</u> is a company incorporated in 2005 under the laws of the Cayman Islands. It is, and was at all material times, the holding company for the Essar Group and the immediate parent of (among other entities) ESL, Essar Capital and Essar Capital Services. EGFL holds itself out on the Essar Group website as having very substantial assets: $18 billion

in investments and $12 billion in revenues. Those assets include the Essar Group's steel business (including ESL) over which EGFL exerts, and at all material times exerted, *de facto* control. In this way, EGFL was able to control all major transactions and decisions of ESL, in particular, those relating to ESL's material assets.

18.   Each of the following individual Defendants has been a director of EGFL as follows:

18.1   Ravi, from 20 September 2005 to 3 July 2009 and from 5 April 2010 to 26 March 2012;

18.2   Mr Baid, from 3 to 31 December 2018;

18.3   Mr Gujadhur, from 3 July 2009 to 23 March 2013; and

18.4   Mr Bell, (as a non-executive Director) from 21 October 2009 to 17 November 2017.

19.   <u>Essar Capital</u> is a company incorporated in March 2013 under the laws of the Cayman Islands. Essar Capital is a wholly owned subsidiary of EGFL and at material times following its incorporation acted as investment manager to EGFL. EGFL's accounts for the year ending 31 March 2017 state that on 23 March 2013, EGFL adopted an inter-company trading policy that *"requires [Essar Capital] to ensure that arrangements entered into between (a) the Fund and one or more portfolio companies or (b) two portfolio companies are on terms that would otherwise be available to entities that are not portfolio companies, are at fair value, and do not represent a substantial portion of [EGFL's] or the portfolio company's (as the case may be) business activity. However, this Policy does not require [EGFL] or any portfolio company to terminate or otherwise unwind any agreements or transactions which were entered into before March 31, 2013."*

20.   Each of the following individuals has held a senior role in Essar Capital:

20.1   Prashant, as a director from 25 June 2013;

20.2   Mr Baid, as a director from 25 July 2014;

20.3   Mr Gujadhur, as a director from 22 March 2013; and

20.4   Mr Wright and Mr Gujadhur are described on the Essar Group website as being *"the key professionals of Essar Capital"*. Mr Wright is there described as *"the*

*Senior Risk Manager at Essar Capital"*, and was the main contact at Essar Capital for Mr Bell, in the latter's capacity as director of EGFL.

21. <u>Essar Capital Services</u> is a company incorporated in 2009 under English law. It is a wholly owned subsidiary of EGFL. It was a party to written services agreements with ESL (from 1 April 2010 to 1 April 2013), EGFL (from 1 April 2010 to 1 April 2013) and Essar Capital (from 1 April 2013 to present) to provide management services to EGFL group companies in the UK.

22. The following relevant persons have been involved in running Essar Capital Services:

    22.1    Mr Baid has been a director of Essar Capital Services since 24 November 2015, and its sole director since 20 May 2016; and

    22.2    Mr Wright was employed by Essar Capital Services from 6 October 2011 to 31 May 2016.

23. <u>ESL</u> is not a defendant. It is a company incorporated in Mauritius. It is a debtor to the ICC Award that AMUSA has obtained against it, no part of which has been paid. On 26 March 2019, the directors of ESL resolved to place it into voluntary administration and appointed an administrator (which AMUSA has challenged in the Mauritian courts). On 19 December 2019, one of ESL's creditors, VTB Bank PJSC (**"VTB"**), applied for a liquidator to be appointed over ESL.

24. Each of the following has been a director of ESL:

    24.1    Mr Gujadhur, from 3 November 1992 to 1 April 2017 (who was also a director of EGFL);

    24.2    Prashant, from 17 March 2010 to 29 July 2016 (who is one the Essar Group's ultimate beneficial owners); and

    24.3    Mr Baid, from 4 April 2017 to present (who was also a director of EGFL).

**C.    THE ICC ARBITRATION; ATTEMPTED ENFORCEMENT**

25. On 17 December 2012, ESML, Essar Resources and AMUSA entered into the Pellet Sale Agreement, which provided for the supply and purchase of iron ore pellets over a ten-year period. On 10 January 2014, AMUSA, ESML and ESL entered into the Amended Pellet Sale Agreement, under which (i) ESL replaced Essar Resources as a party; and (ii)

the date for commencement of delivery of iron ore pellets was extended to July 2015. By replacing Essar Resources as a party to the Pellet Sale Agreement, ESL agreed to be jointly and severally liable for the performance of ESML's obligations under the Agreement, and thereby provided AMUSA with security for the performance of ESML's contractual obligations.

26.    On 27 May 2016, AMUSA informed ESML that it was terminating the Amended Pellet Sale Agreement for failing to give notice of an expected delivery date of pellets (which it was clear would be delayed).  On 8 July 2016, ESML filed a voluntary petition for relief pursuant to Chapter 11 of the US Bankruptcy Code.

27.    On 9 August 2016, AMUSA issued a Request for Arbitration against ESL claiming, amongst other things, damages in respect of ESL's failure to comply with its obligations under the Amended Pellet Sale Agreement.  When required to provide disclosure, including of the financial statements referred to below, ESL ceased to participate in the arbitration.  The arbitration resulted in the ICC Award in AMUSA's favour, in the sum of approximately $1.5 billion.

