# Exhibit 2



Neutral Citation Number: [2020] EWHC 740 (Comm)

Case No: CL-2019-000674

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 30/03/2020

**Before** :

**THE HONOURABLE MR JUSTICE HENSHAW**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **ARCELORMITTAL USA LLC** | **Claimant** |
| **- and –** | |
| **(1) MR RAVI RUIA**<br>**(2) MR PRASHANT RUIA**<br>**(8) ESSAR GLOBAL FUND**<br>**LIMITED** | **Defendants/**<br>**Respondents** |
| **(3) MR SUSHIL BAID**<br>**(4) MR ANDREW WRIGHT**<br>**(5) MR JOSEPH SEIFERT**<br>**(6) MR UDAY KUMAR GUJADHUR**<br>**(7) MR NIGEL BELL**<br>**(9) ESSAR CAPITAL LIMITED**<br>**(10) ESSAR CAPITAL SERVICES**<br>**(UK) LIMITED** | |
| | **Defendants** |
| **– and –** | |
| **VTB BANK PJSC** | **Interested Party** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -
**Anthony Peto QC, Peter Head, Andrew Scott, Isabel Buchanan and Timothy Lau**
(instructed by **Mischon de Reya LLP**) for the **Claimant**

**Paul McGrath QC and Ruth Den Besten** (instructed by **Stephenson Harwood**) for the
**First and Second Defendants**
**Paul Stanley QC and David Peters** (instructed by **Quinn Emmanuel Urquhart & Sullivan UK LLP**) for the **Eighth Defendant**
**Adrian Beltrami QC and Ian Higgins** (instructed by **Dechert LLP**) for the **Interested Party**

Hearing dates: 3 and 4 March 2020

**Draft Judgment circulated on 19 March 2020**

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

**Covid-19 Protocol: This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and release to Bailii. The date and time for hand-down is deemed to be 30 March 2020 at 2:00 pm.**

**Mr Justice Henshaw:**

(A) INTRODUCTION ........................................................................................................4

(B) THE RELEVANT PARTIES ......................................................................................5

(C) AMUSA'S CONSPIRACY CASE ............................................................................6

(D) THE PELLET SALE AGREEMENT AND THE ARBITRATION .................................8

(E) SUBSEQUENT PROCEDURAL HISTORY ............................................................9

    (1) Minnesota ............................................................................................................9

    (2) Mauritius ............................................................................................................9

    (3) Cayman Islands ...............................................................................................10

    (4) Delaware............................................................................................................10

    (5) England and Wales .........................................................................................11

(F) TRANSACTIONS RELATING TO ESSAR STEEL INDIA ...........................................11

    (1) AMUSA's case..................................................................................................11

    (2) Origins of and Essar Steel's decision to enter into the Restructuring ...........13

    (3) Stage 1: June 2012 sale of Essar Steel shares in Essar Steel India ................17

    (4) Stage 2: March 2013 assignments of US$1.38 billion promissory note .........18

    (5) Stages 3 and 4: August and November 2013 sale and assignment .................22

    (6) Stage 5: 2016 change in accounting treatment.................................................22

    (7) Stage 6: VTB subordination deed ...................................................................31

    (8) Essar Steel's failure to seek to recover the 'debt' from EGFL .......................35

    (9) Marex ...............................................................................................................36

(G) ESSAR STEEL UAE ...............................................................................................36

(H) ALGOMA ...............................................................................................................38

(I) ENTRY INTO AMENDED PSA ..............................................................................46

(J) RELEVANT EVENTS IN RELATED PROCEEDINGS ..................................................47

    (1) The ICC Arbitration ........................................................................................47

    (2) Cayman proceedings .......................................................................................51

    (3) Mauritius proceedings .....................................................................................52

    (4) Proceedings in India........................................................................................53

    (5) Proceedings in England and Wales .................................................................57

(K) GOOD ARGUABLE CASE .....................................................................................60

(L) RISK OF DISSIPATION..........................................................................................62

(M) JUST AND CONVENIENT TEST ..........................................................................68

    (1) Likely impact of a worldwide freezing order on the respondents....................69

        (a) Impact on the Essar group ........................................................................69

        (b) Impact on the Ruias...................................................................................71

(2) Likely impact of a worldwide freezing order on VTB ................................................ 71

(3) Delay ........................................................................................................................ 78

(4) The overall balance ................................................................................................. 80

(N) CONCLUSION ............................................................................................................. 81

## (A) INTRODUCTION

1. The Claimant ("*AMUSA*") applies on notice for a worldwide freezing injunction and ancillary disclosure orders against the First Defendant ("*Ravi Ruia*"), the Second Defendant ("*Prashant Ruia*"), and the Eighth Defendant ("*EGFL*").

2. The freezing order is sought in support of AMUSA's claim for damages in excess of US$1.5 billion in respect of loss alleged to have been caused by an unlawful means conspiracy between the Defendants to frustrate enforcement of liabilities under a 10-year iron ore supply contract (the "*PSA*") entered into between AMUSA and three companies in the Essar group, which AMUSA terminated in May 2016, and an ICC arbitral award ("*the ICC Award*") in AMUSA's favour against Essar Steel Limited ("*Essar Steel*") in respect of those liabilities.

3. Essar Steel went into administration in March 2019, and an application to wind it up was filed in December 2019, without it having made any payment pursuant to the Award. AMUSA says Essar Steel's inability to pay resulted from the alleged unlawful means conspiracy. In addition to EGFL, which is Essar Steel's parent company and the group's main holding company, AMUSA alleges that Ravi Ruia and Prashant Ruia are key individuals at the Essar group who were at the heart of the alleged wrongdoing.

4. AMUSA applied without notice on 4 November 2019 for permission to serve these proceedings out of the jurisdiction, which was granted by Jacobs J on 8 November 2019. On 21 November 2019 AMUSA applied without notice for directions for alternative service of their present application, which Jacobs J gave on 3 December 2019. AMUSA did not serve the application until 30 December 2019, apparently for reasons connected with difficulties in obtaining a date for the hearing of the application. Thereafter, a hearing listed for 16 January 2020 was adjourned by consent, against certain undertakings given by the respondents, to the hearing before me on 3 and 4 March 2020. At that hearing AMUSA, EGFL, Ravi Ruia and Prashant Ruia (jointly) were represented by leading and junior counsel, as was the Interested Party VTB Bank PJSC ("*VTB*") which is the Essar group's main lender.

5. The hearing before me lasted for two days and included detailed submissions on the underlying transactions which are the subject of AMUSA's claims, as well as other matters said to evidence risk of dissipation. This was unsurprising in light of the size of the claim, the nature and amount of the worldwide freezing order sought, the complexity of the matter, and the fact that the freezing order is sought in respect of an actively trading group with very large numbers of operating businesses and employees. Moreover, the alleged dissipations which are the subject of AMUSA's substantive claim were also prominent among the factors on which AMUSA relied to establish a risk of dissipation, with the result that it was and is necessary to consider those alleged

dissipations when considering whether both a good arguable case and risk of dissipation have been shown. These factors have in turn contributed to the length of this judgment.

## (B) THE RELEVANT PARTIES

6. AMUSA is part of the ArcelorMittal Group, one of the world's leading steel and mining businesses. It was organised under the laws of Delaware in 2002 to provide steel manufacturing and mining services in the USA.

7. The Essar group is a conglomerate, comprising companies incorporated in various jurisdictions, including the Cayman Islands, where EGFL is incorporated, and Mauritius, where Essar Steel is incorporated. Members of the Ruia family are the group's founders, and are interested in it via companies and discretionary trusts.

8. EGFL is the Essar group's principal holding company. According to its website, "*EGFL is a global investor, controlling a number of world-class assets diversified across the core sectors of Energy, Infrastructure (comprising Ports and EPC businesses), Metals & Mining, and Services (Shipping, IT and Retail businesses)*".

9. EGFL's wholly-owned subsidiaries include Essar Steel, which acted at material times as an intermediate holding company for the Essar Group's steel business. Essar Steel is the award debtor under the ICC Award and the judgment debtor under orders made in Minnesota, England & Wales, and the Cayman Islands enforcing the Award. AMUSA says EGFL exercised de facto control over Essar Steel at all material times.

10. Ravi Ruia along with his brother Shashi Ruia, is a co-founder of the Essar group and interested in it in the manner indicated above. EGFL's accounts for the year ended 31 March 2017 state that EGFL's initial investors (i.e. Ravi and Shashi Ruia, or trusts they have settled) "*exercise significant influence over*" EGFL. Ravi was a director of EGFL from 5 April 2010 to 26 March 2012. AMUSA says that he exercised *de facto* control at all material times, up to and including 2016.

11. Prashant Ruia is Shashi's son and Ravi's nephew. He is a key individual in the Essar group and interested in it in the manner indicated above. He is described on EGFL's website as "*an integral part of EGFL's operations and management since 1985 and a key driver of the Fund's growth, diversification and value creation both within India and internationally*". He is, or was, at material times a director or equivalent officer at various Essar group companies, including Essar Steel, EGFL and Essar Capital. He was a director of Essar Steel up to 29 July 2016, but AMUSA alleges that he continued to maintain *de facto* control thereafter.

12. AMUSA and the Essar group are major commercial competitors of each other, and have for some time been embroiled not only in the present controversy but a series of other legal and commercial disputes. The second witness statement of Susan Prevezer QC, a partner in EGFL's solicitors Quinn Emanuel, sets out details of these, including a dispute over access to Hazira Port in Gujarat, India, which has assumed great significance following AMUSA's acquisition of Essar Steel India Limited (and thus its steel works at Hazira) pursuant to bankruptcy proceedings in India. Issues between the ArcelorMittal and Essar groups in connection with Essar Steel India have resulted in proceedings in the courts of India culminating in a Supreme Court decision on 15 November 2019 which I consider later in this judgment.

**(C) AMUSA'S CONSPIRACY CASE**

13.    The core of AMUSA's conspiracy allegations is set out in §§ 33-36 of its Particulars of Claim as follows:

"33. The Defendants (and each of them) have conspired to injure AMUSA by unlawful means. On various dates unknown in the period from January 2012 to date, the Defendants and/or any two or more of them agreed, or combined together with a common intention, to injure or cause loss to AMUSA by unlawful means, and in particular to:

33.1 Fraudulently induce AMUSA to enter into the Amended Pellet Sale Agreement;

33.2 Wrongfully procure or induce Essar Steel to breach its obligations under the ICC Award and the Judgment, including its obligations not to mislead the arbitral tribunal (the "**Tribunal**") and to pay the ICC Award;

33.3 Wrongfully strip Essar Steel of its assets and prevent Essar Steel from taking steps to recover them, thereby impeding AMUSA's attempts to enforce those obligations referred to at §3 above.

34. Further or alternatively, the Defendants or any two of them entered into more than one such conspiracy. References to the **"Conspiracy"** and the **"Conspirators"** are references to that conspiracy or those conspiracies, and in each case to the parties to that conspiracy or to those conspiracies.

35. The nature of the Conspiracy is such that AMUSA cannot specify with certainty on which occasions the Conspirators, or any of them, entered into the common design or combination. That they did enter into such a common design should be inferred from the fact that, as set out in this Statement of Case, (i) the Defendants are all linked to the Essar Group, (ii) the Defendants each acted in furtherance of the Conspiracy by doing one or more of the acts set out at §36 below, which are consistent with the Conspiracy, and it should be inferred did not do so independently of the other Defendants.

36. The Defendants have acted in furtherance of the Conspiracy by doing one or more of the following unlawful acts (as set out below):

36.1 Inducing AMUSA to enter into the Amended Pellet Sale Agreement by deceit, namely by falsely representing that Essar Steel intended and expected to be able to comply with its obligations thereunder, when the contrary was the case, as the

6

Defendants or certain of them knew at the time (as set out in Part F.2 below);

36.2 Inducing or procuring that Essar Steel breach its express obligations under the Amended Pellet Sale Agreement and/or implied obligation under the Arbitration Agreement (as defined at §112 below) to comply with any award made, by putting it beyond its power to pay the sums it was obliged to pay pursuant to the Amended Pellet Sale Agreement and/or the ICC Award, by the following actions:

(a) Devised, approved, permitted or executed the plan by which assets were removed from the ownership of Essar Steel and placed under the ownership of Essar Steel Asia, for no, or no real consideration (as set out in Part F.1 below);

(b) Caused, encouraged, assisted or permitted Essar Steel to fail to seek to recover sums paid by Essar Steel to other companies in the Essar Group under an arrangement which was not lawful when made and/or in respect of which there was a total failure of consideration and/or which became unlawful by reason of supervening events (as set out in Part F.4 below);

(c) Caused, encouraged, assisted or permitted Essar Steel falsely to restate its accounts so that a debt due to Essar Steel from EGFL was concealed and no longer recognised in Essar Steel's accounts (as set out in Part F.3 below);

(d) Caused, encouraged, assisted or permitted Essar Steel to enter into a deed by which it postponed any debts payable to it from certain other Essar Group companies until VTB Bank had been repaid in full (as set out in Part F.8 below);

36.3 Misled the Tribunal, in order to avoid an award being made against Essar Steel in favour of AMUSA and in order to obtain an award on a counterclaim in favour of Essar Steel (as set out in Part F.5 below);

36.4 Sought unlawfully to disrupt or obstruct proceedings to enforce the ICC Award, and the execution of orders obtained in England, Cayman and Mauritius the purpose of which was to prevent the dissipation of assets and destruction of evidence, in order that the Judgment could be enforced (as set out in Part F.7below)."

14. The alleged stripping of the assets of Essar Steel involves five main components:

i) A series of transactions in 2012 and 2013 by which Essar Steel was divested of its interest in Essar Steel India (an asset then worth approximately US$1.5 billion) and received nothing in return.

7

ii)     A restatement of Essar Steel's accounts in 2016 to recharacterise as an equity interest what had in the 2014 and 2015 accounts been described as a "*receivable*" in the sum of almost US$1.5 billion due to Essar Steel from EGFL.

iii)    Essar Steel's entry into a Deed of Subordination with the Essar group's main lender, VTB, in October 2016, one effect of which was to postpone any liability EGFL might otherwise have had to Essar Steel.

iv)     The alleged removal from Essar Steel in 2015, for no or inadequate consideration, of its interest in Essar Steel UAE Limited ("*Essar Steel UAE*").

v)      Transactions in 2014 involving the assets of another Essar Steel subsidiary, Essar Steel Algoma Inc ("*Algoma*"), which are said to have involved stripping Algoma of assets in a manner prejudicial to the creditors of both Algoma and Essar Steel itself.

15.     The first three of these stages, involving Essar Steel's interest in Essar Steel India, are by some margin the largest in terms of their alleged financial impact on Essar Steel.

## (D) THE PELLET SALE AGREEMENT AND THE ARBITRATION

16.     On 17 December 2012, AMUSA and Essar Steel Minnesota LLC ("*ESML*") entered into the PSA, pursuant to which AMUSA was to purchase iron ore pellets from a facility in Minnesota known as the Nashwauk Project. AMUSA alleges that the agreement was expected to have an approximate value of over US$1 billion over a 10 year contract period.

17.     Negotiations for the PSA had begun in or around 2010. Given the value of the agreement, AMUSA had required a joint obligor to guarantee ESML's performance. AMUSA says it was told by the then CEO and President of ESML that a company known (at the time) as Essar Resources Inc was to become ESML's parent company, and AMUSA therefore requested (in or around August 2012 on AMUSA's case) that that company be an additional party to the PSA.

18.     Under the PSA pellets were due to be delivered to AMUSA from 1 July 2013 (the delivery commencement date) and no later than 1 July 2014 (the delivery deadline date). However, in August 2013 work stopped at the Nashwauk Project and AMUSA says it became clear that delivery dates would be missed by ESML. Amendments to the PSA were negotiated, including extensions of the delivery commencement and deadline dates to 1 July 2015 and 1 October 2015 respectively, along with an agreed sum to compensate AMUSA for the delay. At the same time, AMUSA says it discovered in December 2013 that Essar Resources Inc had not in fact become ESML's parent company and did not have any assets. AMUSA therefore requested that Essar Resources Inc be replaced by Essar Steel, which was ESML's actual parent company, and this was agreed. On 10 January 2014, the parties entered into an amended and restated agreement ("the *Amended PSA*") under which *(inter alia)* Essar Steel replaced Essar Resources and became the joint obligor with ESML. No guarantee was sought from EGFL as the ultimate parent company of ESML and Essar Steel.

19.     A further extension of the delivery deadline date from 1 July 2015 to 1 July 2016 was agreed in June 2015, along with a further sum to compensate AMUSA. However, on

27 May 2016 AMUSA served notice to terminate the PSA on the ground that ESML had failed to give a required notice by 2 April 2016 of the expected quantity of pellets to be delivered. AMUSA says this followed further problems with the work, leading to further anticipated delays.

20. On 31 May 2016, it was announced that AMUSA had entered into a long-term iron ore supply with another supplier, Cliffs Natural Resources Inc.

21. On 8 July 2016 ESML filed a voluntary petition for relief under Chapter 11 of the US Bankruptcy Code. EGFL's evidence is that this was necessary because the termination of the PSA caused ESML's financing to fall through, prompting the Minnesota Department of Natural Resources to terminate its mineral leases.

22. On 9 August 2016 AMUSA commenced ICC arbitration proceedings against Essar Steel.

23. ESML ceased to participate in the arbitration process on 9 August 2017, and the Tribunal on 19 December 2017 issued an Award in AMUSA's favour for US$1,507,573,709 plus interest.

## (E) SUBSEQUENT PROCEDURAL HISTORY

### (1) Minnesota

24. Following the issue of the ICC Award on 19 December 2017, AMUSA in January 2018 applied for orders in the US District Court for the District of Minnesota recognising and enforcing the Award, which were granted on 2 April 2018. Judgment was also entered in the amount of the Award in a Minnesota State court (the District Court for the State of Minnesota, County of Itasca) on 11 May 2018.

25. On 2 March 2018, AMUSA brought proceedings in the Minnesota State court against Essar Steel, EGFL, Essar Steel Asia Holdings Limited, Essar Steel Middle East FZE and Prashant Ruia, alleging a conspiracy to strip Essar Steel of its assets leaving it as a worthless shell. The proceedings were not in fact served on Essar Steel Middle East FZE or Prashant Ruia. The broad thrust, and many though not all of the details, of the allegations were similar to those AMUSA advances in the present proceedings. No freezing order was sought at this stage: AMUSA points out that the Minnesotan State court has no power to issue such orders.

26. On 27 June 2018 the court dismissed AMUSA's complaint in its entirety against the defendants on whom it had been served, on the grounds that it lacked personal jurisdiction over them, and that the courts of Mauritius were the appropriate forum for the determination of AMUSA's claim that EGFL acted as the *alter ego* of Essar Steel or that the corporate veil should be pierced in relation to Essar Steel's alleged wrongdoing.

### (2) Mauritius

27. In the courts of Mauritius the following key steps have taken place:

    i)    On 12 May 2017 Essar Steel applied to set aside a statutory demand which AMUSA had served on it on 3 May 2017.

ii)     AMUSA on 25 May 2017 applied to have that application set aside, and the court granted AMUSA's application on 26 September 2017.

iii)    On 22 February 2018 the Supreme Court of Mauritius made a provisional order granting recognition and enforcement of the ICC Award.

iv)     Essar Steel on 8 March 2018 applied to set that order aside. The application was heard on 20 September 2018 and judgment was reserved.

v)      On 22 October 2018 an appeal by Essar Steel from the court's decision to set aside its application to set aside the statutory demand was dismissed. Essar Steel applied to the Privy Council for permission to appeal.

vi)     On 19 April 2019 AMUSA obtained a without notice order appointing a Mr Oosman as additional administrator of Essar Steel, in addition to the administrator Mr Abdoula whom Essar Steel's board had appointed on 26 March 2019 when resolving to place the company into administration.

vii)    On 22 April 2019 Essar Steel's directors filed an appeal against the appointment of Mr Oosman as additional administrator. That appeal was heard on 20 January 2020 and judgment was reserved.

viii)   On 6 May 2019 EGFL commenced proceedings seeking a declaration that it is not indebted to Essar Steel.

ix)     On 19 December 2019 VTB filed an application for the winding up of Essar Steel.

### (3) Cayman Islands

28.     In the courts of the Cayman Islands, AMUSA in January 2019 brought proceedings seeking Norwich Pharmacal relief against EGFL and Essar Capital. No freezing order was sought against EGFL.

29.     On 26 April 2019 AMUSA issued proceedings in the Cayman Islands seeking an attachment (or garnishee) order in relation to the alleged inter-company receivable due to Essar Steel from EGFL in the sum of US$1.5 bn. AMUSA also sought an interlocutory worldwide freezing order against EGFL pending resolution of those proceedings, later withdrawing that application in favour of an application for a notification injunction. AMUSA did not succeed in obtaining either of those remedies. I discuss the course of these proceedings in more detail in section (F)(7) below.

### (4) Delaware

30.     On 8 July 2016 ESML filed for Chapter 11 bankruptcy protection.

31.     On 29 September 2016 AMUSA filed a proof of claim in those proceedings claiming in excess of US$1 billion pursuant to the Amended PSA.

32.     On 5 July 2017 ESML filed a motion for an order approving a settlement of AMUSA's proof of debt for US$600 million.

### (5) England and Wales

33.    On 14 January 2019 Butcher J granted AMUSA a worldwide freezing order and ancillary relief against Essar Steel on a without notice basis.

34.    Jacobs J on 25 March 2019, following a hearing from 5-7 March 2019, continued those orders, delivering a substantive judgment finding *inter alia* a serious risk of dissipation of Essar Steel's assets.

35.    On 28 June 2019 Males LJ refused permission to appeal from Jacobs J's decision.

## (F) TRANSACTIONS RELATING TO ESSAR STEEL INDIA

### (1) AMUSA's case

36.    AMUSA's overarching pleaded case in relation to the alleged conspiracy to remove assets from Essar Steel is that:

> "51. At the beginning of 2012, during the negotiations prior to the Pellet Sale Agreement, but unbeknownst to AMUSA, EGFL resolved to reorganise the Essar Group's steel portfolio. This was done specifically with the Nashwauk Project in mind: in a witness statement dated 15 February 2019, Mr Baid stated that *"in early 2012, ESML was contemplating a capital markets fundraising for the Nashwauk project, and the reorganisation was intended to facilitate that"*. The Nashwauk Project was, and must have been recognised by the Defendants to be, a significant and expensive project. The Pellet Sale Agreement involved Essar Group companies taking on very substantial obligations to AMUSA, a competitor of the Essar Group. It therefore exposed the Essar counterparties to a large potential claim by AMUSA.

> 52. Those controlling Essar Steel (including, Prashant, Mr Gujadhur, Mr Baid; EGFL, acting through its directors including Mr Bell; Essar Capital, acting through its directors and Mr Wright and Mr Seifert; and Essar Capital Services, acting through its directors and Mr Seifert and Mr Wright) began a process of divesting it of assets. It is inferred that process was undertaken, in whole or in part, in furtherance of the Conspiracy and in order to prevent AMUSA from being able to enforce against those assets any claim it might have in connection with the Nashwauk Project. To the best of AMUSA's knowledge, prior to the restructure Essar Steel had four main assets: Essar Steel India, Essar Steel UAE, Algoma and ESML. As set out below, those subsidiaries, or their substantial assets, were divested in turn. By 2019, Essar Steel's value had been reduced to less than US$2.5 million."

37.    As regards the first main asset, Essar Steel India, AMUSA's case is that:

> "53. Essar Steel disposed of its c.72% shareholding in Essar Steel India by way of two main transactions. The purpose of this disposal was to move Essar Steel India from being a majority owned subsidiary of Essar Steel to being a majority owned subsidiary of a separate Essar entity (also a subsidiary of EGFL, incorporated in March 2012), in which Essar Steel had no interest. Pending further disclosure, it would appear that these transactions were on paper and were part of a scheme the real intention of which was to remove assets from the balance sheet of Essar Steel, which had to be done in steps considering the large values involved."

38.    The first of these transactions is alleged to have been the sale in June 2012 by Essar Steel of virtually the whole of its then holding in Essar Steel India (approximately 1.91 billion shares), to Essar Resources Mauritius Ltd, later renamed Essar Steel Asia Holdings Limited, in return for a promissory note; together with a subsequent assignment of that note from Essar Steel to EGFL in March 2013.

