UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARCELORMITTAL NORTH AMERICA
HOLDINGS LLC,

                    Plaintiff,

          -v.-

ESSAR GLOBAL FUND LIMITED,

                    Defendant,

          and

MESABI METALLICS COMPANY LLC
*f/k/a* ESSAR STEEL MINNESOTA LLC,

                    Garnishee.

---

21 Civ. 6975 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff ArcelorMittal North America Holdings LLC ("ArcelorMittal"), a prominent North American steelmaker, is the holder of an approximately $1.4 billion judgment (the "Judgment") against non-party judgment debtor Essar Steel Limited ("Essar Steel"). The Judgment, in turn, is the product of an arbitral award for Essar Steel's breach of an agreement to supply Plaintiff with a large quantity of iron ore pellets from an iron ore and pelletizing plant under development in Minnesota. Having thus far been frustrated in its collection efforts, Plaintiff commenced the instant action seeking to enforce the Judgment against Essar Steel's parent corporation, Defendant Essar Global Fund Limited ("Essar Global"). More specifically, Plaintiff seeks to unwind a purportedly fraudulent transaction between Essar Steel and Essar Global that erased Essar Steel's largest asset — a $1.48 billion receivable owed by Essar Global — from

its financial statements.  And because Essar Global purportedly operates as
Essar Steel's alter ego, Plaintiff additionally seeks to hold Essar Global
independently liable for the Judgment and to turn over Essar Global's interest
in certain notes sited in this District that were issued by Garnishee Mesabi
Metallics Company LLC ("Mesabi").

Defendant and Garnishee (together, "Defendants") have moved to dismiss
the case on the basis of *forum non conveniens*, and alternatively to dismiss or
stay the action based on principles of international comity in light of ongoing
parallel proceedings in Mauritius and the United Kingdom.[1]  For the reasons
set forth below, the Court declines to dismiss or stay the action on either of
Defendants' proffered grounds.

**BACKGROUND**[2]

**A.    Factual Background**

**1.    The Parties and Related Entities**

Plaintiff ArcelorMittal, a Delaware limited liability company based in
Chicago, Illinois, is part of the ArcelorMittal Group, one of the world's leading

---

[1]    The Court granted Defendants' application to bifurcate their motion to dismiss briefing
to address first the issues of *forum non conveniens* and international comity, while
reserving the right to seek dismissal for lack of personal jurisdiction and failure to state
a claim at a later date.  (Dkt. #21).

[2]    This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)), the well-pleaded
allegations of which are taken as true for the purposes of this Opinion.  *See RIGroup
LLC* v. *Trefonisco Mgmt. Ltd.*, 949 F. Supp. 2d 546, 549 (S.D.N.Y. 2013) ("On a motion to
dismiss for *forum non conveniens* that is decided without a factual hearing, a court
must accept the facts alleged in the complaint as true." (citation omitted)).  The Court
sources additional facts from the declarations submitted by the parties in connection
with this motion and the exhibits appended thereto, which exhibits are cited using the
convention "[Name] Decl., Ex. [ ]."  *See id.* (explaining that on a *forum non conveniens*
motion, a "court may … consider certain evidence outside the pleadings, including
affidavits" (citing *Aguas Lenders Recovery Grp. LLC* v. *Suez, S.A.*, 585 F.3d 696, 697-98
n.1 (2d Cir. 2009))).

steelmakers and miners. (Compl. ¶ 29; Kohlberg Decl. (Dkt. #37) ¶ 2). Plaintiff operates as the primary holding company for ArcelorMittal North America's operations in the United States. (Kohlberg Decl. ¶ 3). Together with its operating companies and affiliates, Plaintiff employs approximately 2,800 people in the United States and has approximately 15 facilities in the United States, including one in New York, engaged in steelmaking, finishing, sales, and other operations. (*Id.* at ¶¶ 3-4). Plaintiff's predecessor in interest is ArcelorMittal USA, LLC ("ArcelorMittal USA"), which entity assigned to Plaintiff the $1.4 billion Judgment against Essar Steel that forms the basis of this action. (Compl. ¶¶ 29-30). As such, Plaintiff is now the judgment creditor and owner of the debt at issue in this case, a debt that amounts to $1,412,880,771.33. (*Id.* at ¶ 30).

Defendant Essar Global is a multinational corporation organized under the laws of the Cayman Islands that operates across various industries, including steelmaking and mining. (Compl. ¶ 31). Defendant is owned and controlled by the Ruia family and is the ultimate parent of dozens of subsidiaries (collectively with Essar Global, the "Essar Group"). (*Id.* at ¶¶ 31, 130). Judgment debtor Essar Steel is a Mauritian limited liability company and a wholly owned subsidiary of Defendant. (*Id.* at ¶ 33; *see also* Doorbiz Decl. (Dkt. #31) ¶ 5). Essar Steel is presently under administration pursuant to Mauritian law, having been placed into voluntary administration proceedings

---

For ease of reference, the Court refers to Defendants' opening brief as "Def. Br." (Dkt. #27); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #33); and Defendants' reply brief as "Def. Reply" (Dkt. #40).

in March 2019 by its directors.  (Compl. ¶¶ 33, 151).[3]  As alluded to above,
Plaintiff argues that Essar Global should be held independently liable for Essar
Steel's debts as Essar Steel's alter ego, because "Essar Global exercised
complete domination and control over Essar Steel such that Essar Steel was a
mere instrumentality of Essar Global."  (*Id.* at ¶ 183).

Garnishee Mesabi, formerly known as Essar Steel Minnesota LLC, is a
limited liability company organized under the laws of Minnesota.  (Compl.
¶ 32).  Essar Steel Minnesota was a signatory to the original 2012 Pellet Sale
Agreement with ArcelorMittal USA that governed the parties' rights and
obligations with respect to the development of a steel pelletizing plant in
Minnesota.  (*Id.* at ¶¶ 32, 39).  In July 2016, following the breakdown of this
contractual relationship with ArcelorMittal USA, Essar Steel Minnesota filed for
bankruptcy.  (*Id.* at ¶¶ 51-52).  In December 2016, as part of its plan to exit
bankruptcy, Essar Steel Minnesota changed its name to Mesabi Metallics and
issued $300 million in Fixed Rate Junior Secured Notes (the "Notes"), $260
million of which were ultimately acquired by Essar Global.  (*Id.* at ¶¶ 7, 32, 62,
64, 69).[4]  The Notes, the associated indenture, and the pledge and security

---

[3]    The Court discusses the significance of the Mauritian administration proceedings in
further detail *infra* note 5.

[4]    Defendants represent that the Notes are not owned by Essar Global and thus Plaintiff's
attempt to garnish Essar Global's interest in the Notes is premised on an error.  (Def.
Br. 21; Def. Reply 7).  As support for their position concerning the ownership of the
Notes, Defendants cite a 2020 decision issued by the Minnesota Court of Appeals,
stating that "[i]n December 2018, Essar Energy Solutions Ltd. (Essar Energy), an
affiliate of Essar Global, purchased $260 million in secured notes issued by Mesabi to
its lenders."  *See Essar Glob. Fund Ltd.* v. *Roberts-Davis*, No. A19-1743, 2020 WL
3172844, at *1 (Minn. Ct. App. June 15, 2020).  This representation is in direct conflict
with Plaintiff's allegation that "[a]s found on Essar's website in a press release dated
January 7, 2019, Essar Global announced that 'Essar Global has purchased US$260

agreement are governed by New York law.  (*Id.* at ¶ 64).  In the present action, Plaintiff requests that the Court order Mesabi to pay over to Plaintiff any and all amounts due on the Notes.  (*Id.* at ¶¶ 190-192).

Several additional entities within the Essar Group factor into this dispute.  Essar Resources, Inc. ("Essar Resources"), an indirect subsidiary of Essar Global, entered into the original Pellet Sale Agreement along with Essar Steel Minnesota.  (Compl. ¶¶ 34, 39).  Essar Resources was eventually removed from the agreement and substituted with Essar Steel.  (*Id.* at ¶¶ 34, 45).  Essar Americas, Inc. ("Essar Americas"), another subsidiary of Essar Global, is a New York-based corporation whose office is located at 277 Park Avenue in Manhattan.  (*Id.* at ¶ 35).  As relevant here, at least some portion of the negotiations over the Pellet Sale Agreement took place out of Essar Americas's office in New York.  (*Id.* at ¶¶ 5, 40).  In addition, Essar Steel, Essar Steel Minnesota, and Essar Global listed Essar Americas's New York City office as the location for notices relating to several of the agreements implicated here. (*Id.* at ¶¶ 5, 16, 35).  Finally, Essar Steel Mauritius Limited ("Essar Steel Mauritius"), Essar Steel Asia Holdings Limited ("Essar Asia"), and Essar Steel India Limited ("Essar India") were involved in the transactions that gave rise to Essar Steel's $1.48 billion account receivable that was subject to an allegedly fraudulent conveyance.  (*Id.* at ¶¶ 36, 37, 71).

---

million face value notes issued by Mesabi Metallics Inc.'"  (Compl. ¶ 4).  Because Defendants have provided no documentary evidence in support of their position as to the ownership of the Notes, the Court presumes the truth of Plaintiff's allegations, as it must on this motion.  *See Aguas Lenders*, 585 F.3d at 697.

### 2.    The Pellet Sale Agreement and Its Amendments

On December 17, 2012, ArcelorMittal USA entered into the Pellet Sale Agreement with Essar Steel Minnesota and Essar Resources for the purchase of a large quantity of iron ore pellets — a raw material necessary for the production of steel — over a ten-year period from an iron ore mine and pelletizing plant then being developed by Essar Steel Minnesota in Nashwauk, Minnesota. (Compl. ¶¶ 5, 39). Employees of Essar Steel Minnesota situated in New York negotiated the Pellet Sale Agreement. (*Id.* at ¶ 40). As a notable example, Essar Steel Minnesota's President and Chief Executive Officer Madhu Vuppuluri was based in New York when he signed the Pellet Sale Agreement on behalf of both Essar Resources and Essar Steel Minnesota. (*Id.* at ¶¶ 21-22, 40). The parties also selected New York law to govern this agreement. (*Id.* at ¶¶ 5, 40).

The Pellet Sale Agreement was critical to the Essar Group's project to construct a mine and pelletizing plant in Minnesota. (Compl. ¶¶ 39, 41). This is because the Pellet Sale Agreement locked in a long-term buyer for the iron ore pellets that the plant expected to produce, which helped assure lenders that Essar Steel Minnesota could generate the revenue necessary to repay the hundreds of millions of dollars of debt that it incurred in pursuit of the project. (*Id.* at ¶¶ 23-24). Essar Global and Essar Steel entered into agreements with several lenders to guarantee Essar Steel Minnesota's debt in order to secure financing for the Minnesota plant, all of which agreements were governed by New York law. (*Id.* at ¶¶ 14(b)-(e), 19(a)-(d), 41-42).

The Pellet Sale Agreement provided that Essar Steel was to commence the production and delivery of the iron ore pellets to ArcelorMittal USA no later than July 1, 2014. (Compl. ¶ 43). When it became evident that Essar Steel Minnesota would be unable to meet its obligations under the Pellet Sale Agreement by the contractually imposed deadline, on January 10, 2014, the parties executed the Amended Pellet Sale Agreement, which extended the deadlines for the commencement of production and delivery of the iron ore pellets to July 1, 2015. (*Id.* at ¶¶ 44-45). The Amended Pellet Sale Agreement also substituted Essar Steel for Essar Resources. (*Id.* at ¶ 45). As with the original agreement, the Amended Pellet Sale Agreement was negotiated, in part, through Essar Group employees in New York, including Vuppuluri, who signed the agreement as President and CEO of Essar Steel Minnesota. (*Id.* at ¶ 46). Incident to the amended agreement, Essar Global entered into additional agreements to guarantee further debt incurred by Essar Steel Minnesota and committed to cover any shortfall in funding for the pellet plant project, all of which agreements were governed by New York law. (*Id.* at ¶¶ 47-48).

The Pellet Sale Agreement was amended three additional times: twice more in 2014 and once in 2015. (Compl. ¶¶ 46, 49). The third of these amendments, executed on June 18, 2015, provided another year-long extension of Essar Steel's pellet delivery deadline to July 1, 2016. (*Id.* at ¶ 49). In December 2015 and January 2016, Vuppuluri sought still another extension of the delivery deadline, hoping to persuade ArcelorMittal USA by assuring it that Essar Global was the ultimate shareholder of Essar Steel Minnesota and

that Essar Global would guarantee Essar Steel Minnesota's debts and cover any shortfall between the total cost of the pellet plant and the available financing.  (*Id.* at ¶ 50).  ArcelorMittal USA did not agree to another extension, after which it became clear that Essar Steel would not meet its delivery deadline.  (*Id.* at ¶ 51).  On May 27, 2016, ArcelorMittal USA provided notice of its decision to terminate the Pellet Sale Agreement for Essar Steel's non-performance.  (*Id.*).  Unable to construct the plant needed to perform under the Pellet Sale Agreement as amended, and saddled with over $1 billion in liabilities, in July 2016, Essar Steel Minnesota filed for bankruptcy.  (*Id.* at ¶¶ 6, 52).

### 3.     The Arbitral Award and the Judgment

On August 9, 2016, ArcelorMittal USA commenced an arbitration before the International Chamber of Commerce (the "ICC") against Essar Steel to recover damages for Essar Steel's breach of the Amended Pellet Sale Agreement (the "ICC Arbitration" or the "Arbitration").  (Compl. ¶¶ 2, 53).  In the Arbitration, ArcelorMittal USA sought compensation for having to purchase substitute iron ore pellets at higher prices.  (*Id.* at ¶ 54).  On December 19, 2017, a three-member arbitral tribunal issued an award in ArcelorMittal USA's favor, concluding that Essar Steel Minnesota anticipatorily repudiated the Amended Pellet Sale Agreement and that Essar Steel was jointly and severally liable for the ensuing damages.  (*Id.* at ¶ 57).  The arbitral tribunal awarded ArcelorMittal USA damages in the amount of $1,379,457,503, plus the costs of the Arbitration and a compounding rate of post-judgment interest.  (*Id.*).