28.    Following the ICC Award, AMUSA took steps in four jurisdictions to attempt to enforce it.  On 2 April 2018, the ICC Award was recognised as a judgment of the US District Court for the District of Minnesota.  AMUSA also brought enforcement proceedings in Mauritius and England, and related proceedings in the Cayman Islands.  The ICC Award was also recognised as a judgment in England and the Cayman Islands.  No part of the ICC Award was paid.  ESL was placed into administration on 26 March 2019.

**D.    THE RESTRUCTURING PLAN AND EVENTS THEREAFTER**

*(1) The Restructuring Plan*

29.    In or around early 2011, it appears that EGFL resolved to restructure the Essar Group's steel portfolio.  It appears that the Essar Group took advice from Grant Thornton in this regard in around July 2011 and from Ernst & Young in around February 2012. According to a document produced by EGFL, at a board meeting on 22 March 2012, ESL resolved to participate in a restructuring.  As part of the restructuring plan approved at that meeting ("**the Restructuring Plan**") Essar Steel India ("**ESIL**") (c.72% of the shares in which were then held by ESL) was to be transferred out of ESL and used to capitalise a newly incorporated subsidiary of EGFL.  This was to be achieved by a

transfer of ESL's shares in ESIL to an indirect subsidiary of EGFL, at that time known as Essar Resources Mauritius Ltd but which subsequently changed its name to Essar Steel Asia Holdings Limited ("**Essar Steel Asia**").  In return, Essar Steel Asia was to issue ESL with promissory notes to the value of the ESIL shares transferred.  ESL was then to assign these promissory notes to EGFL "*by way of dividend/capital reduction*".  EGFL was then further to assign the promissory notes ultimately back to Essar Steel Asia (which had issued the promissory notes) whereupon the notes would be cancelled. The object of the restructuring, as stated in the Restructuring Plan, was to create a structure that would enable moneys to be raised by the listing of a new Canadian company.

30.    It appears that, pursuant to this Restructuring Plan, on or around 30 June 2012, ESL transferred c.1.9 billion shares in ESIL to Essar Steel Asia.  On 29 June 2012, in consideration for the transfer, Essar Steel Asia issued ESL a promissory note for c. $1.38 billion ("**the First Promissory Note**").

*(2) 2013: Departure from the Restructuring Plan*

31.    At a date presently unknown to AMUSA or AMNAH but at latest in August 2013, ESL and EGFL decided not to pursue the raising of monies by the listing of a new Canadian company and the modalities of the restructuring were altered in the manner in which the assignment of the First Promissory Note was implemented.  A document dated 23 March 2013 states that the consideration for the assignment was a future buyback of shares ("**the First Assignment Document**").  It is clear from the accounts that the manner in which the transaction was actually implemented was that the assignment was for consideration, with the face value of the First Promissory Note being shown as a receivable.

32.    The First Assignment Document thus departed materially from the Restructuring Plan, which envisaged an immediate rather than future distribution of capital, namely by way of dividend *in specie* of the First Promissory Note or simultaneous assignment and reduction of capital. However, the accounts establish that the actual assignment was implemented for a full consideration by treating the amount representing the face value of the First Promissory Note as a sum receivable from EGFL.

33.    By 2013, ESL could not comply with what was envisaged in the Restructuring Plan in terms of an immediate distribution of capital because:

33.1    ESL did not satisfy the 'Solvency Test' under section 6 of the Mauritius Companies Act, which requires a company, upon a distribution to its shareholder being made, to be able to pay its debts as they become due in the normal course of business and to have assets the value of which is greater than the sum of the value of its liabilities and its stated capital;

33.2    Even if ESL might have been able to satisfy the Solvency Test by reducing its stated capital (which is not admitted), the steps which would need to be carried out under the Mauritius Companies Act in order to reduce its stated capital and satisfy the Solvency Test were not in fact (and have not since been in fact) carried out; and

33.3    Further and in any event, the lenders to the Essar Group with pledges (and/or other security) over the ESL shares held by EGFL (referred to as the "**Raceview Lenders**") had not consented to (and have not since consented to) a buyback of the shares, and their consent was a pre-requisite to such a buyback taking place.

34.    However, notwithstanding the inability to comply with the Restructuring Plan, ESL nevertheless proceeded in March 2013 to assign the First Promissory Note but with a significant alteration, i.e. for full consideration (as referred to in the last sentence of paragraph 31 above). A second similar assignment occurred later in 2013: on or around 26 August 2013, ESL transferred a further c.118 million shares in ESIL to Essar Steel Asia and in return Essar Steel Asia issued ESL a promissory note for c.$99 million ("**the Second Promissory Note**"); and on 5 November 2013, ESL assigned the Second Promissory Note to EGFL, and again there is a document dated 26 August 2013 ("**the Second Assignment Document**" and together with the First Assignment Document, "**the Assignment Documents**"), stating that the consideration was in return for a 'future buyback' of its shares from EGFL (together with the assignment of the First Promissory Note, the "**EGFL Assignments**"). In its actual implementation, the accounts reflected the assignment at full value and thus evidenced that a sum equal to the face value of the Second Promissory Note was receivable from EGFL.

35.    At the time of the EGFL Assignments, ESL was not lawfully able to distribute capital of $1.5 billion to its shareholder. The EGFL Assignments would therefore constitute *prima face* unlawful returns of capital unless full consideration for their value was provided by EGFL to ESL. It is to be inferred that ESL and EGFL sought to render the transactions

lawful by agreeing, at or around the time of the EGFL Assignments, that EGFL would be liable to pay ESL on demand the face value of the Promissory Notes (which at the time of their assignment represented their fair value), at least unless and until the buyback of the shares occurred ("**the $1.5 Billion Obligation**").