39.    The second divestment transaction is alleged to have been similar, involving a sale of a much smaller holding (approximately 118 million shares) which Essar Steel had acquired following an additional investment of about US$100 million in Essar Steel India in or around March 2013.  These shares were sold by Essar Steel to Essar Steel Asia Holdings in August 2013 in return for a second promissory note, followed by the assignment of that note from Essar Steel to EGFL in November 2013.

40.    These transactions are said to have involved the following unlawful acts:

> "69.1 Essar Steel's disposal of its interest in Essar Steel India was unlawful in that it was at an undervalue;
>
> 69.2 The EGFL Assignments were unlawful at the time they were made;
>
> 69.3 The ineffective share buy-back transaction was unlawful when the Promissory Notes were assigned for that purpose or alternatively subsequently became unlawful; and/or
>
> 69.4 The purpose of (i) the disposal of Essar Steel India, (ii) the EGFL Assignments and (iii) the purported share buy-back transaction was to defraud Essar Steel's creditors, in particular AMUSA"

41.    AMUSA also alleges that a change made in 2016 in the way in which these transactions were treated in Essar Steel's accounts was made pursuant to the (or a) conspiracy, and had the effect that *"a debt due to Essar Steel from EGFL was concealed and no longer recognised in Essar Steel's accounts"* (Particulars of Claim § 36.2(c)).    That restatement is alleged to have been unlawful because:

> "95.1 Instead of plainly reflecting the real transaction, viz. a write off of the debt without any consideration, it reduced the amount of Essar Steel's recorded assets by approximately

12

US$1.5 billion, thereby improperly concealing those assets, less than two months after AMUSA issued its Request for Arbitration against Essar Steel;

95.2 It had the effect that the financial statements for the years ended 31 March 2016 and 2017 were materially incorrect and misleading, to the disadvantage of Essar Steel's creditors, in particular AMUSA;

95.3 It was made possible only by the directors of Essar Steel who approved the inaccurate and/or misleading financial statements, acting in breach of their obligations under ss. 210 and 211 of the Companies Act 2001 of Mauritius to ensure that the financial statements of Essar Steel presented fairly the financial position and financial performance of Essar Steel."

### (2) Origins of and Essar Steel's decision to enter into the Restructuring

42. EGFL's evidence is that Essar Steel did indeed seek to divest itself of its interest in Essar Steel India in 2012/13, as part of a restructuring ("*the Restructuring*"), which was intended to reduce the total value of Essar Steel's assets and equity by an amount equal to the value of its interest in Essar Steel India. The divestment formed part of a larger restructuring of EGFL's worldwide steel holdings, such that the Indian steel business would be held by a different intermediate holding company, i.e. a company other than Essar Steel, though still owned by EGFL. The plan was to remove Essar Steel India's shares from Essar Steel, to reduce its capital, and to use the shares to recapitalise the new intermediate holding company.

43. The contemporary documents exhibited appear to bear out the timing, details and purpose of these restructuring plans.

44. These transactions in relation to Essar Steel India seem to have had their origins in mid 2011. A "*Project Marvel*" briefing note dating from April 2011 outlined ideas for a restructuring in connection with a proposed IPO of Essar's North American assets, which EGFL says was for the purpose of raising capital for ESML (and specifically, an expansion of the Nashwauk Project). Initial advice on tax implications was obtained from Grant Thornton in July 2011, and the documents include a slide deck dated 20 February 2012 setting out options for the form of restructuring then under consideration.

45. The minutes of a meeting of Essar Steel's board on 22 March 2012 include a section on "*Change in Corporate Structure*," referring to a proposal to divest a 10-30% stake in Essar Steel's wholly-owned subsidiary ESML "*by way of a primary offer and/or secondary sale on the Canadian Stock Exchange*". The minutes indicated that the transaction would, subject to the necessary notifications, consents and approvals, include a series of eleven steps as follows:

"a) The Company will sell all of its shares in ESTL [Essar Steel India] to Essar Steel Marvel Mauritius Ltd ('MC02') and in consideration, MC02 will issue a note payable to the Company (the 'India Note');

b) [Essar Steel India] will thereafter transfer its shares in ESPF (Dubai) and PT Essar (UAE) to MC02 and in consideration MC02 shall issue a note payable to the Company (the 'Other Assets Note');

c) Algoma Coop (NL) will subsequently sell shares of Algoma BV to Coop 1 (NL) and in consideration of which, Coop 1 (NL) shall issue a note (the 'Algoma Note') payable to Algoma Coop. Algoma Coop (NL) will subsequently make a capital reduction and effect a distribution in kind of the Algoma Note to the Company;

d) The Company will thereafter distribute the Other Assets Note, the Algoma Note and the India Note (collectively the 'Notes') to EGL by way of dividend/capital reduction;

e) EGL will contribute the Notes into Essar Steel Mauritius Ltd ('MC01') and MC01 shall issue of shares for non-cash consideration;

f) MC01 will contribute the India Note and Other Assets Note to MC02 against issue of equity shares to MC01 for non-cash consideration. Furthermore, MC01 will contribute Algoma Note to Coop 1 against issue of by Coop 1 to MC01;

g) EGL will contribute the Company into MC01 and in consideration for this, MC01 will issue shares to EGL;

h) MC01 to contribute the Company into Coop (NL) and Coop (NL) to issue shares to MC01;

i) Coop (NL) to contribute the Company into List Co (Canada) and List Co (Canada) to issue equity shares to Coop (NL);

j) The Company shall distribute the shares of MN to List Co (Canada) as dividend or capital reduction;

k) List Co (Canada) will thereafter distribute shares of the Company to Coop (NL)."

The minutes record that the proposed transaction was approved.

46. Accordingly, as of 22 March 2012, Essar Steel's board was already envisaging, and had approved in principle, a restructuring intended to include the following features:

i) Essar Steel would divest itself of its stake in Essar Steel India, in return for a promissory note, referred to in the minutes as the 'India Note', issued by the company identified as 'MCO2': see step (a) above.

ii) Essar Steel would subsequently distribute the promissory note to EGFL by way of dividend or capital reduction (step (d) above): i.e. a transfer under which Essar Steel would not receive consideration, at least in an ordinary monetary sense, from EGFL in return for the promissory note.

iii)     The promissory note would then be contributed by EGFL into its subsidiary MCO1, which would in turn contribute the note to MCO2 (steps (e) and (f) above): thus the note would end up with the entity which had issued it.

iv)     Similar transactions would take place, in parallel, with other assets including shares in Algoma BV held by Algoma Coop (NL) (steps (c) to (f) above).

v)      Essar Steel itself would temporarily become a subsidiary of List Co (Canada), and at that stage would transfer its shares in Essar Steel Minnesota ('MN') to List Co (Canada) by way of dividend or capital reduction (steps (g) to (j) above).

vi)     Essar Steel would end up as a subsidiary of 'Coop (NL)' (step (k) above), and would no longer own its stakes in either Essar Steel India or Essar Steel Minnesota.

47.     Essar Steel's total net assets at this stage were in the region of $2.95 billion.  It appears likely (and it was not disputed before me) that at this stage Essar Steel could lawfully have undertaken the transactions envisaged, including the proposed dividend/reduction of capital in respect of the proceeds of its sale of Essar Steel India.

48.     The proposed restructuring is also referred to in the minutes of a board meeting on 30 March 2012 of EGFL.  These minutes include the following:

> "**The proposed changes in the corporate structure under the Steel Vertical in pursuance to the Project Marvel and approve the incorporation of a direct subsidiary of EGL**
>
> At the request of the Chairman, Mr. Manoj Agarwalla informed the Committee Members that there are some proposed changes which is intended to be brought under the Steel Vertical in pursuance to the Project Marvel.
>
> He further informed that the purpose of the restructuring exercise is to make the Steel structure amenable for raising funds at respective holding companies of Essar Steel Limited, India (ESTL); Essar Steel Minnesota LLC (MN) and Essar Steel Algoma Inc. (Algoma). The funds to be used towards expansion of various assets and retirement of debt. He also stated that to proceed with the proposed Project, two direct subsidiaries under EGL will be required."

The 'Steel Vertical' was the term used to refer to the part of the corporate structure relating to holdings in steel industry interests.

49.     Further details of the various steps involved in the restructuring were then set out.  The first phase of the restructuring would be designed to bring about the *"Transfer of shares of ESTL [Essar Steel India] and Algoma from under Essar Steel Limited, Mauritius (ESLM)"*.  This phase would include *"[Essar Steel] to transfer the shares of [Essar Steel India] to MCO2 [a new Mauritian intermediate holding company] at fair value. Fair value of [Essar Steel India] is expected to be in the range of the cost of acquisition of [Essar Steel India] in the hands of [Essar Steel]"*.  The second phase would place

Essar Steel in the desired place in the corporate structure. Ultimately, ESML would end up as a subsidiary of a new Canadian company, and Essar Steel as a subsidiary of a new Dutch intermediate holding entity.

50. The new Mauritian holding company 'MCO2' was Essar Resources Mauritius Limited, subsequently renamed Essar Steel Asia Holdings Limited.

51. The proposed restructuring is also referred to, in more general terms, in a presentation to one of EGFL's lenders, ICICI Bank, dated 4 April 2012 and an accompanying note. These documents identified the name of the proposed Canadian company, intended to become ESML's parent and to be listed on the Toronto Stock Exchange, as Essar Resources Inc: i.e. the British Columbian company which in due course entered into the PSA alongside ESML.

52. By this stage, though negotiations with AMUSA about the proposed PSA had been ongoing since 2010, no agreement had yet been entered into: that did not occur until December 2012. Moreover, AMUSA had not yet even requested that the PSA should be supported by a guarantee from Essar Steel Minnesota's parent company: that request is not alleged to have been made until in or around August 2012.

53. Thus the evidence strongly suggests that a restructuring, elements of which would include the sale of Essar Steel India by Essar Steel in return for a promissory note and the distribution of that note to EGFL by way of dividend or reduction of capital, had been contemplated and planned for many months or years before:

   i)    AMUSA sought a guarantee from any company – let alone Essar Steel – for the proposed PSA with ESML (guarantee alleged to have been requested in or around August 2012);

   ii)   the PSA was entered into (17 December 2012);

   iii)  significant problems emerged in the operation of the PSA (allegedly by August 2013 when work stopped at the Nashwauk Project due to lack of funding);

   iv)   AMUSA requested that Essar Steel become the guarantor under the PSA (December 2013); or

   v)    Essar Steel actually became the guarantor under the Amended PSA (10 January 2014).

54. As set out earlier (§§ 36 and 37 above), AMUSA's case is that these transactions, whereby Essar Steel India was to move from being majority owned by Essar Steel to being owned by a separate Essar entity in which Essar Steel had no interest, were *"part of a scheme the real intention of which was to remove assets from the balance sheet of Essar Steel, which had to be done in steps considering the large values involved.";* and that the *"process of divesting [Essar Steel] of assets ... was undertaken, in whole or in part, in furtherance of the Conspiracy and in order to prevent AMUSA from being able to enforce against those assets any claim it might have in connection with the Nashwauk Project".*

55.  Thus on that case, the plans made in 2011 and 2012, up to and including Essar Steel's 22 March 2012 board meeting and EGFL's 30 March 2012 board meeting, and the transactions executed in order to give effect to those plans, were formulated and executed as part of an unlawful means conspiracy designed to strip Essar Steel of assets in order to prevent AMUSA from enforcing claims in relation to the Nashwauk Project.

56.  It is, however, very difficult to see how that could be the position, bearing in mind that the plans were made well in advance of any of the events referred to in § 53 above.  The contemporaneous documents I have mentioned suggest that the restructuring was conceived for reasons entirely unrelated to the proposed PSA with AMUSA.  In any event, given the timing, it strains credibility to suggest that the restructuring plans were made in anticipation of future claims under a guarantee from Essar Steel which had not yet been sought or mentioned, under an agreement not yet entered into, in respect of prospective breaches that had not yet occurred.  Counsel for the Ruias rhetorically asked, aptly in my view, what the respondents could possibly have gained from such a plan: which would seemingly have involved positively creating (by ESML entering into, and Essar Steel later agreeing to guarantee, the PSA) the liability that was then sought to be evaded.  As Mann J said in *Mortgage Agency Services Number One Limited v Cripps Harries* [2016] EWHC 2483 (Ch) § 88:

> "Of particular relevance to a case of fraud…is the question of motive. By and large dishonest people are dishonest for a reason. They tend not to be dishonest wilfully or just for fun. Establishing a motive for deceit, or conspiracy, is not a legal requirement, but if a motive cannot be detected or plausibly suggested then wrongful intention (to tell a deliberate lie in order to deceive) is less likely. The less likely the motive, the less likely the intention to deceive, or to conspire unlawfully. In many, if not most, fraud cases this would not be a particularly live point. The defendant is often a person who would be a direct beneficiary of the fraud, and a plausible motive is, to that extent, relatively easily propounded. The present case is, however, different."

### (3) Stage 1: June 2012 sale of Essar Steel shares in Essar Steel India

57.  The first stage of the Restructuring was executed in June 2012.  Essar Steel Mauritius Limited ('MCO1') was established as a subsidiary of EGFL, and therefore a sister company of Essar Steel.  A small portion (less than 1%) of Essar Steel's 72.87% stake in Essar Steel India was transferred by gift to Essar Steel Asia Holdings (at this stage still named Essar Resources Mauritius Limited) ('MCO2'), which became a subsidiary of Essar Steel Mauritius Limited. These steps were completed between 22 March 2012 and 28 June 2012.

58.  The balance of Essar Steel's 72.87% shareholding in Essar Steel India was then transferred to Essar Steel Asia Holdings for US$1.389 billion, that being its fair value at the time as determined by Ernst & Young in a valuation report dated 29 June 2012, in return for a promissory note for that sum issued by Essar Steel Asia Holdings.  This part of the transaction was completed on 29 June 2012, i.e. prior to the entry into the PSA and prior to any request for a guarantor of ESML's proposed obligations under it.

### (4) Stage 2: March 2013 assignments of US$1.38 billion promissory note

59.    On 23 March 2013:

i)    Essar Steel assigned the US$1.38 billion promissory note to EGFL in consideration of a "*future capital reduction*";

ii)    EGFL to assigned the promissory note to Essar Steel Mauritius Limited in consideration of equity shares to be issued by Essar Steel Mauritius Limited to EGFL; and

iii)    Essar Steel Mauritius Limited assigned the promissory note to Essar Steel Asia Holdings. Since Essar Steel Asia Holdings was the obligor under the note, that automatically cancelled it.

60.    The text of the first of these assignments, from Essar Steel to EGFL, was:

"In consideration of future capital reduction, Essar Steel Limited (the 'Assignor') hereby assigns to Essar Global Limited (the 'Assignee') all its rights and interests to the amounts payable 1,388,530,158 United States Dollars (the 'Claim') by Essar Steel Asia Holding Limited (fka Essar Resources Mauritius Limited) (the 'Issuer') under this promissory note, and the Assignee hereby accepts the assignment from the Assignor of all those rights and interests. The Assignor shall have no further right in relation to the Claim, whenever and however arising, all of which shall vest in the Assignee and the Assignor shall accordingly cease to enjoy any rights in relation to the Claim. The Assignor shall promptly execute and do all such acts and things as the Assignee may reasonably require to perfect the assignment effected or intended to be effected hereunder and shall in particular (without prejudice to the generality of the foregoing) give notices to the Issuer which the Assignee may think expedient for the purpose of perfecting such assignment."

61.    EGFL says the reason why the assignment was stated to be in consideration of a "*future*" reduction in capital was that Essar Steel understood the consent of certain lenders with security over its shares to be required for the reduction in capital; there was no financial impediment at this time.

62.    AMUSA alleges that this assignment formed part of the conspiracy and was done in order to asset strip Essar Steel. It says in its Particulars of Claim:

"57. … By [23 March 2013], EGFL and Essar Steel must have envisaged that ESML (and Essar Steel, as its parent company) might be exposed to a significant damages claim as a result of the Pellet Sale Agreement: as set out above at §41, long before August 2013 (when work stopped at the Nashwauk Project) it must have been clear to ESML and those controlling it that ESML would not be able to commence delivery on the contractually agreed date; and given AMUSA's request for

> ESML's parent company to be joint obligor, ESML and Essar Steel must have foreseen that AMUSA would seek to substitute ESML's actual parent, Essar Steel, for Essar Resources Inc, and that Essar Steel would thereby become liable for ESML's breach. …"

63.    However, based on the evidence I have seen I consider that allegation to lack any real cogency.  The assignments executed in March 2013 were in accordance with the plans for the Restructuring outlined out in section (F)(2) above.  AMUSA makes the point that by August 2012, the plan to list Essar Steel Minnesota's intended parent company on the Canadian Stock Exchange had been abandoned, referring to evidence in the second witness statement of EGFL's solicitor, Ms Susan Prevezer QC, on information from the then CEO of Essar Steel Minnesota, that *"following a marked deterioration in market conditions in 2012, a decision was made by the Board of [Essar Steel] not to continue with the proposed listing"*.  Ms Prevezer exhibits minutes of a meeting of Essar Steel's board on 28 August 2012 which include a section on "*Project Marvel*" which records that ICICI Bank approval was awaited for the restructuring of Essar Steel Minnesota, and that *"The banks have requested [Essar Steel] to evaluate equity private placement opportunities due to the uncertainty in the IPO markets globally and in particular Canada.  Furthermore, alternate sources of finance such as high yield debt are currently being exposed to minimise the overall equity component"*.

64.    AMUSA in its evidence in response interpreted the above evidence as indicating that Essar Steel *"appears to have abandoned"* on 28 August 2012 its proposal for a listing of the Canadian entity, with the result that from that date *"the entire rationale for transferring [Essar Steel India] out of Essar Steel and for assigning Promissory Note no longer existed"*.  That led Ms Prevezer QC to serve a third witness statement to clarify and correct the statement in her second witness statement.  In her third statement, Ms Prevezer points out – correctly in my view – that the statement quoted above from the minutes of 28 August 2012 did not evince an intention to abandon the proposed listing altogether.  Ms Prevezer QC exhibits further documents which indicate that ESML was still contemplating an IPO by an affiliate on 12 November 2012, and that on 19 February 2013 ESML was said, in Essar Steel board minutes, to be *"preparing for market soundings meetings in respect of the various opportunities in prospective private placement and IPO markets.  Such meetings are planned for early mid-February."*

65.    The 19 February 2013 Essar Steel board minutes from which latter quotation is taken also recorded the decision of Essar Steel's board to authorise the assignment of the US$1.38 billion promissory note:

> **"6.3 ASSIGNMENT OF PROMISSORY NOTE**
>
> Mr. Soni informed the Board that pursuant to the share purchase agreement entered into between Essar Steel Asia Holdings Limited ("ESAHL") and the Company, the Company has disposed of 1,910,255,183 equity shares of INR 10 each of Essar Steel India Limited to ESAHL at a consideration of USD 1,388,530,158. He added that in this respect, ESAHL has issued a promissory note (the "Promissory Note") in favour of the Company.

> Mr. Soni further informed the Board that it was now proposed to assign the Promissory Note in favour of Essar Global Limited, the sole shareholder of the Company ("EGL") and in consideration, EGL will dispose of 1,388,530,158 ordinary shares of USD 1 each held in the Company to the Company. He added that all the issued share capital of the Company are currently pledged in favour of the Raceview lenders and the latter's approval will be required to buy back the 1,388,530,158 ordinary shares of USD 1 each from EGL. He further added that in this connection, EGL is in the process of obtaining the Raceview lenders' consent.
>
> Mr. Soni also informed the Board that since the consent of the Raceview lenders will take some time, it was proposed that the Promissory Note be assigned to EGL as advance against future share buy back.
>
> After due considerations, **IT WAS RESOLVED** as follows:
>
> a) THAT the Company be and is hereby authorised to assign the promissory note received from Essar Steel India Holdings Limited to Essar Global Limited for a consideration as advance against future share buy back.
>
> b) THAT any one Director or Mr. Sushil Kumar Baid be and are hereby authorised to execute any necessary documents in connection with the above, on behalf of the Company."

66. These minutes indicate that Essar Steel's decision to proceed with the assignment of the promissory note was taken at a time when the board understood ESML still to be actively pursuing both private placement and an IPO. In any event, even if the IPO plan had been abandoned or at least put on hold (as it appears happened in July 2013, when EGFL board minutes refer to Project Marvel having been "*aborted*"), there may well have been (as EGFL asserts) good and obvious reasons to complete all stages of that portion of the restructuring which had already been partially executed, namely the spinning off of the Indian holdings, thus avoiding a situation where the new Asian subsidiary (Essar Steel Asia Holdings) was inadequately capitalised.

67. The 19 February 2013 minutes are also relevant to two other, related, matters. The first of these is AMUSA's point that the plan contemplated in the restructuring documents was for an assignment of the promissory note in return for an immediate dividend or return of capital, not an assignment in contemplation of a future return of capital. AMUSA suggests that the only reason for making an immediate assignment, even though a dividend or capital reduction could not at the time proceed, was that (following the entry into the PSA on 17 December 2012) EGFL knew that AMUSA would discover in due course that Essar Steel was ESML's parent company, and that AMUSA would 'require' Essar Steel to become a guarantor to the PSA: with the result that EGFL had a motive to cause sums to be extracted from Essar Steel without delay.

68. That is, however, to pile inference upon inference without any real basis. The 19 February 2013 minutes indicate that Essar Steel understood EGFL to be in the process

of obtaining the lenders' consent considered necessary for a reduction of capital or dividend to proceed. At the same time, on the basis that the Restructuring was still in contemplation, there was good reason to believe that Essar Resources Inc., rather than Essar Steel, was an appropriate entity to have guaranteed ESML's obligations under the PSA. Even if that is wrong, and Essar Steel did by February 2013 anticipate being asked to become the guarantor under the PSA (as occurred 10 months later), it remains in my view a step too far to infer, as AMUSA suggests, that the only reason for continuing to execute parts of the restructuring was an attempt to asset strip Essar Steel in order to avoid liabilities for losses which had not yet arisen under an agreement to which it had not yet agreed to become a party.

69. The second further matter to which the 19 February 2013 minutes are relevant is AMUSA's complaint that it was misled about the identity of ESML's parent company at the time the PSA was entered into in December 2012. I was not shown specific evidence about the representations alleged to have been made to AMUSA at that time, but the board minutes referred to above provide reason to believe that EGFL might very well in December 2012 still have been anticipating that Essar Resources Inc (the Canadian company proposed to become listed) was to become ESML's parent company.

70. AMUSA alleges, in relation to both the February 2013 assignment and the smaller one in November 2013 discussed in section (5) below, that:

> "65. A buy-back of shares is a method by which companies that have accumulated profits reduce the outstanding shareholding by buying back shares from their shareholders. On a buy-back there is a reduction of capital of the company that is buying back its shares. It is only after the buy-back offer is made, and accepted, that the share capital is reduced when the shares are received for cancellation. The purported characterisation of the cancellation of the debt from EGFL to Essar Steel arising from the EGFL Assignments as a payment in advance by Essar Steel for the buy-back of its shares from EGFL is a ruse for removing that debt from the list of assets in Essar Steel's balance sheet. By removing that debt from the sums receivable and reducing it from the share capital, Essar Steel in effect waived recovery of the sum representing the value of shares to be transferred by it, in favour of its parent company, and thereby deprived its creditors (and AMUSA in particular) of their right to proceed against this valuable asset."

71. However, for the reasons given in the preceding paragraphs above, I do not consider that the evidence provides any real support for the suggestion that the assignments were a *"ruse"* designed to deprive Essar Steel's creditors, and AMUSA in particular, of a right to proceed against a valuable asset. The current evidence supports the view that the assignments were, rather, executed pursuant to an existing and ongoing restructuring plan, and did not have AMUSA in contemplation at all.

## (5) Stages 3 and 4: August and November 2013 sale and assignment

72.    In August and November 2013 a second, much smaller, transaction took place, evidently intended to transfer Essar Steel's remaining shareholding in Essar Steel India to Essar Steel Asia Holdings.  That shareholding was sold to Essar Steel Asia Holdings in August 2013 for approximately US$99 million, in return for a promissory note, and the note was assigned to EGFL on the same terms as the March 2013 assignment of the bulk of Essar Steel's stake in Essar Steel India.  The assignment appears to have been signed on behalf of Essar Steel as assignor on 23 August 2013 and by EGFL on 5 November 2013.