Several months later, on April 2, 2018, the Judgment arising from the arbitral award against Essar Steel was entered in the United States District Court for the District of Minnesota. (Compl. ¶ 58). On June 11, 2021, ArcelorMittal USA assigned the Judgment to Plaintiff, which, in turn, registered the Judgment in the Southern District of New York. (*Id.* at ¶¶ 59, 60). To date, neither Essar Steel nor any other Essar Group entity has satisfied any portion of the amount due to Plaintiff pursuant to the Judgment. (*Id.* at ¶ 61).

### 4. The Alleged Fraudulent Conveyance

Beginning in 2012 — the year the original Pellet Sale Agreement was executed — Essar Global engaged in a series of transactions that culminated in the creation of a $1.48 billion receivable that was ultimately erased from Essar Steel's financial statements. (*See* Compl. ¶¶ 1-2, 70, 152-180). Before delving into further detail into each of the relevant transactions, the Court first provides a general outline of the parties' positions with respect to the nature of the corporate maneuvers at issue. On Plaintiff's view, the transactions that created the $1.48 billion receivable lacked any legitimate business purpose, thus evincing Essar Global's disregard for the corporate formalities of its subsidiaries. (*See id.* at ¶¶ 77, 85). Further, Plaintiff insists that Essar Steel's erasure of this receivable from its financial statements was fraudulent in that it was designed to frustrate Plaintiff's collection on the Judgment. (*Id.* at ¶¶ 117-126). These illegitimate transactions, Plaintiff argues, violate several provisions of New York's Debtor and Creditor Law and should be unwound. (*Id.* at ¶¶ 152-181).

Defendants maintain that the receivable of which Plaintiff speaks was never truly a debt that Essar Global owed to Essar Steel.  (*See* Doorbiz Decl. (Dkt. #31) ¶¶ 8, 10-11).  To the contrary, the transactions that gave rise to the purported receivable were part of a longstanding restructuring plan — developed years before Plaintiff initiated the ICC arbitration — that was intended to capitalize a new part of the Essar Group's business without leaving Essar Global in debt to Essar Steel.  (*Id.* at ¶¶ 8, 10).  On this view, Plaintiff's confusion arises from an accounting error that mistakenly recorded an account receivable as an asset in Essar Steel's financial statements, when in reality the Essar Group had planned for years to shift Essar Steel's assets to another part of the Essar Group.  (*Id.* at ¶ 11).  Thus, Defendants claim, removal of the receivable from Essar Steel's financial statements was needed to accurately reflect the economic substance of the transactions that the Essar Group executed in furtherance of a preexisting restructuring plan that was wholly unrelated to the Judgment.  (*Id.*).

### a.   The 2012 Share Purchase Agreement

According to Defendants, the first relevant transaction occurred on June 29, 2012, when Essar Steel sold approximately 1.9 billion shares of Essar India to Essar Asia in exchange for an unsecured, non-interest-bearing promissory note worth about $1.3 billion.  (Compl. ¶¶ 71-72).  On March 23, 2013, Essar Steel transferred the $1.3 billion promissory note to Essar Global pursuant to an assignment agreement.  (*Id.* at ¶ 74).  From there, Essar Global reassigned the $1.3 billion promissory note to one of its direct subsidiaries,

Essar Steel Mauritius, which then assigned the note back to Essar Asia.  (*Id.* at ¶ 75).  This left Essar Asia in possession of both the shares of Essar India that it had purchased from Essar Steel, as well as the promissory note it had issued as consideration for these shares.  (*Id.*).  According to Plaintiff, this web of transactions extinguished the $1.3 billion promissory note for all practical purposes.  (*Id.* at ¶¶ 75, 81).

After assigning the $1.3 billion promissory note to Essar Global, Essar Steel recorded a $1.3 billion account receivable as a current asset in its audited financial statements for the year ending on March 31, 2013.  (Compl. ¶¶ 76-78).  These financial statements, which were audited by an external auditor and approved by Essar Steel's Board of Directors, specified that this $1.3 billion account receivable from Essar Global to Essar Steel was "unsecured, non-interest bearing and repayable on demand."  (*Id.* at ¶¶ 78-80).  At the time, this receivable comprised approximately 94 percent of Essar Steel's current assets, and approximately 54 percent of its total assets.  (*Id.* at ¶ 76).

### b.   The 2013 Share Purchase Agreement

In March 2013, less than a year after transferring a large volume of Essar India shares to Essar Asia as just described, Essar Steel purchased nearly 119 million additional shares of Essar India for nearly $100 million. (Compl. ¶ 83).  Thereafter, on August 26, 2013, Essar Steel transferred these additional shares of Essar India to Essar Asia in exchange for a second non-interest-bearing promissory note worth approximately $99 million.  (*Id.* at ¶ 84).  This $99 million promissory note was then shuffled around Essar Group

11

entities just as the prior-issued $1.3 billion promissory note had been: first from Essar Steel to Essar Global, then from Essar Global to Essar Steel Mauritius, and finally from Essar Steel Mauritius to Essar Asia. (*Id.*). Like the series of transactions that created the $1.3 billion receivable, the upshot of these transactions as reflected on Essar Steel's contemporaneous financial statements was an exchange of Essar Steel's Essar India stock for a commensurate account receivable from Essar Global. (*Id.*).

Both the $1.3 billion account receivable and the $99 million account receivable from Essar Global were included in Essar Steel's financial statements for the year ending on March 31, 2014. (Compl. ¶ 86). As with the previous fiscal year's financial statements, the March 31, 2014 financial statements were audited by an independent auditor and approved by Essar Steel's Board of Directors. (*Id.* at ¶¶ 89-90). Combined, these two receivables totaled approximately $1.48 billion, which comprised approximately 91 percent of Essar Steel's current assets and 57 percent of its total assets. (*Id.* at ¶ 87). The $1.48 billion account receivable also appeared unchanged in Essar Steel's March 31, 2015 financial statements. (*Id.* at ¶ 90).

### c.     The Elimination of the $1.48 Billion Account Receivable

On September 29, 2016 — less than two months after ArcelorMittal USA noticed the ICC arbitration — Essar Steel's Board of Directors approved the company's financial statements for the fiscal year ending on March 31, 2016, which statements eliminated the $1.48 billion account receivable. (Compl.

¶¶ 92-94).  Unsurprisingly, the parties sharply dispute the import and the intent of this revision to Essar Steel's financial statements.

Essar Steel noted in its 2016 financial statement that it was changing the accounting treatment of the $1.48 billion account receivable by way of a prior year adjustment.  (Compl. ¶ 102).  To justify this adjustment, Essar Steel explained that its assignment of the $1.48 billion worth of promissory notes to Essar Global was "an advance against future buyback" of its own equity shares.  (*Id.*).  In other words, Essar Steel assigned its interest in the promissory notes to Essar Global expecting the notes to serve as prepayment for the buyback of shares of its own stock that were held by its parent company.  (Doorbiz Decl. ¶ 10).  Because Essar Steel's transfer of the promissory notes was intended to serve as prepayment for an equal value of its own shares, Essar Steel attested that its financial statements never should have listed the $1.48 billion account receivable, and that it was this mistake that the 2016 prior-year adjustment corrected.  (Compl. ¶¶ 101-102).

Plaintiff disputes this explanation and argues that this proposed share buyback is mere "pretextual justification" for the elimination of Essar Steel's most valuable asset, amounting to nothing more than "meaningless coinage designed to mask the fraudulent transfer" motivated by avoidance of the Judgment.  (Compl. ¶¶ 103, 125).  Plaintiff points to several features of the extinguishment of the $1.48 billion account receivable as evincing badges of fraud, including that (i) it was executed mere months following the initiation of the ICC Arbitration (*id.* at ¶¶ 117-118); (ii) it took place between related

entities, without any consideration to Essar Steel, and left Essar Steel insolvent (*id.* at ¶¶ 119-121); (iii) it was done outside the ordinary course of business by auditors and board members who had repeatedly affirmed the integrity of Essar Steel's previous balance sheets (*id.* at ¶¶ 122, 124); and (iv) the proposed share buyback was illegal under Mauritian law when it was announced (*id.* at ¶¶ 108-116, 123, 125). In addition, Plaintiff argues that this conveyance "is a textbook case of a dominant shareholder disregarding the corporate form of, and siphoning assets from, its subsidiary," thus furthering Plaintiff's contention that Essar Global and Essar Steel are alter egos. (*Id.* at ¶ 128; *see also id.* at ¶¶ 127-151 (detailing how Essar Global controlled Essar Steel and other Essar Group entities)).

### 5. Related Proceedings

In support of their arguments for dismissal, Defendants point to the existence of three separate actions addressing the same transactions that form the basis of Plaintiff's claims in this action. The first action is a now-dismissed case that was brought by ArcelorMittal USA against Essar Global (and others) in Minnesota state court to recover on the arbitral award on a similar alter ego theory. The other two actions are foreign proceedings that remain ongoing in Mauritius and the United Kingdom. Because the relationship between these actions and the case at bar is critical to the Court's resolution of Defendants' motion, the Court summarizes them in relevant part below.

### a.    The Minnesota Action

On March 2, 2018, ArcelorMittal USA brought suit against Essar Steel, Essar Global, Essar Steel Asia, Essar Steel Middle East Fze, and Prashant Ruia in Minnesota state court, seeking to hold the named Essar Group entities and the CEO of Essar Global liable for Essar Steel's outstanding liability to Plaintiff on alter ego, veil-piercing, and agency theories (the "Minnesota Action"). (Beattie Decl. (Dkt. #29), Ex. 1 (the "Minnesota Complaint")).  Like the present action, the Minnesota Complaint alleged that Essar Group entities "stripped Essar Steel of its assets in an attempt to avoid claims by Essar Steel's creditors."  (*Id.* at ¶ 1).  To this end, the allegedly fraudulent conveyances of Essar Steel's stake in Essar India were but "one part of a broader scheme in which Essar Global … disregarded corporate form to shield subsidiaries' assets from claims such as ArcelorMittal USA's claim against Essar Steel."  (*Id.* at ¶¶ 52-56, 62).

The Essar Group entities moved to dismiss the Minnesota Action based on lack of personal jurisdiction, *forum non conveniens*, and failure to state a claim.  (Beattie Decl., Ex. 2 (the "Minnesota State Court Order") at 8-9).  In a decision dated June 27, 2018, the Minnesota court found that it lacked personal jurisdiction over Essar Steel, Essar Global, and Essar Asia with respect to ArcelorMittal USA's claims that Essar Steel made fraudulent transfers to the Essar Group entities named as defendants in the case.  (*Id.* at 34-40).  The court next found that, assuming it had jurisdiction over ArcelorMittal's fraudulent transfer claim, as well as its alter ego, veil-piercing,

and agency claims, it would decline to exercise that jurisdiction due to the
doctrine of *forum non conveniens.*  (*Id.* at 43-51).  In so holding, the court
reasoned that (i) Mauritius was an adequate, alternative forum for
ArcelorMittal's claims and that the private and public interest factors weighed
in favor of dismissal given the foreign entities involved, and (ii) Cayman Islands
law likely applied to Plaintiff's alter ego, veil-piercing, and agency claims.  (*Id.*
at 44-50).

### b.    The Mauritian Proceeding

On March 26, 2019, Essar Steel's Board of Directors placed Essar Steel
into voluntary administration proceedings in Mauritius.  (Uteem Decl. (Dkt.
#32) ¶ 3).[5]  The board appointed insolvency practitioner Abdul Sattar Adam Ali
Mamode Hajee Abdoula as Essar Steel's administrator.  (*Id.*).  Within a month
following Essar Steel's entry into administration, on April 17, 2019,
ArcelorMittal USA, acting in its capacity as a creditor of Essar Steel, filed an
application with the Supreme Court of Mauritius, Bankruptcy Division to end
the administration proceedings and remove Abdoula as administrator out of
the related concerns that Essar Steel was feigning insolvency after fraudulently
conveying its assets to Essar Global and that Abdoula was not an impartial

---

[5]    Under Mauritian law, the primary purpose of administration is to rehabilitate a
distressed company to provide it with a chance to continue its operations.  (Bahemia
Decl. (Dkt. #35) ¶ 8).  To this end, when an entity enters voluntary administration in
Mauritius, either the entity itself (through its directors), its creditors, or a court
appoints an administrator to formulate a plan to rescue the entity or make it solvent.
(*Id.* at ¶ 9).  The commencement of administration proceedings neither concentrates all
litigation concerning the subject entity into the administration proceedings, nor
precludes the filing of additional actions against the subject entity outside of the
Bankruptcy/Commercial Division of the Supreme Court of Mauritius.  (*Id.* at ¶ 11).

administrator.  (Bahemia Decl. ¶ 16; Uteem Decl. ¶ 4).[6]  That same day,
ArcelorMittal USA filed a motion to appoint Mushtaq Mohamed Oomar
Noormohamed Oosman as an additional administrator of Essar Steel to
exercise the powers of administrator jointly and concurrently with Abdoula.
(Bahemia Decl. ¶ 17; Uteem Decl. ¶ 4).  On April 19, 2019, the Supreme Court
of Mauritius, Bankruptcy Division granted the motion and appointed Oosman
as a co-administrator of Essar Steel.  (Bahemia Decl. ¶ 17; Uteem Decl. ¶ 4).

Essar Steel's placement into voluntary administration has spawned
several separate legal disputes that have combined to cloud the status of the
administration proceedings.  The Court begins with the related litigation that
bears the closest resemblance to the case at bar:  After learning of ArcelorMittal
USA's claim that it was entitled to garnish the debt that Essar Global
purportedly owed to Essar Steel in order to collect on the Judgment, Essar
Global initiated a lawsuit on May 6, 2019, against Essar Steel in the Supreme
Court of Mauritius, Commercial Division seeking a declaration that Essar
Global was not, in fact, indebted to Essar Steel (the "Mauritian Proceeding").
(Uteem Decl. ¶ 6; Bahemia Decl. ¶ 22; *see also* Bahemia Decl., Ex. 1 (the
"Mauritian Plaint")).[7]  As set forth in Essar Global's pleading in the Mauritian

---

[6]     To the Court's knowledge, this application remains pending before the Supreme Court
of Mauritius, Bankruptcy Division.  (Uteem Decl. ¶ 4; Bahemia Decl. ¶ 21).