36.    Pending disclosure, ~~AMUSA~~ AMNAH is unable to particularise precisely when the $1.5 Billion Obligation was agreed or by what means, however its existence is to be inferred from the following:

36.1    The recognition in ESL's accounts for 2013, 2014 and 2015 of a receivable in ESL's favour from EGFL in the face value of the Promissory Notes, payable on demand.  Such accounts:

(a)    Record that ESL assigned the Promissory Notes to EGFL;

(b)    Record a "*receivable from related parties*" in the sum of:

(i)    In the year ended 31 March 2013, $1.436 billion;

(ii)    In the year ended 31 March 2014, $1.582 billion;

(iii)   In the year ended 31 March 2015, $1.501 billion;

(c)    Record that the "*receivable from related parties includes receivable as per Promissory Note*".  The related party referred to from whom these amounts were receivable was EGFL: note 21 to the 2014 and 2015 accounts describes a receivable from ESL's holding company in the amount of approximately $1.48 billion; note 23 states that EGFL is ESL's immediate holding company.

(d)    Record (in Note 10 to the 2014 and 2015 accounts) that the receivable from EGFL to ESL was "*unsecured, non-interest bearing and repayable [or receivable] on demand*".

36.2    The fact that, absent such an obligation and by reason of the matters pleaded at paragraph 32 above, the EGFL Assignments would have constituted unlawful returns of capital;

36.3    The description of the EGFL Assignments as an "*advance against future buyback*" – in ESL's board minutes dated 19 February 2013 authorising the

EGFL Assignments and in ESL's 2016 accounts – does not reflect a change in the accounting treatment but a change in the transaction itself. But even this is consistent with an obligation on the recipient to repay the advance if the buyback does not occur;

36.4    The description in the EGFL Assignments themselves as being made "*[i]n consideration of future capital reduction*", is also consistent with an obligation to repay the value of the Promissory Notes if the capital reduction did not occur; and

36.5    The fact that, under the Restructuring Plan as approved by the ESL Board on 22 March 2012, upon their assignment to EGFL, the Promissory Notes would be assigned by EGFL and ultimately back to their issuer (Essar Steel Asia), which is what in fact occurred. The asset acquired in turn by ESL was the sum recoverable from EGFL and accounted for as a receivable in three sets of financial statements. Alternatively, even if the 2016 accounts are taken at face value, it must follow that in the event that the buyback did not ultimately occur, it would not be possible to reverse the EGFL Assignments by way of reassignment because the Promissory Notes would have been cancelled, hence the need instead to recognise a cash liability in the face value of the Promissory Notes.

37.    Further, or in the alternative, if there was no agreement that the $1.5 billion would be payable pending completion of the buyback, an obligation to repay the value of the notes on demand arose as a matter of legal implication and/or as a matter of restitutionary obligation until such time as the buyback was completed.

*(3) 2015-2016: Waiver*

38.    The result of the events in 2013 referred to above was that EGFL owed a sum of approximately $1.5 billion to ESL. That remained the case in 2014. ESL did not call in the sum of $1.5 billion owed to it by EGFL. Further, on a date or dates between around 29 September 2015 and around 29 September 2016, the $1.5 Billion Obligation was extinguished. This is evidenced by ESL's accounts for the year ended 31 March 2016 (approved by ESL's Board on 29 September 2016) ("**2016 Accounts**"). These accounts describe a *"prior year adjustment"* and "*restatement*" of the 2013, 2014 and 2015 accounts as follows:

*"In 2013, the Company disposed of 2,028,934,025 equity shares held in [ESIL] to [Essar Steel Asia] and as consideration the latter issued promissory notes for the amount of USD1,487,980,158. Subsequently, under a future buyback arrangement, the promissory notes were assigned to [EGFL], the sole shareholder of the Company, as an advance against future buyback of 1,487,980,158 equity shares at USD 1 each. This amount should have been classified under equity. Accordingly, the financial statement for the years ended 31 March 2014 and 2015 have been restated to reflect the correct accounting treatment. The Company will have to satisfy the solvency test to finalise the share buyback."*

39.   The 2016 Accounts include the following further statement:

*"Advance against future buyback represents the consideration paid to the sole shareholder in 2013 towards future buy back of 1,487,980,158 equity shares at par value. Under the buyback arrangement, [ESL] has right for gross physical delivery of its own equity shares. The sole shareholder has no contractual obligation to refund the cash or provide another financial asset and hence, it is to be classified as equity. However, this has been wrongly classified as an asset in the previous years. Accordingly, the financial statements of 2014 and 2015 have been restated to reflect the accounting treatment."*

40.   The 2016 Accounts therefore recorded that EGFL had "*no contractual obligation to refund the cash [i.e. the $1.5 billion] or provide another financial asset and hence, it is to be classified as equity.*" This differed from the relationship as evidenced by ESL's accounts for 2013, 2014 and 2015, pursuant to which EGFL was obliged to pay ESL $1.5 billion unless and until the buyback occurred.

41.   The accounts for 2013 to 2015 made no mention of any future buyback of shares. The ESL accounts for 2013 do not show the degree of solvency that would have entitled it to propose a buyback. There was nothing to suggest that ESL would earn enormous profits in the next year or next few years that could sustain a buyback of shares. Thus the inference from these accounts is that in 2013 the actual transaction was that of an assignment for consideration, the sum being shown as an amount receivable (as referred to in the last sentence of paragraph 31 above). Alternately, the Defendants having realised that a *future buyback* was not possible, especially when the company in question did not fulfil the conditions for a buyback under Mauritian law, and when the request for

consent for such a transaction had been declined by the Raceview Lenders, recognised in the account that the future buyback was no more than an expression of an intention to do something at a later point of time. In no event did it render the amount irrecoverable.