73.    AMUSA invites a similar inference to that which it invites in relation to the March 2013 assignment, adding that the inference is strengthened by the fact that in August 2013 work at the Nashwauk Project had ceased.  Whilst that is a conceivable inference, I do not consider it to be at all likely, bearing in mind that it remained the position in August 2013 that Essar Steel had not yet either become, or been requested to become, the guarantor of ESML's obligations under the PSA.  If, as AMUSA asserts, by this time *"the Defendants or certain of them and [Essar Steel Minnesota] knew that [Essar Steel Minnesota] would or was likely to fail to meet the first delivery date, and if that occurred there would be exposure to a significant damages claim"*, it is far from obvious why Essar Steel's reaction would be to agree to become a guarantor of ESML's obligations whilst at the same time seeking to divest itself of its remaining substantive asset.

74.    AMUSA also alleges that the total price paid, via the two promissory notes, for Essar Steel India was an undervalue: the face value of the notes totalled around US$1.47 billion, whereas Essar Steel India had a carrying value in Essar Steel's financial statements of about US$1.9 billion.  Thus, AMUSA says, Essar Steel incurred a loss of US$404 million.  However, as I note earlier, the price for the transactions was based on an independent valuation by Ernst & Young in June 2012.

75.    Finally, AMUSA alleges that the assignments were unlawful under section 68(7) of the Mauritian Companies Act, because Essar Steel could not satisfy the solvency test for a buy-back of shares or reduction in capital.  I note, however, that Ms Prevezer QC's evidence, based on the Essar Steel accounts for the year ended 31 March 2013 which she exhibits, is that the company's financial position was such that it could have effected such a capital reduction at that time.

## (6) Stage 5: 2016 change in accounting treatment

76.    Until September 2016, the face value of the Essar Steel Asia Holdings Promissory Notes which Essar Steel had in 2013/14 assigned to EGFL was included in Essar Steel's accounts as a *"receivable"*.  The accounts for the years ending 31 March 2014 and 31 March 2015 included separate entries for *"loan receivables"* and *"other receivables"*.  The 2014 accounts, for example, stated *"Other receivables"* as being US$1,594,508,979 as at 31 March 2014 (and as having been US$1,435,882,342 as at 31 March 2013) and cross-referred to Note 10 to the accounts.

77.    Note 10 to the accounts listed two items under the heading *"Other receivables"* (US$1,582,120,023), namely *"Receivable from related parties"* and a much smaller sum for *"Other receivables and prepayments"*.  The Note added:

> "Receivable from related parties are unsecured, non-interest bearing and receivable on demand.
>
> Receivable from related parties includes receivable as per Promissory Note (see note 6*)".

78. Note 6 to the 2014 accounts stated:

> "On 29th June 2012 and 26th August 2013, a share purchase agreement was entered into between Essar Steel Asia Holdings Limited (a fellow subsidiary) and the Company by virtue of which the company has disposed 1,910,255,183 & 118,678,842 equity shares …INR 10 each of Essar Steel India Limited to Essar Steel Asia Holdings Limited at a consideration of USD 1,388,530,158 & USD 99,450,000 respectively.  In this respect, Essar Steel Asia Holdings Limited had issued a Promissory Note in favour of the Company.
>
> The Company has assigned the Promissory Note in favour of Essar Global Fund Limited (holding company) who in turn has assigned it in favour of Essar Steel Mauritius Ltd (a fellow subsidiary) in consideration that Essar Steel Mauritius Ltd has issued (FY 2014: 99,450,000, FY 2013: 1,388,530,158) ordinary shares of USD 1 each in favour of EGFL.  Upon receipt of the promissory note from EGFL, Essar Steel Mauritius ltd has assigned the promissory note in favour of Essar Steel Asia Holdings Limited in consideration that Essar Steel Asia Holdings Limited has issued (FY 2014: 99,450,000, FY 2013: 1,388,530,158) ordinary shares of USD 1 each in favour of Essar Steel Mauritius Ltd."

79. The relevant parts of the 2015 accounts were in similar terms.

80. However, the accounting treatment of these transactions was changed in Essar Steel's accounts for the financial year ended 31 March 2016 (approved and authorised by the directors of Essar Steel on 29 September 2016), and those accounts included restated figures for 2014 and 2015 by way of "*prior year end adjustment*".  The new treatment was to regard the assignment as having given rise not to a receivable owed to Essar Steel by EGFL but instead a negative capital entry of US$1,487,980,158 described as *"Advance against future buy-back".*  The relevant part of former Note 6 was replaced by a new Note 26 stating:

> "In 2013, the Company disposed of 2,028,934,025 equity shares held in Essar Steel India Limited (ESIL) to Essar Asia Holdings Limited (ESAHL) and as consideration the latter issued promissory notes for the amount of USD1,487,980,158. Subsequently, under a future buyback arrangement, the promissory notes were assigned to Essar Global Fund Limited (EGFL), the sole shareholder of the Company, as an advance against future buyback of 1,487,980,158 equity shares at USD 1 each.  This amount should have been classified under equity.

> Accordingly, the financial statement for the years ended 31 March 2014 and 2015 have been restated to reflect the correct accounting treatment. The Company will have to satisfy the solvency test to finalise the share buyback."

81.    A letter dated 13 June 2017 from Essar Steel's auditors Nexia Baker & Arenson, who took over from Deloitte in 2014, stated:

> "Dear Sirs,
>
> We refer to the audited financial statements of the Company for the year ended 31 March 2016.
>
> As stated in note 26 of the financial statements, on 29 June 2012 and 26 August 2013, a share purchase and sale agreement was entered between Essar Steel Asia Holdings Limited ("ESAHL") and the Company,  whereby the Company disposed of 1,910,255,183 and 118,678,842 equity shares of Essar Steel India Limited to ESAHL for a consideration of USD 1,388,530,158 and USD 99,450,000 respectively. In this respect, ESAHL issued Promissory Notes in favour of Company for a total amount of USD 1,487,980,158.
>
> Subsequently, under a buyback arrangement, the Promissory Notes were assigned to Essar Global Fund Limited ("EGFL"), the sole shareholder of the Company, as an equity advance against future buyback of 1,487,980,158 equity shares of USD 1 each.
>
> The equity advance against future buyback of shares was inadvertently treated as a receivable in the financial statements of the Company for the year ended 31 March 2013 when it should have been classified under equity.
>
> Accordingly, the comparatives in the financial statements for the year ended 31 March 2016 were restated to reflect the proper accounting treatment."

82.    No evidence has so far been provided from the previous auditors, Deloitte, as to how the alleged mistake occurred, nor any further correspondence about how it came to light or the considerations leading to the change of accounting treatment. The respondents' evidence about how the mistake was identified has at times been unclear.

83.    AMUSA's case is that:-

   i)    as at 31 March 2016 (the date to which the accounts related), Essar Steel did not satisfy the solvency test and therefore could not lawfully have finalised the intended share buy-back;

   ii)    in addition, EGFL had not been able to obtain the consent of Essar group's lenders to the transaction;

iii)    as a result, EGFL was liable to repay the US$1.5 billion face value of the promissory notes to Essar Steel, either (a) under contract and/or restitution by reason of "*the condition and consideration for the transfer of the Promissory Notes having failed*", or (b) because the assignment to EGFL by Essar Steel of the promissory notes in return for the putative future buy-back of shares and at a time when Essar Steel did not meet the solvency test, entitled Essar Steel as a matter of Mauritian law to recover the value of the Promissory Notes from EGFL;

iv)    when the 2014 and 2015 accounts were drawn up, Essar Steel's directors and auditors must have understood that the substance of the arrangements between Essar Steel and EGFL involved a receivable in the amount stated;

v)    the 2016 accounting treatment was wrong, and inadequate explanation has been provided for it;

vi)    the change in accounting treatment occurred less than two months after AMUSA had commenced the ICC Arbitration against Essar Steel seeking damages in excess of US$1 billion; and

vii)    it should therefore be inferred that, in furtherance of the conspiracy, and with knowledge of its valuable rights against EGFL and of AMUSA's substantial claim under the PSA, Essar Steel and EGFL agreed that: (i) Essar Steel would waive the condition that attached to the transfer of the promissory notes or waive the claim for repayment that it had when that condition and the consideration for the transfer failed, and (ii) Essar Steel would restate its accounts so as to dress this up as a correction of a mistake in the prior accounting treatment, rather than the fundamental change to the substance of the contractual arrangements that it was.

84.    AMUSA relies on Jacobs J's finding, on AMUSA's application for a worldwide freezing order against Essar Steel itself, that the result of the accounting change was that Essar Steel's most valuable asset – a US$1.5 billion receivable owed by EGFL – simply "*disappeared*", that it provided "*solid evidence of asset dissipation*", and that the timing of the change was "*no coincidence*".  Jacobs J further stated:

> "75.  There is no precise definition of what is meant by the phrase "international fraud" found in the case-law, but I do not consider that it is confined to cases where the underlying cause of action is a claim in deceit or a proprietary claim relating to the theft of assets. If there is a strong case of serious wrongdoing comprising conduct on a large or repeated scale whereby a company, or the group of which it is a member, is acting in a manner prejudicial to its creditors, and in bad faith, then I see no reason why the English court should not be willing to intervene rather than to stand by and allow the conduct to continue and, to put the matter colloquially, to let the wrongdoer get away with it. In the present case, I would regard the attempted dissipation of Essar Steel's US$ 1.5 billion asset, in the face of the commencement of arbitration proceedings, as sufficient in itself potentially to warrant intervention under the "international fraud" exception,

or as constituting "exceptional circumstances". It is clear from Duvalier that the scale of the wrongdoing may be relevant to the question of whether the court should intervene: see per Staughton LJ at page 217. The other examples (Algoma, Numetal, DRI) of conduct, in different jurisdictions, which was fraudulent or prejudicial to creditors, reinforces the conclusion that there are exceptional circumstances applicable in the present case." (judgment § 75)

85. In the light of the detailed evidence and submissions provided to me in the context of the present application, however, I have very considerable doubt that the 2016 change in accounting treatment, even if arguably controversial, is likely to have amounted to a dissipation of assets constituting a step in an unlawful act conspiracy or providing solid evidence of a risk of dissipation.

86. The legal effect of the transactions between Essar Steel and EGFL in relation to the promissory notes is far from straightforward, even if one leaves aside the fact that it may well be governed by the law of Mauritius (where Essar Steel and Essar Steel Asia Holdings are incorporated) or possibly the law of the Cayman Islands (where EGFL is incorporated).

87. As a preliminary point, the terms of each of the assignments themselves provide for an absolute assignment of the relevant promissory note "*In consideration of future capital reduction*", and each provides that *"[Essar Steel] shall have no further right in relation to the Claim [i.e. the amount payable under the promissory note], whenever and however arising, all of which shall vest in [EGFL] and [Essar Steel] shall accordingly cease to enjoy any rights in relation to the Claim"*. An initial question therefore might well be whether the consideration for the assignment was the future capital reduction if and when it occurred, or simply the present expectation of a future capital reduction. That might affect whether the assignment was liable to be rescinded if no reduction of capital occurred by some unspecified date, or if such a reduction at some stage could be regarded as having become impossible.

88. Assuming, however, that the assignments were *prima facie* liable to be rescinded, then difficult questions are likely to arise as to the existence and quantum of any claim Essar Steel may have against EGFL.

89. At the time the assignments occurred, it seems reasonable to assume that the promissory notes were worth their face value, since their issuer Essar Steel Asia Holdings owned Essar Steel India, which in turn had been valued at a sum reflected in the amount of the promissory notes. However, the situation is likely to have been very different by the date on which the 2016 restatement occurred, and is certainly very different today. It is common ground that Essar Steel India became insolvent in August 2017, a few months before AMUSA obtained its arbitration award. A number of things flow from this.

90. First, it follows that had none of the transactions that AMUSA alleges were undertaken pursuant to the conspiracy occurred, then AMUSA would have been left with a claim against a company (Essar Steel) whose main asset (Essar Steel India) had become valueless in any event. The aggregate effect of the transactions allegedly undertaken

pursuant to the conspiracy, in so far as concerns Essar Steel India, would therefore probably not have been to cause any material loss to AMUSA.

91.    In the hearing before me, AMUSA took its stand on the effect of the 2016 accounts restatement, submitting that it did not need to rely on the earlier transactions for the purpose of its worldwide freezing order application.  Nonetheless, AMUSA did not resile from its claim that the whole series of events outlined earlier, starting with Essar Steel's sale of its shares in Essar Steel India, formed part of an asset-stripping scheme pursuant to the alleged conspiracy.

92.    That does not seem to me a coherent basis on which to base an application for a US$1.5 billion freezing order, exceptionally sought over the assets of persons outside the jurisdiction.  If AMUSA's pleaded case is correct, then all of the alleged stages in the asset-stripping operation were improper steps which should not have been taken.  However, AMUSA's case that it has lost the benefit of a receivable due from EGFL to Essar Steel depends on the court assuming, when considering loss, that most of the steps pursuant to the alleged conspiracy (namely stages 1-5 above) would have been taken, since it is only by taking those steps that Essar Steel ended up in a position where it was (on AMUSA's case) due a 'receivable' from EGFL.

93.    AMUSA might alternatively seek to argue that it was only stage 6, the change in accounting treatment, that gave effect to an unlawful means conspiracy: but that would have been a different conspiracy, likely to have occurred at a different time and quite possibly involving different participants, from the conspiracy pursuant to which AMUSA continues to allege stages 1-6 as a whole occurred.  Yet scant details of any such discrete alleged conspiracy have been provided.  Moreover, it would have been a conspiracy pursuant to which the only demonstrable or reasonably inferable step taken to implement it was not a transaction at all but merely a change in the accounting treatment of transactions effected three years previously, in accounts which were never proffered to or relied on by AMUSA (and on which EGFL does not appear subsequently to have relied in the proceedings it has brought in Mauritius seeking a declaration of non-liability).

94.    Secondly, Essar Steel India was a principal asset (if not the principal asset) of Essar Steel Asia Holdings, the issuer of the promissory notes.  As Essar Steel India became insolvent in August 2017, it must be open to doubt what value Essar Steel Asia Holdings had by the time of the September 2016 restatement of Essar Steel's accounts.  AMUSA did not direct me to any specific evidence as to the actual value which a claim against Essar Steel Asia Holdings under the promissory notes would have had by that time.  Instead, AMUSA took the position that, bearing in mind that the promissory notes were assigned onward by EGFL and in effect cancelled, the receivable due from EGFL (in the event that no capital reduction occurred) was not the value which the promissory notes would have had at that time but, rather, a debt claim in the full face value of the original promissory notes.  Alternatively, it might be argued that any recovery claim against EGFL should be based on the value which the promissory notes had at the time they were originally assigned, as opposed to any later date.

95.    The receivable was not, strictly speaking, classified as a debt even in Essar Steel's 2014 and 2015 accounts.  Moreover, the statement in those accounts that a receivable existed *"as per Promissory Note"* is difficult to understand given that the promissory notes had been assigned to EGFL, and further assigned leading to their cancellation.  The 2014

and 2015 accounting treatment may well therefore have involved some element of confusion.

96.    More substantively, the result for which AMUSA contends is far from obvious and, in some respects, counterintuitive.  The asset which Essar Steel transferred to EGFL on each occasion was not cash but a promissory note, i.e. an unsecured debt claim against Essar Steel Asia Holdings.  At the time of the assignment that claim may have been worth the face value of the promissory note.  However, by August 2017, and also by the time of the accounts restatement in September 2016, it seems likely to have had much less value, or perhaps no value at all.  AMUSA has mounted no positive case as to Essar Steel Asia Holdings' financial position at either date.  Consequently, to treat whatever receivable EGFL may have owed Essar Steel, in the event of no capital reduction occurring, as a debt or other claim for the full face value of the original promissory notes would potentially result in a very large windfall for Essar Steel (which was never intended to end up with the shares in Essar Steel India, nor a receivable reflecting their value, still less a receivable reflecting more than their current value).

97.    AMUSA responds that had the promissory notes never been assigned to EGFL, then Essar Steel would (acting in the interests of its creditors) have enforced payment from Essar Steel Asia Holdings in the full value of the notes <u>before</u> Essar Steel Asia Holdings' subsidiary Essar Steel India was placed into bankruptcy in 2017.   As EGFL points out, that approach would involve assuming that part of what were always a linked set of transactions, planned together, would have been carried out and part not.  It might, nonetheless, be a point which Essar Steel could take in a claim against EGFL to unwind the transaction comprising the assignment of the promissory notes.  However, even on that approach significant complications arise:-

    i)    At least from October 2016 when the Deed of Subordination discussed in section (7) below was put in place, it would not have been possible for Essar Steel to take any such action.

    ii)    In any event, as soon as EGFL had received the assignments of the promissory notes in 2013, it immediately on-assigned them to other group companies pursuant to the planned restructuring. EGFL may therefore have had – and still have – a change of position defence.

    iii)    EGFL has disclosed a legal opinion dated 17 May 2019 from Paul Lam Shang Leen, a retired President of the Supreme Court of Mauritius, Commercial Division, which includes reference to a number of potential defences available to EGFL to any claim by Essar Steel, including a potential change of position defence, lack of fault on the part of EGFL pursuant to the Mauritian Civil Code, good faith receipt for the purposes of the Mauritian Companies Act, as well as time bar.

    iv)    These are all likely to be legal points of some difficulty.  It is (to put the matter at its lowest) far from obvious that as at September 2016 Essar Steel was legally entitled, by way of contractual or restitution claim, to recover from EGFL a sum that is likely – by reason of the great decline in the fortunes of Essar Steel India – to have far exceeded either (a) any gain EGFL itself made from the transaction or (b) (arguably) any loss in reality suffered by Essar Steel.

98.    For these reasons, far from Essar Steel having had a clear debt claim against EGFL as at the date of the change in accounting treatment, it is well arguable that the previous accounting treatment in 2014 and 2015 was incorrect and would have radically overstated a highly contestable asset.

99.    In any event, even on the footing that there was and is an arguable claim by Essar Steel against EGFL, I do not consider that the evidence establishes a cogent case that the September 2016 change in accounting treatment amounted to a dissipation of any such asset, or an attempted dissipation of it.

100.   The contents of the accounts, quoted above, contain no hint that there has been any waiver or other disposition or attempted disposition of any receivable owed by EGFL to Essar Steel.  Rather, the 2016 accounts simply set out a summary of the transactions in 2013 and then state the revised accounting treatment accorded to those transactions.

101.   There is similarly no indication that EGFL, in the proceedings it has commenced in Mauritius seeking a declaration that it has no liability to Essar Steel (to which proceedings AMUSA is named as a party), relies on any waiver or equivalent transaction as having brought to an end any liability it may have had to Essar Steel. The evidence includes a copy of EGFL's Plaint dated 6 May 2019 initiating those proceedings in the Supreme Court of Mauritius (Commercial Division), which makes no reference to any such waiver or other disposition (other than an argument that EGFL relied on the lack of any assertion by Essar Steel of a claim that the transactions were not valid, by further assigning the promissory notes to third parties: which as set out above had occurred by November 2013).  The Plaint may not represent the totality of the documents filed to date, but AMUSA has not drawn my attention to any suggestion, whether in the Mauritian proceedings or elsewhere, of an actual or attempted transaction waiving or disposing of any receivable owed by EGFL to Essar Steel. Rather, EGFL's position is and has been that as a matter of law, no such receivable (or no such receivable in the sum alleged by AMUSA) existed or exists.

102.   It might be objected that EGFL would hardly be likely to take that position following the findings made by Jacobs J earlier in 2019.  However, if the restatement of accounts in 2016 had been intended to give effect to a dissipation of an asset held by Essar Steel, then ultimately it would have needed to reflect some further transaction or legal act over and above the underlying transactions that had already occurred in 2012 and 2013.  Of that there is no hint either in the 2016 accounts themselves or in EGFL's subsequent conduct.

103.   In the absence of any such actual or claimed waiver or other disposition, it is in my view difficult to see how the September 2016 change in accounting treatment could realistically be viewed as an attempt to dissipate assets.  Unless it was waived by a transaction in the period leading up to the restatement of the accounts, any receivable owed by EGFL to Essar Steel was unaffected by the change in accounting treatment.

104.   AMUSA also alleges that the September 2016 change in accounting treatment was an attempt to conceal an asset or its removal.  It pleads that the restatement of the accounts:

       i)    *"reduced the amount of Essar Steel's recorded assets by approximately US$1.5 billion, thereby improperly concealing those assets, less than two months after AMUSA issued its Request for Arbitration"*; and

ii)    *"had the effect that the financial statements for the years ended 31 March 2016 and 2017 were materially inaccurate and misleading, to the disadvantage of Essar Steel's creditors, in particular AMUSA".*

105.    The restatement is said to have been part of the larger scheme:

> "98. The proposed future buy-back of shares, the assignment of the Promissory Notes in anticipation of that future buy-back, and the recording of the value of the Promissory Notes as a receivable in the financial statements (the **"Scheme"**), if effective, would have enabled Essar Steel:
>
> > 98.1 To conceal or transfer its assets, in particular the value of the Promissory Notes, worth approximately US$1.5 billion;
> >
> > 98.2 To present itself, and be presented, as a company (i) the assets of which included the approximately US$1.5 billion of value extracted by the EGFL Assignments, and (ii) from which its sole shareholder had not stripped a substantial proportion of the value; and
> >
> > 98.3 At any time to "*restate*" the accounts, re-classify the EGFL Assignments as a reduction of equity, rather than a debt due, and thereby reduce Essar Steel's apparent assets by US$1.5 billion at a time of its choosing."

106.    In my view, the suggestion that the restatement formed part of a scheme aimed at concealment or covert asset-stripping lacks any cogency:

i)    The 2016 accounts made no attempt to conceal anything. On the contrary, they overtly referred to the relevant transactions before going on to state what was now considered to be their correct accounting treatment.

ii)    AMUSA makes no allegation that the 2016 accounts were, at any material time, proffered to or relied on by AMUSA.

iii)    AMUSA does not allege that any accounts of Essar Steel were provided to AMUSA until after the Amended PSA had been terminated and arbitration proceedings were under way.

iv)    AMUSA does not allege that Essar Steel sought to mislead it by producing the 2016 accounts during the arbitration itself. On the contrary, as discussed later, it alleges that Essar Steel failed to produce them. As EGFL points out, in order to further the alleged conspiracy Essar Steel would have needed to produce the 2016 accounts: the very opposite of what was done.

107.    Viewing this part of the case in the round, I recognise that aspects of the change of accounting treatment remain unexplained, and as counsel for EGFL candidly commented, it is arguable that both the pre and post 2016 accounting treatment is incorrect. However, for the reasons set out above, I consider AMUSA's contentions that the change made in 2016 was a dissipation, or an attempted dissipation, of a

valuable asset held by Essar Steel, leading to a real loss of US$1.5 billion, to be weak, even before considering the further problem arising from the Deed of Subordination to which I now turn.

### (7) Stage 6: VTB subordination deed

108.    A further aspect of AMUSA's case (which, like the 2016 accounts restatement, it says became known to it only as a result of documents emerging in the proceedings last year) is that in furtherance of the conspiracy Essar Steel entered into a Deed of Subordination with its main lender, VTB, "*thereby preventing it from enforcing any claim which it might otherwise have had against EGFL for the US$1.5 billion*".

109.    The Deed of Subordination provides that "*Junior Debt*" is subordinated to the "*Senior Debt*". The Junior Debt is defined to mean all liabilities payable or owing by a debtor to any of the "*Junior Creditors*", including without limitation under or pursuant to any intercompany loan.

110.    The "*Junior Creditors*" are defined to include a list of Essar entities, including but by no means limited to Essar Steel. Thus the Deed subordinated the claims of not only Essar Steel but a range of other group companies.

111.    The Deed forms part of a package of security documents supporting the secured facilities VTB has made available to the Essar group. It was entered into as part of a debt restructuring in 2016 pursuant to which VTB advanced US$2.588 billion to the group. The Deed has the effect that VTB is entitled to insist on its lending to the group being repaid before any inter-company loans (which would include the liability alleged to be owed by EGFL to Essar Steel) or other junior debt is repaid. It is not disputed that the Deed is a perfectly conventional type of document that one might expect to be required by the lender in connection with secured facilities made available to a group of companies. Moreover, Essar Steel itself was a guarantor under the group's pre-existing facilities, and thus had its own interest in the refinancing package.