[7]     In addition to Essar Steel, Essar Global named ArcelorMittal USA, Essar Steel's
purported creditor VTB Bank (PJSC) ("VTB Bank"), and Essar Steel's management
company and company secretary Rogers Capital Corporate Services Ltd. as co-
defendants in the Mauritian Proceeding.  (Mauritian Plaint ¶¶ 3-4, 6).  Plaintiff
represents that it (though not Essar Global) has taken the necessary steps to request
the substitution of ArcelorMittal for ArcelorMittal USA in these proceedings; the court
there has yet to effectuate this substitution.  (Bahemia Decl. ¶¶ 35-44).

17

Proceeding, the action "seek[s] the determination of certain issues ... as to the validity of the [Essar Group's] Corporate Reorganization ... and, in particular, as to (i) the validity of the Buybacks [of Essar Steel stock from Essar Global] ... and (ii) whether [Essar Global] is presently indebted to [Essar Steel] in the sum of approximately US1.5b or otherwise liable to [Essar Steel]."  (Mauritian Plaint ¶ 8).  As such, the Mauritian Proceeding focuses on the same web of transactions that generated the $1.48 billion account receivable that previously appeared on Essar Steel's financial statements.

The parties have assumed divergent positions over the propriety and integrity of the Mauritian Proceeding.  Plaintiff asserts that Essar Global's suit against Essar Steel in Mauritius is a collusive effort between a parent company and one of its wholly owned subsidiaries geared toward extinguishing a debt to enable the subsidiary to avoid repaying its third-party creditors.  (Bahemia Decl. ¶ 25).  As support for its theory of collusion, Plaintiff underscores the history of ArcelorMittal USA's efforts to enforce the Judgment, including the fact that Essar Global initiated the Mauritian Proceeding following the entry of two adverse orders by foreign courts relating to the satisfaction of the Judgment: (i) an English court's worldwide freezing order against Essar Steel and (ii) a Caymanian court's search and disclosure order against Essar Global. (*Id.*; Mauritian Plaint ¶ 4).  Furthermore, Plaintiff notes that a conflicted law firm simultaneously representing Essar Global and Essar Steel instituted the Mauritian Proceeding.  (Bahemia Decl. ¶¶ 25-32).

18

Defendants dispute Plaintiff's characterization of the Mauritian Proceeding, arguing that there is nothing collusive or procedurally improper about Essar Global's suit against Essar Steel.  (Uteem Decl. ¶ 7).  Defendants observe that Essar Global (i) obtained leave from the Supreme Court of Mauritius, Bankruptcy Division to bring the action; (ii) included ArcelorMittal USA as a co-defendant; and (iii) specifically disclosed the adverse orders from the English and Caymanian courts in the Mauritian Plaint.  (*Id.*).  Defendants also maintain that the attorney who instituted the Mauritian Proceeding was not conflicted from representing Essar Global, but that he nevertheless withdrew from this representation and has since been replaced by substitute counsel.  (*Id.*).

The Mauritian Proceeding remains at an early stage, its progress having been stalled by a stalemate that has developed in Essar Steel's administration proceedings.  (*See* Uteem Decl. ¶ 10; Bahemia Decl. ¶ 34).  On September 23, 2019, ArcelorMittal USA obtained an interim order from the Supreme Court of Mauritius, Commercial Division, preventing Essar Steel's administrator Abdoula from unilaterally convening a watershed meeting of Essar Steel's creditors without input from co-administrator Oosman.  (Uteem Decl. ¶ 9; Bahemia Decl. ¶ 18).  Co-administrators Abdoula and Oosman remain deadlocked over the convening of this watershed meeting of creditors, which has prevented this meeting from being held during the mandatory period prescribed by the Mauritian Insolvency Act of 2009, thereby muddling the status of the administration proceedings.  (Uteem Decl. ¶ 9).  Hoping to resolve

the questions around Essar Steel's administration, VTB Bank, as a creditor of Essar Steel, commenced a separate action on December 19, 2019, in the Supreme Court of Mauritius, Bankruptcy Division seeking a declaration that Essar Steel's administration has ended or, in the alternative, removing Essar Steel's co-administrators and appointing a liquidator. (Bahemia Decl. ¶ 19). The following year, on October 22, 2020, Oosman filed an application to formally extend Essar Steel's administration. (*Id.* at ¶ 20). To the Court's knowledge, no ruling has been made either on Oosman's application or in VTB Banks's suit, thus leaving Essar Steel's administration proceedings in a state of limbo.

### c.    The English Proceeding

As for the final relevant litigation, Plaintiff is presently pursuing an action to recover on the ICC arbitral award in the English High Court of Justice, Business and Property Courts of England and Wales, Queens Bench Division, Commercial Court on the theory that certain Essar Group entities and individuals conspired to strip Essar Steel of its assets in order to prevent it from satisfying its debt obligations (the "English Proceeding"). (Rocher Decl. (Dkt. #36) ¶ 5; O'Rourke Decl. (Dkt. #30) ¶¶ 3, 6). The proceedings in the United Kingdom kicked off on January 10, 2019, when ArcelorMittal USA filed Application Notices seeking (i) a worldwide freezing order against Essar Steel; (ii) a search order against Essar Capital Services (UK) Limited ("Essar Capital Services") and two Essar Group senior executives; and (iii) an order for disclosure of documents and information — termed *Norwich Pharmacal* relief in

English legal parlance — from Essar Capital Services and six Essar Group senior personnel.  (Rocher Decl. ¶ 6; *see also id.*, Ex. 1 (the "English Freezing Order")).[8]  Following a private hearing held on January 14, 2019, Justice John Butcher granted ArcelorMittal USA permission to enforce the ICC award as a judgment of the High Court and entered a worldwide freezing order against Essar Steel, as well as a search order and *Norwich Pharmacal* relief against the parties flagged by ArcelorMittal USA.  (Rocher Decl. ¶ 6; English Freezing Order ¶ 8).  By written order dated March 25, 2019, Justice Richard Jacobs denied the defendants' request to set aside these orders.  (Rocher Decl. ¶ 7; *see* English Freezing Order).

ArcelorMittal USA filed the Particulars of Claim in the English Action on November 18, 2019, alleging that the defendants had engaged in a "wide-ranging unlawful conspiracy to avoid paying damages arising out of the breach of [the Pellet Sale Agreement]."  (Particulars of Claim ¶ 1).  As pleaded, the defendants endeavored to, among other things, "[w]rongfully strip Essar Steel of its assets and prevent Essar Steel from taking steps to recover them, thereby impeding [ArcelorMittal USA's] attempts to enforce those obligations [based on the ICC award and the ensuing Judgment]."  (*Id.* at ¶ 33.3).  ArcelorMittal claimed that in furtherance of this conspiracy, those controlling Essar Steel

---

[8]     Essar Capital Services is an English company that is wholly owned by Essar Global. (Rocher Decl., Ex. 2 ("Particulars of Claim") ¶ 23).  Essar Capital Services was implicated in the English Proceeding because ArcelorMittal believed that it possessed documents relevant to Essar Steel's assets as a function of providing management services to, and entering into service agreements with, Essar Global and Essar Steel. (English Freezing Order ¶ 23).

divested the company of its assets, including its holdings of Essar India via the transactions detailed *supra* Background Section A.4.  (*Id.* at ¶¶ 52-70).  Just as Plaintiff asserts in the present action, ArcelorMittal USA alleges in the English Proceeding that Essar Global and others caused "Essar Steel falsely to restate its accounts so that a debt due to Essar Steel from [Essar Global] was concealed and no longer recognized in Essar Steel's accounts."  (*Id.* at ¶ 36.2(c)).  From the surrounding circumstances, ArcelorMittal USA infers that the "unlawful restatement of the accounts was part of the Conspiracy, and was intended to conceal, or covertly to remove, value from Essar Steel, so as to disadvantage any creditors, in particular [ArcelorMittal USA]."  (*Id.* at ¶ 100; *see also id.* at ¶¶ 91-101).

On December 30, 2019, ArcelorMittal USA filed an application with the English High Court of Justice for a worldwide freezing order against Essar Global and two members of the Ruia family.  (O'Rourke Decl. ¶ 9; Rocher Decl. ¶ 9).  Following a two-day hearing, Justice Andrew Henshaw denied the application in an 81-page judgment issued on March 30, 2020.  (*See* O'Rourke Decl., Ex. 2 ("Henshaw Order")).  Justice Henshaw made several observations in this decision that speak to issues implicated in the instant action.  To begin, Justice Henshaw analyzed contemporaneous documentary evidence relating to the restructuring plan that motivated Essar Steel's adjustment of its financial statements, noting that "the evidence strongly suggests that a restructuring, elements of which would include the sale of [Essar India] by Essar Steel in return for a promissory note and the distribution of that note to [Essar Global]

by way of dividend or reduction of capital, had been contemplated and planned

for many months or years before" ArcelorMittal entered into the Pellet Sale

Agreement or significant problems emerged with respect to that agreement.  (*Id.*

at ¶ 53; *see also id.* at ¶¶ 42-43).  Justice Henshaw therefore concluded that

ArcelorMittal USA's "case that the restructuring in 2012 and 2013 involving the

removal of Essar Steel India from Essar Steel was done pursuant to an

unlawful means conspiracy strains credulity." (*Id.* at ¶ 214(i)).  Likewise, with

respect to Essar Steel's assignments to Essar Global of the promissory notes it

received from Essar Asia in exchange for its shares of Essar India, Justice

Henshaw concluded that "[t]he allegation that the assignment of by far the

larger of the two promissory notes to [Essar Global] in March 2013 was

designed to evade liabilities to [ArcelorMittal USA] lacks any real cogency," and

that "[t]he same applies to the assignment of the smaller note in November

2013." (*Id.* at ¶ 214(ii)-(iii)).  Finally, Justice Henshaw cast doubt on

ArcelorMittal USA's allegation that the revision to Essar Steel's 2016 financial

statement was part of an unlawful means conspiracy because it failed to "put

forward any realistic case that the change amounted to a dissipation or

attempted dissipation of an asset, let alone of a clear debt claim." (*Id.* at

¶ 214(iv)).  On April 20, 2020, Justice Guy Newey of the English Court of

Appeal, Civil Division denied ArcelorMittal USA permission to appeal Justice

Henshaw's interlocutory order.  (O'Rourke Decl., Ex. 3).

Following the adverse decision on its application for a freezing order

against Essar Global, on December 7, 2020, ArcelorMittal USA filed an

Amended Particulars of Claim, which narrowed the scope of the alleged conspiracy to focus on Essar Steel's waiver of the $1.48 billion account receivable at a time when it bore substantial financial obligations to ArcelorMittal USA.  (*See* Rocher Decl. ¶ 11; *see also id.*, Ex. 3 ¶¶ 5-6). ArcelorMittal USA filed the currently operative pleading in the English Proceeding on March 24, 2021, when it re-amended its particulars of claim to substitute ArcelorMittal into the case for ArcelorMittal USA.  (O'Rourke Decl., Ex. 1 ("Re-Amended Particulars of Claim")).  The conspiracy outlined in the Re-Amended Particulars of Claim is substantively identical to that outlined in the Amended Particulars of Claim: Plaintiff alleges that the defendants conspired to render Essar Steel judgment-proof by causing Essar Steel to waive the $1.48 billion account receivable with the intention of thwarting Essar Steel's ability to satisfy the Judgment.  (*Id.* at ¶¶ 38-43, 47-49).  Defendants employed unlawful means to further the conspiracy because forcing Essar Steel to waive the account receivable violated, among other things, Essar Steel's directors' fiduciary duties under Mauritian law.  (*Id.* at ¶¶ 50-56).[9]

The parties to the English Proceeding are currently engaged in disclosures, with a six-week trial scheduled to commence on November 13, 2023.  (Rocher Decl. ¶ 16; O'Rourke Reply Decl. (Dkt. #41) ¶ 3).  As for immediate next steps in the English Proceeding, the parties are in the process

---

[9]     Plaintiff explains that while English law applies to its tort claim for unlawful means conspiracy, Mauritian law applies to determine whether Essar Steel's directors committed the underlying unlawful act of breach of fiduciary duty.  (Rocher Decl. ¶ 13).

of agreeing on the scope of discovery, which is expected to take some time.

(O'Rourke Reply Decl. ¶ 3).

## B.   Procedural Background

Plaintiff initiated the instant action on August 18, 2021, with the filing of the Complaint, asserting alter ego and fraudulent conveyance claims against Essar Global and claiming an interest in the Notes issued by Mesabi.  (Dkt. #1). The Complaint asserts six causes of action: the first three call for Essar Global to rescind and turn over Essar Steel's fraudulent conveyance pursuant to various provisions of New York's Debtor and Creditor Law (Compl. ¶¶ 152-181); the fourth is an alter ego claim against Essar Global seeking to hold it independently liable for Essar Steel's debt to Plaintiff (*id.* at ¶¶ 182-186); the fifth seeks turnover of Essar Global's interest in the Notes and any other assets in an amount to satisfy the Judgment (*id.* at ¶¶ 187-189); and the sixth seeks an order directing Mesabi to pay to Plaintiff any and all amounts due on the Notes (*id.* at ¶¶ 190-192).

On September 17, 2021, Defendants filed a pre-motion letter indicating their intent to move to dismiss the Complaint for *forum non conveniens*, comity abstention, lack of personal jurisdiction, and failure to state a claim.  (Dkt. #14).  In this letter, Defendants asked for leave to bifurcate their motion to dismiss to address first what they perceived to be the threshold issue of *forum non conveniens*.  (*Id.* at 1).  The following week, Plaintiff filed a letter in opposition to Defendants' proposed motion (Dkt. #17), and the Court set a conference to discuss Defendants' anticipated motion to dismiss (Dkt. #20).