42. It is to be inferred that such change in the relationship was the result of a waiver of the $1.5 Billion Obligation. It is to be inferred that the Waiver took place on a date or dates between around 29 September 2015 (being the date on which the 2015 accounts were approved, which continued to record the receivable as an asset in ESL's favour) and around 29 September 2016 (being the date on which the 2016 Accounts were approved). The narrative in the 2016 Accounts was an attempt to disguise a waiver of the receivable that was effected sometime between 29 September 2015 and 29 September 2016.

43. Pending disclosure, ~~AMUSA~~ AMNAH is unable to particularise by what means the Waiver was effected (whether orally, in writing or by conduct). However, its existence is to be inferred from *inter alia* the following facts and matters:

   43.1 Following the EGFL Assignments, EGFL was under an obligation to pay ESL $1.5 billion;

   43.2 The 2016 Accounts record that EGFL was under no such obligation, despite the fact that no share buyback had occurred, the Solvency Test had not been satisfied and the consent of the Raceview Lenders had not been obtained;

   43.3 The explanation given in the 2016 Accounts that the recording of the $1.5 billion as an asset of ESL was merely a mistake, and should instead have been treated in the accounts as a reduction in capital, cannot be correct given that:

      (a) ESL did not reduce its capital in 2013 or at any time thereafter;

      (b) The accounts for 2013 to 2015, duly audited, continued to show the sum as an amount receivable. This establishes that the legal effect of the transaction was to complete the assignment for valuable consideration. The mention of a future buyback, would only be the expression of an intention which did not affect the legal nature of the transaction – i.e. an assignment for full consideration.

      (c) Such accountancy treatment would in any event be inconsistent with the device employed by ESL, namely that of a '*future*' buyback of shares. In

effect it would convert a future buyback into a present buyback despite no repurchase of shares having occurred, the Solvency Test not having been satisfied, and the consent of the Raceview Lenders not having been obtained;

43.4    The failure by the Defendants as of the date of these Amended Particulars of Claim – and despite many opportunities to do so – to provide:

(a)    Any explanation from Deloitte, ESL's auditors at the time of the EGFL Assignments and the 2013 accounts, as to the basis on which a $1.5 billion receivable was recorded in the 2013 accounts;

(b)    Any explanation from Nexia Baker, ESL's auditors for the 2014-2016 accounts, as to the basis on which a $1.5 billion receivable was recorded in the 2014 and 2015 accounts;

(c)    Any contemporaneous documents demonstrating the basis on which a $1.5 billion receivable was recorded as an asset of ESL's, or ESL's consideration of how such a receivable should be recorded, notwithstanding that such a sum was ESL's largest asset, and the transactions giving rise to it were complex, unorthodox and involved significant sums with a related party; and

(d)    Any contemporaneous documents demonstrating the basis for (let alone any consideration of) the restatement in the 2016 Accounts, notwithstanding that it is said to have been (i) a "mistake" in relation to ESL's largest asset; and (ii) a related party transaction.

43.5    The inconsistent evidence given by the Defendants as to the circumstances in which the alleged mistake was discovered and the absence of any evidence (contemporaneous or otherwise) given by the Defendants to support their case that it was in fact a mistake and how they considered it should be addressed.

*(4) 2015: the UAE Disbursements*

44.    Further, on or about 30 September 2015, ESL transferred its 100% shareholding in Essar Steel UAE to Essar Middle East FZE ("**Essar Middle East**") for the sum of $200 million. On or about the same date, ESL transferred the $200 million to EGFL and a related

company, Peak Trading, by way of one payment to EGFL of $50 million and two payments to Peak Trading of $90 million and $60 million respectively (i.e. the UAE Disbursements).

45.     The explanations given by the Defendants for the basis of the UAE Disbursements are as follows:

    45.1    The $50 million paid to EGFL is said to have been by way of repayment of a loan from EGFL under a loan agreement dated 30 July 2014;

    45.2    The $90 million paid to Peak Trading is said to have been a refund of a trade advance paid by Peak Trading to ESL pursuant to a contract for the purchase of steel products dated 7 May 2013; and

    45.3    The $60 million paid to Peak Trading is said to have been a trade advance pursuant to a contract for the purchase of steel products dated 28 September 2015.

46.     These purported explanations are false:

    46.1    As regards the $50 million paid to EGFL, Article 2 of the loan agreement dated 30 July 2014 provides that the maturity date is 1 year after the effective date (30 July 2014) at which point "*the entire outstanding loan balance, including principal and interest, is due for payment in one single instalment by the Borrower to the Lender. The Agreement can be extended upon mutual agreement of the Parties*".   The loan does not appear to have been extended.   Accordingly the loan agreement expired on 30 July 2015 and the payment of $50 million on 30 September 2015 cannot have been made pursuant to it;

    46.2    As regards the $90 million paid to Peak Trading, clause 7.1 of the contract dated 7 May 2013 provides merely for a prepayment of $40 million; it does not refer to any "refund" or "trade advance". The contract therefore provided no basis for a $90 million refund of a trade advance; and

    46.3    As regards the $60 million paid to Peak Trading, the contract dated 28 September 2015 provides for no trade advance in Peak Trading's favour whatsoever (let alone any payment obligation).