112.    Nonetheless AMUSA, while stating that it does not impugn VTB's conduct, complains that the Essar Group entered into it at a time when it knew that AMUSA had a substantial claim under the PSA and that Essar Steel had for many years a substantial US$1.5 billion receivable from EGFL on its balance sheet. AMUSA makes the point at the time that the Subordination Deed was executed on 21 October 2016, on the basis of the 2016 accounts Essar Steel was balance sheet insolvent, and failed the Mauritian law solvency test by U$2.8 billion. It says neither the respondents' witness statements, nor such disclosure as they have been prepared to give, provides any evidence that Essar Steel's directors considered that the Subordination Deed was in that company's interests or consistent with their fiduciary duties, including in that regard consideration of the position of the company's creditors. Nor, AMUSA says, is there any evidence that Essar Steel itself benefited from the Subordination Deed or the refinancing of which it was part.

113.    AMUSA points out that the Deed of Subordination was executed on 21 October 2016, some three weeks after the 2015 accounts had been restated, but no disclosure has been provided of what documents VTB saw before the Deed was executed, including which sets of accounts for Essar Steel – whether original, restated, or both; nor evidence of what considerations EGFL took into account in determining how to deal with the

US\$1.5 billion alleged "*mistake*".  Given that both the restatement and entry into the Subordination Deed happened at "*much the same time*", and in the midst of the ICC arbitration, AMUSA says *"it is properly to be inferred that these matters are not unrelated, and the participation in them of EGFL and Essar Steel was in furtherance of the conspiracy alleged"*.  AMUSA emphasises that it is not the concept of subordination *per se* that gives rise to its concern, but the fact that the Subordination Deed occurred at around the same time as Essar Steel *"dissipated its major asset and doctored its accounts, all in the wake of the ICC arbitration"*.

114.  In its Particulars of Claim, AMUSA alleges that the entry into the Deed of Subordination was an improper preference and alienation of assets from Essar Steel for the purpose of prejudicing Essar Steel's creditors, and/or a transaction intended to defraud AMUSA as creditor.  Further, the Deed *"conferred no commercial benefit"* on Essar Steel, but ensured that Essar Steel would be *"disabled from claiming US\$1.5 billion from EGFL and other intercompany debts"*.

115.  AMUSA adds that Essar Steel's subsequent actions support this view of the intention behind the Deed of Subordination, including documents dating from 2018 indicating that debt owed to AMUSA would be dealt with by placing Essar Steel into liquidation, and Essar Steel's directors' decision on 26 March 2019 to place Essar Steel into administration and to choose an Administrator who would *"prefer the interests of the Essar Group over those of AMUSA and other creditors"*.

116.  The VTB Group is a leading international banking group with its headquarters in Moscow, and listed on the London and Moscow stock exchanges.  VTB has intervened in the proceedings as an interested party, as it did in the Cayman proceedings to which I refer later, in which AMUSA unsuccessfully sought a garnishee order over EGFL's alleged liability to Essar Steel.

117.  VTB has provided a witness statement from Mr Anton Galkin, a Managing Director of VTB, who states that he has been involved in all of the financing arrangements between VTB and the Essar group, explaining VTB's lending to the Essar group and its concerns about the worldwide freezing order sought (at least vis a vis EGFL).  His statement updates a previous detailed account of the VTB lending given in an affidavit of Adam Silver dated 21 May 2019 served in connection with the Cayman proceedings.

118.  In outline, Mr Galkin explains that VTB and/or its affiliate VTB Capital plc (VTB Capital) has been a lender to the Group since 2014.  VTB is currently the major lender under two facilities, in the combined principal amount of around €2.35 billion, pursuant to two agreements:

i)      a Facility Agreement dated 1 August 2014 (the Energy Facility), subsequently amended and restated on several further occasions, under which more than €1.28 billion of principal remains outstanding and the borrower is Essar Oil (Cyprus) Ltd (EOCL); and

ii)     a Facility Agreement dated 24 December 2018 (the Ports Facility), under which the total principal balance outstanding is around €1.07 billion and the borrower is Essar Sapphire Holdings Ltd (ESHL).

119.  VTB's security in support of this lending includes:

i)    guarantees from EGFL and its subsidiaries, secured by share pledges and charges on assets, including a floating charge over all the assets of EGFL in support of the underlying lending.  VTB does not, however, have security over fixed assets or revenue streams of the operating companies in the Essar Group; and

ii)   assignments by way of security in respect of underlying intra-group (and cross-guaranteed) lending to, *inter alia*, EGFL and Essar Steel which was refinanced by VTB.

120.   EGFL is a contingent debtor pursuant to its guarantees under the VTB facilities. Pursuant to the security assignments, and up to the value of the overall debt, EGFL is also a direct and contingent debtor under certain underlying intra-group facilities (in respect of which the aggregate liability is said to be over US$4bn).

121.   VTB is entitled to accelerate all sums due under the VTB facilities.  VTB's security is extensive, but is nonetheless limited in the sense that its recourse is primarily to EGFL and the shares in companies in the group that can be characterised as intermediate holding companies and operating companies under the security documents.  It has no fixed charges over any underlying assets of the operating companies and has no direct recourse to or security over their revenue streams.

122.   Under the Deed of Subordination:

i)    all intra-group debts (referred to as Junior Debt) are postponed and subordinated to all liabilities owed under the Energy Facility (referred to as Senior Debt);

ii)   prior to the discharge in full of the Energy Facility (which has not occurred), (i) Junior Debtors undertake not to pay, nor to allow to be discharged, any Junior Debt; (ii) Junior Creditors undertake not to demand nor to receive payment of, nor to discharge, any Junior Debt; (iii) if any Junior Creditor receives payment or distribution in respect of any Junior Debt, it must hold the same on trust and immediately pay it to the Agent for application against the Senior Debt; and (iv) No Junior Creditor may: (a) demand payment of any Junior Debt or enforce payment of any Junior Debt by attachment, set-off, execution or otherwise; (b) sue for, commence or join any legal or arbitration proceedings against any member of the Group to recover any Junior Debt; (c) bring or support any legal proceedings against any Debtor; or (d) otherwise exercise any remedy for the recovery of any of the Junior Debt.

123.   On 26 April 2019 AMUSA issued proceedings in the Cayman Islands, seeking an attachment (or garnishee) order in relation to the alleged inter-company receivable due to Essar Steel from EGFL in the sum of US$1.5 billion.  AMUSA also sought an interlocutory worldwide freezing order against EGFL pending resolution of those proceedings.  AMUSA did not join VTB as a party or notify it of the proceedings, and initially opposed VTB's application to be joined: which the court unsurprisingly granted given VTB's obvious interest in the matter.

124.   VTB on 21 May 2019, having been allowed into the proceedings, filed detailed evidence (in the form of Mr Silver's affidavit) to explain its position as secured creditor, including details of the history of its banking relationship with the Essar group, and the

prejudicial impact on it of a freezing order against EGFL. EGFL had itself filed evidence the previous day responding to the application on the merits and explaining the potential damage which a freezing order would cause to the group's business.

125. Following service of this evidence, AMUSA ceased to pursue its claim for a freezing order, indicating that in the light of the matters raised in EGFL's affidavit, *"our client intends to only seek (at least at this stage) a modified form of injunctive protection against EGFL to ensure that there is no unjustified dissipation of its assets pending the hearing of the claim against it."* AMUSA instead sought an order requiring EGFL to disclose certain of its assets and liabilities, to update AMUSA of any changes to assets and liabilities above US$10 million, and to give AMUSA notice before dealing with any shares in any Essar group company or any other assets in the Essar group worth more than US$100 million.

126. However, that application failed because, following a two-day hearing in May 2019, Kawaley J concluded that AMUSA had failed to show a serious issue to be tried on the merits of its garnishee application, in support of which the worldwide freezing order had been sought. That was because, even if any debt was due from EGFL to Essar Steel, the Deed of Subordination prevented any inter-company debts within the group from being paid or enforced while liability remained outstanding under the secured VTB facilities. The judge referred to VTB's submissions as *"a compelling analysis of the legal effects of the Subordination Deed"* which AMUSA ultimately did not seek to contradict.

127. AMUSA had sought directions to be given for an ancillary determination as to *"the extent to which VTB as the third party is entitled to subordinate the debt that otherwise ESL is owed to EGFL"*, Kawaley J noted that and therefore adjourned, rather than dismissing, the applications before him in order to give AMUSA the opportunity to make a challenge to the Deed. However, AMUSA did not avail itself of that opportunity.

128. I note in passing at this stage that at the hearing before Kawaley J on 29 May 2019, leading counsel then acting for AMUSA stated that the circumstances in which ESML withdrew from the ICC arbitration *"may form an important part of a conspiracy claim that AMUSA will bring against members of the Essar Group"*.

129. Just as AMUSA failed to put forward any substantive case before the Cayman court to the effect that the Deed of Subordination can be impugned, it has failed in the present application to put forward any substantive evidential basis for its assertions that the Deed was, from Essar Steel's point of view, entered into for the purpose of asset-stripping in order to avoid liability for the claim AMUSA had a few months previously referred to arbitration. The available evidence indicates that:

   i)   the subordination of intra-group debt to the debt of a third-party lender is standard practice and very common;

   ii)  it was VTB (and not any party within the Essar group) which required companies in the Essar group to enter into the Subordination Deed;

   iii) VTB did so as part of the 2016 debt restructuring described by Mr Galkin, as part of which VTB made $2.5 billion of new facilities available to the Essar

group.   VTB's legitimate commercial interest in requiring Essar group entities to enter into a debt subordination is obvious, and there is no evidence (nor any basis to infer) that VTB did so in an attempt to help Essar group evade liabilities owed to AMUSA; and

iv)    Essar Steel itself was prior to the 2016 restructuring liable for the entirety of certain existing facilities (known as the 'Raceview' facilities) amounting to around US$4 billion, whether as principal debtor or as guarantor.   Those facilities were, in large part, refinanced in 2016.   There was a clear corporate benefit to Essar Steel in the restructuring of its facilities, whether or not new monies were advanced to it.

130.    For these reasons, I find AMUSA's allegations that the entry into the Deed of Subordination was an unlawful act performed pursuant to an asset-stripping conspiracy to be wholly lacking in evidential support or cogency.   I also agree with EGFL's submission that the notion that a third party, VTB, not alleged to be complicit in any wrongdoing was willing to engage in a complex refinancing at Essar's request, in order to serve Essar's interest in avoiding liability to AMUSA, is far-fetched.

131.    Those conclusions in turn have a significant impact on AMUSA's claim to have lost US$1.5 billion, even assuming for present purposes that EGFL owes Essar Steel that sum by way of inter-company indebtedness.   The effect of the Deed of Subordination is that any such sum would be recoverable by Essar Steel only if and when all the group's secured indebtedness to VTB is discharged.   That in turn is bound to have an effect on the proper assessment of the net present value of Essar Steel's (assumed for present purposes) claim against EGFL and hence of AMUSA's potential loss.

132.    However, despite the fact that AMUSA knew (if only from the Cayman proceedings) the impact of the Deed on the alleged debt claim, it has made no attempt to address this point in the context of the present application: save by its implicit case, which I do not accept, that the Deed should be ignored as having formed part of the conspiracy. AMUSA puts forward no alternative case, either in its Particulars of Claim or its evidence, as to how its alleged loss should be quantified on the footing that the alleged inter-company debt is postponed by reason of the Deed.

133.    AMUSA during its counsel's oral reply submissions accepted that the alleged debt might be worth less than US$1.5 billion; however, it submitted, since at the moment EGFL's draft accounts for 2019 show a significant surplus, there is sufficient reason to infer that AMUSA could realise the full amount, and thus a solid evidential basis for a freezing order in that sum.   I do not accept that the matter can be approached in such a simplistic manner.   The impact of the Deed of Subordination is that AMUSA's loss is likely to be, at best, a loss of the prospect of a recovery (via Essar Steel enforcing a claim against EGFL) at some future time after all the VTB secured indebtedness has been repaid.   The court should in my view be extremely cautious about granting the exceptional relief of a worldwide freezing order in circumstances where no real attempt has been made to put forward a considered and realistic assessment of the claimed loss.

## (8) Essar Steel's failure to seek to recover the 'debt' from EGFL

134.    Although AMUSA did not place particular reliance on it in the present application, AMUSA's claim includes an allegation that pursuant to the conspiracy Essar Steel's

directors have failed to attempt to 'recover' the sum allegedly due to Essar Steel from EGFL.  It pleads:

> "103. In implementing the Scheme, and failing to seek to recover from EGFL the sum of approximately US$1.5 billion paid out by Essar Steel for no return, the directors of Essar Steel have carried out a transaction which defrauds creditors of Essar Steel, and in particular AMUSA; and EGFL, Essar Capital and Essar Capital Services and their directors and controllers have assisted in and procured that transaction."

135.    I do not consider that for present purposes this allegation adds materially to the allegations already discussed above in relation to the receivable and the restatement of Essar Steel's accounts.

### (9) Marex

136.    The respondents have taken the point (variously) in their evidence and/or pleaded case that AMUSA's claim is barred on reflective loss grounds in the light of *Marex Financial Ltd v Sevilleja* [2019] QB 173; [2018] EWCA Civ 1468.  That point is contested by AMUSA both on its merits under English law (if it were applicable) and on the basis that Mauritian law applies but does not recognise the rule against reflective loss.  In any event, the matter must be regarded as arguable for present purposes given that the UK Supreme Court granted permission to appeal from the Court of Appeal's decision and its judgment is pending.  It was common ground before me that the reflective loss issue should not therefore be taken into account when determining the present application.

## (G) ESSAR STEEL UAE

137.    AMUSA's allegations in respect of this matter are as follows:-

> "71. On or about 30 September 2015, Essar Steel transferred its 100% shareholding in Essar Steel UAE Ltd to Essar Middle East FZE ("**Essar Middle East**", the "**Essar UAE Transfer**").
>
> 72. The Essar Steel UAE shares were said to be worth approximately US$40 million in Essar Steel's financial statements for the year ending 31 March 2015. They were purportedly sold to Essar Middle East for US$200 million, with that price subsequently reduced by US$66 million. The US$66 million reduction was to be refunded by Essar Steel to Essar Middle East. Essar Middle East assigned its right to the refund to EGFL. Essar Middle East is not a subsidiary of Essar Steel.
>
> 73. The Essar UAE Transfer thus transferred Essar Steel's assets to a separate corporate structure in which Essar Steel had no interest. By September 2015, when the Essar UAE Transfer took place:
>
>> 73.1 Essar Steel was insolvent;
>>
>> 73.2 AMUSA infers from the following facts and matters that ESML, Essar Steel and those controlling them knew that ESML

would be unable to perform its obligations under the Amended Pellet Sale Agreement, or would be unlikely to be able to perform those obligations, that ESML would be likely to enter into insolvency and thus that Essar Steel would probably shortly be exposed to and/or would undertake significant liabilities:

(a) Essar Steel was a party to the Amended Pellet Sale Agreement;

(b) ESML had already twice requested amendments to the Amended Pellet Sale Agreement to extend the delivery date;

(c) ESML was seeking further amendments to the Amended Pellet Sale Agreement; and

(d) Work was slowing down on the Nashwauk Project (and soon thereafter essentially ceased) owing to ESML's failure to pay its contractors.

74. Pending disclosure and further information, AMUSA infers that the Essar UAE Transfer was wrongfully effected at an undervalue, for the purposes of defeating the claims of creditors of Essar Steel, in particular AMUSA. That inference is supported by the fact that after the price was agreed a further agreement was reached that Essar Steel would rebate one third of the purchase price to another entity. That suggests that Essar Steel and Essar Middle East were not concerned to ensure they had identified the arm's length market price. The purchase price was passed on by Essar Steel to a related company, Peak Trading Overseas Limited shortly after its receipt for no real consideration in connection with purported steel sale and purchase transactions which it will be contended were sham."

138. EGFL's evidence in response indicates that Essar Steel UAE's value rose significantly in 2015 and so a sale was seen as a potentially profitable transaction for Essar Steel. Whilst the book value was US$40 million, KPMG were instructed to prepare a valuation of Essar Steel UAE's primary asset, PT Essar Indonesia, which they valued in the range US$134-143 million based on their forecasts of steel prices. Essar Steel UAE was in fact sold to another group company, Essar Steel Middle East, for US$200 million, a price which reflected management's forecasts of steel prices. A problem later arose with Essar Steel's ability to transfer unencumbered title to Essar Steel UAE by the contractual deadline, and in March 2016 the parties agreed a US$66 million refund, which in substance brought the purchase price back down to the bottom end of KPMG's estimate.

139. The US$200 million which Essar Steel received for the sale was paid out on 30 September 2015, partly to repay a sum borrowed from EGFL under a July 2014 loan agreement, partly as an advance to a group company, Peak Trading Overseas Limited, under a contract dated 28 September 2015 for the purchase of steel products, and partly as a refund to Peak Trading Overseas Limited of a trade advance the latter company had made to Essar Steel under a contract dating from 2013/14 for the purchase of steel

products.  The evidence indicates that Peak Trading Overseas Limited was a substantial trading entity.

140.    Although AMUSA suggests that at least some of these transactions were a sham or *"questionable"*, I see no proper basis on which to draw that inference or to infer that they formed part of an asset stripping operation.  I was shown copies of the 2014 accounts of Peak Trading Overseas Limited, which indicate that its ordinary business included making advances to other group companies, and that it had for example in 2014 made trade advances to, and received repayments of trade advances from, Essar Steel itself.  Similarly Peak's 2015 accounts showed it having undertaken substantial intra group trade advances.  Overall, I see nothing in the nature, timing or circumstances of the transactions with Peak to support an inference of asset stripping, nor solid evidence of a risk of dissipation.

## (H) ALGOMA

141.    Essar Steel Algoma Inc ("*Algoma*") was a subsidiary of Essar Steel which operated a steel works and an associated port in the Canadian town of Sault Ste Marie.

142.    It is common ground that by 2013 Algoma was in financial trouble with liquidity and upcoming debt maturity issues, and that it required restructuring if it were to avoid insolvency.

143.    AMUSA's allegations in relation to this transaction are as follows:

> "76. By at least the end of 2013, Algoma was facing significant financial issues. These involved a liquidity crisis and upcoming debt maturity issues. Algoma was operating with very tight liquidity. Its capital structure was untenable and it would not be able to meet an upcoming coupon payment to unsecured bondholders (due in June 2014) and an approximately US$300 million loan maturity payment (due in September 2014).

> 77. At that time, Algoma's board was composed of eight directors; three of whom were independent, with the remaining five associated with the Essar Group. In January 2014, the three independent directors proposed that the board consult external financial advisors in an effort to resolve Algoma's financial difficulties. The directors associated with the Essar Group voted against the proposal put forward by the three independent directors, who subsequently resigned.

> 78. In or about November 2014 (subsequent to the resignation of Algoma's independent directors), Algoma entered into two transactions:

>> 78.1 A recapitalisation transaction (the "**Recapitalisation**"). As part of this process, EGFL entered into a Restructuring Support Agreement (the "**RSA**") with Algoma and others. As a condition in the RSA, EGFL agreed to make a cash investment of US$250-300 million into Algoma. The RSA was approved as an arrangement under the Canada Business Corporations Act 1985 in September 2014. However, in November 2014 the RSA was amended to provide

instead for a cash injection of only US$150 million, to be funded not by EGFL but by a loan from third party lenders to a new and separate entity (which was also a subsidiary of EGFL), Port of Algoma Inc ("**Portco**"); EGFL was released from its obligations to pay US$250-300 million to Algoma.

78.2 Algoma then entered into the "**Port Transaction**" with Portco. This transaction involved (i) Algoma selling to Portco its port assets (buildings and plant machinery but not land); (ii) Algoma leasing its real property to Portco for 50 years; (iii) Portco agreeing that it would provide the services necessary for the operation of the port assets in return for a monthly payment from Algoma to Portco and (iv) Algoma agreeing that it would provide to Portco the services necessary to operate the port, in return for a monthly payment from Portco to Algoma (less than the payment from Algoma to Portco). The total payable by Portco was US$171.5 million. The cash amount paid by Portco to Algoma (US$151.6 million) was largely funded by a US$150 million loan from third party lenders; the remainder (US$19.8 million) was to be satisfied by a promissory note from Portco. Portco immediately assigned its obligations under the promissory note to EGFL: it became payable in November 2015 and by March 2017 EGFL had not paid it. As part of this transaction, a cargo handling agreement between Portco and Algoma stipulated that Portco's consent was required for a change of control of Algoma.

79. On 9 November 2015, Algoma entered protection pursuant to the Canadian Companies' Creditor Arrangement Act 1985.

80. The Algoma transaction demonstrates the control exercised by EGFL, Essar Capital and Prashant over the affairs of even indirect subsidiaries of EGFL, for the benefit of EGFL not the benefit of those subsidiaries, in that:

80.1 The direction and decision making in relation to Algoma's recapitalisation and the Port Transaction was driven by EGFL and Essar Capital and led by Mr Seifert, at the request of Prashant;

80.2 Algoma management did not negotiate the terms of the Recapitalisation and Port Transaction, the negotiations were carried out by EGFL's representatives;

80.3 The Port Transaction was beneficial to EGFL, not to Algoma. It transferred Algoma's critical port asset to a wholly owned subsidiary of EGFL, with a change of control provision that benefitted EGFL, at a time when the Algoma board could have taken, and received legal advice that it should take, steps to oblige EGFL to fulfil its commitments to Algoma, which would have made the Port Transaction unnecessary, but did not do so.

81. AMUSA infers that the actions of Algoma's board were taken in the interests of EGFL and on the instruction of EGFL, Essar Capital,

Prashant and Mr Seifert. AMUSA infers that EGFL and those controlling it and its subsidiaries, failed to fulfil EGFL's obligations to Algoma under the RSA, and instead stripped Algoma of its assets in order to insulate those assets, which were until then indirectly owned by Essar Steel, from the anticipated future claims of Essar Steel's creditors, in particular, AMUSA. These actions were unlawful, being committed in breach of fiduciary duties owed to Algoma or being acts of knowing assistance of such breaches and/or as being acts committed with the intention of prejudicing, oppressing or defrauding creditors."

144.    The court in Ontario (the Ontario Superior Court of Justice, Newbould J) overseeing Algoma's bankruptcy found that the port transaction was:

"[123] … an exercise in self-dealing in that Algoma's critical Port asset was transferred out of Algoma to a wholly owned subsidiary of [EGFL] with a change of control provision that benefitted [EGFL] at a time that a future insolvency was a possibility. That would not have been necessary had [EGFL] lived up to its cash injection commitment. Yet the board did not take any steps to call [EGFL] on its commitment, even in the face of legal advice that it should do so." (*Ernst & Young Inc. v. Essar Global Fund Ltd et al,* 2017 ONSC 1366, Newbould J)

145.    The Ontario court also made a number of other adverse findings:

"[82]  The entire Port Transaction and the GIP secured loan to Portco would not have been necessary had Essar Global lived up to its obligations under the Restructuring Support Agreement it made with Algoma and the accompanying Equity Commitment Letter dated July 24, 2014 pledging a cash investment of $250 to $300 million. However, it is quite clear from the evidence that, despite its obligations to Algoma under these agreements, Essar Global had no intention of living up to its promises. Essar Global acted in bad faith in this regard.

[83]  On March 28, 2014, the Ruias made it clear to Mr. Saraf of Essar Services India Ltd in Mumbai that they did not have $ 250 million for an equity investment in Algoma, that they did not want to tell any banks or investors that they would put in $ 250 million of equity and that they could only put in $ 120 million but would just take it out to reduce liabilities of Algoma owed to Essar companies.

[84] Mr. Saraf was dealing with Goldman Sachs, who were advising on the Recapitalization that would pay out Algoma's junior unsecured noteholders. Goldman Sachs advised that up to $300 million was needed as an equity contribution. On July 29, 2014, just five days after Essar Global signed the Equity Commitment Letter obliging it to provide equity of $250 to 300 million (less $50 million in potential third party inventory financing), Mr. Saraf advised Goldman Sachs that Essar Global

wanted to limit its equity contribution to Algoma to $150-160 million and asked if it could be reduced to $100 million. On his cross-examination, Mr. Seifert referred to the equity commitment in the Restructuring Support Agreement as "a temporary agreement to an ultimate refinancing". That agreement was not by its terms a temporary agreement. While the Equity Commitment Letter provided for a payment to be made if it or the RSA were breached, it did not make the agreement temporary."