The Court convened a pre-motion conference on November 3, 2021, at which the parties discussed the interplay between this action and the ongoing proceedings in Mauritius and the United Kingdom.  (Dkt. #22 (transcript of conference)).  The day following the conference, the Court issued an order granting Defendants' application to bifurcate their motion to dismiss to first address the issues of *forum non conveniens* and international comity and setting a briefing schedule for this first round of motion practice.  (Dkt. #21).

Defendants filed their motion to dismiss and supporting papers on January 14, 2022 (Dkt. #26-32), and Plaintiff filed its opposition papers on March 4, 2022 (Dkt. #33-37).  On April 1, 2022, Defendants submitted their reply brief and supporting materials.  (Dkt. #40-42).  On May 19, 2022, Defendants filed a notice of supplemental authority, alerting the Court to a recent decision from the Second Circuit bearing on the *forum non conveniens* analysis.  (Dkt. #43).  Four days later, Plaintiff filed a response to Defendants' notice of supplemental authority, disputing Defendants' characterization of the relevance of this recent decision.  (Dkt. #44).  Accordingly, the Court deems Defendants' motion to dismiss fully briefed and ripe for consideration.

## DISCUSSION

Defendants have moved to dismiss the Complaint on two grounds: *forum non conveniens* and comity-based abstention.  With respect to *forum non conveniens*, Defendants contend that all of Plaintiff's claims fundamentally concern foreign entities engaged in transactions consummated abroad that are governed by foreign law.  (Def. Br. 1-3).  Defendants posit that either England

26

or Mauritius would be a superior alternative forum to adjudicate this dispute, as parallel actions have been pending in these jurisdictions for years, and as Plaintiff's claims bear only a tenuous connection to the United States. (*Id.* at 18-28). On the comity front, Defendants urge deference to the proceedings currently before the English and Mauritian courts because they stand to fully resolve Plaintiff's claims in this action. (*Id.* at 28-34).

As the Court will explain, Plaintiff's choice of forum is entitled to substantial deference in the *forum non conveniens* analysis, and that deference is not overcome by any of the relevant public or private interest factors that might otherwise counsel in favor of pursuing the claims elsewhere. The Court also concludes that principles of international comity do not provide a basis for dismissal or stay of this action, as this case does not pose the type of exceptional circumstance that would compel this Court to relieve itself of its obligation to exercise jurisdiction.

## A.    *Forum non Conveniens*

### 1.    Applicable Law

"The doctrine of *forum non conveniens* is a discretionary device permitting a court in rare instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim." *Carey* v. *Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004) (internal quotation marks and citation omitted). The decision to grant a motion to dismiss on grounds of *forum non conveniens* "lies wholly within the broad discretion of the district court[.]" *Iragorri* v. *United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (en

banc) (citation omitted).  The party seeking dismissal "bears the burden of proof on all elements of the motion." *Bank of Credit & Com. Int'l (Overseas) Ltd. v. State Bank of Pak.*, 273 F.3d 241, 246 (2d Cir. 2001) (citations omitted).  In the Second Circuit, a district court's exercise of discretion on a *forum non conveniens* motion is guided by a three-step process: "first, the court 'determines the degree of deference properly accorded the plaintiff's choice of forum'; second, it assesses the adequacy of the defendant's proposed alternative forum; and third, it weighs the private and public interests implicated in the choice of forum." *Esso Expl. & Prod. Nigeria Ltd.* v. *Nigerian Nat'l Petro. Corp.*, 40 F.4th 56, 71 (2d Cir. 2022) (quoting *Norex Petroleum Ltd.* v. *Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005)).

At the first step, review of a *forum non conveniens* motion starts with "a strong presumption in favor of the plaintiff's choice of forum." *Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 255 (1981).  Indeed, it is generally understood that, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501, 508 (1947).  In applying this general presumption, courts nevertheless recognize that "the degree of deference given to a plaintiff's forum choice [can vary] with the circumstances." *Iragorri*, 274 F.3d at 71.  To this point, the Second Circuit has instructed district courts to consider "the totality of circumstances supporting a plaintiff's choice of forum," *Norex Petroleum*, 416 F.3d at 154, and that "the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale" dependent upon whether that choice was "dictated by

28

reasons that the law recognizes as valid," *Iragorri*, 274 F.3d at 71-72. "[T]he greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*." *Id.* at 72 (internal footnotes omitted). By contrast, "diminishing deference" is owed to a plaintiff's forum choice if it appears it was motivated by "forum-shopping reasons," such as "attempts to win a tactical advantage." *Id.* at 72-73.

Under the next prong of the *forum non conveniens* test, courts assess whether the alternative forum is adequate. "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux Holding Ltd.* v. *Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003). Conversely, the alternative forum is inadequate when there is "a complete absence of due process or an inability of the forum to provide substantial justice to the parties." *In re Arbitration Between Monegasque De Reassurances S.A.M. (Monde Re)* v. *Nak Naftogaz of Ukraine*, 311 F.3d 488, 499 (2d Cir. 2002). A plaintiff may not "defeat a motion to dismiss on the ground of *forum non conveniens* merely by showing that the substantive law that would be applied in the alternative forum is less favorable to the plaintiffs than that of the present forum." *Piper Aircraft Co.*, 454 U.S. at 247.

At the final step, the district court "balance[s] a series of factors involving the private interests of the parties in maintaining the litigation in the competing fora and any public interests at stake." *Wiwa* v. *Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000) (citing *Gilbert*, 330 U.S. at 508-09. The private interest factors include: "[i] the relative ease of access to sources of proof; [ii] availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; [iii] possibility of view of premises, if view would be appropriate to the action; and [iv] all other practical problems that make trial of a case easy, expeditious and inexpensive." *Iragorri*, 274 F.3d at 73-74 (citing *Gilbert*, 330 U.S. at 508). The public interest factors include: (i) the local interest in resolving local disputes; (ii) the local interest in avoiding the difficulties of applying foreign law; (iii) the imposition on jurors of having them decide cases that have no impact on their community; and (iv) the administrative challenges associated with court congestion. *See Gilbert*, 330 U.S. at 508-09.

Where a plaintiff's choice of forum merits substantial deference, dismissal based on the balancing of factors is only warranted when "trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience, or [when] the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems." *Sinochem Int'l Co.* v. *Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007) (internal quotation marks and alterations omitted). By contrast, where the plaintiff's choice of forum is

entitled to diminished deference — for instance, if plaintiffs have engaged in forum shopping — a lower standard for dismissal applies, under which "[t]he action should be dismissed only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable." *Iragorri*, 274 F.3d at 74-75; *accord Bigio* v. *Coca-Cola Co.*, 448 F.3d 176, 179 (2d Cir. 2006).

After proceeding through these steps, this Court declines, in the exercise of its discretion, to dismiss Plaintiff's claims for *forum non conveniens*.

### 2. The Court Denies Defendants' Motion to Dismiss for *Forum non Conveniens*

#### a. Plaintiff's Choice of Forum Is Entitled to Substantial Deference

The Court begins by assessing the degree of deference owed to Plaintiff's choice of forum. Defendants assert that Plaintiff's decision to bring suit in this District is entitled to "minimal deference" because Plaintiff's litigation history indicates that this suit was motivated by forum shopping, rather than a genuine connection to either New York or the United States. (Def. Br. 11-17). Defendants claim that if Plaintiff perceived a greater chance of succeeding in either the English or Mauritian Proceedings, Plaintiff would not, in all likelihood, have pursued this action. (*Id.* at 12-13). The Court disagrees with Defendants' assessment and does not believe that this action is reflective of forum shopping, as distinguished from a legitimate effort to recover on a U.S. judgment by targeting assets located in this District.[10]

---

[10]   Plaintiff argues that "the existence of parallel litigation is not relevant to the *forum non conveniens* analysis." (Pl. Opp. 14 (capitalization altered)). While the Court agrees that the existence of related litigation is not one of the public or private interest factors to be

Defendants frame this proceeding as "the textbook case for forum shopping," because Plaintiff initiated this suit only after adverse rulings in the United Kingdom regarding its application for a worldwide freezing order against Essar Global.  (Def. Br. 13).  On Defendants' view, the tactical advantage that Plaintiff stands to gain from litigating in this District is self-evident because a lawsuit here avoids prior adverse rulings, forces Essar Global to litigate the propriety of its corporate machinations in yet another forum, and leaves open the possibility of a jury trial that would be unavailable in the English Proceeding.  (Def. Reply 4-5).  Defendants' framing narrative, however, is complicated by salient features of the relevant litigation history.

At the outset, this is not a situation in which Plaintiff sought refuge in the United States only after being thwarted in foreign proceedings.  To the contrary, shortly after obtaining the ICC arbitral award (and nearly a year prior to initiating the English Proceeding), Plaintiff sought to enforce the Judgment in Minnesota state court.  Notwithstanding the fact that the Minnesota court dismissed Plaintiff's claims against Essar Global for lack of personal

---

assessed in step three of the *forum non conveniens* analysis, *see DiRienzo* v. *Philip Servs. Corp.*, 294 F.3d 21, 31 (2d Cir. 2002), this does not mean that consideration of ongoing parallel proceedings has no place at any stage of the analysis.  In fact, the Second Circuit recently affirmed a district court's determination to afford less deference to a plaintiff's choice of forum at the first step of the *forum non conveniens* inquiry where that plaintiff "sought a tactical advantage in New York, as [it] 'first chose a different forum to litigate the termination of the [relevant contracts] ... [and] thus far, [it] has not found success in those Angolan proceedings." *Aenergy, S.A.* v. *Republic of Angola*, 31 F.4th 119, 129 (2d Cir. 2022); *see also Kingstown Cap. Mgmt., L.P.* v. *Vitek,* No. 19 Civ. 3170 (DLC), 2020 WL 5350492, at *8 (S.D.N.Y. Sept. 4, 2020) (finding case to "bear[ ] indicia of forum shopping" where plaintiffs brought suit "more than four years after [the filing of] a substantially similar action in Luxembourg").  Accordingly, the Court deems it appropriate to take account of the ongoing foreign proceedings in determining the degree of deference to which Plaintiff's forum choice is entitled.

jurisdiction and in the alternative for *forum non conveniens*, that Plaintiff first sought to enforce the Judgment in Minnesota undercuts Defendants' claim that Plaintiff's current entreaty to a U.S. forum is merely a hedge against the risk of an adverse outcome in the English Proceeding.

Next, Defendants place undue significance on what Justice Henshaw's denial of a worldwide freezing order against Essar Global portends for the remainder of the English Proceeding. For one, the ruling was an interlocutory order pertaining to a previous iteration of the pleadings in that case. That Justice Henshaw did not deem it appropriate to freeze Essar Global's assets does not spell inevitable failure for Plaintiff's claim of unlawful conspiracy, especially considering (i) Plaintiff has repleaded its claim to advance a theory of conspiracy that was not addressed by Justice Henshaw's decision (*see* Re-Amended Particulars of Claim); (ii) a different High Court justice found it just and convenient earlier in the English Proceeding to freeze Essar Steel's assets (*see* English Freezing Order ¶¶ 69-83); and (iii) there is not fixed case assignment in the High Court of Justice, making it possible that someone other than Justice Henshaw will preside over the trial in this action (Rocher Decl. ¶¶ 11, 14). None of this is to cast doubt on the thorough analysis contained in Justice Henshaw's decision, but rather is to say that this decision does not necessarily represent a fatal setback in the English Proceeding that would compel a reasonable litigant to resort to a different court system. Also telling, Plaintiff has not renewed its application for injunctive relief against Essar

Global in the present suit, which refutes any suggestion that Plaintiff is seeking to use this action to evade the immediate effect of Justice Henshaw's decision.

Nor have Defendants made a convincing showing as to any of the other indicia of forum shopping that have been outlined by the Second Circuit, which include:

> [i] attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, [ii] the habitual generosity of juries in the United States or in the forum district, [iii] the plaintiff's popularity or the defendant's unpopularity in the region, or [iv] the inconvenience and expense to the defendant resulting from litigation in that forum.

*Norex Petroleum*, 416 F.3d at 155 (quoting *Iragorri*, 274 F.3d at 72). *First*, Defendants have not pointed to any local law or legal principle that would make Plaintiff better off in the United States over the United Kingdom. *Second*, Defendants have not attempted to argue that a New York jury would be more sympathetic to Plaintiff's claims than would a finder of fact in England. Regardless, the Court agrees with then-District Judge Gerard E. Lynch's observation in *Cyberscan Tech., Inc.* v. *Sema Ltd.*, that "this factor may have less relevance in a commercial case than in a tort case in which jury discretion over findings of pain and suffering or punitive damages make 'jury generosity' a more salient issue." No. 06 Civ. 526 (GEL), 2006 WL 3690651, at \*12 (S.D.N.Y. Dec. 13, 2006). *Third*, there is no argument that the parties' relative popularity in the United States has any relevance to this dispute. *Fourth*, and as elaborated in the Court's discussion of the private interest factors *infra*

Discussion Section A.2.c.i, Defendants do not face so significant a burden litigating this case in this District as to suggest Plaintiff is forum shopping.

Perhaps most importantly, Plaintiff has alleged meaningful connections between its claims and the United States.[11]  Plaintiff is a U.S. company, with extensive operations in the U.S., seeking to enforce a U.S. judgment based on the breach of an agreement that was negotiated in part in New York, was governed by New York law, and contemplated performance in the United States.  (Kohlberg Decl. ¶¶ 3-4; Compl. ¶¶ 14(a), 39-44).[12]  Defendants are

---

[11]    That Plaintiff is a Delaware LLC with its principal place of business in Chicago does not render Plaintiff's choice of forum in the Southern District of New York any less worthy of deference in the circumstances of this case.  *See Guidi* v. *Inter-Continental Hotels Corp.*, 224 F.3d 142, 146 (2d Cir. 2000) (holding that plaintiffs' "'home forum' as American citizens is a United States court, such as the courts of the Southern District of New York," even though they were not New York residents); *see also Iragorri* v. *United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001) ("In many circumstances, it will be far more convenient for a U.S. resident plaintiff to sue in a U.S. court than in a foreign country, even though it is not the district in which the plaintiff resides.").