**E.    THE CONSPIRACY**

*(1) Combination or Agreement*

47.    In the premises, it is to be inferred that, on a date or dates unknown between around 29 September 2015 and around 29 September 2016, the Defendants or any two or more of them agreed or combined together with a common intention to cause harm to AMUSA by disabling ESL from being able to meet its liabilities towards AMUSA; and, pursuant to such combination or agreement, acted by unlawful means by (1) causing or procuring ESL not to recover the $1.5 billion from EGFL; (2) causing or permitting the $1.5 Billion Obligation to be waived thereby releasing EGFL from its obligation to ESL in that regard; and (3) causing ESL to gift or transfer at an undervalue to EGFL and Peak Trading a total of $200 million following the sale of Essar Steel UAE.  Further or alternatively, the Defendants or any two of them entered into more than one such conspiracy.  References to the "Conspiracy" are to that conspiracy or those conspiracies.

48.    Pending disclosure, ~~AMUSA~~ AMNAH cannot specify with certainty when or by what means the Defendants, or any of them, entered into the combination or agreement.  That they did enter into such a combination or agreement should be inferred from the fact that: (i) the Defendants are all linked to the Essar Group, (ii) the Defendants each acted in furtherance of the Conspiracy by causing or acquiescing in the unlawful means deployed as referred to at paragraphs 50-56 below, in circumstances where such unlawful means were consistent with the Conspiracy, and (iii) it should be inferred did not do so independently of the other Defendants (such being inherently improbable in all the circumstances).

*(2) Intention to harm AMUSA*

49.    It is to be inferred that in combining to disable ESL from satisfying its liabilities, the Defendants intended to cause harm to AMUSA.  ~~AMUSA~~ AMNAH will rely on the following:

49.1    Throughout the period September 2015 to September 2016, AMUSA was a significant contingent or potential creditor of ESL pursuant to the Amended Pellet Sale Agreement, and as such would be harmed if ESL was disabled from meeting its liabilities.  In particular:

(a)    By September 2015:

    (i)    ESML had already twice requested amendments to the Amended Pellet Sale Agreement to extend the delivery date;

    (ii)    ESML was seeking further amendments to the Amended Pellet Sale Agreement to extend the delivery date;

    (iii)    Work had stopped on the Nashwauk Project; and

    (iv)    It was clear that ESML's ability to meet its obligations under the Amended Pellet Sale Agreement was in doubt and, therefore, it was highly likely that ESL would be liable to pay substantial damages to AMUSA.

(b)    By May 2016, in breach of the Amended Pellet Sale Agreement, ESML had failed to give notice at least 90 days in advance of the delivery date of the expected quantity of pellets to be delivered;

(c)    On 27 May 2016, AMUSA had informed ESML that it was terminating the Amended Pellet Sale Agreement;

(d)    On 8 July 2016, ESML had filed a voluntary petition for relief pursuant to Chapter 11 of the US Bankruptcy Code; and

(e)    On 9 August 2016, AMUSA issued the Request for Arbitration claiming amongst other things substantial damages for breach of the Amended Pellet Sale Agreement.

49.2    It is to be inferred that each of the Defendants knew between around September 2015 and around September 2016, or was wilfully blind, that AMUSA was a major contingent or potential creditor of ESL and would be harmed if ESL was disabled from meeting its liabilities. ~~AMUSA~~ AMNAH will rely, inter alia, on the following:

(a)    The amounts involved in the Nashwauk Project and the fact that it involved the Essar Group's major steel competitor (AMUSA);

(b)    Ravi's status as founder of the Essar Group and control over it, as well as his involvement in material transactions including the Nashwauk Project,

and his role as a director (and/or shadow director) of EGFL and ultimate beneficial ownership of the Essar Group;

(c)     Prashant's role as a director of ESL until 29 July 2016 and as a shadow director of EGFL, and ultimate beneficial ownership of the Essar Group;

(d)     Mr Baid's role as director of ESL, Essar Capital and Essar Capital Services, the latter two of which companies were responsible for transactions involving EGFL portfolio companies and providing investment management services;

(e)     Mr Wright's role as Senior Legal Counsel at Essar Capital Services from September 2011 to March 2016, his role as an in house legal consultant to Essar Capital between around June 2016 to June 2018, and his representation of ESL in the ICC Arbitration;

(f)     Mr Gujadhur's role as director of ESL and Essar Capital;

(g)     Mr Bell's role as non-executive director of EGFL;

(h)     EGFL's 100% direct ownership and control of ESL, and the fact that it was the obligor of the $1.5 Billion Obligation;

(i)     Essar Capital's responsibility for transactions between EGFL portfolio companies, and the attribution to Essar Capital of the knowledge of its directors at the relevant time, namely Prashant, Mr Baid and Mr Gujadhur; and

(j)     Essar Capital Services' provision of investment management services to Essar Capital and the attribution to Essar Capital Services of the knowledge of Mr Baid, one of its directors at the relevant time.