"[88]   It was Essar Global's decision not to fund Algoma according to the terms of the Equity Commitment Letter that made it necessary to carry out the Port Transaction. The Port Transaction was the result of the structure required by GIP to support the loan of $150 million to Portco that was advanced to Algoma net of costs. That reduced the amount of cash equity previously promised by Essar Global to be advanced to Algoma. In the amended RSA, $150 million of historical debt owed by Algoma to Essar Global was converted into preferred equity for Essar Global. That however was not cash as had been agreed to be advanced by Essar Global to Algoma in the Equity Commitment Letter. Moreover, the $150 million debt had been at the bottom of the capital structure of Algoma and its value was certainly questionable, making the conversion of debt to equity also of questionable value. On cross-examination, Mr. Seifert chose not to "speculate" on what he would pay for the $150 million debt and said the value was something in the eye of the beholder. This is confirmatory of the fact that the loans and equity conversion was of questionable value and certainly less than the cash infusion that Essar Global had previously agreed to put into Algoma and later reneged on.

[89]  In my view, Essar Global's failure to inject cash equity into Algoma as agreed was the root cause of the Port Transaction and the resulting long-term effect on Algoma and its stakeholders of the transfer of control over the Port facilities from Algoma to Portco/Essar Global. The cash equity injection agreed to by Essar Global was a contractual alternative and clearly more beneficial to Algoma. That root cause was an exercise in bad faith. Had an independent committee of the board of directors of Algoma been struck, it may have been that steps may have been taken to hold Essar Global to its bargain rather than simply look to third party financing from GIP under the structure of the Port Transaction. The failure of the board of Algoma to look to some other way to effect a Recapitalization was in itself an indication of a lack of regard for the interests of stakeholders of Algoma."

…

"[122]   Algoma's Board held meetings on October 30 and November 1, 2014. It is quite clear from the meeting minutes

that it was Mr. Seifert who was leading the Recapitalization effort. At the November 1 meeting, Mr. Schrock of Weil, Gotschal & Manges advised that unsecured noteholders would not react well to proposed changes to the Port Transaction and would likely push for a higher infusion of cash/equity from Essar Global, as promised in the Equity Commitment Letter. The advisors said that the board should insist that Algoma press all parties to fully satisfy their commitments and this could include a letter to Essar Global setting forth its obligations regarding the equity commitments. That advice was not followed.

[123] I fail to see how the directors of Algoma can rely on the business judgment rule in the face of not following advice to go after Essar Global on its cash equity commitment. There was no issue about the validity of that commitment. If the Ruia interests had acquiesced to forming an independent committee of the board, or listened to the truly independent directors before they resigned in frustration, steps may have been taken differently including accepting and following Mr. Schrock's advice..."

146.    The email referred to in paragraph §83 above was sent on 28 March 2014 – four months before the Equity Commitment Letter – from Mr Saraf (Vice President, Mergers & Acquisitions, of Essar Steel India) to Mr Seifert stating:

"Hi Joe,

Just met PSR. He (and RNR) have made the following things clear:

1. They do not have $250 mn for equity.

2. Therefore they do not want to tell any of the banks or investors that we are looking to put a refinancing plan assuming we will put $250 mn of equity.

3. They can put in $120 mn of money in Algoma but this money will be taken out of Algoma and used to reduce liabilities (owned to Essar companies - though that will not be highlight of the external message) ...

. . . PSR wants to speak with you and me today or tomorrow. Please call me so that we can sync up before speaking with him."

147.    These were serious findings, and Jacobs J regarded them as significant when granting a worldwide freezing order against Essar Steel.

148.    Nonetheless, a number of points need to be borne in mind when considering the import of the Ontario judgment and its relevance in the context of the current claim of an unlawful act conspiracy directed at AMUSA, and, more generally, AMUSA's case on risk of dissipation.

149.    First, there was no allegation, nor any finding, of asset stripping. On the contrary:

i)   Algoma was a troubled company: it had undergone a restructuring in proceedings under the Canadian Companies' Creditor Arrangement Act (CCAA) in 1991 and again in 2001; in late 2013 Algoma faced another liquidity crisis and was restructured in 2014 under the Canada Business Corporations Act (Newbould J judgment § 2).

ii)   EGFL had nonetheless evidently been supporting Algoma for some time. Newbould J said:

> "By the end of 2013, it was clear that Algoma was facing significant financial issues involving a liquidity crisis and upcoming debt maturity issues. Algoma was operating with very tight liquidity, resulting in low inventory levels. Algoma's capital structure was untenable and it would not be able to meet a coupon payment to unsecured bondholders due in June 2014 and an approximately $300 million term loan maturity payment due in September 2014. While support from Essar Global had been enabling Algoma to meet its liabilities as they came due, by early 2014 Essar Global was increasingly hesitant to advance cash to Algoma".

iii)   Whilst Newbould J's findings on the point were (in the Ontario Court of Appeal's words) *"admittedly somewhat confusing"* (*Ernst & Young Inc. v. Essar Global Fund Ltd et al,* 2017 ONCA 1014 § 177), the Court of Appeal accepted that EGFL provided US$150 million in cash to Algoma as part of the November 2014 restructuring, in addition to the other components of the refinancing (Ontario CA judgment § 178).

iv)   Thus, far from asset stripping, EGFL put a further substantial amount of its own funds into Algoma in November 2014: the criticism was that it put in less than it had initially agreed to in July 2014.

150.   Secondly, although it was initially alleged that the port transaction was at an undervalue, that allegation was not pursued. The Ontario Court of Appeal specifically noted that Newbould J had not held that the US$171.5 million consideration paid by Portco to Algoma constitute an undervalue: rather, the judge had found that EGFL received an *"unreasonable benefit"* from the port transaction.

151.   Thirdly, the question of whether EGFL had failed to comply with its July 2014 equity commitment letter was to a degree collateral to the main issue. The question the court had to decide was whether a claimant's *"reasonable expectation"* was violated by conduct falling within the terms "*oppression*", "*unfair prejudice*" or "*unfair disregard*" of a relevant interest (Newbould J judgment § 61), and the case advanced was as follows:

> "In this case, the reasonable expectations asserted by the Monitor relate to the loss by Algoma of a critical asset and value to Portco and the change of control clause in the Cargo Handling Agreement. The Monitor contends that the reasonable expectations of the creditors of Algoma, including the trade creditors, employees, pensioners and retirees, were that Algoma

would not deal with its core assets like the Port in such a way as it would lose long-term control and value over those assets to a related party on terms that permitted the related party to veto or thwart Algoma's ability to do significant transactions or restructure, as was done in this case." (Newbould J judgment § 64)

152.  Fourthly, EGFL's commitment to put in new equity was subject to inherent limitations. EGFL took the position in the Ontario proceedings that the complaint about non-adherence to its July 2014 Equity Commitment Letter was not relevant to the issues, but in any event argued that (a) the letter was not an absolute commitment to invest US$250-300 million but only to do so in the context of a restructuring and (b) EGFL's potential liability for any failure to invest was limited by the terms of the Letter itself. By clause 3.04(a) of the Restructuring Agreement dated 24 July 2014, EGFL's commitment to invest equity was *"Subject to the terms and conditions hereof, and as long as neither this agreement or the EGFL commitment letter has been terminated in accordance with the terms hereof"* (subject in effect to a proviso in clause 3.04(b) that EGFL must not take any action likely to interfere with the consummation of the restructuring).  Clause 8.01 provided that the Restructuring Agreement could be terminated by mutual consent, and clause 8.03 provided that EGFL (among others) could terminate it on the occurrence of specified events including *"the failure to consummate the Restructuring contemplated by this Agreement, either in-court or out-of-court, by the Restructuring End Date"*, defined in clause 6.01(f) as 15 November 2014.  Clause 12.17(b) provided that:

> "Notwithstanding anything to the contrary herein, in the event that this Agreement is terminated as a result of a breach of this Agreement or the EGFL Commitment Letter by EGFL and, at such time, no Consenting Noteholder is in breach of its obligations under this Agreement or the EGFL Commitment Letter, then (A) any amount of the Commitment contemplated in the EGFL Commitment Letter paid to the Company by EGFL pursuant to the terms of the EGFL Commitment Letter shall be retained by the Company and, if EGFL funded all or any portion of such Commitment pursuant to a Permitted Shareholder Loan (as such term is defined in the Unsecured Notes Indenture), such Permitted Shareholder Loan shall automatically convert into common equity of the Company (the "Company Payment"), and (B) EGFL shall pay to the Unsecured Noteholders (i) the amount of interest that was due and payable on the Unsecured Notes on June 16, 2014 at the non-default rate, and (ii) interest on such past due interest at the default rate, and (iii) all other unpaid interest accruing after June 16, 2014 through and including the date such interest amount is paid by EGFL to the Unsecured Noteholders at the default rate, which amounts in clause (B) shall be applied against the amount of such accrued and unpaid and past due interest on the Unsecured Notes (such interest payment, the "Noteholder Payment" and, together with the Company Payment, the "Termination Payment"). In the event that the Noteholder Payment becomes payable it shall be paid by EGFL

in immediately available funds within ten (10) Business Days after the date of termination of this Agreement or the EGFL Commitment Letter, as applicable. Solely for purposes of establishing the basis for the amount thereof, and without in any way increasing the amount of the Termination Payment or expanding the circumstances in which the Termination Payment is to be paid, it is agreed that the Termination payment is liquidated damages, and not a penalty, and the payment of the Termination Payment in the circumstances specified herein is supported by due and sufficient consideration. The Parties acknowledge and agree that the agreements contained in this paragraph are an integral part of the transactions contemplated in this Agreement and the EGFL Commitment, and that without these agreements the parties would not have entered into this Agreement and the EGFL Commitment Letter. The parties agree that upon payment of the Termination Payment, EGFL shall have no further liability to the Company, the Unsecured Noteholders, or any of their affiliates or any other person, whether at law or equity, in contract, in tort, or otherwise arising from or in connection with any breach or default by EGFL of this Agreement or the EGFL Commitment Letter or arising from any claim or cause of action that the Company, the Unsecured Noteholders, or any of their affiliates may have relating to such breach or default, and no person will have any rights or claims against EGFL or any of its affiliates relating to such breach or default. The parties agree that the payment of damages in an amount not to exceed the Termination Payment by EGFL shall be the sole and exclusive remedy of the Company and the Unsecured Noteholders for any breach of, or default under, this Agreement or the EGFL Commitment Letter by EGFL."

153. <u>Fifthly</u>, after executing the Equity Commitment Letter and Restructuring Agreement, EGFL was subsequently able to negotiate a reduction in its equity commitment from US$250-330 million to US$150 million. That reduction was reflected in an amendment to the Restructuring Agreement dated 6 November 2014, which was approved by the Ontario court. A consent plan of arrangement based on the amended Restructuring Agreement included a release of EGFL from its obligations under the Equity Commitment Letter (Newbould J judgment § 20).

154. Before the Ontario Court of Appeal, EGFL made the point that Newbould J had ignored the limitations outlined above on EGFL's liability under the Equity Commitment Letter and the subsequent court-approved variation of its obligations. The Court of Appeal dealt with these points by emphasising that no claim was being made under the Equity Commitment Letter, nor any claim for the release of EGFL's obligations to be set aside: rather, EGFL's failure to fund as agreed in the original Equity Commitment Letter was part of the factual circumstances to be taken into account in considering whether the affected stakeholders were treated fairly by the port transaction, viz pensioners, employees, retirees and trade creditors (Ontario CA judgment §§ 171 and 187).

155.  <u>Sixthly</u>, there was no pleaded allegation that EGFL, when it entered into the Equity Commitment Letter in July 2014, had no intention to comply with it and therefore acted in bad faith.  Nor did the court directly hear any oral evidence on that point: the hearing before the Ontario court came on as an urgent matter (Newbould J described it as *"real time litigation to be sure"*: judgment § 29); and the parties decided to cross-examine the witnesses and experts before the trial, with the result that the trial consisted of argument on the affidavits, expert reports and transcripts (Newbould J judgment § 27).

156.  I was invited to read pages 90-95 of the deposition of Mr Seifert on 17 January 2017 and pages 52-63 of the deposition of Prashant Ruia on 20 January 2017.  I have read those pages (and several pages further on in the deposition of Prashant Ruia, where the discussion continued).  On my reading of those deposition extracts, it was not suggested in terms to either witness that EGFL, by the time it signed the Equity Commitment Letter in July 2014, had no intention of putting up as much as US$250 million in equity, or that it was therefore acting in bad faith.  Mr Ruia made clear during the course of this portion of his deposition that the situation with Algoma had been long-running and very complicated, and that many different numbers (for investment) had been considered at different times.  Mr Ruia stated that he believed that EGFL had, on the advice of Essar Capital, invested something of the order of US$575 million in Algoma over the previous five years; that the investment had not gone well or produced any returns; and that there was concern and discussion at board level about how much additional capital was to be invested in Algoma, but that he did not specifically recollect any advice from Essar Capital against investing a further US$250 million.

157.  In the circumstances referred to in §§ 155-156 above, and with the greatest respect to Newbould J, I do not consider it would be right for me to place great weight on a finding of bad faith made in respect of an unpleaded allegation that was not, so far as has been drawn to my attention, put to the relevant witnesses.  I do consider that the circumstances referred to in § 85 of Newbould J's judgment would tend to suggest that EGFL was seeking to reduce its proposed equity commitment almost as soon as it had entered into it.  However, the manner in which EGFL managed to do so was via a contractual renegotiation, subsequently approved by the court, of its obligations.

158.  <u>Seventhly</u>, the timing of these events, in the months up to and including November 2014, make it hard to detect any plausible link with the PSA or any wish to dissipate assets of Essar Steel, some 18 months or more before the termination of the PSA.  There is no evidence to suggest or reason to believe that AMUSA was a target of the Algoma transaction, or that any loss was caused to AMUSA by it.  Indeed, Newbould J made orders, upheld by the Ontario Court of Appeal, reversing those aspects of the port transaction which he found to have been oppressive.

## (I) ENTRY INTO AMENDED PSA

159.  AMUSA's pleaded claim includes an allegation that Essar Steel induced it to enter into the Amended PSA by a fraudulent implied misrepresentation, induced or procured by *inter alia* the respondents to the present application, that Essar Steel expected and intended to fulfil its obligations under that agreement.  The implied representation is said to have been false because (in summary) the share buy-back transaction discussed in section (F) above was intended to remove from Essar Steel assets valued on its balance sheet at US$1.9 billion without Essar Steel receiving valuable consideration for those assets.

160.   AMUSA did not highlight this part of its claim for the purposes of the present application, and I deal with it briefly here.

161.   The respondents submit that even if AMUSA were to establish such an implied representation, its claim would have fundamental deficiencies for several reasons:

    i)   Essar Steel indeed did not expect the sum shown in its accounts prior to 2016 as due in respect of the promissory notes to be paid by EGFL. However, it is not suggested that AMUSA was shown or relied on those accounts. Further, even without that sum, Essar Steel remained an amply solvent company at the time of the alleged representation.

    ii)   The loss AMUSA claims is said to flow from its inability to enforce the Award, or having to incur the expenses in taking investigatory or legal action to enforce it. However, but for the alleged misrepresentation AMUSA would have remained in the original PSA with ESML and Essar Resources, and would have been no better off in the end.

    iii)   It was clear to AMUSA from the time the Amended PSA was entered into that there was an unresolved issue about financing for the project, as reflected in clause 28 of the Amended PSA: which provided that "*Essar is endeavouring to obtain financing sufficient to complete the construction of the Mine by July 1, 2015 or before*" and, absent such investment or evidence of Essar's ability to make the same by 30 April 2014, gave AMUSA the option to rescind the Amended PSA and revert to the terms and conditions of the PSA.

162.   AMUSA's answer to (ii) above is that, but for the implied representation by Essar Steel, it would have sought a guarantee from another Essar group company. However, that strikes me as being a hypothesis based on knowing the alleged representation by Essar Steel to have been untrue, as opposed to the correct hypothesis viz (merely) the absence of any implied misrepresentation by Essar Steel.

163.   Moreover, the notion that a commercial enterprise such as AMUSA would rely on an implied representation from a counterparty as to the counterparty's own ability to perform a contract – as opposed to AMUSA performing its own due diligence on the counterparty, asking for a guarantee, or indeed simply deciding not to undertake due diligence or seek a guarantee – seems somewhat counter-intuitive.

## (J) RELEVANT EVENTS IN RELATED PROCEEDINGS

### (1) The ICC Arbitration

164.   AMUSA's evidence is that Essar Steel was uncooperative during the ICC arbitration. In particular, it makes two main complaints about Essar Steel's conduct.

165.   The first is that Essar Steel misled the ICC tribunal about its access to relevant documents held by ESML, by stating that it had very little documentation to produce unless it received co-operation from ESML. It is said that a Mr Vuppuluri, who had been ESML's president and CEO at the relevant times, in fact still had his ESML laptop and access to his emails.

166.   AMUSA says Essar Steel then repeated its untruthful statements about its access to documents to the court in Mauritius (when seeking to prevent the Award being recognised in Mauritius) and in the proceedings before this court before Jacobs J when AMUSA sought a freezing order against Essar Steel.

167.   Mr Baid's witness statement dated 15 February 2019 in the proceedings in this court rejected AMUSA's allegations in this regard and stated that at the time at which Essar Steel had complained of lack of access to documents, it had not appreciated that Mr Vuppuluri had retained his laptop; and that Essar Steel had relied on Mr Vuppuluri's statements and had no reason to doubt them as they appeared consistent with what Essar Steel had been told by ESML's representative in bankruptcy. When Essar Steel did realise the true position, he said, it served corrective evidence in the form of Mr Baid's second affidavit in the Mauritian enforcement proceedings.

168.   This issue was considered by Jacobs J in §§ 107-115 in his judgment on AMUSA's application for a search order against Essar Steel. At § 113 he stated:

> "I consider that this aspect of the arbitration proceedings provides solid and powerful evidence in support of AMUSA's case that documentation relating to ESML, and available on Mr. Vuppuluri's computer, was deliberately withheld from production, and that deliberately false information was given to the Tribunal in the 28 March 2017 letter as to the availability of that information. If, as Essar Steel now accepts, Mr. Vuppuluri did in fact have access via his computer and email, it is somewhat remarkable that the contrary should have been stated in the letter dated 28 March 2017, and then reiterated in the response to AMUSA's request for production of documentation. In saying this, I should emphasise that I am not making a definitive fact-finding that documentation was deliberately withheld and that false information was deliberately given. It is theoretically possible that, if the matter were to be investigated in detail, with the benefit of cross-examination of Mr. Baid and Mr. Vuppuluri, a court might accept the innocent explanation put forward by Mr. Baid in his Affidavit in the Mauritian proceedings and repeated in substance in his first witness statement in these proceedings. However, I do agree with Mr. Peto's submission that the account given by Mr. Baid is a "very unlikely story". At its lowest, the episode indicates a cavalier attitude on the part of Essar Steel and Mr. Vuppuluri to the production of relevant documents, since it would not have been difficult – and indeed was incumbent on both of them – to check what the position actually was."

169.   This episode is also one which I must take into account when considering whether there is a risk of dissipation of assets by the current respondents, given their central role in the group of which Essar Steel forms part. At the same time, I bear in mind that (a) whether or not there was a deliberate misstatement by Mr Vuppuluri, I do not think it would be proper to infer a deliberate misstatement by Mr Baid without further enquiry of the kind mentioned by Jacobs J in the passage quoted above; (b) there is no positive suggestion of any involvement by any of the present respondents in this episode; and (c) the episode does not relate to dissipation of assets, though clearly a lie about access

to documents may be a pointer to dishonesty from which a risk of asset dissipation could be inferred.

170. The second main allegation is that Essar Steel in the course of the arbitration produced only its original 2015 accounts and deliberately concealed its 2016 accounts (which contained the purported explanation of the restatement of its 2014 and 2015 accounts) despite AMUSA's requests for Essar Steel's accounts from 2007 to 2017.

171. Following an order by the arbitral tribunal to produce certain categories of documents, including the 2016 accounts, Essar Steel withdrew from the arbitration that same day. Jacobs J described the manner in which Essar Steel dealt with the information about the restatement of accounts as "*evidence of an attempt to conceal information about the restatement from AMUSA.*", and said it was an "*obvious inference*" that the Essar group did not want AMUSA to see the restated accounts. He added:

> "57. In addition, when Essar Steel withdrew, they made it clear that they were standing by their defence and counterclaim, and invited the Tribunal to "have due regard to the material that it has already submitted". That material included the 2015 accounts which Essar Steel knew to have been restated and which had been withheld from disclosure. It seems to me that AMUSA were entitled to submit, as it did, that Essar Steel thereby invited the Tribunal to proceed on a false basis, and that this is also relevant to risk of dissipation and the ancillary orders in the present proceedings."

172. AMUSA relies on this point as showing that Essar Steel attempted deliberately to mislead the tribunal into proceeding on a false basis.

173. No doubt in view of the seriousness of this matter, EGFL before me provided a detailed explanation of the circumstances in which the 2015 accounts were relevant to the issues before the tribunal.

174. Mr. Toledano had argued unsuccessfully before Jacobs J that the reason for producing the 2015 accounts in the arbitration was to evidence certain capital injections which had been made. However, Jacobs J considered that that could have been evidenced by production of the restated accounts, rather than accounts which on Essar Steel's case had been restated and therefore superseded.

175. Before me, EGFL made four main points on this matter.

176. First, there were and are no 'restated 2015 accounts' in the sense of a document replacing the 2015 accounts. Rather, the 2016 accounts showed, in the columns that would normally show the figures for prior years by way of comparison, restated figures for 2014 and 2015 reflecting the (explicitly) changed accounting treatment of the 'receivable' previously stated to be due from EGFL to Essar Steel.

177. Secondly, the cash injection (of about $370 million into Essar Steel Minnesota Cooperatief UA, a company related to Algoma) which Essar Steel had wished to demonstrate by reference to the 2015 accounts, in connection with Essar Steel's counterclaim in the arbitration, could not just as well have been shown from the 2016

accounts.  The 2016 accounts did not provide the same level of relevant detail, and there would have been no reason to use the briefer descriptions in the 2016 accounts when the 2015 accounts were more informative on the relevant issue.

178.    The note to the 2015 accounts made the point which Essar Steel wished to establish by referring to an investment in subsidiaries of US$370,156,608 relating to Essar Steel Cooperatief UA with the explanatory note:

> "In May 2014, the Company transferred its contributed interest of USD 305 Million in Essar Steel Minnesota LLC to ESML Holding USA INC, a Delaware company, ESML Holding USA INC contributed interest in Essar Steel Minnesota LLC to ESML Holding INC. Subsequently, the Company acquired Essar Steel Minnesota Cooperatief U.A. from Essar Steel Mauritius Limited and contributed capital of ESML Holding USA INC to Essar Steel Minnesota Cooperatief U.A."

The corresponding note in the 2016 account provided only this information:

> "Essar Steel Limited is co-guarantor along with other group companies for the USD 530 Million Facility availed by Essar Steel Minnesota LLC from ICICI bank. As Essar Steel Minnesota LLC has defaulted in payment of the loan and also has filed for bankruptcy, the Company has recognised impairment of its assets to the tune of USD370,156,685 invested."

179.    Thirdly, if the intention of the transactions with Essar Steel India shares which took place in 2012-13 had been to remove assets from Essar Steel, then there would have been no point at all in producing (in both senses of that word) accounts that indicated Essar Steel was holding an asset as a result of them.  To further the alleged conspiracy, Essar Steel would need to have produced the 2016 accounts: the very opposite of what was done.

180.    Fourthly, there is no suggestion that EGFL was itself involved in the conduct of the arbitration.

181.    A fifth point might be added: it was not suggested before me that the issue about whether EGFL owed a 'receivable' to Essar Steel was of any relevance to the issues before the arbitral tribunal.  On that basis, AMUSA's submission that Essar Steel invited the tribunal to proceed on a false basis is wide of the mark.

182.    As to the reason for Essar Steel's abruptly ceasing to participate in the arbitration, Mr Baid's witness statement dated 15 February 2019 in the proceedings in this court against Essar Steel explained that Essar Steel ultimately dropped out of the arbitration because it did not consider that the 6-month period for completion of the arbitration, provided for in the arbitration agreement and which AMUSA refused to amend, gave Essar Steel sufficient time to deal with the matter, bearing in mind problems obtaining documents from ESML.

183.    It is not possible on the materials before me to judge whether or not this explanation is accurate.  The timing of Essar Steel's departure plainly gives rise to grounds for a strong suspicion that it was connected with the tribunal's disclosure order, and that Essar Steel

may have been reluctant to produce its 2016 accounts. It is not clear, however, why any desire to withhold disclosure of those accounts would be so compelling as to cause Essar Steel to pull out of an arbitration in which it had been participating.