Defendants seek to downplay Plaintiff's U.S. ties by highlighting the fact that it is a wholly owned subsidiary of its Luxembourg-based parent.  (Def. Br. 16).  But the only case Defendants cite in favor of disregarding Plaintiff's corporate citizenship involved a U.S. entity created for litigation purposes, which does not apply to Plaintiff in this case.  *See Wave Studio, LLC* v. *Gen. Hotel Mgmt.,* No. 13 Civ. 9239 (CS), 2017 WL 972117, at *6 (S.D.N.Y. Mar. 10, 2017) (affording little deference to plaintiff's forum choice where it was "admittedly a 'holding company formed under New York law prior to the onset of this case and located within this District for the purpose of enforcing the copyrights' to the photographs at issue in this case"); *see also Iragorri*, 274 F.3d at 72 n.3 ("If a plaintiff has adopted a U.S. residence for the purpose of having his suit tried in a U.S. court, the same deference would not apply.").

[12]    To be clear, the Court is not gauging the deference owed to Plaintiff's choice of forum by the existence of forum selection clauses in any of the financing agreements that Essar Global or Essar Steel entered into with lenders relating to the construction of the pelletizing plant in Minnesota or in the Pledge and Security Agreement that Mesabi entered into for the Notes.  (Compl. ¶ 19).  In concluding that Plaintiff's forum choice is entitled to substantial deference, the Court has considered Essar Global's activities in the United States, including its decision to pursue the construction of a pelletizing plant in Minnesota; however, Plaintiff was not a party to any of the aforementioned contracts that contain a New York forum selection clause, which reduces their relevance to this case.  Furthermore, neither the Judgment nor any of Plaintiff's claims in this matter arises out of the breach of an agreement with a New York forum selection clause.  Accordingly, the Court sees no occasion to weigh the impact of a forum selection clause on the *forum non conveniens* inquiry in this case.  *See Lfoundry Rousset SAS* v. *Atmel*

correct to point out that Plaintiff's alter ego and fraudulent conveyance claims implicate transactions effectuated between foreign entities and require the examination of the operations of these foreign companies (Def. Br. 13-16); but Plaintiff's allegations are inextricably linked to the United States as part of an effort to evade Essar Steel's substantial financial obligation embodied in the Judgment, and the Court is obliged to accept these allegations as true for purposes of this motion. *See Goldfarb* v. *Channel One Russ.*, 442 F. Supp. 3d 649, 658 n.9 (S.D.N.Y. 2020) ("On a motion to dismiss for *forum non conveniens*, a court must accept the facts alleged in the complaint as true." (citing *Aguas Lenders Recovery Grp. LLC* v. *Suez, S.A.*, 585 F.3d 696, 697 (2d Cir. 2009))).  Of course, it remains to be seen whether Plaintiff's theory ultimately prevails on the merits; but at this stage of the proceedings, Plaintiff's allegations convincingly suggest that its choice to litigate in this District was motivated by a desire to enforce a U.S. judgment against assets located in this jurisdiction in the face of a concerted evasive effort by Essar Steel and Essar Global. *See, e.g.*, *JW Oilfield Equip., LLC* v. *Commerzbank AG*, 764 F. Supp. 2d 587, 599 (S.D.N.Y. 2011) (finding it "perfectly reasonable" for U.S. plaintiff to bring suit in the United States, as opposed to Germany, where it obtained judgment in the United States, but judgment debtor retreated to Germany).

---

*Corp.*, No. 14 Civ. 1476 (LTS) (HBP), 2015 WL 4461617, at *5 (S.D.N.Y. July 21, 2015) (determining that because "no contract claims have been brought here," choice of law and forum selection clauses in related agreements "have a limited impact on the overall [*forum non conveniens*] calculus"), *aff'd sub nom. Guerrini* v. *Atmel Corp.*, 667 F. App'x 308 (2d Cir. 2016) (summary order); *see also Acosta* v. *JPMorgan Chase & Co.*, 219 F. App'x 83, 86 n.2 (2d Cir. 2007) (summary order) (affirming limited deference where plaintiff was neither party nor beneficiary to agreement containing forum selection clause and plaintiff's claims did not arise under that agreement).

Nor does any of Defendants' cited authorities diminish the link between Plaintiff's claims and the United States.  (Def. Br. 13-16).  Defendants cite two Second Circuit cases — *In re Arbitration Between Monegasque De Reassurances S.A.M.* v. *Nak Naftogaz of Ukraine*, 311 F.3d 488 (2d Cir. 2002), and *Figueiredo Ferraz e Engenharia de Projeto Ltda* v. *Republic of Peru*, 665 F.3d 384 (2d Cir. 2011) — as illustrative dismissals of proceedings to enforce arbitration awards based on *forum non conveniens*.  (*Id.* at 13, 24).  These cases stand in marked contrast to the instant action because they were brought by *foreign* petitioners seeking to enforce *foreign* arbitral awards based on activity that occurred on *foreign* soil.  *See Monde Re*, 311 F.3d at 491 (involving Monegasque petitioner seeking to enforce Russian arbitration award against Ukraine and Ukrainian company pertaining to delivery of natural gas to Europe); *Figueiredo Ferraz*, 665 F.3d at 386-87 (addressing Brazilian corporation's attempt to enforce foreign arbitration award against Peru arising out of consulting agreement to provide water and sewage services in Peru).  Understandably, the Second Circuit determined that the forum choices of these foreign plaintiffs were entitled to reduced deference.  *See Monde Re*, 311 F.3d at 499; *Figueiredo Ferraz*, 665 F.3d at 390.  But the circumstances justifying lessened deference are not present here, where a U.S. entity is seeking to enforce an arbitration award arising out of U.S.-centric commercial activity.

Similarly, in *Acosta* v. *JPMorgan Chase & Co.*, the Second Circuit accorded reduced deference to the forum choice of hundreds of foreign plaintiffs who brought suit against a participant in an international bank fraud

that led to the failure of two large commercial banks in Argentina and Uruguay, because "the vast majority of the activities alleged in the complaint were committed by foreign nationals on foreign soil."  219 F. App'x 83, 86 (2d Cir. 2007) (summary order).  To be sure, the conduct of Essar Global and Essar Steel — two foreign companies whose operations are housed abroad — is at the center of the claims in the Complaint.  What distinguishes this case, however, is these foreign entities' conscious decision to pursue business dealings in the United States that generated the arbitral award that Plaintiff now seeks to enforce.  Indeed, these ties to the United States are a critical factor that compels substantial deference to Plaintiff's forum choice.[13]  Accordingly, the Court concludes that Plaintiff's decision to litigate in this District is entitled to substantial deference.

### b.  Mauritius and England Are Adequate Alternative Fora

The Court next evaluates whether the alternative fora proposed by Defendants — Mauritius and England — would be adequate in this case.  As noted above, an alternative forum is adequate if "the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute."  *Pollux*, 329 F.3d at 75.  Movants bear the burden of

---

[13]    Defendants additionally argue that the "serious questions as to whether the Court may exercise personal jurisdiction over Essar Global" should weigh against deferring to Plaintiff's choice of forum.  (Def. Br. 16).  Notably, it was Defendants' request to bifurcate their motion to dismiss briefing that inhibits the Court from assessing the basis for personal jurisdiction over Defendants at this stage.  (*See* Def. Br. 1 n.1).  Without determining the issue, the Court understands Essar Global to have entered into multiple contracts governed by New York law that are at least facially relevant to this dispute.  (*See* Compl. ¶¶ 14-17; *see also* Pl. Opp. 13 n.7).  As such, the Court does not perceive the extant questions regarding personal jurisdiction over Defendants to diminish the deference due to Plaintiff's choice to litigate in this forum.

demonstrating that an adequate alternative forum exists.  *State Bank of Pak.*, 273 F.3d at 248.  As outlined below, Defendants have demonstrated that both of their proposed alternative fora are adequate.

Turning first to England, there can be no doubt that Defendants are amenable to service of process in that jurisdiction, as Essar Global is a named defendant that has been served and is actively participating in the English Proceeding.  (*See* O'Rourke Decl. ¶¶ 3, 12-13).  Further, it is indisputable that the English court system permits litigation of the type presented here — a point proven by the course of the English Proceeding.  *See Pollux*, 329 F.3d at 75 ("[T]here can be no doubt that England permits litigation to resolve commercial disputes of the type presented in this case.").  That Plaintiff's claim in the English court is not identical to those presented in this action does not defeat the adequacy of the forum, because "the availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum, nor on identical remedies."  *Aenergy, S.A.* v. *Republic of Angola*, 31 F.4th 119, 130 (2d Cir. 2022) (quoting *Norex Petroleum*, 416 F.3d at 158).

With respect to Mauritius, Defendants note that in the Minnesota Action ArcelorMittal USA did not contest that Mauritius is an adequate alternative forum.  (Def. Br. 19 (citing Minnesota State Court Order 44-45)).  This concession appears to be for good reason: Essar Global operates primarily out of Mauritius, meaning it is subject to service of process there.  (Doorbiz Decl. ¶ 3).  Further, irrespective of whether the Mauritian Proceeding is collusive in nature, it is set to adjudicate the legitimacy of the transactions and accounting

39

restatement that lie at the heart of this action.  Mauritian law also "allow[s] for the corporate veil to be pierced … when it can be proved that a company conducts business with the intent to defraud creditors or as a mere facade." *Presbyterian Church of Sudan* v. *Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 683 (S.D.N.Y. 2006), *aff'd*, 582 F.3d 244 (2d Cir. 2009).  Therefore, Mauritius is an adequate alternative forum for purposes of this analysis.

Plaintiff contends that England and Mauritius are inadequate for all practical purposes because neither has the power to attach Essar Global's assets located in the United States, including the Notes.  (Pl. Opp. 17-18).  But the Second Circuit has expressly rejected the argument that a foreign forum is inadequate merely because it is incapable of attaching a defendant's U.S. assets.  *See Figueiredo Ferraz*, 665 F.3d at 390 (acknowledging that "only a United States court may attach a defendant's particular assets located here, but that circumstance cannot render a foreign forum inadequate.  If it could, every suit having the ultimate objective of executing upon assets located in this country could never be dismissed because of [*forum non conveniens*].").  To the extent Plaintiff "might recover less in an alternate forum" — and there is no indication that this is the case in either Mauritius or England — it would "not render that forum inadequate."  *Id.* at 391 (citing *Alcoa Steamship Co.* v. *M/V Nordic Regent*, 654 F.2d 147, 159 (2d Cir. 1980)).

Therefore, the Court concludes that both England and Mauritius are adequate alternative fora for Plaintiff's claims.  Be that as it may, this conclusion does not end the *forum non conveniens* inquiry, because "[a]

40

defendant does not carry the day simply by showing the existence of an adequate alternative forum." *Iragorri*, 274 F.3d at 74.

### c.   On Balance, the Public and Private Interests Do Not Favor Dismissal

As the final step in the *forum non conveniens* analysis, the Court must "balance a series of factors involving the private interests of the parties in maintaining the litigation in the competing fora and any public interests at stake." *Wiwa*, 226 F.3d at 100; *see also Gilbert*, 330 U.S. at 508-09 (setting forth the public and private interest factors). "In considering these factors, the court is necessarily engaged in a comparison between the hardships defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country." *Iragorri*, 274 F.3d at 74. Because of the substantial deference owed to Plaintiff's choice of forum, Defendants have the burden of demonstrating that the balance of private and public interest factors "strongly" favor dismissal. *DiRienzo* v. *Philip Servs. Corp.*, 294 F.3d 21, 30-31 (2d Cir. 2002); *see also R. Maganlal & Co.* v. *M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991) ("Because there is ordinarily a strong presumption in favor of plaintiff's choice of forum, that choice will not be overcome unless the relevant private and public interest factors weigh heavily in favor of trial in the alternative forum."). In evaluating these interests, the Second Circuit has counseled district courts to "arm themselves with an appropriate degree of skepticism in assessing whether the defendant has demonstrated genuine inconvenience and

41

a clear preferability of the foreign forum." *Gross* v. *British Broad. Corp.*, 386 F.3d 224, 233 (2d Cir. 2004) (quoting *Iragorri*, 274 F.3d at 75).

The Court begins by addressing the private interest factors, which in this case are neutral or, at most, slightly favor Mauritius as a forum. It then turns to the public interest factors, which are neutral as to dismissal.

### i. Private Interest Factors

The Supreme Court has identified the following private interest factors to be considered on a *forum non conveniens* motion: (i) the relative ease of access to sources of proof; (ii) the availability of compulsory process for the attendance of unwilling witnesses; (iii) the cost of willing witnesses' attendance; (iv) if relevant, the possibility of a view of premises; and (v) all other factors that might make the trial quicker or less expensive. *See Gilbert*, 330 U.S. at 508; *accord Iragorri*, 274 F.3d at 73-74.

Defendants explain that because the transactions comprising the alleged fraudulent conveyance occurred between foreign entities primarily operating out of Mauritius that made use of auditors in Mauritius, the majority of the relevant witnesses and documents are likely to be located in Mauritius. (Def. Br. 25-28; Def. Reply 12-13). Corroborating this contention, Defendants note that since 2011, all of Essar Global's board meetings have occurred in Mauritius and none of the company's board members or officers during the relevant time resided in the United States, let alone New York. (Doorbiz Decl. ¶ 4). The same goes for Essar Steel, which convened all of its board meetings in Mauritius and did not have a single director or officer located in New York

during the relevant period.  (*Id.* at ¶ 6).  Of particular relevance, members of the Ruia family — whom Plaintiff alleges exercised *de facto* control over Essar Global and, by extension, the entire Essar Group — were based in Mauritius and Dubai during the relevant time period.  (*Id.*).  Heightening the inconvenience of litigating in this forum, four of these directors of Essar Steel who likely possess testimony relevant to the instant matter — Ravikant Ruia, Prashant Ruia, Sushil Baid, and Uday Gujadhur — are already named defendants in the English Proceeding.  (Re-Amended Particulars of Claim). Crediting these facts, the Court finds that most of the evidence and witnesses relevant to Plaintiff's claims would appear to be located abroad.