49.3    Further, the knowledge and intentions of Ravi and Prashant are to be attributed to all companies in the Essar Group (at least in respect of all material transactions), alternatively to at least EGFL, Essar Capital, and Essar Capital Services in circumstances where Ravi and Prashant were directing minds of and had control over those companies, each acting as a statutory director or otherwise as a shadow director.  In support of such attribution and control, AMUSA AMNAH relies pending disclosure on the following:

(a) Ravi's status as a founding member of the Essar Group;

(b) Prashant and Ravi's status as members of the Ruia Family and major beneficial owners of the Essar Group;

(c) Ravi's status as a director of EGFL as set out above, and being held out in EGFL's accounts for the year ended 31 March 2017 as exercising "*significant influence*" over EGFL;

(d) Prashant's status as a director of Essar Group companies, including: (i) Essar Capital at all times from 25 June 2013; and (ii) ESL at all times during the period 17 March 2010 to 29 July 2016 (being the period that ESL entered into the Amended Pellet Sale Agreement, ESML defaulted on its obligations under such agreement and ESL entered into the EGFL Assignments (including their accounting treatment in ESL's accounts over four years));

(e) That Prashant is held out by the Essar Group (and is properly to be inferred has allowed himself to be so held out) as being a founding member and *"integral part"* of EGFL's operations and management (see paragraph 12 above);

(f) Ravi's *de facto* control over EGFL and its subsidiaries, as illustrated by his involvement in the Nashwauk Project (including when it was first discussed between the Essar Group and AMUSA and as recently as in June 2019 when Ravi visited the plant), the fact that Prashant was accustomed to seeking Ravi's approval or input regarding proposals affecting Essar Group business, and the high degree of control he exercised over transactions relating to one of the Essar Group's large steel assets, Essar Steel Algoma Inc (**"Algoma"**).

(g) Prashant's *de facto* control over subsidiaries of EGFL, as illustrated by his control of the board of Algoma, and by strategic decisions in relation to Algoma being made by EGFL and Essar Capital rather than Algoma's board;

(h) Prashant and Ravi's provision of personal guarantees in support of approximately €2.35 billion facilities extended to the Essar Group by VTB;

(i) That their "sign off" or approval was required for material transactions of the Essar Group, including in respect of the Nashwauk Project and the restructure of the Essar Group's steel assets (codenamed Project Marvel); and

(j) Further or alternatively, the inference that their "sign off" was required for the Waiver in 2015-16; this being a decision of such importance and significance to the Essar Group (including on account of the wrongdoing that it involved) that it is inherently improbable that it can have occurred without the approval of Ravi and Prashant.

49.4 ~~AMUSA~~ AMNAH will contend that it is properly to be inferred in the circumstances that in respect of those Essar Group companies of which Ravi and Prashant were not statutory directors, the company was accustomed to acting on their instructions or those given on their behalf. Further, in addition to the knowledge of Ravi and Prashant as set out above, and in any case, the knowledge and intentions of the other individual Defendants are to be attributed to the corporate Defendants to the extent that they were directors of them between around 29 September 2015 and around 29 September 2016;

49.5 Further, it is properly to be inferred pending disclosure and further information that the conduct of each corporate Defendant referred to in these Amended Particulars of Claim was procured by or knowingly acquiesced in by its directors at the material time and/or by Ravi and Prashant as shadow directors, and in the premises each individual Defendant who was such a director at the time is liable for the wrongful acts of any corporate Defendant in relation to which he so acted;

49.6 ~~AMUSA~~ AMNAH will also rely on the following matters from which the Defendants' intention to harm AMUSA can be inferred:

(a) The fact that the failure to call in the $1.5 billion, Waiver and UAE Disbursements conferred no benefit on ESL but did have the effect of frustrating or impeding AMUSA from recovering sums owed to it by ESL;

(b) The fact that in the ICC Arbitration in May 2017, ESL produced in disclosure (and intended AMUSA and the Tribunal to rely on) ESL's 2015

accounts without disclosing the 2016 Accounts.  ESL and its controllers thereby misrepresented ESL's financial position to the arbitrators and to AMUSA in order falsely to bolster ESL's counterclaim in the ICC Arbitration to injure AMUSA. This counterclaim only had a realistic prospect of success  if ESL could show that it was in a position to support its subsidiary, ESML, and finance it sufficiently to perform its obligations under the Amended Pellet Sale Agreement (had such agreement not been terminated); and

(c)    The fact that, by 2018 at the latest, EGFL had formed the intention not to provide any financial support to ESL, ESL had formed the intention not to seek any financial support from EFGL, and each in combination had formed the intention to put ESL into insolvent liquidation as a means of preventing AMUSA from making any recovery from ESL.

(d)    The fact that it is to be inferred that the steps taken in 2013 referred to at paragraphs 31 to 36 above were taken with the object and/or had the effect of enabling ESL as the need arose in due course unjustifiably to dissipate its assets to frustrate or impede enforcement of claims by its creditors (including claims arising out of the Nashwauk Project) and were not carried out in furtherance of the aims described in the documents setting out the Restructuring Plan. ~~AMUSA~~ AMNAH will rely upon the fact of that general anti-creditor animus and those general anti-creditor actions in support of their contention that the Defendants formed a similar  animus specifically against AMUSA in 2015-2016 pursuant to the Conspiracy.  The inference referred to in this subparagraph is to be drawn from the following:

(i)    The financial difficulties encountered by ESL and ESML on the Nashwauk Project in the course of 2013, including the fact that, in August 2013, work stopped at the project owing to a lack of funding.

(ii)    The financial difficulties encountered at the same time by ESL's other principal subsidiary, Algoma.

(iii) The fact that it would have been apparent in 2013 to ESL and its controllers that: (i) ESL's two principal subsidiaries, i.e. ESML and Algoma, following the transfer of ESIL, were in financial trouble; (ii) ESML would fail to commence delivery of the iron ore pellets on the contractually agreed date under the Pellet Sale Agreement; (iii) such failure might expose ESL to claims; and (iv) in the event that such claims were made   ESL and its assets would be exposed, including the Promissory Notes (which were among its principal assets at the time).