184. Separately, AMUSA also alleges that the respondents procured Essar Steel's breach of the arbitration agreement and Award, but those allegations in substance repeat those already considered above in relation to the alleged asset stripping of Essar Steel, the 2016 restatement of Essar Steel's accounts, and the entry into the Subordination Deed with VTB.

## (2) Cayman proceedings

185. AMUSA alleges that EGFL failed properly to comply with its disclosure obligations under the Cayman *Norwich Pharmacal* order in relation to the location of relevant materials and has consistently sought to delay its obligations to disclose those materials.

186. On 15 January 2019, Kawaley J granted *ex parte Norwich Pharmacal* relief against EGFL and Essar Capital. This was continued following a contested *inter partes* hearing less than a month later on 13 February 2019. In doing so, Kawaley J held that there were "*sufficiently cogent*" grounds for establishing the alleged wrongdoing:

> "In all the circumstances of the present case, I am satisfied that (a) there was a risk of documents being destroyed, (b) there was a need for an Information Preservation Order and (c) it is arguable that the Defendants have directed asset dissipation actions in the past. AMUSA's belief that wilful attempts to evade enforcement of the ICC Award have been made and will likely continue to be made are sufficiently cogent to substantiate an arguable case of wrongdoing in the requisite legal sense."

Kawaley J also noted that "*I regarded the historic conduct to be relied upon as evidence of a propensity for future dissipation steps being likely to happen*": that being presumably a cross-reference back to the reasons he gave when initially granting relief *ex parte* on 15 January 2019.

187. That judgment is under appeal, with judgment pending following an appeal hearing on 6 November 2019. I was not taken to the full reasoning for Kawaley J's decision, but the passage quoted above indicates that it was based on arguable asset dissipation in the past and "*wilful attempts to evade enforcement of the ICC Award*". It seems reasonable to assume that the evidence relied on was similar to, or a subset of, that relied on before me. On that basis, I should take Kawaley J's decision into account, but consider that ultimately I must form my own view as to whether on the basis of the evidence and submissions before me the necessary prerequisites for a worldwide freezing order have been made out.

188. AMUSA alleges in its Particulars of Claim that instead of providing the required information about the location of certain items within 72 hours, EGFL and Essar Capital provided incomplete evidence after 5 days then further evidence over the ensuing weeks disclosing additional locations but not explaining why they were not identified sooner.

189. There is, on the other hand, no suggestion of any deliberate concealment. The evidence indicates that the additional locations were volunteered by the respondents to the order, albeit late. EGFL also makes the point that the task was difficult, because the 'lists' of items in fact took the form of compendious document requests relating to particular issues.

### (3) Mauritius proceedings

190. I have already referred under heading (1) to the events relating to Mr Vuppuluri's documents.

191. AMUSA also complains about Essar Steel's choice of administrator and the administrator's conduct. On 26 March 2019 (the day after Jacobs J continued the worldwide freezing order against Essar Steel), Essar Steel's directors placed Essar Steel into administration. AMUSA notes that the administrator appointed by Essar Steel (Mr Satter Hajee Abdoula) had previously served as a co-director with Ravi Ruia and Prashant Ruia at various Essar Group companies. Fearing that the appointment would prejudice creditors, AMUSA applied for an independent joint administrator and on 19 April 2019 Mr Mushtaq Oosman was appointed. AMUSA alleges that Mr Abdoula has since failed to cooperate with Mr Oosman, in breach of an injunction made on 26 April 2019 by the Supreme Court of Mauritius restraining Mr Abdoula from acting without the authorisation of Mr Oosman.

192. For EGFL, Ms Prevezer QC explains in her evidence that Mr Abdoula, the CEO of Grant Thornton Mauritius, is an insolvency practitioner of over 30 years' experience with no current ties to or proximity with the Essar group or the Ruia family. In April 2010 Mr Abdoula was appointed as an independent non-executive director of Essar Energy Limited, a party related to Essar Steel. Essar Energy Limited was, at that time, a public company quoted on the London Stock Exchange. Mr Abdoula resigned as a director in March 2014. Mr Abdoula was also a director of Essar Oil (UK) Ltd from October 2012 to 2014. Ms Prevezer adds that there is a small pool of registered insolvency practitioners in Mauritius with the experience and ability to take on large and complex assignments.

193. The controversy about the appointment and conduct of the administrators is currently before the Mauritian courts, and I do not consider that on the evidence before me I can draw any conclusions with any significant bearing on the issues before me.

194. On 19 December 2019, VTB applied for a declaration that, among other things, the joint administration of Essar Steel be terminated and a liquidator be appointed. AMUSA says it has concerns about the independence of VTB's proposed liquidators, both of whom have been connected to companies in the Essar Group, as well as the fact that liquidation would achieve the Essar group's stated objective of "*shielding the structure*" from AMUSA's claims to enforce the ICC Award.

195. It is not clear how these expressed concerns sit with AMUSA's express statement in its skeleton argument that its claim "*does not impugn VTB's conduct*". In any event, I agree with VTB that if AMUSA has concerns, then the straightforward approach would be to engage with VTB or with the proposed liquidators (of Ernst & Young Mauritius and BDO Mauritius respectively) themselves, rather than to hint at impropriety in the context of the present application.

### (4) Proceedings in India

196. AMUSA provides evidence that the Directorate for Revenue Intelligence in India published a 'show cause' setting out a *prima facie* case that a number of Essar entities had "*conspired with each other*" to create a fraudulent invoicing and customs scheme. In his judgment against Essar Steel, Jacobs J said:

> "65. The Indian Directorate of Revenue Intelligence (the "DRI") produced a report dated 11 March 2015 (the "DRI Report"). The report runs to some 247 pages, but only the summary (22 pages) was contained in the exhibits. The summary does not directly concern Essar Steel, and it does not directly implicate any of the individuals who are the focus of AMUSA's case. Nevertheless, the summary provides solid evidence of what appears to be serious fraudulent activity within the Essar Group. The DRI found that Essar Group entities had conspired to create a fraudulent invoicing customs duty scheme and participated in trade-based money laundering via a UAE-incorporated company called Global Supplies (UAE) FZE ("GSF"). The DRI found GSF to be a "front company of the Essar Group" created "to act as an intermediary invoicing agent for facilitating invoice inflation" and a "dummy agent … for enabling siphoning off of money abroad".
>
> 66. If the DRI Report had been the only evidence relied upon in this case, I do not think that it would justify the grant of any of the relief sought. However, I consider that it is relevant as an additional piece of evidence which shows a pattern of wrongdoing, in this case fraudulent activity, within the Essar Group. Mr. Baid's evidence that the report is being challenged by certain companies is not in my judgment an answer in the present context. Even if there is a challenge to the DRI report, that does not mean that the DRI report does not provide strong and solid evidence of the matters which it addresses and describes."

197. The 'show cause' notice related to events from 2009 to 2013, and Mr Baid's evidence was that it remains subject to challenge pursuant to ongoing adjudicative processes. The allegation was evidently very serious, albeit not an allegation of dissipation and not one relating to any of the current respondents or to recent events.

198. AMUSA also relies on certain statements by the Supreme Court of India in the proceedings arising from the insolvency of Essar Steel India. Again it is most convenient to begin by quoting from Jacobs J's judgment on this issue:

> "60. On 4 October 2018, the Indian Supreme Court issued a lengthy judgment in a case between ArcelorMittal India Private Ltd. (a subsidiary within the ArcelorMittal Group) and Satish Kumar Gupta and others. The case concerned the Indian insolvency of Essar India, and respective bids by an ArcelorMittal company and also a company called Numetal to

bid for Essar India. The decision of the Supreme Court is relied upon by AMUSA because of the findings which the court made concerning Mr. Rewant Ruia, a member of the Ruia family who also featured in connection with the Algoma transaction.

61.   One of the matters on which the Indian Supreme Court focused was a statutory provision (Section 29A (c) of the Insolvency and Bankruptcy Code 2016). This provision was aimed at ensuring that, as the court said, "persons who are in charge of the corporate debtor" for whom a resolution plan is made "do not come back in some other form to regain control of the company without first paying off its debts". The section is therefore an important protection for creditors. The relevant issue in the case concerned Numetal and its alleged connection with Mr. Ruia. In substance, if this was Mr. Ruia's company, then (as the Supreme Court said) "the only manner in which Numetal could successfully present a resolution plan would be to first pay off the debts of [Essar India], as well as those of such other corporate debtors of the Ruia group of companies …".

62.   The court's decision concluded, in substance, that Mr. Ruia had sought to evade this prohibition, and had done so through what the court described in paragraph [88] of the judgment as a "smokescreen in the chain of control". The smokescreen involved the use of an elaborate chain of companies and trusts. The Indian Supreme Court therefore concluded that Numetal's participation was caught by the prohibition and was ineligible.

63.   AMUSA contends, convincingly in my view, that Mr. Rewant Ruia was likely to have been acting in concert with other members of his family to acquire Essar India's assets without meeting its liabilities to creditors. The case therefore provides solid evidence, in my view, of the misuse by the family of corporate structures to the prejudice of creditors of the Essar Group of companies.

64.   In his witness statement, Mr. Baid submitted that there had been no attempt to shield any corporate ownership structures from the relevant authorities. But this submission is difficult in my view to reconcile with the conclusions of the Supreme Court, including that there was "one more smokescreen in the chain of control, which would conceal the fact that the actual control over AEL is by none other than Shri Rewant Ruia himself"."

199.   It is relevant to bear in mind two contextual points alongside these conclusions.

200.   First, the Supreme Court of India recorded in §§ 87 and 91 of its judgment that the resolution plan submitted by Numetal to Mr Gupta as Resolution Professional in February 2018, under discussion in this part of the court's judgment, made clear that Mr Rewant Ruia retained an ultimate interest in Numetal: see e.g. the passage from § 6.3 of the plan quoted in § 91 of the court's judgment, which included the following:

> "The beneficiaries of such discretionary trust are general charities and Solis Enterprise Limited, a company incorporated in Bermuda, the share capital of which is held by Mr. Rewant Ruia.
>
> Mr. Rewant Ruia is the son of Ravi Ruia, who is one of the existing promoters of the Corporate Debtor."

201. The argument was about whether these admitted interests amounted to control. The court's references to smokescreens and concealment should be read in that light.

202. <u>Secondly</u>, as pointed out in the evidence of Ms Prevezer QC on behalf of EGFL the Supreme Court of India in fact ruled ineligible attempts by <u>both</u> AMUSA's group and Essar-related entities to acquire Essar Steel India from the bankruptcy proceeding. She explains that:

> "63.1. On 2 August 2017, following an application by Standard Chartered Bank and the State Bank of India, the National Company Law Tribunal, Ahmedabad Bench (**NCLT**) ordered a commencement of a "Corporate Insolvency Resolution Process" in respect of ESIL (**2017 NCLT Order**) under India's Insolvency and Bankruptcy Code 2016 (**India Bankruptcy Code**). This application was at the direction of the Reserve Bank of India. Proceedings filed by ESIL in the High Court of Gujarat to challenge the Reserve Bank's direction were not successful.
>
> 63.2. On 10 October 2017, following this order and in accordance with the IBC, the "Resolution Professional" appointed by the NCLT to manage ESIL's Corporate Insolvency Resolution Process (Mr Satish Gupta) invited public expressions of interest from all interested resolution applicants to present resolution plans for "rehabilitating" ESL. Mr Gupta also established a Committee of Creditors of ESIL to consider any such proposal received.
>
> 63.3. On the day the resolution plans were due (12 February 2018), Mr Gupta received proposals from an entity associated with the ArcelorMittal Group (ArcelorMittal India Private Group Ltd (**ArcelorMittal India)** and an entity associated with the Ruia family, Numetal Limited (**Numetal**).
>
> 63.4. Mr Gupta considered both plans as ineligible under Section 29A of the India Bankruptcy Code which prohibits, among other things, promoters of distressed assets with defaulted loans or their related parties from submitting a resolution plan unless such defaults are cured and called for fresh resolution plans to be submitted on 2 April 2018.
>
> 63.5. In a very broad summary, Arcelor Mittal India and Lakshmi Mittal, immediately prior to submitting the resolution plan, had sold their direct / indirect shareholding in two distressed companies in India namely (Uttam Galva Steels Ltd and KSS Petron Pvt Ltd) and claimed that due to such sale, the restrictions under Section 29A were not applicable to it. Mr Gupta while agreeing with this position, asserted that in the case of

Uttam Galva Steels Ltd, ArcelorMittal India had not yet obtained stock exchange approvals relating to declassification as a promoter, and on this ground disqualified the resolution plan of Arcelor Mittal India. Accordingly Mr Gupta, therefore, the only requirement for ArcelorMittal India to become eligible to resubmit a fresh resolution plan was to obtain necessary stock exchange approvals. These approvals were obtained shortly thereafter and therefore the fresh resolution plan submitted by ArcelorMittal India on 2 April 2018 would have been considered as an eligible plan by Mr Gupta.

63.6. In the case of Numetal, Mr Gupta considered it to be ineligible on account of the fact that Rewant Ruia, who had an indirect interest in Numetal, was deemed to be acting in concert with Ravi Ruia, his father, who was one of the promoters of ESIL. It was prohibited for a past promoter of ESIL or anyone acting in concert with a past promoter to participate in the resolution process.

63.7. Numetal challenged the decision of Mr Gupta in relation to its own disqualification as well as the position that ArcelorMittal India could become qualified merely by obtaining relevant stock exchange approvals at the NCLT. Following proceedings before the NCLT, the appellate tribunal (ie the NCLAT) and the Supreme Court(and while Numetal's own resolution plan was ultimately held to be ineligible for substantially the same reasons mentioned by Mr Gupta) in relation to the resolution plan of ArcelorMittal India, it was finally held by the Supreme Court in its Judgment dated 15 November 2019 that

> '...there is no doubt whatsoever that AMNLBV's shares in Uttam Galva were sold only in order to get out of the ineligibility mentioned in Section 29A(c)…', and '...the Uttam Galva transaction clearly renders AMIPL ineligible under Section 29A(c) of the code'; and

> "..as in the case of Uttam Galva, there can be no doubt whatsoever that the sale of Freaseli's shareholding in KSS Global, together with the resignation of the Mittal directors from the board of directors of KSS Global, is a transaction reasonably proximate to the date of submission of the resolution plan by AMIPL, undertaken with the sole object of avoiding the consequence mentioned in the proviso to Section 29A(c).."

63.8. As a direct result of the challenge brought by Numetal, therefore, ArcelorMittal Group was eventually required to make payment of overdue loans of Uttam Galva and KSS Petron amounting to Rs 7469 crores (approximately USD 1 billion) in order to become eligible to submit a fresh resolution plan for ESIL."

203. This evidence is borne out by paragraphs §§ 106-111 of the Supreme Court's judgment, which include the passages quoted in § 63.7 of Ms Prevezer QC's affidavit and concluded that the ArcelorMittal Group bid too was inadmissible.

### (5) Proceedings in England and Wales

204. AMUSA says Prashant Ruia failed to comply with his obligations under the orders made by Butcher J in January 2019, including by: (i) breaching the anti-tipping off provisions; (ii) failing to serve the affidavit required of him on time; and (iii) providing inconsistent and incomplete disclosure.

205. Prashant Ruia responds (in summary) that:

   i) The alleged breach of the anti-tipping off provision contained in the search order occurred unknowingly, because the provision was not drawn to his attention by AMUSA's solicitors when serving it, in violation of the supervising solicitor's undertaking to the court. Furthermore, the alleged tipping off breach comprised Prashant Ruia forwarding the search order and accompanying documents to Essar's counsel for the purpose of obtaining legal advice, and to other key personnel for their information. The tipping-off provisions did not come to Prashant Ruia's attention before he forwarded the email because the covering letter did not draw attention to them, no oral explanation was provided to him by AMUSA, and he was unable to download the vast attachments. Any breach was therefore not deliberate. It is also to be measured as against AMUSA's decision to serve the search order on Prashant Ruia at his corporate service address at the administration offices of the Stanlow plant in Cheshire, where it might have been opened by any member of staff prior to or during the conduct of the search.

   ii) Prashant Ruia's challenge to the legitimacy of service of the search order under s.1140 of the Companies Act dictated the timing of his provision of affidavit evidence (which obligation ran from service).

   iii) Prashant Ruia has explained that the difference between Mr Baid's evidence that relevant documents were held in Prashant's home, and his own evidence that they were not, was simply occasioned by further reflection on the matter, and accordingly was again not deliberate, and nothing turns on the same.

206. I have read and considered Prashant Ruia's explanation of these matters in §§ 25-29 of his witness statement, and do not regard any of them as materially supporting AMUSA's present applications.

207. Separately, and more seriously in my view, certain employees of companies within the Essar group who worked at Essar Capital Service's offices at Lansdowne House deleted emails during the execution of the search order granted by Butcher J. One of them, Ms. Popat, was the receptionist on the front desk and apparently an employee of Essar Oil. She sent emails to Mr. Sanjiv Radia, a qualified non-practising solicitor who works for Essar Capital Limited (the Cayman Islands company) and who was working at Lansdowne House at the time, saying: "*hide all docs for ecsl asap as soon as you come in*" and "*you need to hide andres pc I think*".

208. Jacobs J dealt with this episode in §§ 116-123 of his judgment. Having quoted the emails, he said:

"118.  This e-mail contained a typo, but it was common ground that the reference to "andres pc" was a reference to the computer (a laptop) of Mr. Wright. The evidence was that this particular email was subsequently deleted both from Ms. Popat's computer and from Mr. Radia's computer, although in due course it was possible to recover it. In an Affidavit served by Ms. Popat subsequent to the hearing, in the context of committal proceedings which AMUSA had commenced against her, Ms. Popat said that she had deleted the email both from her computer and Mr. Radia's computer.

119.  AMUSA attached considerable significance to these two emails, including the deletion of the second email by Ms. Popat with the active consent of Mr. Radia. They submitted that this showed that Butcher J. was quite right in his instinct that this was an appropriate case for a search order because there was a real possibility that documents would be destroyed. They also relied upon the fact that the emails were sent by an Essar Oil employee to an ECL employee, but relating to the need to hide the documents of a different UK company Essar Capital Services. This showed that the Essar Group did not in practice draw distinctions between the various Essar corporate entities.

120.  Mr. Stanley on behalf of Essar Capital Services did not seek to minimise the seriousness of what had occurred. He recognised the "forensic embarrassment" created by these documents. But he submitted that Ms. Popat was a junior employee who had acted foolishly, and that there had been equally foolish concealment of that by a more senior employee who certainly should have known better. The second email was deleted by or with the agreement of Mr. Radia because, in effect, Ms. Popat begged him to do so, having realised that it was improper for her to have sent it and having appreciated that it might have very serious repercussions for her. Therefore these events told one very little. More significant was the fact that the suggestions of Ms. Popat had not in fact been acted upon: documents were produced, and Mr. Wright's laptop was not concealed but has been imaged and is being searched.

121.  As with many aspects of this case, it is not appropriate or indeed possible for me to make definitive fact-findings relating to the state of mind of these two individuals, or why they acted as they did. This is reinforced by the consideration that AMUSA have commenced committal proceedings against Ms. Popat, and are likely to do so against Mr. Radia. Indeed, on Friday 15 March (i.e. after the conclusion of the hearing to discharge the orders) I gave directions in the committal proceedings which will lead to a hearing which is presently estimated to last one and half days (to include the proposed proceedings against Mr. Radia).

> 122. Ultimately, the question which I am considering in the present context is whether there is a real possibility that evidence will be destroyed if the relief is not given. I consider that the content of the two emails, and the subsequent destruction of one of those emails, provides very solid evidence of that real possibility. These emails were, after all, sent after a court order had been made and served, with a penal notice attached. If such emails could be sent after a court order, it is not difficult to imagine what might have happened if there had been no court order for preservation. The suggestion that the first email was a panicked immediate reaction by Ms. Popat to the search order is a matter that is likely to arise for consideration at the committal hearing, and again it is not appropriate for me to express any views about that. However, I note that by 09.53 that morning Ms. Popat was not the senior person dealing with the search order. By that time, Ms. Samantha Chambers, who was a qualified solicitor and legal counsel to and the company secretary of Essar Oil, had arrived and was engaged in discussions with Mr. Warburton who was one of the solicitors supervising the search order. It is therefore perhaps somewhat surprising that Ms. Popat should be panicking, since a qualified lawyer was dealing with the search order. But even if the first email was sent without sufficient thought and in a panic, it is difficult to see how that explanation could apply to the second email. That was sent some 3 hours later, after there must have been time for reflection. The deletion of that email occurred some time after that.
>
> 123. It seems to me that this episode does provide evidence which reflects adversely upon the culture within the Essar Group, and that it is therefore consistent with the other evidence (already described) as to bad faith, conduct prejudicial to creditors, and the deliberate withholding or concealment of documentation."

209. As with the episode relating to Mr Vuppuluri's laptop, I do consider this matter is of concern and must be taken into account when considering whether or not to grant a worldwide freezing order in the present case. At the same time, it is relevant to bear in mind that it appears the proposal (from a very junior employee) to hide materials was not in fact acted upon and the required items were disclosed: only the emails about hiding documents were deleted as opposed to any of the underlying documents.

210. In a further matter, EGFL was the subject of an English judgment (*Midtown Acquisitions LP v Essar Global Fund Ltd* [2018] EWHC 789 (Comm)) in which its solvency was doubted; it defaulted on an English judgment; and its director, Mr Bell (the Seventh Defendant) submitted to cross-examination as to EGFL's assets. The judgment cited above related to an argument between creditors about priority, on which EGFL took a neutral position. There was no suggestion of asset dissipation.

## (K) GOOD ARGUABLE CASE

211.    It is common ground that the relevant question is whether AMUSA can show a good arguable case, i.e.:

> "… a case which is more than barely capable of serious argument, and yet not necessarily one which the Judge believes to have a better than fifty per cent chance of success" (*Ninemia Maritime Corp v Trave Schiffahrts GmbH & Co KG ("The Niedersachsen")* [1983] 2 Lloyd's Rep 600, [1984] 1 All ER 398, 404, per Mustill J)

212.    In considering whether that threshold is passed, it is relevant to consider the elements required to be shown in a claim for unlawful means conspiracy, viz *"a combination or agreement between the defendant and another person pursuant to which unlawful action is taken which causes loss or damage to the claimant and is intended or expected by the defendant to do so (whether or not this was the defendant's predominant purpose)" Marathon Asset Management LLP v Seddon* [2017] IRLR 503 §§ 132 and 135.  Further:-

    i)      an allegation of conspiracy to harm by unlawful means "*must be clearly pleaded and clearly proved by convincing evidence*": *Jarman & Platt Ltd v Barget Ltd* [1977] FSR 260, 267; *CEF Holdings v Mundey* [2012] EWHC 1534 (QB) § 74;

    ii)     all specific facts and matters relied upon in support of any inferences of dishonesty must be pleaded: *ED&F Man Sugar v T&L Sugars* [2016] EWHC 272 (Comm); and

    iii)    where parties may have joined the conspiracy at different times, they will only be liable for loss caused post their involvement. Accordingly, knowing when it is alleged they became knowing participants in an alleged conspiracy is critical to understanding the claim made against them.

213.    I am conscious that this is only an interlocutory hearing, and also that this court has already held AMUSA (on a without notice application) to have a sufficiently arguable case to justify the grant of permission to serve these proceedings out of the jurisdiction. I have, however, dwelt in some detail above on the transactions relating to the sale of Essar Steel India because they form a key part of AMUSA's case, not only on the merits of its conspiracy claim but also on risk of dissipation.  This is an application where the events relied on to found the claim also form a key plank of the basis for alleging there to be solid evidence of risk of dissipation.  In such cases, a claimant's allegations as to the underlying events need to be considered not only in the context of the good arguable case hurdle for the grant of a freezing order, but also in the context of the risk of dissipation hurdle.  A case that might narrowly pass the former test will not necessarily provide sufficient foundation for finding there to be solid evidence of a risk of dissipation.  It depends on the nature and strength of the case and the totality of the evidence said to demonstrate risk of dissipation.