While the location of witnesses and documents is an "important factor" that weighs in Defendants' favor, it "is not dispositive toward [Mauritius] as a forum."  *Everard Findlay Consulting, LLC* v. *Republic of Suriname*, No. 18 Civ. 8926 (AJN), 2022 WL 845757, at *7 (S.D.N.Y. Mar. 22, 2022) (citing *Zweig* v. *Nat'l Mortg. Bank of Greece*, No. 91 Civ. 5482 (CSH), 1993 WL 227663, at *7 (S.D.N.Y. June 21, 1993)).  "For many years, courts in this Circuit have recognized that modern technologies can make the location of witnesses and evidence less important to the *forum non conveniens* analysis, particularly where the parties are major corporations."  *Metito (Overseas) Ltd.* v. *Gen. Elec. Co.*, No. 05 Civ. 9478 (GEL), 2006 WL 3230301, at *6 (S.D.N.Y. Nov. 7, 2006) (collecting cases).  This logic applies with particular force in this case, as it is not one that "involve[s] substantial physical evidence that is difficult or expensive to transport."  *Wiwa*, 226 F.3d at 107.  Quite the opposite, Plaintiff's

fraudulent conveyance and alter ego claims will rely in significant part on documentary evidence that is not excessively burdensome to transport or transmit to this jurisdiction.  *See, e.g., Itoba Ltd.* v. *LEP Group PLC*, 930 F. Supp. 36, 44 (D. Conn. 1996) ("To the extent documents exist [overseas], advances in transportation and communication accord this issue less weight."), *cited in DiRienzo*, 294 F.3d at 30; *see also Terra Sec. ASA Konkursbo* v. *Citigroup, Inc.*, 688 F. Supp. 2d 303, 317 (S.D.N.Y. 2010) ("Even assuming that a majority of the relevant evidence is in Europe …, Defendants have offered no reason why transporting any evidence to New York would pose any significant hardship to the parties.").  To the extent testimony from any non-party witnesses is required, there exists a preference for live witness testimony, but the Second Circuit has "recognized the availability of letters rogatory as relevant in deciding whether plaintiffs' forum is inconvenient."  *DiRienzo*, 294 F.3d at 30.[14]

As a final point concerning the private interest factors, Essar Global is no stranger to litigating in the United States.  (*See* Pl. Opp. 7 (noting the existence of suits in Minnesota, Delaware, and New York state courts initiated by Essar

---

[14]    Modern-day accommodations occasioned by the COVID-19 pandemic underscore the possibility of facilitating litigation remotely.  As a sister court in this District recently observed, "sure to be one of the enduring lessons of the ongoing COVID-19 pandemic is that we can accomplish far more remotely than we had assumed previously," which "lesson should apply with equal force to managing this litigation, especially given that both parties are represented by sophisticated, first-rate, international law firms." *Petersen Energía Inversora S.A.U.* v. *Argentine Republic*, No. 15 Civ. 2739 (LAP), 2020 WL 3034824, at *11 (S.D.N.Y. June 5, 2020).  While the private interest factors may weigh in favor of Mauritius were the litigants restricted to hard copy documents and in-person testimony, the Court believes these factors approach neutral given contemporary remote capabilities.

Global)).  Defendants are, of course, correct to point out that there are meaningful distinctions between the subject matters of the cases that likely alter the relative burdens in litigating these disputes in the United States.  (Def. Reply 12).  Nevertheless, the fact that Essar Global has voluntarily brought several proceedings in the United States suggests that the burden of litigating in the United States is not so high as to be oppressive or vexatious.[15] Relatedly, Mesabi has represented in another proceeding brought in Minnesota state court that Essar Global, its "ultimate parent company," "has significant operations throughout the world, including Mauritius, London, *New York*, Dubai, and Mumbai[.]"  (Myatt Decl., Ex. 9 at ¶ 34 (emphasis added)).  Further likely to reduce the burden placed on the members of the Ruia family who may have testimony relevant to this action, are their apparent ties to this District, which include their ownership of an apartment in Manhattan and a private airplane that has made frequent trips to the United States in the past five years.  (*See id.*, Ex. 1-2 (property records), 3 (flight records); *see also* Pl. Opp. 2).  Taking a holistic view of the private interest factors, the Court believes that Essar Global (a multinational corporation with professed ties to New York) and Mesabi (a U.S. entity) will not be overly burdened by litigating in this forum.

---

[15]    Plaintiff argues that the multiple badges of fraud concerning the extinguishment of the $1.48 billion account receivable suggest that its fraudulent conveyance claim is conducive to summary adjudication.  (Pl. Opp. 20).  Apart from the fact that at least one jurist (Justice Henshaw) would likely disagree with this characterization, the Court is not equipped at this stage of the proceedings to assess the merits of Plaintiff's claims. As such, the Court does not believe that the complexity *vel non* of Plaintiff's claims is a factor that weighs in either party's favor.

Accordingly, on balance, the Court believes that the private interest factors lean, if at all, slightly in favor of Mauritius as an alternative forum.

## ii.        Public Interest Factors

The Supreme Court has outlined four public interest factors to be weighed in the *forum non conveniens* inquiry: (i) administrative difficulties associated with court congestion; (ii) the unfairness of imposing jury duty on a community with no relation to the litigation; (iii) the "local interest in having localized controversies decided at home;" and (iv) avoiding difficult problems in conflict of laws and the application of foreign law.  *Gilbert*, 330 U.S. at 508-09; *accord Iragorri*, 274 F.3d at 74.  The parties emphasize the local interests at stake and the questions concerning the appropriate choice of law in their briefing, as will the Court.[16]  Here, the local interests at stake weigh in favor of Plaintiff, while the likely application of foreign law weighs in favor of Defendants.  As a result, the Court deems the competing public interest factors to be neutral in the balancing analysis.[17]

---

[16]    The Court adds that "[c]ourt congestion is of course always a concern in the Southern District of New York, but [Defendants] have made no effort to show that it is less of a concern in [either the United Kingdom or Mauritius]."  *Cyberscan Tech., Inc.* v. *Sema Ltd.,* No. 06 Civ. 526 (GEL), 2006 WL 3690651, at *13 (S.D.N.Y. Dec. 13, 2006) (citing *Cap. Currency Exch., N.V.* v. *Nat'l Westminster Bank PLC*, 155 F.3d 603, 611 (2d Cir. 1998)).  As such, Defendants have not shown that considerations of court congestion tip the scales in their favor.

[17]    Defendants further argue that the existence of parallel proceedings tips the balance of the public interests in their favor.  (Def. Br. 21-22).  While the Court considered these related actions in assessing the deference due to Plaintiff's forum choice, *see supra* note 10, the existence of foreign proceedings is not one of the public interest factors enumerated by the Supreme Court in *Gilbert* and thus the Court does not believe it necessary to duplicate its analysis of these proceedings when assessing the public interest factors.  *See DiRienzo*, 294 F.3d at 31 (finding the existence of parallel proceedings in Canada to be "of little weight because the existence of related litigation is not one of the factors enumerated in *Gilbert*"); *Guidi*, 224 F.3d at 148 ("The existence of

46

Beginning with the second and third public interest factors — which redound to a case's connection to the forum — the United States has a strong interest in ensuring that a U.S. litigant is able to recover on a U.S. judgment stemming from business dealings that occurred in the United States.  *See JW Oilfield*, 764 F. Supp. 2d at 598 (enunciating "the strong United States interest in enforcement of its own judgments").  It follows as a necessary corollary that the United States has an interest in halting a judgment debtor's circumvention of financial responsibilities that arose from voluntary commercial activity in the United States.  In this case, although Defendants' alleged evasive maneuvers comprised transactions between foreign entities spurred by the actions of foreign decisionmakers, at least one of Plaintiff's fraudulent conveyance claims requires explicit consideration of whether the transactions at issue were effectuated with an intent to thwart Plaintiff's recovery on the arbitral award, which bears a strong connection to the United States.  *See* N.Y. Debt. & Cred. Law § 276 ("Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.").  In addition, Plaintiff's alter ego claim ultimately seeks to determine whether Essar Global exploited its network of subsidiaries, including Essar Steel, to escape satisfaction of the Judgment.  Because Plaintiff's claims seek to vindicate a U.S. judgment stemming from business activity that took

related litigation … is not listed as a relevant factor in the *forum non conveniens* analysis laid out in *Gilbert*.").

47

place in the United States, the Court believes that the local interests weigh in favor of adjudicating the case in this forum.

In attempting to minimize Plaintiff's link to this forum, Defendants harp on the foreign situs of Essar Global and Essar Steel, framing the case as fundamentally concerning foreign transactions and the relationship between foreign entities.  (Def. Br. 24-25).  Yet, none of the cases they cite as having analogously attenuated ties to the United States involved a domestic plaintiff's attempt to enforce a domestic judgment arising out of events that occurred in the United States.  For instance, Defendants urge that *Prodprogramma-Impuls Ltd.* v. *Bank of India*, No. 12 Civ. 3036 (LLS), 2012 WL 2411809 (S.D.N.Y. June 21, 2012), is "particularly instructive" because, as here, it was an action to enforce an arbitral award challenging the relationship between two foreign entities, while a foreign court was set to decide the alter ego question under foreign law.  (*Id.* at 25).  But *Prodprogramma* involved a Russian petitioner's application to compel an Indian bank to turn over an Indian company's assets located in India in the hopes of enforcing an English arbitral award related to a breach of a contract to ship rice abroad.  *Prodprogramma*, 2012 WL 2411809, at *1, 3.  Unlike in the instant matter, the petitioner in *Prodprogramma* was foreign — which typically weakens the deference owed to a plaintiff's forum choice, *see Gross*, 386 F.3d at 231 (presenting a case "in which courts should initially be at their most deferential: a U.S. plaintiff suing at home for valid reasons") — and neither the underlying arbitral award nor the parties' relationship bore a connection to the United States.

48

As another example, Defendants cite to *Wilson* v. *ImageSat Int'l N.V.*, No. 07 Civ. 6176 (DLC), 2008 WL 2851511, at *1-2, 6 (S.D.N.Y. July 22, 2008), *aff'd sub nom. Wilson* v. *Eckhaus*, 349 F. App'x 649 (2d Cir. 2009) (summary order), a shareholder lawsuit against an Israeli-based corporation, and others, for mismanagement and domination of the company by its two Israeli majority shareholders. (Def. Br. 14-15, 23-24). But the interests implicated in that case are a far cry from those presented here, as the company-defendant at the center of *Wilson* was not registered to do business in the United States, and the claims against it implicated the interests of the Israeli military, even prompting the Israeli Ministry of Defense to express a strong interest that the dispute be resolved in Israel. *Id.* at *7 & n.10. The instant case bears a stronger connection to the United States than any of the cases that Defendants cite to suggest the contrary.[18]

---

[18]    The bulk of cases that Defendants cite as being of a predominantly foreign character are distinguishable on the grounds that they involve foreign plaintiffs seeking to adjudicate disputes entirely unrelated to the United States, perhaps implicating weighty issues of foreign concern. (Def. Br. 24-25). *See, e.g.*, *Murray* v. *British Broad. Corp.*, 81 F.3d 287, 293 (2d Cir. 1996) (copyright infringement action arising out of a British designer's dispute with a British broadcasting agency's authorization and licensing of a concept throughout the United Kingdom); *Osuna* v. *Citigroup Inc.*, No. 17 Civ. 1434 (RJS), 2018 WL 6547205, at *1, 11 (S.D.N.Y. Sept. 28, 2018) (suit brought by Mexican citizen and Mexican oil services enterprise concerning a campaign of defamation waged in part by a Mexican bank and its parent, implicating Mexican criminal justice system); *CHS Eur. S.A.* v. *El Attal,* No. 09 Civ. 2619 (LAK), 2010 WL 3000059, at *2 (S.D.N.Y. July 22, 2010) (action brought by Swiss corporation to enforce British arbitral award arising out of Egyptian corporation's breach of contract to buy Ukrainian wheat).

Defendants additionally cite a handful of cases that apply *forum non conveniens* to claims brought by U.S. plaintiffs asserting claims related to foreign investments. (Def. Br. 21-22, 24). The Court does not understand any of these cases to bear the same relationship to the United States as this case, because none involved commercial activity centered in the United States. *See, e.g.*, *Scottish Air Int'l, Inc.* v. *British Caledonian Group, PLC*, 81 F.3d 1224 (2d Cir. 1996) (affirming *forum non conveniens* dismissal of American investor in Scottish airline who sought a seat on Scottish corporation's board of directors); *Abert Trading, Inc.* v. *Kipling Belgium N.V/S.A.*, No. 00 Civ. 478 (RMB), 2002 WL 272408 (S.D.N.Y. Feb. 26, 2002) (involving American

Notwithstanding the pertinent U.S. interest in resolving this dispute, the fourth public interest factor — choice of law considerations — weighs in favor of adjudicating this case elsewhere. Although the Court need not definitively resolve the choice of law inquiry at this stage of the proceedings, *see Piper Aircraft*, 454 U.S. at 251 ("The doctrine of *forum non conveniens* ... is designed in part to help courts avoid conducting complex exercises in comparative law."), a finding that it is likely (even if not certain) that foreign law would apply militates in favor of dismissal, *see LaSala* v. *TSB Bank, PLC*, 514 F. Supp. 2d 447, 463 (S.D.N.Y. 2007) ("The mere likelihood of the application of foreign law weighs in favor of dismissal." (internal citations omitted)); *Strategic Value Master Fund, Ltd.* v. *Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 774 (S.D.N.Y. 2006) ("The likelihood that the present forum would have to apply a foreign jurisdiction's law would weigh in favor of dismissal.").