(iv) The fact that in the light of the circumstances referred to in (i) to (iii) immediately above, ESL and its controllers had the motive to take steps to enable an unjustified dissipation of ESL's assets, and in particular the Promissory Notes.  Such motive is further to be inferred from:

A. The absence of any legitimate commercial rationale for assigning the Promissory Notes given the lack of sufficient distributable reserves from which to do so, or the satisfaction of the Mauritian law Solvency Test, or the approval of the Raceview Lenders; and/or

B. The fact that the future buyback arrangements converted assets which were relatively difficult to dissipate (the Promissory Notes) into an asset that could be more readily dissipated by being waived or written off (the $1.5 Billion Obligation).

C. The mention of a future buy back in the deed of assignments, placed in the financial situation in which ESL found itself, makes no sense. As a matter of law, a future buy back is untenable, for the decision to buy back must be taken by the Board when the company has the legal ability to buy back the shares.

D. If the mention of a future buy back in the deeds of assignment of the Promissory notes was intended to be a binding obligation thus justifying a change in the accounts as was resorted to 2016, it would be plainly illegal, and factually untenable since there was, as stated,

> no basis to assume that ESL would be in a position to effect a buy back of shares.
>
> E.  The accounts for 2013 to 2015 also do not refer to any future buy back. Thus the only inference can be that the mention of a future buy back in the deeds of assignment of the promissory notes was to create a mechanism for a dissipation of assets in the future, and this mechanism was used in 2016.

### (3) Unlawful means

50.  In circumstances where the effect of causing ESL not to call in the $1.5 billion and the Waiver was to release EGFL from the $1.5 Billion Obligation and reduce ESL's assets by a corresponding amount, and the effect of the UAE Disbursements was to reduce ESL's assets by $200 million for nothing in return or significantly less value, such actions or omissions were the means of causing harm to AMUSA pursuant to the Conspiracy.

51.  The procuring of ESL not to call in the $1.5 billion was unlawful as it amounted to a breach of fiduciary duty on the part of ESL's directors:

  51.1  Under section 143(1)(c) of the Mauritius Companies Act the directors were obliged to exercise their powers honestly in good faith in the best interests of the company;

  51.2  By 29 September 2016 (when the accounts were finalised for the financial year ended 31 March 2016) it would have been apparent to ESL and its controllers that the Solvency Test could not be satisfied and that the Raceview Lenders would not consent to the buyback, such that a buyback of shares would not and could not occur. Thus the sum receivable as consideration for the assignment would continue to be due and payable by EGFL;

  51.3  In such circumstances, it was not in the best interests of ESL not to call in the $1.5 billion thereby exposing ESL to the risk of non-payment or default by EGFL and to the risk that it would be unable to meet its liabilities;

  51.4  Further or alternatively, between around 29 September 2015 and 29 September 2016, ESL was balance sheet insolvent or of doubtful solvency such that its

directors owed their duties primarily to ESL's creditors. The failure to call in the $1.5 billion was not in the creditors' best interests;

51.5    To date, neither the Defendants nor ESL have provided to AMUSA or AMNAH any evidence that: (i) ESL's directors gave consideration to calling in the $1.5 billion; and (ii) decided that it would be in the best interests of ESL and/or ESL's creditors not to call it in. No honest director acting rationally could have so decided in the circumstances set out above; and it is to be inferred that ESL's directors did not so decide. In fact the directors became parties to a waiver of the sum receivable from EGFL; and

51.6    In the premises, ESL's directors breached their duties under section 143(1)(c) of the Mauritius Companies Act.

52.    The Waiver was unlawful in that it released ESL's sole shareholder from a $1.5 billion liability for nothing in return, and in effect converted the EGFL Assignments into an unlawful return of capital. As such, the Waiver constituted:

52.1    A breach by ESL of sections 61(2), 62(5)(b) and/or 68(4) of the Mauritius Companies Act; and

52.2    A breach by ESL's directors of their fiduciary duties, in particular their duty under section 143(1)(c) of the Mauritius Companies Act to exercise their powers honestly in good faith in the best interests of the company. In particular:

(a)    The Waiver was not in the best interests of ESL in circumstances where it conferred no benefit on ESL, caused ESL to contravene the Mauritius Companies Act, and/or was effected at a time when ESL was balance sheet insolvent or of doubtful solvency such that ESL's directors owed their duties primarily to its creditors, whose interests were not served by waiving EGFL's obligation; and

(b)    To date, neither the Defendants nor ESL have provided to AMUSA or AMNAH any evidence that ESL's directors decided that the Waiver would be in the best interests of ESL and/or ESL's creditors. No honest director acting rationally could have so decided in the circumstances set out above; and it is to be inferred that ESL's directors did not so decide.

53. The Waiver was an act of asset stripping which was seriously prejudicial to the interests of the present and future creditors of ESL.

54. The UAE Disbursements were unlawful insofar as they amounted to gifts or transactions at an undervalue in favour of EGFL and Peak Trading. As such they were entered into in breach of ESL's directors' fiduciary duties, in particular their duty to exercise their powers honestly in good faith in the best interests of the company. Paragraph 52.2 above is repeated, *mutatis mutandis*.

55. Further, the failure to call in the $1.5 billion, Waiver and UAE Disbursements constituted unlawful means in that they amounted to unjustified dissipation of ESL's assets, undertaken to frustrate and/or impede enforcement of AMUSA's claims against ESL.