214.    Dealing at this stage with the strength of AMUSA's substantive case, I am not persuaded that AMUSA has a good arguable case on its claim.  I come to that

conclusion based on the totality of the matters considered in sections (F) to (I) above. By way of summary I highlight the following points:

i)      AMUSA's case that the restructuring in 2012 and 2013 involving the removal of Essar Steel India from Essar Steel was done pursuant to an unlawful means conspiracy strains credibility (section (F)(2) above).

ii)     The allegation that the assignment of by far the larger of the two promissory notes to EGFL in March 2013 was designed to evade liabilities to AMUSA lacks any real cogency (section (F)(4) above).

iii)    The same applies to the assignment of the smaller note in November 2013 (section (F)(5) above).

iv)     AMUSA's case relying on the change of accounting treatment in 2016 is inconsistent with its overall case of conspiracy, and in any event I do not consider AMUSA to have put forward any realistic case that the change amounted to a dissipation or attempted dissipation of an asset, let alone of a clear debt claim (section (F)(6) above).

v)      The allegation that Essar Steel's entry into the Deed of Subordination with VTB occurred pursuant to an unlawful means conspiracy is wholly lacking in evidential support or cogency (section (F)(7) above).

vi)     The allegation that Essar Steel failed, pursuant to the alleged conspiracy, to seek to recover the alleged debt from EGFL adds nothing of substance to AMUSA's claim (section (F)(8) above).

vii)    There is no substance in the allegation that Essar Steel's sale of Essar Steel UAE was made pursuant to the alleged conspiracy (section (G) above).

viii)   There is no plausible case that the Algoma transaction occurred pursuant to the alleged conspiracy (section (H) above).

ix)     AMUSA's claim for fraudulent misrepresentation inducing its entry into the Amended PSA was not argued before me in detail and appears weak (section (I) above).

215.    Secondly and in any event, I am not persuaded that AMUSA has a good arguable case of a claim for US$1.5 billion, or any other currently quantifiable sum. In addition to my view on the merits of the claim *per se*, I do not consider that a claim can be made out, or therefore any freezing order justified, in that amount in the light of:

i)      the significant issues likely to arise about the real value of any claim Essar Steel may have against EGFL, discussed in §§ 89-98 above; and

ii)     the unaddressed question about the effect on the value of any claim Essar Steel may have against EGFL, and hence the real value of AMUSA's claim, of the postponement of the former claim under the Deed of Subordination: see §§ 131-133 above.

## (L) RISK OF DISSIPATION

216.  An applicant for a freezing injunction must establish a real risk of unjustified dissipation of assets demonstrated by solid evidence.  In *National Bank Trust v Yurov* [2016] EWHC 1913 (Comm) at §70 Males J said:

> "(a) The claimant must demonstrate a real risk that a judgment against the defendant may not be satisfied as a result of unjustified dealing with the defendant's assets.
>
> (b) That risk can only be demonstrated with solid evidence; mere inference or generalised assertion is not sufficient.
>
> (c) It is not enough to rely solely on allegations that a defendant has been dishonest; rather it is necessary to scrutinise the evidence to see whether the dishonesty in question does justify a conclusion that assets are likely to be dissipated.
>
> (d) The relevant inquiry is whether there is a current risk of dissipation; past events may be evidentially relevant, but only if they serve to demonstrate a current risk of dissipation of the assets now held.
>
> (e) The nature, location and liquidity of the defendant's assets are important considerations.
>
> (f) Whether or to what extent the assets are already secured or incapable of being dealt with is also relevant.
>
> (g) So too is the defendant's behaviour in response to the claim or anticipated claim."

217.  The relevant considerations were also usefully summarised by Popplewell J in *Fundo Soberano de Angola v Jose Filomeno dos Santos* [2018] EWHC 2199 (Comm) § 86 (approved in *Lakatamia Shipping Co Ltd v Morimoto* [2019] EWCA Civ 2203 subject to the amendment marked in square brackets below) as including the following:

> "(1)  The claimant must show a real risk, judged objectively, that a future judgment would not be met because of an unjustified dissipation of assets. In this context dissipation means putting the assets out of reach of a judgment whether by concealment or transfer.
>
> (2)  The risk of dissipation must be established by solid evidence; mere inference or generalised assertion is not sufficient.
>
> (3)  The risk of dissipation must be established separately against each respondent.
>
> (4)  It is not enough to establish a sufficient risk of dissipation merely to establish a good arguable case that the defendant has been guilty of dishonesty; it is necessary to scrutinise the

evidence to see whether the dishonesty in question points to the conclusion that assets [may] be dissipated. It is also necessary to take account of whether there appear at the interlocutory stage to be properly arguable answers to the allegations of dishonesty.

(5)  The respondent's former use of offshore structures is relevant but does not itself equate to a risk of dissipation. Businesses and individuals often use offshore structures as part of the normal and legitimate way in which they deal with their assets. Such legitimate reasons may properly include tax planning, privacy and the use of limited liability structures.

(6)  What must be threatened is unjustified dissipation. The purpose of a freezing order is not to provide the claimant with security; it is to restrain a defendant from evading justice by disposing of, or concealing, assets otherwise than in the normal course of business in a way which will have the effect of making it judgment proof. A freezing order is not intended to stop a corporate defendant from dealing with its assets in the normal course of its business. Similarly, it is not intended to constrain an individual defendant from conducting his personal affairs in the way he has always conducted them, providing of course that such conduct is legitimate. If the defendant is not threatening to change the existing way of handling their assets, it will not be sufficient to show that such continued conduct would prejudice the claimant's ability to enforce a judgment. That would be contrary to the purpose of the freezing order jurisdiction because it would require defendants to change their legitimate behaviour in order to provide preferential security for the claim which the claimant would not otherwise enjoy.

(7)  Each case is fact specific and relevant factors must be looked at cumulatively."

218.    The Court of Appeal in *Lakatamia* added that:

"(1) Where the court accepts that there is a good arguable case that a respondent engaged in wrongdoing against the applicant relevant to the issue of dissipation, that holding will point powerfully in favour of a risk of dissipation.

(2) In such circumstances, it may not be necessary to adduce any significant further evidence in support of a real risk of dissipation; but each case will depend upon its own particular facts and evidence."

219.    The following further statements of principle are relevant:

i)      The claimant should depose to objective facts from which it may be inferred that the defendant is likely to move assets or dissipate them; unsupported statements

or expressions of fear have little weight (*O'Regan v Iambic Productions* (1989) 139 N.L.J. 1378 (per Sir Peter Pain)).

ii) Where dishonesty is alleged, it is sometimes possible to infer a risk of dissipation from the fact of the dishonesty (*Norwich Union v Eden* (25 January 1996, unreported, Hirst and Phillips LJJ), cited in *VTB Capital plc v Nutritek International Corp* [2012] EWCA Civ 808 at § 177; *Metropolitan Housing Trust v Taylor* [2015] EWHC 2897 (Ch) § 18 per Warren J).

iii) However, it is appropriate in each case for the court to "*scrutinise with care whether what is alleged to have been the dishonesty of the person against whom the Order is sought in itself really justifies the inference that that person has assets which he is likely to dissipate unless restricted*" (*Thane Investments Ltd v Tomlinson (No.1)* [2003] EWCA Civ 1272 § 28; *VTB v Nutritek International* § 177 citing *Jarvis Field Press v Chelton* [2003] EWHC 2674 (Ch)).

iv) For example, in *VTB* the Court of Appeal concluded at § 178 that it would have been right to take into account a finding of a good arguable case that a defendant had been engaged in a major fraud, and that he operated a complex web of companies in a number of jurisdictions which enabled him to commit the fraud and would make it difficult for any judgment to be enforced: such factors would be capable of providing powerful support for a case of risk of dissipation.

v) Relevant factors include the nature, location and liquidity of the defendant's assets, and the defendant's behaviour in response to the claim or anticipated claim; past events may be evidentially relevant, but only if they serve to demonstrate a current risk of dissipation of the assets now held (*National Bank Trust v. Yurov* [2016] EWHC 1913 (Comm) §§ 69-70 per Males J).

vi) Where a defendant knows that he faces legal proceedings for a substantial period of time prior to the grant of the order, and does not take steps to dissipate his assets, that can be a powerful factor militating against any conclusion of a real risk of dissipation (see e.g. *Candy v Holyoake* [2017] EWCA Civ 92; [2018] Ch 297 § 62 and *Petroceltic Resources Ltd v Archer* [2018] EWHC 671 (Comm) §§ 58, 64-65).

vii) "*A cautious approach is appropriate before deployment of what has been called one of the court's nuclear weapons*", and "*the risk is not to be inferred lightly. Bare or generalised assertion of risk by a claimant is not enough.*" (*Tugushev v Orlov et al* [2019] EWHC 2031 (Comm)) § 49 and 49(ii).

220. AMUSA's case on risk of dissipation relies on the combination of the various matters considered earlier, but highlighted the following points in its skeleton argument:

i) the "*clear evidence (and judicial findings) of unjustified dissipation of Essar Steel's assets in order to place them (for the benefit of the Essar Group) beyond the reach of AMUSA's enforcement efforts*";

ii) the findings of the Ontario court in the Algoma proceedings that the strategic decisions about Algoma were made not by its board but by EGFL and Essar

Capital, that the evidence given by Prashant Ruia in those proceedings was evasive, and that EGFL had acted in bad faith;

iii)     the decision of the Cayman court that Norwich Pharmacal relief should be granted against EGFL emphasising the propensity of EGFL for directing the affairs of the Essar Group and Essar Steel so as to dissipate assets and evade debts: as noted by Kawaley J: "*I regarded the historic conduct to be relied upon as evidence of a propensity for future dissipation steps being likely to happen*";

iv)     the evidence that the Essar group, and the individuals who control it, transfer assets and funds between the companies with little regard to corporate separation and deliberately in order to evade the claims of certain creditors, in which context Jacobs J found this case to be analogous to "*international fraud*";

v)      the nature of the assets held by EGFL (shares and inter-company debt), being (AMUSA says) of a type that can be easily dissipated, given some advanced planning with the assistance or connivance of professionals;

vi)     the fact that the corporate arrangements at the Essar group comprise a complex chain of companies and offshore trusts, with Ravi and Prashant Ruia holding their interests in EGFL through a series of offshore companies and trusts: which, given the other evidence of dissipation, AMUSA says is likely to have been created to obscure the manner in which assets are held;

vii)    the willingness of the present respondents to obstruct and disobey court orders, and to mislead the court, as shown in particular by:

a)      the way in which Essar Steel sought to conceal information about the restatement of its accounts from AMUSA, and when it withdrew from the ICC arbitration effectively inviting the ICC arbitral tribunal to proceed on a false basis;

b)      Essar Steel misleading the ICC tribunal and then the courts of Mauritius and England & Wales about its access to relevant documents held by ESML through Mr Vuppuluri;

c)      Prashant Ruia's failure to comply with his obligations under the orders made by Butcher J in January 2019;

d)      a failure by EGFL properly to comply with its disclosure obligations under the Cayman Norwich Pharmacal order in relation to the location of relevant material, and efforts to delay those obligations; and

e)      the episode involving Ms Popat and Mr Radia's reaction to the search order granted by Butcher J.

221.   As to those points:

i)      I do not agree that there is clear evidence of unjustified dissipation of Essar Steel's assets in order to place them (for the benefit of the Essar group) beyond the reach of AMUSA's enforcement efforts: see sections (F) to (H) and § 214

above.  I do accept that there are certain judicial findings to that effect, and I must take these into account and give weight to them.

ii)    The findings of the Ontario court in the Algoma proceedings support the view that the strategic decisions about Algoma were made not by its board but by EGFL and Essar Capital, and I must take account of that court's findings that the evidence given by Prashant Ruia in those proceedings was evasive, and that EGFL had acted in bad faith.  At the same time, as indicated in section (H) above, I note that there was no allegation or finding of asset stripping, and on the contrary EGFL had provided very high levels of financial support to its ailing subsidiary; that the allegation that the port transaction involving Algoma was at an undervalue was not pursued; and that in the circumstances I set out there, I do not consider it would be right for me to place great weight on the court's statement that EGFL acted in bad faith.

iii)   As indicated in section (J)(2) above, it seems likely that the Cayman court's decision to grant *Norwich Pharmacal* relief was based on evidence similar to, or a subset of, that relied on before me.  On that basis, I should take Kawaley J's decision into account, but consider that ultimately I must form my own view on whether on the basis of the evidence and submissions before me the necessary prerequisites for a worldwide freezing order have been made out.  For my part, I do not accept that the evidence shows a historic propensity to dissipate assets.

iv)    I would accept that the evidence tends to indicate that the affairs of the Essar group were to a significant degree centrally controlled.  I do not, however, consider the evidence before me indicates that the Essar group, and the individuals who control it, transfer assets and funds between group companies deliberately in order to evade the claims of certain creditors; and for the reasons I have already given in section (F) above, I do not consider that the evidence relating to the transactions in respect of Essar Steel India (including the 2016 change of accounting treatment) are aptly characterised as international fraud.

v)     I would agree that to the extent that EGFL's assets consist of shares and inter-company debt, they could be easily dissipated given a degree – probably a very considerable degree – of advanced planning and the assistance or connivance of professionals.

vi)    I agree that, on present evidence, the corporate arrangements at the Essar group involve a complex chain of companies and offshore trusts, with Ravi Ruia and Prashant Ruia holding their interests in EGFL through a series of offshore companies and trusts.  That is not, however, an uncommon situation, and I do not consider the evidence suggests that the structure is likely to have been created to obscure the manner in which assets are held.

vii)   As to the respondents' approach to courts and court orders:

a)     I would agree that the reasons for Essar Steel's apparently abrupt disengagement from the ICC arbitration have not been explained in detail, and might reasonably give rise to suspicion about its motives, including whether Essar Steel wished to avoid its 2016 accounts coming to the attention of AMUSA.  At the same time, for the reasons explained

66

in section (J)(1) above, I am not persuaded that Essar Steel therefore set out to mislead the arbitral tribunal.

b)   As indicated in § 169 above, Essar Steel's conduct in relation to its access to relevant documents held by ESML through Mr Vuppuluri is a matter of significant concern - which should be taken into account, though I do not think it would be proper to infer deliberate misstatement by Mr Baid at least without further enquiry.

c)   I should take account of Prashant Ruia's non-compliance with certain obligations under the orders made by Butcher J in January 2019, though in the circumstances referred to in §§ 204-206 above I do not consider that to be factor of great weight in the context of the present application.

d)   For the reasons given in § 189 above, I do not believe the issue relating to EGFL's late compliance with the Cayman *Norwich Pharmacal* order to be a significant factor in the present context.

e)   I must take into account the episode involving Ms Popat and Mr Radia's reaction to the search order granted by Butcher J, which showed a troubling willingness to seek to evade orders made by this court. I bear in mind also though that the proposal, made by a very junior employee, to hide materials was not acted on, in the sense that whilst the email proposing that items be hid was itself wrongfully deleted, the underlying materials themselves were not in fact hidden and were disclosed.

222.   It is also appropriate to take account of certain other factors relevant to whether solid evidence exists of a risk of dissipation.

223.   First, it has been clear to the respondents since at least March 2018, when the proceedings in the Minnesota State court were brought, that AMUSA seeks to hold them responsible for a conspiracy to strip Essar Steel of its assets in order to defeat AMUSA's claims. AMUSA alleged that asset-stripping operation to have been carried out at the direction of EGFL and members of the Ruia family, and to have included the transfers of shares in Essar Steel India. A year and eight months then elapsed before AMUSA made its present application for a worldwide freezing order. I consider this point further below in the context of delay. For present purposes, though, it is obvious that the respondents have already had a long-lasting opportunity to divest themselves of their own assets if they wished to. This is a different point from the argument sometimes advanced that any assets would, given the delay, already have been dissipated. That argument goes to the utility of an injunction, whereas there is a distinct point that the *absence* of evidence of actual or attempted dissipation during a long period of delay goes to risk of dissipation.

224.   AMUSA makes the point that given the lack of transparency of the Essar group's affairs, it might well not be aware of any dissipation that may have taken place during that period. Nonetheless, particularly in circumstances where the group's assets are subject to extensive security arrangements in favour of VTB, it is striking that no dissipation or attempted dissipation has come to light since the events of 2016 alleged to constitute dissipation by Essar Steel.

225. AMUSA further points out that it did not know about the 2016 restatement of Essar Steel's accounts until February 2019 or about the Deed of Subordination until 24 April 2019. However:

   i) the respondents are likely to have known about both at all material times, and AMUSA's later knowledge of these matters in no sense detracts from the point that the respondents must have known since early 2018 that they were likely to be among AMUSA's targets; and

   ii) even the period since February 2019 (when AMUSA learned of the 2016 accounts, which it regards as key to its case) to November 2019 provided a significant opportunity for assets to be dissipated.

226. Secondly, dissipation by EGFL would not be at all easy because (as it points out) (i) in order to dissipate, EGFL would have to move assets entirely outside its group (something it is not alleged ever to have done), (ii) the nature of the assets it holds are such that they cannot easily or secretly be marketed, and (iii) VTB has both a strong interest in preventing that and the tools to do so.

227. The latter point does not depend on VTB having an interest in protecting AMUSA – which AMUSA points out VTB does not – but rather that VTB, as an independent third party not alleged to have connived or to be likely to connive in asset stripping, would necessarily have to be aware of, and in practice complicit in, any future stripping of EGFL's assets.

228. Thirdly, AMUSA has put forward no evidence at all of any dissipation or attempted dissipation by Ravi Ruia or Prashant Ruia of their own assets, whether in the form of their interests in the Essar group or other assets. The fact they hold those interests via companies and trusts is not *per se* a pointer towards risk of dissipation. I acknowledge that the Supreme Court of India considered that a particular structure set up in relation to the proposed re-acquisition of Essar Steel India was a 'smokescreen' designed to 'conceal' certain interests. I have already made the point that it appears from the judgment that those interests had been overtly stated; and in any event there was no suggestion there of any attempt to dissipate or conceal assets.

229. Viewing these considerations in the round, whilst I would accept that (as highlighted above) there have been aspects of the Essar group's conduct that give rise to concern, I am ultimately not persuaded that there is solid evidence of a risk of dissipation such as might justify the imposition of a freezing order over the respondents' assets.

## (M) JUST AND CONVENIENT TEST

230. It is, in any event, necessary when contemplating a freezing order (as with any injunction) to consider whether it would in all the circumstances be just to impose it. This stage of the process involves taking account of the strength of the case on the merits and the risk of dissipation of assets, but also the circumstances as a whole and where the balance of justice lies. There is no exhaustive list of factors to be taken into account. Some factors often likely to be relevant are mentioned in Gee on *Commercial Injunctions* (6th ed) at § 12-042: the balance of prejudice between the parties; whether an order would interfere unacceptably with the interests of third parties; or whether an injunction might destroy the defendant's business.

231.    In the present case, the risk to AMUSA is obviously that if (contrary to my earlier findings) it has a good arguable case and there is solid evidence of risk of dissipation of assets, then any judgment it may ultimately obtain against the present respondents will be unsatisfied.  Thus, on AMUSA's case, it will have been the victim of asset stripping not once but twice or more.

232.    Against that, I have to consider the likely impact of a freezing order on the respondents, and also whether (as the respondents submit) an order should be refused on the grounds of delay.

### (1) Likely impact of a worldwide freezing order on the respondents

#### (a) Impact on the Essar group

233.    The worldwide freezing order sought by AMUSA would affect (as EGFL puts it) a massive conglomerate engaged in day-to-day commerce, on whose operations many third parties (employees, contractors, purchasers and financiers) depend.  I have already outlined how in the Cayman proceedings AMUSA initially sought a worldwide freezing order, but then instead sought a far more limited notification order following service of evidence by EGFL and VTB about the prejudice that a freezing order would cause. Kawaley J noted at § 46 of his judgment that AMUSA had *"prudently 'throttled back'"* in the light of that evidence.  It is striking that AMUSA now seeks before this court a full-blown freezing order despite the fact that the risk of prejudice remains essentially the same.

234.    The order sought would be likely to have a profound effect on the Essar group's operations.  It would provide that EGFL must not *"in any way dispose of, deal with or diminish the value of any interest the Respondent may have"* in certain defined *"Assets"*, *"whether such interest is direct or indirect"*. The definition of 'Assets' includes:

> "any asset which it has the power, directly or indirectly, to dispose of or deal with as if it were [its] own. The Respondent is to be regarded as having such power if a third party holds or controls the asset in accordance with [its] direct or indirect instructions"

and the prohibition expressly includes (a) shares in eleven named companies, (b) shares in any other direct or indirect subsidiary with assets of more than US$ 10 million, and (c) certain further property or assets, including assets within a named trust.

235.    Of the eleven named companies, two are direct subsidiaries of EGFL, and the others are indirect subsidiaries, thus the definition proceeds on the premise that EGFL has or may have the power directly or indirectly to deal with the shares in each of the indirect subsidiaries (named or unnamed) as if they were its own (cf *JSC BTA Bank v Ablyazov (No 10)* [2015] 1 WLR 4754 (SC)).

236.    The order sought defines *"dealing"* to include *"selling, giving away, transferring, lending, devaluing, destroying or defacing or encumbering any Asset."*  For that reason, and because the proposed order also expressly extends to *"diminishing the value"* of the relevant shares, transactions involving the affected companies' underlying assets are also potentially affected, including the shares they hold in subsidiaries further down the

chain, and the other assets of all such companies.  That is, as VTB points out, because transactions which may be said to affect or impact on the value of such indirect assets may equally be said to amount to dealing with or diminishing the value of the shares that are the subject of the order (cf *Lakatamia Shipping Co v Su* [2015] 1 WLR 291 (CA)).

237.    The draft order contains an exception that would permit EGFL to deal with, dispose of or diminish the value of Assets in the ordinary and proper course of business, provided that EGFL gives AMUSA 14 days' written notice of transactions exceeding US$ 10 million.  AMUSA in its reply submissions indicated that it would be willing to drop the notification aspect if the court considered it too intrusive.

238.    The "value" threshold, which in principle permits dealing so long as the "*total unencumbered value*" of each respondent's assets remains above US$ 1.5  billion, would be of limited comfort in practice given the room for debate about the value of EGFL's assets and the extent to which they are or are not encumbered by VTB's security.

239.    EGFL points out that:

i)      the Essar group as a whole comprises about 240 direct or indirect subsidiaries;

ii)     it operates in four main sectors: energy, metals and mining, infrastructure, and services;

iii)    its subsidiaries employ around 7,000 staff and over 10,000 contractors;

iv)     EGFL's draft 2019 Accounts show non-current assets of US$ 11.3 billion, and total liabilities of US$ 9.5 bn. The fair value of EGFL's equity portfolio at 31 March 2019 was US$ 11.2 billion; and

v)      the group's debt position is complex. Its main secured creditor is (since 2016) VTB, but there remain various legacy facilities. In the years since 2015, Essar has undertaken a major exercise to reduce its debt burden: its overall external debt has reduced from US$ 28.3 billion in March 2015, which was a peak, to US$6.3 billion today. The total outstanding amounts under the facilities are around US$ 2.4 billion, and given their size, repayment of the VTB facilities is likely to require asset sales.

240.    Particularly in this type of context, the "*ordinary course of business*" exception is likely to create great uncertainty about whether particular transactions may or may not proceed without AMUSA's or the court's consent.  I agree with EGFL that, among other things, that gives rise to a risk that third parties will, for understandable reasons, refuse to accede to any transaction that has not been specifically sanctioned.  It is well known that in practice banks will not permit any payment to be made once a worldwide freezing order is imposed unless there is a court order or an agreement specifically sanctioning that payment.  VTB is in my view correct in pointing out that, particularly in the present case, the scope for debate about what does and does not constitute the ordinary and proper course of business, in the context of a freezing order with a penal notice attached, inherently undermines the ability of the group to go about its business with third parties.  Every transaction of any size will carry the risk of a subsequent

allegation of contempt of court (or aiding and abetting a contempt of court) unless prior consent is obtained.  Having to seek prior consent either from a major competitor or from the court is bound to have a severe chilling effect on the carrying on of the group's business.  It is therefore not unreasonable for Mr Galkin of VTB to state that *"VTB considers that there is a real prospect that a WFO would cripple the Essar Group's business and cause loss to VTB"*.

### *(b) Impact on the Ruias*

241. The Ruias have an interest in the fortunes of the Essar group by reason of their holdings in companies which are discretionary beneficiaries of the trusts which own EGFL and, indirectly, the group companies as a whole.  The likely effects of the proposed worldwide freezing order on the group (directly, and also by reason of the impact discussed in section (2) below on its ability to satisfy its obligations to VTB) therefore also carry significant potential financial implications for the Ruias.