The Court believes it more likely than not that both Plaintiff's fraudulent conveyance and alter ego claims will entail the application of foreign law. At the outset, "[a] federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law." *Fieger* v. *Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) (citing *Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under New York law, the first step in the choice of law analysis is to determine whether there is, in fact, an "actual

---

plaintiff's claim for breach of agreement to distribute and sell Belgian goods in Central and South America); *Diatronics, Inc.* v. *Elbit Computers, Ltd.*, 649 F. Supp. 122 (S.D.N.Y. 1986) (pertaining to American investor's securities fraud claims against Israeli medical device company), *aff'd*, 812 F.2d 712 (2d Cir. 1987).

conflict of laws." *Curley* v. *AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).  Only if

there is such a conflict is the court required to apply choice of law principles

and resolve which forum's law applies.  *Fed. Ins. Co.* v. *Am. Home Assur. Co.*,

639 F.3d 557, 566-67 (2d Cir. 2011).  Without delving too deeply into the

intricacies of foreign law, the Court observes that Defendants have provided it

with ample reason to believe that there exist substantive differences between

the laws of New York and that of the possibly relevant foreign jurisdictions —

namely Mauritius (Essar Steel's place of incorporation) and the Cayman

Islands (Essar Global's place of incorporation) — on the issues presented in

this case.  (Def. Reply 8).[19]

Despite Plaintiff's assertions to the contrary, the applicable choice of law

principles suggest that the location of a defendant's wrongful conduct dictates

---

[19]    Defendants include authorities in their briefing suggesting that the courts of Mauritius
and the Cayman Islands look to English law on questions of alter ego and fraudulent
conveyance.  (Def. Reply 8).  *See Presbyterian Church of Sudan* v. *Talisman Energy, Inc.*,
453 F. Supp. 2d 633, 683 (S.D.N.Y. 2006) ("When faced with novel questions of
corporate law, Mauritian courts turn to English case law for guidance."); *Sec. Inv. Prot.
Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789 (CGM), 2021 WL 4994435, at *7
(Bankr. S.D.N.Y. Oct. 27, 2021) ("British law applies to veil piercing claims against
[Caymanian] entities."); *Am. Pegasus SPC* v. *Clear Skies Holding Co., LLC*, No. 13 Civ.
3035 (ELR), 2015 WL 10891937, at *18 (N.D. Ga. Sept. 22, 2015) ("Both sides
acknowledge that Cayman Islands fraudulent transfer law has its roots in English law,
and that courts in the Cayman Islands frequently look to British law as persuasive.").

Accepting this representation, the Court further acknowledges that at least one sister
court in this District has recognized a conflict between New York law and English law
on alter ego and fraudulent conveyance claims.  *See Fallman* v. *Hotel Insider Ltd*, No. 14
Civ. 10140 (SAS), 2016 WL 316378, at *7 (S.D.N.Y. Jan. 15, 2016) (finding conflict
between New York and English law with respect to constructive and actual fraudulent
conveyance claims); *In re Optimal U.S. Litig.*, No. 10 Civ. 4095 (SAS), Fed. Sec. L. Rep.
¶ 96570 (C.C.H.), 2011 WL 13071558 (S.D.N.Y. Oct. 14, 2011) (finding conflict between
New York and Bahamian veil-piercing law, the latter of which "generally follow[s] the
decisions of English courts in the absence of contrary Bahamian authority").  Without
conclusively resolving the issue, the Court presumes, based on the above authorities,
that there is an actual conflict between New York and Mauritian or Caymanian law.

the applicable law for fraudulent conveyance claims.  *See Licci ex rel. Licci* v.

*Lebanese Canadian Bank, SAL*, 672 F.3d 155, 158 (2d Cir. 2012) ("If conflicting

conduct-regulating laws are at issue, the law of the jurisdiction where the tort

occurred will generally apply because that jurisdiction has the greatest interest

in regulating behavior within its borders." (quoting *Cooney* v. *Osgood Mach.,*

*Inc.*, 81 N.Y.2d 66, 72 (1993))).  Under this rule, the law of Mauritius likely

governs Plaintiff's fraudulent conveyance claims, because that is where Essar

Steel and Essar Global base their operations.  *See Lyman Com. Sols., Inc.* v.

*Lung*, No. 12 Civ. 4398 (TPG), 2014 WL 476307, at *3 (S.D.N.Y. Feb. 6, 2014)

(deeming it "well-settled in the fraudulent conveyance context" that "it is the

location of the defendant's conduct that controls" the choice of law inquiry);

*accord Atsco Ltd.* v. *Swanson*, 816 N.Y.S.2d 31, 32-33 (1st Dep't 2006).

Plaintiff's alter ego claim is also likely governed by foreign law.  "[U]nder

New York choice of law principles, the law of the state of incorporation

determines when the corporate form will be disregarded[.]"  *Fletcher* v. *Atex,*

*Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citation

omitted); *see also Hayden Cap. USA, LLC* v. *Northstar Agri Indus., LLC*, No. 11

Civ. 594 (DAB), 2012 WL 1449257, at *6 (S.D.N.Y. Apr. 23, 2012) ("When

plaintiffs seek to pierce the corporate veil, New York courts generally apply the

law of the state of the defendant's incorporation.").  Plaintiff advocates for the

application of an exception to this general principle, pursuant to which "New

York courts will disregard the state of incorporation only when the Defendant's

contacts and the events at issue in the case substantially implicate New York."

52

(Pl. Opp. 25 (citing *Hayden Cap.*, 2012 WL 1449257, at *6)).  The Court deems

it unlikely that this exception would apply in the circumstances of this case,

because it is undisputed that the alleged fraudulent transactions were

developed, approved, executed, and audited in Mauritius.

While the likely application of foreign law weighs against keeping the

case in this forum, this factor is not dispositive, and the Second Circuit has

cautioned "against an excessive reluctance to undertake the task of deciding

foreign law, a chore federal courts must often perform."  *Manu Int'l, S.A.* v. *Avon*

*Prods., Inc.*, 641 F.2d 62, 68 (2d Cir. 1981); *see also Boosey & Hawkes Music*

*Publishers, Ltd.* v. *Walt Disney Co.*, 145 F.3d 481, 492 (2d Cir. 1998) ("While

reluctance to apply foreign law is a valid factor favoring dismissal under

*Gilbert*, standing alone it does not justify dismissal.").  As noted above, the

Court finds the strong U.S. interests in enforcing a domestic judgment arising

out of domestic commercial activity to effectively cancel out the likelihood that

foreign law applies to Plaintiff's claims in this case.  As such, the public

interests in this case are essentially neutral.

\*       \*       \*

In sum, Defendants have failed to satisfy even the lesser standard of

demonstrating that "the chosen forum is ... genuinely inconvenient and the

[alternative] forum significantly preferable," *Bigio*, 448 F.3d at 179 (citation and

internal quotation marks omitted), nor have they shown that Plaintiff seeks

"not simply justice but perhaps justice blended with some harassment,"

*Gilbert*, 330 U.S. at 507.  The instant matter is therefore not "one of those

rather rare cases where the doctrine [of *forum non conveniens*] should be applied." *Id.* at 509.

## B.      Comity Abstention

After resolving to retain venue in this District, the Court next turns to Defendants' motion to dismiss or, in the alternative, stay this action out of deference to the pending proceedings in Mauritius and the United Kingdom.  In view of the totality of the circumstances, the Court concludes that neither of these cases presents circumstances that warrant dismissal or a stay for reasons of international comity.

### 1.      Applicable Law

"A court has the inherent power to dismiss or stay an action based on the pendency of a related proceeding in a foreign jurisdiction." *Ole Media Mgmt., L.P.* v. *EMI Apr. Music, Inc.*, No. 12 Civ. 7249 (PAE), 2013 WL 2531277, at *2 (S.D.N.Y. June 10, 2013) (collecting cases).  This prior pending action doctrine recognizes the "principles upon which international comity is based: the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency." *Royal & Sun All. Ins. Co. of Can.* v. *Century Int'l Arms, Inc.*, 466 F.3d 88, 94 (2d Cir. 2006).

At the same time, federal courts must be mindful of their "virtually unflagging obligation … to exercise the jurisdiction given them." *Colo. River Water Conservation Dist.* v. *United States*, 424 U.S. 800, 817 (1976); *see also Leopard Marine & Trading, Ltd.* v. *Easy St. Ltd.*, 896 F.3d 174, 191 (2d Cir. 2018) ("The general rule is that 'concurrent proceedings' regarding the same

question are 'tolerate[d].'" (citation omitted)).  By virtue of this obligation, "[f]ederal courts are reluctant to decline jurisdiction solely on the basis of concurrent proceedings in another jurisdiction." *Evergreen Marine Corp.* v. *Welgrow Int'l Inc.*, 954 F. Supp. 101, 103 (S.D.N.Y. 1997).  As such, "[t]he task of a district court evaluating a request for dismissal based on a parallel foreign proceeding is not to articulate a justification *for* the exercise of jurisdiction, but rather to determine whether *exceptional circumstances* exist that justify the surrender of that jurisdiction." *Royal & Sun All.*, 466 F.3d at 93 (citations omitted) (first emphasis in original, second emphasis added).  To this end, the Second Circuit has articulated five nonexclusive factors that courts should consider when determining whether to defer to a foreign proceeding, including: (i) the similarity of the parties and issues; (ii) the interests of judicial economy; (iii) the order in which the actions were filed; (iv) the adequacy of the alternative forum; and (v) the convenience of, and potential prejudice to, either party.  *See id.* at 94; *accord Keswani* v. *Sovereign Jewelry Inc.*, No. 20 Civ. 8934 (KPF), 2021 WL 4461332, at *7 (S.D.N.Y. Sept. 29, 2021).  A decision to abstain from exercising jurisdiction "based on the existence of parallel litigation 'does not rest on a mechanical checklist, but on a careful balancing of the important factors … as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction.'" *Royal & Sun All.*, 466 F.3d at 94 (citation

omitted).  The Court's ultimate determination should be based on the "totality of the circumstances."  *Id.*[20]

### 2. The Court Denies Defendants' Motion to Dismiss or Stay Based on Principles of International Comity

Defendants ask this Court to abstain from exercising jurisdiction over Plaintiff's claims in light of the English and Mauritian Proceedings.  (Def. Br. 2, 28-34).  In particular, Defendants posit that this Court should abstain because (i) there is "complete parallelism" among the related actions (*id.* at 29-31); (ii) the interests of judicial economy would be served by deferring to the foreign proceedings (*id.* at 31-32); (iii) Defendants would be prejudiced by having to defend against simultaneous actions (*id.* at 32-33); (iv) Essar Steel is under

---

[20]     Plaintiff argues that the multifactor balancing test articulated by *Royal & Sun Alliance* and its progeny has no application in the context of an enforcement action.  (Pl. Opp. 27).  Plaintiff contends that this Court should instead apply the five-factor test articulated in *JW Oilfield Equipment, LLC* v. *Commerzbank AG*, 764 F. Supp. 2d 587, 596-97 (S.D.N.Y. 2011), because it is the only judgment enforcement case cited by either side addressing international comity.  (*Id.* at 27 n.18).  The Court declines Plaintiff's invitation, because the test set forth in *JW Oilfield* pertains to circumstances where "two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person[.]"  764 F. Supp. 2d at 596; *see also id.* (describing a possible conflict between foreign law and plaintiff's requested relief, which "would place [defendant] in the untenable position of having to either violate this Court's order or German banking laws").  Such is not the case here.

    *JW Oilfield* dealt with an issue of what has been termed "prescriptive comity," which fundamentally "asks a question of statutory interpretation: should a court presume that Congress, out of respect for foreign sovereigns, limited the application of domestic law on a given set of facts?"  *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 100 (2d Cir. 2019) (internal citations omitted).  The instant case, however, implicates the "distinct doctrine" of "adjudicative comity," which asks whether a "court should nonetheless abstain from exercising jurisdiction in deference to a foreign nation's courts that might be a more appropriate forum for adjudicating the matter."  *Id.* at 101.  In these latter circumstances, as presented here, the Second Circuit continues to endorse the application of the *Royal & Sun Alliance* factors.  *See, e.g.*, *Bugliotti* v. *Republic of Argentina*, 952 F.3d 410, 414-15 (2d Cir. 2020) (applying *Royal & Sun Alliance* factors in the context of comity-based abstention due to ongoing foreign proceedings).

administration proceedings in Mauritius (*id.* at 33-34); and (v) this action bears a tenuous relationship to New York (*id.* at 34).  The Court concludes that Defendants have failed to demonstrate the type of "exceptional circumstances" that warrant dismissal or stay for reasons of adjudicative comity.  *Royal & Sun All.*, 466 F.3d at 93.

> ### a.       The Mauritian Proceeding

To begin, the Court is not moved to decline to exercise jurisdiction over the instant suit out of deference to the Mauritian Proceeding.  In that proceeding, Essar Global named ArcelorMittal USA as a co-defendant as part of its case seeking to determine "whether [Essar Global] is presently indebted to [Essar Steel] in the sum of approximately U.S. $1.5b" due to the same transactions challenged in the present action.  (Def. Br. 29; Mauritian Plaint ¶ 8).  To be sure, there is a degree of parallelism between the two actions.  But rather than establishing exceptional circumstances, Defendants point primarily to "circumstances that routinely exist in connection with parallel litigation[,] [which] cannot reasonably be considered 'exceptional circumstances'" that are necessary to justify comity-based abstention.  *Royal & Sun All.*, 466 F.3d at 95; *see also Kitaru Innovations Inc.* v. *Chandaria*, 698 F. Supp. 2d 386, 391 (S.D.N.Y. 2010) (noting that the "similarity of the parties and issues presented and the burden of litigating in two fora simultaneously ... are commonly present when a parallel foreign proceeding is ongoing").  Overshadowing these similarities, there are salient distinctions between the two actions, as Mesabi is not implicated at all — let alone a party to — the Mauritian Proceeding, and the

Proceeding will not address the extent of Essar Global's control over Essar Steel to determine whether the former can be held independently liable for the debts of the latter.