56. ~~AMUSA~~ AMNAH reasonably infers that each of the Defendants procured, knew of or acquiesced in the unlawful means referred to above. That inference is supported by the facts and matters referred to at paragraph 49.2 above. ~~AMUSA~~ AMNAH also relies on the following:

   56.1    The value of the sums being written off or gifted by means of the failure to call in the $1.5 billion, the Waiver and UAE Disbursements was such that they were sufficiently important to have been brought to the attention of Ravi and Prashant and to have acquired their approval;

   56.2    As a result of his role at Essar Capital and Essar Capital Services, it is to be inferred that Mr Wright will have advised on the failure to call in the $1.5 billion, the Waiver and the UAE Disbursements;

   56.3    EGFL was the direct owner and controller of ESL, and liable to ESL in the sum of approximately $1.5 billion. Pending disclosure it is to be inferred that EGFL must have caused ESL to take no steps to call in the $1.5 billion, as well as considered the proposed Waiver and approved and directed that ESL carry it out; and

   56.4    EGFL (along with Peak Trading) was the beneficiary of the $200 million disbursed to it for no consideration or at undervalue by way of the UAE Disbursements. It is therefore to be inferred that EGFL knew that the sums transferred to it and Peak Trading were not justified and that the explanations given for them were false.

**F.    LOSS AND DAMAGE**

57.    AMUSA has suffered loss and damage as a consequence of the Conspiracy, being the loss of a chance of recovering the ICC Award in full (with credit being given for any recovery in the ESL administration or subsequent liquidation, as to which ~~AMUSA~~ AMNAH cannot at present give any particulars).

<u>**Particulars**</u>

57.1    But for the procurement of ESL not to call in the $1.5 billion, ESL would have done so, or there is a substantial chance it would have done so, and EGFL would have paid such sum on demand in accordance with its obligation to do so.  Such sum would then have been available for satisfaction of ESL's liabilities including the ICC Award;

57.2    But for the Waiver, the $1.5 Billion Obligation would continue to have been owed by EGFL to ESL.  ESL is to be presumed to have demanded payment from EGFL no later than the date on which it was apparent that the Solvency Test could not be satisfied and the share buyback would not proceed, alternatively there is a substantial chance that, if it was acting properly and lawfully, it would have so acted.  ~~AMUSA~~ AMNAH will contend that such date was no later than 29 September 2016, being the date on which the 2016 Accounts were approved. Damages are to be assessed on the basis that EGFL would have paid the $1.5 billion on demand in accordance with its obligation to do so.  Such sum would then have been available to satisfy the ICC Award;

57.3    In assessing damages, it is to be assumed that, if the Waiver had not taken place and the $1.5 billion had remained in existence, the directors of ESL would have acted in accordance with their fiduciary duties to the company and as such would not have caused it to enter into the Subordination Deed between VTB, EGFL, ESL and others dated 21 October 2016 ("**the Subordination Deed**") pursuant to which ESL *inter alia* subordinated its claims against EGFL to VTB's claims against EGFL and thereby put it beyond ESL's power immediately to call in the $1.5 billion.  If the $1.5 billion had still existed, the Subordination Deed would have conferred no benefit on ESL, alternatively a benefit worth significantly less in value than the benefit thereby conferred on VTB, such that it was not in the best

interests of ESL to agree to it and/or not in the best of interests of ESL's creditors insofar as ESL was by 21 October 2016 insolvent or of doubtful solvency;

57.4 Alternatively, if it is to be assumed that the Subordination Deed would have been entered into in any event, ~~AMUSA~~ AMNAH will contend that there remained a substantial chance of recovering the ICC Award in full in circumstances where, based on its draft accounts for 2019, EGFL had sufficient assets both to pay VTB in full and to honour the $1.5 Billion Obligation;

57.5 As to the UAE Disbursements, but for the wrongful gifting or transferring at an undervalue of such sums, ESL's assets would not have been diminished by $200 million. AMUSA's loss and damage is the difference between such dividend if any as it recovers in ESL's insolvency and the dividend it would otherwise have received;

57.6 Further, AMUSA has incurred costs in mitigating its losses including by conducting investigatory and legal action in this jurisdiction, the Cayman Islands and Mauritius, and is entitled to and claims those sums (insofar as not recoverable as costs in those proceedings) as damages.

58. By reason of the Conspiracy, the Defendants are jointly and severally liable to ~~AMUSA~~ AMNAH in such damages.

## G.    INTEREST

59. On all sums found due to it and for the period they are due and owing or such other period as the Court considers just, ~~AMUSA~~ AMNAH claims:

59.1    Compound interest as damages for unlawful means conspiracy;

59.2    Alternatively, simple interest pursuant to section 35A of the Senior Courts Act 1981 at such rate as the Court considers just.

AND the Claimant claims:

(1) Damages for unlawful means conspiracy;

(2) Interest as aforesaid;

(3) Costs.

**ANTHONY PETO Q.C.**

**HARISH SALVE Q.C.**
**PETER HEAD**


**ANTHONY PETO Q.C.**
**HARISH SALVE Q.C.**
**PETER HEAD**


**<u>Statement of Truth</u>**

The Claimant believes that the facts stated in these Re-Amended Particulars of Claim are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised by the Claimant to sign this statement.


Dated:  24 March 2021

Signed: Kasra Nouroozi Shambayati

Partner, Mishcon de Reya LLP, Legal representative for the Claimant

…………………………………………………………