242. The freezing order may also impact on their personal reputations.  AMUSA points out that there has already been adverse press commentary over the years of aspects of the Essar's group's business conduct.  The only matter cited relating directly to Ravi Ruia or Prashant Ruia personally is that in 2011, Ravi Ruia was charged with *"criminal conspiracy"* and *"cheating"* in connection with the Essar group's steps to acquire a presence in the Indian telecoms market.  AMUSA's evidence is that as a result of those allegations, Ravi Ruia stepped down as Chairman of Essar Energy Limited.  However, he and the other defendants were acquitted in 2018, albeit an appeal is pending from the acquittal.  I would accept that the adverse coverage in relation to the Essar group is also likely to have reflected on Ravi Ruia and Prashant Ruia.  On the other hand, insofar as AMUSA's suggestion may be that their reputations are incapable of further damage, I would not accept that suggestion.  If the requirements for a freezing order are otherwise made out, I would not consider the risk of reputational damage to be a major factor to weigh in the balance, but it should be taken into account to a degree.

### **(2) Likely impact of a worldwide freezing order on VTB**

243. It is also necessary to consider the impact on third parties, including VTB.

244. To the extent that a worldwide freezing order would be damaging for the Essar group, as considered in section (M)(1)(a) above, its effects would also extend to third parties linked to the group: its trade and banking creditors, suppliers, purchasers and employees.

245. VTB as the group's main lender says it is concerned that the freezing order presently sought against EGFL would risk severely damaging the Essar group, and hence the value of VTB's security and its ability to make recovery on its lending: it is an innocent third party which finds itself (by reason of its ordinary commercial lending) at risk of material prejudice should the orders sought be granted.  In summary, VTB submits that:

   i) There is a real risk that the Essar group will suffer real prejudice as a result of the proposed injunction against EGFL.

ii) VTB's loan to value (LTV) is very high, and the adverse effects of a freezing order on the Essar group are such that there is a real risk that VTB will suffer a shortfall under the VTB facilities.

iii) VTB is particularly vulnerable because its security is principally over shares, in circumstances where the assets and revenue streams of operating companies are secured to other lenders.

iv) In order to repay VTB, the Essar group will need to effect complex and time consuming asset sales which would be imperilled by the proposed order.

v) VTB cannot avoid this harm by simply enforcing its security.

vi) The day-to-day operation of the Essar Group requires frequent intra-group restructuring and refinancing transactions (in order to preserve value and effect repayments to VTB). That would also be imperilled by a worldwide freezing order.

vii) Having regard to the difficult commercial relationship between AMUSA and its group and the Essar group, as well as the consistent failure to respect VTB's interests to date, VTB can have no confidence that AMUSA would act neutrally or co-operatively so as to maintain the value of the Essar group or to avoid prejudice to VTB.

246. VTB cites the statement in *Gee* that in general:

> "[t]he court will protect third parties against exposure to unacceptable interference by an injunction with their business or other activities" (Gee, Commercial Injunctions (6th ed) § 21-075)

247. It says the court should not lightly grant equitable relief in favour of one party which has the effect of disturbing the status quo to the prejudice of an innocent and unconnected party under pre-existing and unconnected arrangements, citing the following general statements of principle:

i) *Searose Ltd v Seatrain UK Ltd* [1981] 1 WLR 894:

> "Lastly, may I say this. It is, I believe, now generally recognised that the *Mareva* jurisdiction has filled a gap in the court's powers which badly needed to be filled. In the Commercial Court, certainly, a very large number of these injunctions is granted each year. But care must be taken to ensure that such injunctions are only given for the purpose for which they are intended, viz. to prevent the possible abuse of a defendant removing assets in order to prevent the satisfaction of a judgment in pending proceedings: and likewise, care must be taken to ensure that such injunctions do not bear harshly upon innocent third parties. If these principles are not observed, a weapon which was forged to prevent abuse may become an instrument of oppression." (at 897 per Goff J)

ii)  *Galaxia Maritime SA v Mineralimportexport* [1982] 1 WLR 539:

"I regard it as absolutely intolerable that the fact that one person has a claim for a debt against another, that third parties should be inconvenienced in this way, not only to affect their freedom of trading but their freedom of action generally speaking." (at p 542 per Eveleigh LJ)

"But where the effect of service must lead to interference with the performance of a contract between the third party and the defendant which relates specifically to the assets in question, the right of the third party in relation to his contract must clearly prevail over the plaintiff's desire to secure the defendant's assets for himself against the day of judgment…

Where the effect of service of the injunction on the third party substantially interferes with the third party's business, the rights of the third party must in my view always prevail over the desire of the plaintiff to secure the ultimate recovery of debts or damages from the defendant with which the third party is in no way concerned." (at p 542-3 per Kerr LJ)

iii)  *Project Development Co Ltd v KMK Securities* [1982] 1 WLR 1470:

"… it is an essential aspect of the jurisdiction to grant *Mareva* types of injunction that the position of innocent third parties should be fully protected…" (at p 1472 per Parker J)

iv)  *Guinness Peat Aviation v Hispania Lineas Aereas SA* [1992] 1 Lloyds Rep 190:

"There is much authority for the proposition that Mareva injunctions should not be obtained so as to prejudice innocent third parties." (at p 195 per Webster J).

248.  The factors which VTB says show a risk of prejudice to it may be summarised as follows:

i)  As of the beginning of 2020, VTB's Credit Department assesses the loan to value of its lending to the Essar group as being over 85% assuming an orderly sale of assets for their reasonable market value (and not taking account of either the effects of a freezing order, or the risk of a further reduction in the value of the group's port assets as a result of a separate ongoing dispute with AMUSA). VTB's 'cushion' is therefore fairly thin already.

ii)  VTB's security is over shares in intermediate holding companies and certain operating companies within the Essar group, and not their underlying assets. Since fixed and floating charges in favour of other lenders have been granted over assets of the majority of the operating companies, in a stressed scenario the value of those assets will be removed from each operating company to the extent of those other lenders' secured indebtedness. That creates a risk of

diminution or elimination of the value of the shares over which VTB has security. VTB is therefore particularly vulnerable to any measure which may affect the value of any particular group entity as a going concern.

iii)     VTB relies for repayment on complex asset sales which will be imperilled by the freezing injunction. VTB states in its evidence that such transactions, while always commercially sensitive, are particularly so given the commercial hostility between the ArcelorMittal and Essar groups; and that a potential transaction in 2019 collapsed in part because of the unwillingness of the potential buyer to proceed because of the threat of a Cayman freezing order.

iv)     The prospects of successful completion of these complex transactions at acceptable prices are likely to be damaged by the imposition of the proposed orders. There are a limited number of potential buyers and Mr Galkin of VTB considers it inevitable that, if there is an order, some buyers will be put off and others will offer lower bids.

v)     For VTB simply to enforce its security, as AMUSA suggests it can, would be likely to lead to substantial losses. VTB's interest is not in the fact of having security but the value which can be obtained from that security. Its security is not over tangible assets but shares in underlying companies. In order to realise that security VTB would need to sell those shares. That would in turn require the co-operation of the Essar group, unless the shares were to be sold on a highly discounted 'fire sale' basis. In any event, VTB considers that the prospect of a 50% discount in an enforcement scenario (compared to an orderly sale) is entirely possible: which would obviously be highly detrimental both to VTB and to the Essar group itself.

vi)     VTB's ability to receive regular loan repayments would be imperilled if intra-group restructuring/refinancing transactions were restricted.

vii)     The complexity of the business and operations of the Essar group and its multi-level financing requires regular amendments to facility documents, movements of cash around the group and complex restructurings, examples of which Mr Galkin provides. Where material changes are made, VTB requires the group to provide additional/supplementary security. That process may be hindered if a freezing order is granted. In particular, the Essar group is currently raising a multi-hundred million dollar syndicated loan facility to arrange pre-sale financing in respect of certain assets, involving a group re-organisation and the taking of steps that would not be permitted under the terms of the proposed order. Mr Galkin's experience is that commercial banks would be reluctant to enter into any such transaction with a freezing order in place.

viii)     In an ordinary case, a successful applicant for a freezing injunction will be concerned to ensure that the order does not operate to destroy the value of the defendant, so that it retains the ability to meet any money judgment following trial. Here, however, the AMUSA and Essar groups are competitors locked in disputes across a wide canvass. VTB is concerned that AMUSA will act in its perceived commercial best interests by putting pressure on the Essar group by preventing or discouraging proposed transactions.

249. AMUSA makes five main points in response to VTB's expressed concerns about prejudice.

250. <u>First</u>, AMUSA says the draft freezing order does not restrain VTB in any way. In particular, it does not prevent VTB from exercising such rights as it has under the finance arrangements it has entered into with the Essar Group. In *Taylor v Van Dutch Marine Holdings Ltd* [2017] 1 WLR 2571 (Ch) at §10 Mann J said:

> "In the absence of authority it would seem to me to be clear that principle does not stand in the way of a secured creditor enforcing its security over charged assets caught by a freezing order. The whole point of a freezing order, as is now well established, is to prevent a defendant from dissipating its assets improperly in the face of a claim by the claimant. It is a remedy which operates personally against the defendant (or any other person identified as a respondent in the injunction and against whom the injunction is specifically directed). It does not operate so as to give security to the creditor; and it does not operate so as to affect the genuine rights of third parties over those assets."

Nothing in the worldwide freezing order prevents VTB from exercising its stated present entitlement to accelerate all sums due under the VTB facilities or to enforce its security over the shares of Essar group companies that fall within the definition of "*Assets*" in paragraph 2 of the draft freezing order.

251. AMUSA says the present case is accordingly distinguishable from those in which the court has refused an otherwise meritorious application for a freezing order based on its impact on third parties. For example, in *Galaxia* an injunction restraining cargo owners from removing cargo from the jurisdiction was discharged on the ground that it prevented third party owners of the vessel laden with the cargo, which was on voyage charter, from departing the port and interfered with the personal arrangements of the vessel's crew. By contrast, the injunction sought in the present case does not restrain VTB at all.

252. These contentions do not, however, address the prejudice about which VTB is concerned. Mann J's point in the passage from *Taylor* which AMUSA cites was that a freezing order does not prevent a secured creditor from exercising its legal rights: he was not suggesting that a freezing order may not, as a matter of fact, cause real prejudice to a secured creditor. In the present case there is a serious risk that it would, by affecting the value which VTB can obtain from the security it holds. Whilst in one sense it might be said that VTB assumed the risk that its customer's circumstances may change, it did not assume the risk that the court, seised of a dispute in which VTB has no involvement, would act to VTB's prejudice by granting a wide-ranging freezing order with the potential severely to hamper the operations of the Essar group.

253. <u>Secondly</u>, AMUSA says VTB does not explain how a worldwide freezing order would adversely impact on the value of VTB's security over the Essar group, and resorts to pure speculation about the impact that the presence of a worldwide freezing order may have on servicing VTB's debt and on asset sales in an enforcement scenario. VTB does not give any evidence for its assertion that the relief sought by AMUSA will cause a depression in the value of the Essar group's assets. Mr Galkin does not seek to quantify

the extent of any such depression or how long it would last.  It is particularly surprising, AMUSA says, that he has failed to do so given that similar injunctive relief as that presently sought against the respondents was granted by the English court last year against Essar Steel. There is no suggestion that such relief impacted the value of the Essar group.

254.    In my view, it is unlikely that it would be feasible to quantify the likely effect of the proposed freezing order on the functioning of the Essar group or the value of VTB's security.  That does not, however, mean no such effect is likely.  On the contrary, I find persuasive Mr Galkin's evidence about the likely effects of a freezing order on transactions the group will need to undertake with third parties such as lenders and potential purchasers of assets.  Further, the comparison with Essar Steel is entirely inapt.  That company was already in administration and has neither an ongoing business nor a need to undertake asset realisations or refinancings.  It contrasts starkly with EGFL, the holding company of a multinational operating group seeking to service and repay borrowings in excess of US$2 billion.

255.    Thirdly, AMUSA contends that even if there were any depression in the value of the Essar group's assets, that would be unlikely materially to prejudice VTB.  VTB says that it has the right to accelerate repayment of the debt, appears to have procured a very extensive security package, and Mr Galkin considers that "*there should be sufficient value in the Essar Group to ensure VTB is repaid in full*".  If VTB wishes to exercise these rights nothing in the worldwide freezing order that AMUSA seeks will prevent it from doing so.

256.    This contention is in my judgment ill-founded for two reasons:

i)      VTB's right to call in all its borrowings is unlikely to be a realistic or effective way of obtaining repayment, compared to the planned orderly sale of assets over time.  AMUSA's quotation from Mr Galkin's evidence is selective and has been removed from its context, which was as follows:

"On 4 September 2019, I attended a credit committee meeting within VTB where the further financing (availed in October 2019) referred to at paragraph 21 above was discussed. At the time, VTB's Credit Department formed the view that the LTV of its lending to the Essar Group was 69%. By the start of 2020, this had been adjusted in light of the group's poor performance[1] to in excess of 85% which is, in my experience, very high for this type of financing (i.e. where loans are advanced to intermediate holding companies and security is not obtained against fixed assets). This means that, whilst VTB considers that, all else being equal, there should be sufficient value in the Essar Group to ensure VTB is repaid in full, the expected "headroom" is relatively speaking modest and will be further reduced if the value of the Essar Group's ports assets are reduced and will be further reduced as a result of actions of ArcelorMittal as described at paragraphs 64 to 66 of Prevezer 2 or the

---

[1] [footnote in original] *Inter alia*, the Stanlow oil refinery experienced a number [of] publicly documented safety incidents in 2018/19 which affected its revenues and profits.

> value of EGFL's subsidiaries are affected by the WFO as described in this statement"

ii) Even if VTB could obtain repayment by calling in its facilities immediately, that course of action would be hugely and obviously detrimental to the Essar group. Indeed, common sense would suggest that it would be likely to result in the group's collapse.

257. <u>Fourthly</u>, AMUSA says that to the extent there is any depression in the value of VTB's security over EGFL's assets, it will not have been caused by the granting of the injunctive relief sought by AMUSA in the present application. Rather, any adverse impact on the Essar group's business, and knock-on impacts on the value of the rights for which VTB contracted as lender, arises from findings in courts and tribunals around the world that the Essar group has engaged in "*international fraud*" and large-scale asset dissipation. These findings are in the public domain, pre-date the present application and are distinct from the injunctive relief that may be granted. No doubt VTB would have performed its due diligence on the Essar group before it decided to extend facilities exceeding €2 billion to it. VTB must bear the risk of lending to such a borrower. It is not incumbent on AMUSA to protect VTB from that risk, and nor should this court do so.

258. I do not accept that submission. VTB's concern, and that of the respondents, relates not to the damage caused by events to date but the specific effects of the worldwide freezing order AMUSA currently seeks. Moreover, VTB cannot fairly be regarded as having taken the risk of Essar group's business and the value of its security being severely affected by a freezing order based on events which there is no reason to believe VTB was involved in or aware of.

259. <u>Lastly</u>, AMUSA points out that VTB will have the benefit of an undertaking in damages from AMUSA. While VTB has suggested in its evidence that the undertaking should be fortified, AMUSA say the evidence falls well short of what is necessary to justify fortification having regard to the principles stated in *Energy Venture Partners Ltd v Malabu Oil and Gas Ltd* [2015] 1 WLR 2309; [2014] EWCA Civ 1295 at §§ 52-54. AMUSA submits that VTB has provided no evidence to support the requisite good arguable case that the interim relief is so likely to cause loss and in such an amount that fortification should justly be ordered.

260. As VTB says, however, AMUSA cannot simply buy the right to interfere with VTB's business by offering an undertaking in damages and/or fortification:

> "A plaintiff seeking to secure an alleged debt or damages due from the defendant, by an order preventing the disposal of assets of the defendant, cannot possibly be entitled to obtain the advantage of such an order for himself at the expense of the business rights of an innocent third party, merely by proffering him an indemnity in whatever form." (*Galaxia*, *supra*, at p 542 per Kerr LJ)

The existence of an undertaking is merely one factor in the overall balance. Moreover, VTB submits, the more complex the underlying dealings and the larger the scale of the risks of prejudice to an innocent party, the less an undertaking to the court (even with

fortification, let alone without) is likely sufficiently to ameliorate the prejudice to a third party's own, consensually arranged, business dealings with its counterparty. VTB submits that the prospect of proceedings against a third party claimant with a view to establishing a compensation claim on an undertaking given to the court, followed by the process of enforcement, is an unlikely substitute for the right of an innocent commercial party to go about its business without interference. I accept those submissions.

261. For these reasons, I accept VTB's evidence and submissions to the effect that the worldwide freezing order sought against EGFL would be likely to cause VTB very serious prejudice.

### (3) Delay

262. In *Madoff Securities International Ltd v Raven* [2011] EWHC 3102 (Comm) Flaux J set out a summary of the relevant principles, which was approved by the Court of Appeal in *JSC Mezhdunarodny Promyshlenniy Bank v Pugachev (No. 3)* [2015] EWCA Civ 906:

> "(1) The mere fact of delay in bringing an application for a freezing injunction or that it has first been heard inter partes, does not, without more, mean there is no risk of dissipation. If the court is satisfied on other evidence that there is a risk of dissipation, the court should grant the order, despite the delay, even if only limited assets are ultimately frozen by it;
>
> (2) The rationale for a freezing injunction is the risk that a judgment will remain unsatisfied or be difficult to enforce by virtue of dissipation or disposal of assets……In that context, the order for disclosure of assets normally made as an adjunct to a freezing injunction is an important aspect of the relief sought, in determining whether assets have been dissipated, and, if so, what has become of them, aiding subsequent enforcement of any judgment;
>
> (3) Even if delay in bringing the application demonstrates that the claimant does not consider there is a risk of dissipation, that is only one factor to be weighed in the balance in considering whether or not to grant the injunction sought."

263. Delay is a discretionary factor which can be relevant to the overall assessment of (a) the credibility and weight of the applicant's evidence, (b) whether during the delay the respondent has dissipated assets, and (c) whether the delay has caused any prejudice to the respondent. Delay is not a bar to seeking relief, but is one factor to be weighed in the balance. See *Ras Al Khaimah Investment Authority & Ors v Bestfort Development LLP & Ors* [2017] EWCA Civ 1014 § 55 *per* Longmore LJ and Gee, *Commercial Injunctions*, §§ 2-022 to 2-044.

264. AMUSA submits that delay ought not to be a factor against it, because:-

i) There has been no material delay in applying for the worldwide freezing order. All previous proceedings by AMUSA have been focussed on obtaining a binding ICC Award, obtaining recognition and registration of that Award, enforcing that Award against Essar Steel or obtaining information to enable it to do so. AMUSA's attempts to enforce the ICC Award have so far borne no fruit. AMUSA has been enforcing Jacobs J's search order ever since April 2019 by insisting on the continuing search of Essar Capital Services' computer images by its solicitors for documents relating to Essar Steel's assets. That enforced search is still continuing.

ii) The Minnesota proceedings are materially different to the present. Worldwide freezing injunctive relief is not available in the United States. Further, no reference was made in the Minnesotan proceedings to the majority of steps AMUSA now relies on as taken in furtherance of the conspiracy, including in particular the restatement of Essar Steel's accounts and the entry into the Subordination Deed.

iii) The reference by AMUSA's Leading Counsel in the Cayman proceedings to a conspiracy claim AMUSA would bring was a passing comment made in support of a submission that information obtained pursuant to *Norwich Pharmacal* relief might support a conspiracy claim against the Essar group.

iv) In *PJSC National Bank Trust v Mints* [2019] EWHC 2061 (Comm) at § 62, the court held that in assessing whether there has been any delay, the focus should be on determining at what point in time the applicant could have brought the application in England. Jacobs J there said:

> "62. The Defendants also referred, on occasions, to the possibility of the Claimants bringing proceedings in Cyprus for a WFO against the present Defendants, and to the Claimants' delay in so doing. I did not consider that this argument advanced the case based on delay. When delay is put forward as a reason for the court not granting a WFO, the focus in my view should be on such delay as occurred in seeking relief from the English court. This is particularly so in the present case, where the evidence indicates that the Defendants are domiciled here and where there is no evidence that the Defendants are domiciled or have assets in Cyprus. Moreover, the whereabouts of the Defendants were not known at the time that the Cyprus proceedings were commenced in January 2018, and the various reasons given by Mr. Tseshinskiy for the delay in commencing proceedings in England applied, at least for the most part, to potential proceedings in Cyprus."

> Once that approach is adopted, it is (AMUSA says) clear beyond serious argument that AMUSA has not materially delayed in bringing this application.

v) AMUSA did not learn of the main planks of its claim until: (i) February 2019 when Essar Steel's restated accounts were first disclosed and the alleged US$1.5 billion debt to EGFL was discovered, and (ii) 24 April 2019 when AMUSA learnt of the existence of the Deed of Subordination.

vi)    Since that discovery, AMUSA has acted with all reasonable expedition in preparing and issuing its claim and the present application.  This is a complex international conspiracy claim against defendants relating to events from 2012 onwards and spanning many jurisdictions. AMUSA obtained permission to serve out on 4 November 2019, six months after it learnt of the Deed of Subordination. In the meantime, AMUSA has continued to enforce the search order in an attempt to trace assets which might be available to enforce the judgment against Essar Steel.

vii)    Having obtained permission, AMUSA did not (as alleged by the respondents) tactically delay service of the present application. The timing of its service, on 30 December 2019, is explained in its evidence.  The short point is that AMUSA wished to serve earlier but, due to issues with court listing, was unable to do so.

viii)    In any event, the modern authorities make clear that delay is not itself a bar to relief.

265.    I do not read Jacobs J's statement quoted in (iv) above as meaning that there can be no question of delay provided a claimant applies for a freezing order soon after it commences proceedings in England & Wales, however long it takes to reach that point. The relevant question must be whether there has been delay from the time at which the claimant appreciated or, arguably, should have appreciated that there were grounds on which a freezing order could be sought here and would be useful.

266.    Even accepting for present purposes AMUSA's point that the 2016 accounts were a key trigger for its claim and application in the present case, the fact remains that by March 2019 AMUSA knew about all the main ingredients of its conspiracy claim other than the Deed of Subordination; had already commenced proceedings in Minnesota alleging conspiracy in relation to the events of 2012/2013; had sought injunctive relief in the Cayman Islands; and had sought and obtained a worldwide freezing order against Essar Steel in this court based in part on its case regarding the 2016 accounts restatement.  I do consider the period of nine months from March to November 2019 to be a material delay in the context of applying for a worldwide freezing order, particularly one of this magnitude sought against *inter alia* the lead holding company of a large group of actively trading companies.  Such delay is not determinative, but is a factor to take into account as part of the overall balance.

### (4) The overall balance

267.    Drawing these various strands together, I have reached the conclusion that it would not be just and convenient to grant a worldwide freezing order against any of the respondents.  In summary, that is because in my judgment:

i)    AMUSA has not shown a good arguable case on the merits of its substantive claim.

ii)    AMUSA has, moreover, not shown a good arguable case that it has a claim in or approximating to the amount claimed, or any other specific amount.

iii)    There is no solid evidence of a risk of dissipation by any of the respondents.

iv)     In any event, the order sought would be gravely detrimental to the business of the Essar group, a conglomerate headed by EGFL comprising multiple operations across several countries with many employees.

v)      The order sought would also be seriously detrimental to VTB, the Essar group's main lender, a third party against whom no allegation of wrongdoing is advanced.  I have already made the point that it is striking that in the Cayman proceedings, AMUSA withdrew its application for a worldwide freezing order following service of VTB's and EGFL's evidence of prejudice.

vi)     There has been delay, at least between March and November 2019, in bringing the application.

vii)    The freezing order is sought against persons out of the jurisdiction, in respect of assets outside the jurisdiction, and in relation to matters with relatively limited links with England & Wales.  It is appropriate for the court to proceed with particular caution in such cases.

The factors referred to in (iv) to (vii) above, taken together, would have led me to refuse the order sought even if I had considered AMUSA had, marginally, shown a good arguable case and a risk of dissipation.

268.    I bear in mind the conclusions which other courts have reached on the evidence before them about related matters, including the decision of this court in AMUSA's proceedings against Essar Steel.  However, on the evidence and arguments presented to me, the balance in my judgment comes down clearly against the grant of the relief sought.

## (N) CONCLUSION

269.    AMUSA's application for a worldwide freezing order will be dismissed.  I shall hear any submissions that may be advanced as to whether, in the light of my conclusions, there remains a case for any of the other relief sought.