It also bears emphasizing that it was Essar Global — not Plaintiff — who instituted the Mauritian Proceeding against one of its wholly owned subsidiaries. Without ascribing collusive intent to the Mauritian Proceeding, the Court remains cognizant that Plaintiff characterizes the Mauritian Proceeding as part and parcel of the Essar Group's scheme to avoid satisfaction of the Judgment. The Court need not make a formal finding vis-à-vis Essar Global's intentions in suing a member of its own corporate family to conclude that the circumstances surrounding the commencement of the Mauritian Proceeding — including the fact that Plaintiff did not initiate these proceedings — weaken the argument for deference based on international comity concerns.

Furthermore, it is true that Essar Global initiated the Mauritian Proceeding nearly two years prior to Plaintiff's commencement of the instant action, which ordinarily would counsel in favor of deference to the foreign action. Despite the years-long pendency of the Mauritian Proceeding, the case remains at an early stage while Essar Steel mires in administration proceedings. (*See* Uteem Decl. ¶ 10; Bahemia Decl. ¶ 34). The parties shed little light on the path forward for the Mauritian Proceeding, except to say that trial is unlikely to occur before 2023. (Bahemia Decl. ¶ 34). Provided this minimal progress and the uncertain timeline, the Court sees little efficiencies to

be gained by deferring to the Mauritian Supreme Court's resolution of that action, especially where it does not stand to resolve all of the claims presented in this case, namely the alter ego claim and turnover claim related to Mesabi as garnishee.  In the event the Mauritian Proceeding concludes before this one, Defendants remain "free to present [any] res judicata arguments on the relevant issues to this Court[.]"  *NovaSparks SA* v. *EnyxFPGA*, 344 F. Supp. 3d 666, 679 (S.D.N.Y. 2018) (internal quotation marks omitted) (quoting *Klonis* v. *Nat'l Bank of Greece, S.A.*, 487 F. Supp. 2d 351, 356 (S.D.N.Y. 2006)).

With respect to the adequacy of Mauritius as a forum, the Court concludes that it is well-equipped to adjudicate the claims presented in this action for substantially the same reasons articulated in its *forum non conveniens* analysis.  *See supra* Discussion Section A.2.b.  Notwithstanding the competence of the Mauritian courts to handle this commercial dispute, Plaintiff seeks relief in this case that is not attainable in Mauritius (or any other foreign forum, for that matter): Essar Global's purported interest in the Notes issued by Mesabi.

The Court has already discussed many of the relevant considerations of convenience and potential prejudice in relation to the private interest factors outlined in *Gilbert*.  *See supra* Discussion Section A.2.c.i.  Just as in the *forum non conveniens* context, the inconvenience of litigating this case does not weigh in favor of dismissal.  In advocating for abstention, Defendants assert that "Essar Global will be both inconvenienced and prejudiced by having to defend against simultaneous actions involving substantially similar issues and parties,

exposing it to the risk of inconsistent judgments and duplicative discovery." (Def. Br. 32).  Yet Defendants neglect to consider that Essar Global is responsible for filing one of these three actions, which diminishes the force of their argument that Essar Global is being forced to litigate the propriety of the Essar Group's restructuring transactions in three fora.  (*Id.*).  On a more general note, Defendants have not presented any exceptional issues of inconvenience or prejudice beyond those that typically inhere in litigating in multiple fora.  *See C.D.S., Inc.* v. *Zetler*, 198 F. Supp. 3d 323, 333 (S.D.N.Y. 2016) (explaining that the "burden of litigating simultaneously in two forums is not sufficient prejudice to weigh in favor of [abstention]" (internal quotation marks and citation omitted)); *Schenker A.G.* v. *Societe Air France*, No. 14 Civ. 4711 (BMC) (PK), 2016 WL 1465353, at *3 (E.D.N.Y. Apr. 14, 2016) ("Although it can be expensive and time consuming for parties to have to litigate similar conduct in different forums, the Court does not find this factor gives rise to exceptional circumstances[.]").

Defendants additionally argue that the existence of foreign bankruptcy proceedings constitutes exceptional circumstances that demand deference in this case.  (Def. Br. 33).  The Court is unmoved by this argument because it rests on a false premise — there are, in fact, no pending bankruptcy proceedings involving either Essar Global or Mesabi.  Even if the Court were to consider non-party Essar Steel, the administration proceedings pending in Mauritius do not compel dismissal or delay of this action.  The Second Circuit has singled out foreign bankruptcy proceedings as the one category of cases

that often requires dismissal of parallel district court actions, reasoning that a "foreign nation's interest in the 'equitable and orderly distribution of a debtor's property' is an interest deserving of particular respect and deference."  *See Royal & Sun All.*, 466 F.3d at 92-93 (citing *Victrix S.S. Co., S.A.* v. *Salen Dry Cargo A.B.*, 825 F.2d 709, 713-15 (2d Cir. 1987)).  Importantly, these administration proceedings were instituted with the goal of maintaining Essar Steel as a going concern, meaning the present action poses no current threat to any foreign nation's interest in the equitable and orderly distribution of Essar Steel's property.  (*See* Bahemia Decl. ¶¶ 8-12 (describing the ultimate aim and mechanics of Mauritian administration proceedings)).  Moreover, the status of Essar Steel's administration proceedings remains clouded by the impasse of the appointed co-administrators.  (*See id.* at ¶¶ 18-21).  For all these reasons, principles of international comity do not call for deference to the Mauritian Proceeding, whether in the form of dismissal or a stay.

### b.   The English Proceeding

The Court draws the same conclusion with respect to the English Proceeding.  Although there is parallelism between the parties in both actions (save for Mesabi), Defendants overstate the degree of overlap between the issues presented in this action and in the English Proceeding.  (Def. Br. 29 (claiming there to be "complete parallelism" between the two actions)).  The premise of the English Proceeding, as pleaded in the Re-Amended Particulars of Claim, is that Essar Global conspired with others in the Essar Group to evade Essar Steel's financial obligation to Plaintiff by, *inter alia*, waiving Essar Steel's

61

right to the $1.48 billion account receivable, in violation of Mauritian law.  (*See* Re-Amended Particulars of Claim ¶¶ 5-7, 29-43).  There is, of course, a good deal of overlap between the unlawful means conspiracy that Plaintiff asserts in the English Proceeding and the fraudulent conveyance claims it brings here, but it is by no means completely parallel.  Critically, a final ruling in the English Proceeding will not inevitably address all of the issues presented in the instant matter.  Most obviously, there is no alter ego claim in the English Proceeding.  Regardless of whether an English court accepts the merits of Plaintiff's theory of conspiracy, it stands to reason that whether Essar Global has so dominated Essar Steel as to warrant piercing its corporate veil is a question that will remain.[21]  Furthermore, Plaintiff seeks turnover of the Notes

---

[21]    Defendants excerpt the Re-Amended Particulars of Claim in their briefing to suggest that the English Proceeding will resolve the alter ego claim.  (Def. Br. 9; *see also* O'Rourke Reply Decl. ¶ 6).  The paragraph that Defendants excerpt reads, in full:

> [Essar Global] was the direct owner and controller of [Essar Steel], and liable to [Essar Steel] in the sum of approximately $1.5 billion.  Pending disclosure it is to be inferred that [Essar Global] must have caused [Essar Steel] to take no steps to call in the $1.5 billion, as well as considered the proposed Waiver and approved and directed that [Essar Steel] carry it out[.]

(Re-Amended Particulars of Claim ¶ 56.3; *see also id.* at ¶ 17 (alleging that Essar Global at all material times exerted "*de facto* control" over Essar Steel's assets)).  While such an allegation is undoubtedly relevant to Plaintiff's alter ego claim, it is not clear to the Court that proving its veracity would be sufficient to pierce Essar Global's corporate veil and hold it independently liable for Essar Steel's financial obligations.  Furthermore, if the English court discredits Plaintiff's theory of the case, that would in no way foreclose Plaintiff from marshalling additional evidence concerning the extent of Essar Global's domination and control over Essar Steel.

At base, Plaintiff's allegations in the English Proceeding are focused on establishing the existence of an unlawful means conspiracy between Essar Global and several other individuals and entities within the Essar Group, none of which is named in this action.  The Court does not believe that proving this unlawful means conspiracy necessarily entails resolution of the alter ego question.

issued by Mesabi, which is a claim to property that cannot be adjudicated by an English court.

As the above analysis implies, certain efficiencies may be gained by letting the English Proceeding run its course, most poignantly with regard to a ruling that may inform Plaintiff's fraudulent conveyance claims. At the same time, abstention in favor of the English Proceeding could result in a substantial delay of the adjudication of Plaintiff's alter ego claim against Essar Global, as well as any outstanding issues related to Mesabi as garnishee. Defendants posit that this concern is misplaced because the English Proceeding will, in fact, definitively resolve this action because a victory in England will make Plaintiff whole, while a loss would obviate Plaintiff's grounds for recovery in this action. (Def. Reply 16). But Defendants gloss over meaningful steps that Plaintiff may reasonably wish to pursue in this forum irrespective of the outcome of the English Proceeding. On the one hand, if Plaintiff loses in the English Proceeding, it may still wish to pursue its alter ego claim against Essar Global in this jurisdiction. On the other, if Plaintiff is victorious in the English proceeding, the issue of satisfying any consequent judgment would remain, which is precisely the impetus for the present action. The Court is unable to presage whether Plaintiff will be successful in collecting on a judgment in the United Kingdom, which raises the specter of future enforcement actions targeting Essar Global's assets located in other jurisdictions. The possibility of additional proceedings that closely mirror the instant action following the close

of the English Proceeding suggests that dismissing this action out of deference to the English Proceeding may very well disserve interests of judicial economy.

While Plaintiff initiated the English Proceeding more than two years before this action, the action has not progressed to a point that convinces the Court to abstain.  After filing the currently operative pleading in the English Proceeding on March 24, 2021 (*see* Re-Amended Particulars of Claim), the parties remain in the process of exchanging disclosures, with trial set to commence in November 2023.  (O'Rourke Decl. ¶¶ 12-13; O'Rourke Reply Decl. ¶ 3).  Given the posture of the English Proceeding, the Court does not believe that "abstention would so advance judicial efficiency as to present an exceptional circumstance" warranting abstention in favor of this foreign proceeding.  *Ace Arts, LLC* v. *Sony/ATV Music Pub., LLC*, 56 F. Supp. 3d 436, 446 (S.D.N.Y. 2014).

Finally, the Court acknowledges that it can be expensive and time-consuming for parties to have to litigate similar conduct in different fora, although, as noted with regard to the Mauritian Proceeding, Defendants have not pointed to any extraordinary costs that make this case exceptional relative to others involving parallel foreign litigations.  And although England may provide an adequate forum for this case, the Court has already explained that the Judgment Plaintiff seeks to enforce bears legitimate ties to this forum, primarily because of the circumstances giving rise to the arbitral award.  As already explained, that this enforcement action involves foreign litigants and conduct that occurred abroad does not pose extraordinary circumstances that

64

demand this Court to withhold jurisdiction.  *See Global Tech Indus. Grp., Inc.* v. *Go Fun Grp. Holdings, Ltd.,* No. 17 Civ. 3727 (AJP), 2017 WL 5036665, at *4 (S.D.N.Y. Nov. 2, 2017) ("[C]ommercial litigation involving foreign parties and concerning foreign corporations and/or their assets is not unusual in this District, or in federal courts generally.").

*          *          *

To review, although some circumstances relating to the Mauritian and English Proceedings cut against the Court's retention of the present lawsuit, none is exceptional.  This lack of extraordinary circumstances convinces the Court that it would be inappropriate either to dismiss this case or to stay it out of deference to either or both of these foreign proceedings.  *See Royal & Sun All.*, 466 F.3d at 96 ("'[A] stay is as much a refusal to exercise federal jurisdiction as a dismissal,' because the decision to grant a stay 'necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case.'" (quoting *Moses H. Cone Mem'l Hosp.* v. *Mercury Constr. Corp.*, 460 U.S. 1, 28 (1983))); *see also Leopard Marine & Trading, Ltd.* v. *Easy St., Ltd.*, No. 15 Civ. 3064 (JSR), 2015 WL 4940109, at *4 (S.D.N.Y. Aug. 6, 2015) ("A stay likewise is inappropriate because it would have the same effect as a dismissal.  If the Court were to defer to a foreign court to determine the outcome of this case, *res judicata* would take effect and control these proceedings."), *aff'd*, 896 F.3d 174 (2d Cir. 2018).

Generally speaking, it does not strike the Court as unusual that a judgment creditor might employ a multi-pronged litigation strategy as part of

its efforts to recover on a billion-dollar judgment against an entity purported to be engaged in a strategy of evasion. *Cf. Karaha Bodas Co., L.L.C.* v. *Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 368 (5th Cir. 2003) ("[M]ultiple judicial proceedings on the same legal issues are characteristic of the confirmation and enforcement of international arbitral awards under the [New York] Convention.").[22] The Court expects that by retaining jurisdiction, this case will afford both sides an opportunity to resolve the issues presented in an efficient and timely manner.

## CONCLUSION

For the forgoing reasons, Defendants' motion to dismiss on the grounds of *forum non conveniens* is DENIED. In addition, Defendants' motion to dismiss or, in the alternative, stay this matter on grounds of adjudicative comity is DENIED.

The parties are hereby directed to file a joint status letter on or before October 10, 2022. If it is Defendants' present intention to file a second motion to dismiss for lack of personal jurisdiction or failure to state a claim, they shall meet and confer with Plaintiff to develop a mutually convenient briefing schedule for inclusion in the joint status letter.

---

[22]   While Defendants are correct to note that this action is not brought under the New York Convention, the fact remains that the existence of multiple, simultaneous proceedings to enforce an arbitral award is not an uncommon occurrence. (*See* Def. Br. 34 n.13; Pl. Opp. 26-27)

66

The Clerk of Court is directed to terminate the pending motion at docket entry 26.

SO ORDERED.

Dated:     September 19, 2022
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge